# IN THE UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| WENDY'S NETHERLANDS B.V., | : | |
| | : | Case No. 2:24-cv-03077 |
| **Plaintiff,** | : | |
| | : | Judge Michael H. Watson |
| v. | : | |
| | : | Magistrate Judge Kimberly Jolson |
| ANDREW LEVY, | : | |
| | : | |
| **Defendant.** | : | |

### PLAINTIFF WENDY'S NETHERLANDS B.V.'S POST-HEARING BRIEF

**I.     INTRODUCTION**

This case arises out of Defendant Andrew Levy's ("Defendant") attempt to avoid a cognovit judgment entered against him by the Franklin County Court of Common Pleas, following his failure to repay amounts previously loaned to him as he had promised.[1] After the judgment was entered, Defendant removed the case to this Court and then moved to vacate the judgment, alleging failure of consideration and duress.

On January 28, 2025, the Court partially denied Defendant's Motion to Vacate the Cognovit Judgment (the "Motion"), finding that Defendant failed to prove lack of consideration. [*See* January 28, 2025 Opinion and Order, ECF No. 23, at PageID # 1234–38]. As to Defendant's duress claim, the Court found that Defendant had failed to set forth any evidence of duress. [*See id.* at PageID # 1238–40]. However, the Court decided to provide Defendant an opportunity, at a

---

[1] Wendy's incorporates and reiterates herein the facts and law set forth in its Opposition to Defendant Andrew Levy's Amended Motion to Vacate the Cognovit Judgment. [*See* Wendy's Opp. Br., ECF No. 16].

hearing, to "present evidence to verify the operative facts he alleges" in support of his duress claim. [*Id*.] The Court held the evidentiary hearing on April 18, 2025 (the "Hearing").

At the beginning of the Hearing, the Court inquired as to the impact of the *Rooker-Feldman* doctrine on the Court's jurisdiction over Defendant's Motion. As set forth below, the *Rooker-Feldman* doctrine is not applicable, since Defendant's Motion is directed at Wendy's purported actions and not as a result of any injury suffered by the Franklin County Common Pleas Court decision.

In addition, Defendant failed to set forth any evidence to support his claim of duress at the Hearing. The evidence showed that, from the beginning, Wendy's structured the Cognovit Note to provide Defendant a payment plan and $1.2 million credit for a financial obligation otherwise immediately due under the Guarantee. Wendy's then made multiple concessions to Defendant on various aspects of the Note in an effort to provide him terms under which he could be successful and to assist his remaining franchise business. Defendant, a sophisticated franchise owner, voluntarily entered into the Cognovit Note after months of negotiations and advice by his own legal counsel. Defendant's Motion should therefore be denied.

## II. LAW & ARGUMENT

### A. The Court has Subject-Matter Jurisdiction Over this Case as the *Rooker-Feldman* Doctrine Does Not Apply.

The *Rooker-Feldman* doctrine precludes "lower federal courts...from exercising appellate jurisdiction over final state-court judgments." *Skyway Inv. Corp. v. Tushman*, 541 F. App'x 536, 538 (6th Cir. 2013) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)). The doctrine is "confined to cases…brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280,

2

284 (2005). "If the source of the injury is the state court decision, then the *Rooker–Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third party's actions, then the plaintiff asserts an independent claim." *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006).

Here, Defendant is not claiming that the source of his injury is the state court judgment. Rather, Defendant contends that Wendy's "coerced him" into signing the Cognovit Note that led to the judgment against him. It is thus Wendy's alleged actions and not the state court's judgment that is at issue in this proceeding. The *Rooker-Feldman* doctrine therefore does not apply. *See id.* at 392–93 (finding that claims that "state court judgments were procured by certain Defendants through fraud, misrepresentation, or other improper means" were not barred by *Rooker–Feldman*).

### B. Defendant Has Failed to Set Forth Any Evidence to Support His Duress Defense.

It is undisputed that Defendant had significant financial obligations resulting from the closing of the Wendy's restaurants in Brazil. As Wendy's representative Kris Kaffenbarger[2] testified at the Hearing, Wendy's attempted to work with Defendant to create a viable repayment plan:

Q. Did you ever have any discussions with Mr. Levy about the repayment of his financial obligations?

A. Many discussions.

Q. Can you just generally tell the Court what those discussions were?

A. Yeah, it was generally we had a large obligation of what we were trying to do is craft a plan that he could be successful at repaying over time.

---

[2] Mr. Kaffenbarger has been employed at Wendy's for almost 28 years. [April 18 Tr. at PageID # 1347:21–22]. Currently, he is serving as Wendy's Vice President of Global System Optimization, Franchise and Portfolio Management. [*Id.* at PageID # 1336:25, 1337:1]. In 2019 and 2020, he solely held the position of Vice President of System Optimization. [*Id.* at PageID # 1347:23–25; 1348:1].

[Transcript of April 18, 2025 Evidentiary Hearing ("April 18 Tr."), ECF No. 41, PageID # 1351:23–25, 1352:1–5]. Wendy's and Defendant, with the assistance of counsel, negotiated the terms of the Cognovit Note, which Defendant admitted that he signed in Franklin County, Ohio, on February 23, 2020. [*Id.* at PageID # 1378:11-17]. Defendant also testified that he later defaulted on his payment obligations under the Note. [*Id.* at PageID # 1378:22–25, 1379:1–2].

Following his default and the entry of a judgment against him, Defendant has attempted to argue that he should not be held accountable because he entered into the Cognovit Note as a result of duress. According to Defendant, Wendy's threatened to terminate his U.S. franchises if he did not execute the Cognovit Note. As set forth below, his self-serving testimony alone is not sufficient to establish duress and the remaining evidence in the record makes plain that his claim cannot be substantiated.

*1. Defendant's Negotiation and Representation By Legal Counsel Proves Defendant Did Not Execute the Note Under Duress.*

To establish economic duress, a party must demonstrate (1) it involuntarily accepted the terms of another; (2) under the circumstances it had no other reasonable alternative; and (3) the circumstances were a product of coercive actions on the part of the opposite party. *Blodgett v. Blodgett*, 49 Ohio St.3d 243, 246 (Ohio Sup. Ct. 1990). Participation in the negotiation of a Cognovit Note and representation of counsel during such negotiations are clear indications of a lack of duress. *See Medina Supply Co. v. Corrado*, 116 Ohio App. 3d 847, 852, 689 N.E.2d 600 (Ohio Ct. App. 1996); *Morana v. Foley*, 2015-Ohio-5254, ¶ 11, 54 N.E.3d 749 (Ohio Ct. App.).

At the Hearing, Defendant admitted that he participated in the negotiation of the Cognovit Note; that he worked with legal counsel; and that the Note went through multiple drafts. Defendant testified on these points as follows:

> Q. But during your discussions over the cognovit Note, you worked with legal counsel?

4

> A. Yes, sir.
>
> Q. And you had the opportunity to get their advice as well?
>
> A. Yes, sir.
>
> Q. And you still signed the note; is that correct?
>
> A. Yes, sir.
>
> Q. And I won't go over it again, but you saw that the first version you got in December 10th, 2019, went through multiple changes before you actually signed it, isn't that right?
>
> A. Yes, sir.
>
> Q. And they went through changes that you requested and that they made; is that right?
>
> A. Yes, sir.

[April 18 Tr. at PageID #1379:21–25, 1380:1–2].

As outlined in detail at the Hearing, there were four versions of the Cognovit Note prior to the parties' execution of that document on February 23, 2020. [*See id*. at PageID # 1366:16–25]. The first version, sent on December 10, 2019, included quarterly payments of $125,000, an interest rate of five percent, and a credit to Defendant of $1.2 million at the end of the Note term if he made all the payments. [*Id.* at PageID # 1353:12–24, 1354:1-20; *see also* Plaintiff's April 18 Hearing Exhibit 2]. Additionally, this version of the Note was secured by one of Defendant's properties and the Note could be assigned to anyone at the sole discretion of Wendy's. [*See* April 18 Tr. at PageID # 1355:2–10, 1355:11–16]. Defendant did not sign this version of the Note. [*Id.* at PageID # 1356:11–13].

Instead, Defendant requested changes, and Wendy's sent Defendant the second version of the Note on January 16, 2020. [*See* Plaintiff's April 18 Hearing Exhibit 3; April 18 Tr. at PageID # 2357:2–6]. Most significantly, Wendy's altered Defendant's payment schedule, so that the first two quarterly payments were $0.00 and the next eight payments were $50,000, as opposed to

$125,000 per quarter. As Mr. Kaffenbarger testified at the Hearing, these changes were made in "the spirit of trying to create a plan that would work" for Defendant. [April 18 Tr. at PageID # 1358:5–11]. Wendy's also added a provision regarding Defendant's reimaging obligations, reiterating commitments already required of Defendant.³ [*See id.* at PageID # 1359: 24–25, 1360:1–16]. Following receipt of this version of the Note, there were further negotiations of the terms between the parties, also with the assistance of counsel. [*See id.* at PageID # 1361:16–22].

On February 14, 2020, Wendy's sent Defendant and his counsel the third version of the Note, which Wendy's represented to Defendant as their "final offer". [*See id.* at PageID # 1362:5–8, 15–25; Plaintiff's April 18 Hearing Exhibit 4]. Wendy's changed the Note to reduce Defendant's interest rate from five percent to four and a half percent, and Defendant received an up-front credit of $1.2 million, which significantly reduced his interest obligations. [April 18 Tr. at PageID # 1364:1–13]. As Mr. Kaffenbarger explained at the Hearing:

> Q. So by moving the $1.2 million from the end to the beginning, what did that do to the interest payments?
>
> A. Reduced them greatly.
>
> Q. Do you know how much?
>
> A. No, I don't. Off the top of my head, probably 20,000 a month.

[*Id.* at PageID # 1364:8–13]. Furthermore, the provision regarding Defendants' reimaging obligation was removed, and the Note no longer required any security; in essence it became an unsecured note. [*Id.* at PageID # 1364:17–20]. Finally, Wendy's standard general release of all claims was converted to a mutual release given to both Wendy's and Defendant specifically

---

³ Notably, along with this version of the Note, the parties also updated Defendant's Joint Capital Plan, allowing Defendant to use a cheaper "Refresh Lite" model to re-image some of his sites, an option previously not available to Defendant based on System standards. [*See* April 18 Tr. at PageID # 1361:6–15, 1370:7–9].

regarding the Guarantee. [*Id.* at PageID # 1366:2–10 ("And the general release, by the way, is something that we, Wendy's, do for every transaction[.]")].

Despite Wendy's stating it was their "best and final offer," Wendy's ultimately agreed to additional changes at the request of Defendant and his legal counsel. [*Id.* at PageID # 1366:23–25, 1367:11–15]. This further updated version of the Note allowed Defendant to make prepayments without any penalties (*id.* at PageID # 1367:19–25), limited Wendy's right to assign the Note to only Wendy's affiliated companies (*id.* at PageID # 1368:3–13), and added additional changes to the mutual release (*id.* at PageID # 1368:14–23). Defendant executed this version of the Note on February 23, 2020. [*See* Plaintiff's April 18 Hearing Exhibit 6]. Notably, despite Wendy's hoping to execute the Note by end of 2019 for good project management and to help Defendant focus on his U.S. franchises, Wendy's repeatedly agreed to delay the signing of the Note and negotiate with Defendant to his benefit for several months. [*See id.* at PageID # 1352:12–22, 1356:11–19].

As Defendant candidly admitted at the Hearing, the terms of the Cognovit Note improved in his favor over the course of the parties' and counsel's negotiations:

> Q. So it looks like the terms of the deal actually got better for you, didn't it?
> A. Terms of the deal changed, yes, sir.
> Q. In your favor?
> A. Yes, sir.

[*Id.* at PageID # 1383:2–6]. Accordingly, there is no evidence to support Defendant's claim of duress.

> 2. *Defendant Failed to Provide Credible Evidence to Support Defendant's Allegation that Wendy's Threatened to Terminate Defendant's U.S. Franchises.*

Defendant failed to set forth any credible evidence to support his allegation that Wendy's threatened to terminate his U.S. Wendy's franchise agreements if Defendant did not sign the Cognovit Note. [*See id.* at PageID # 1368:24–25, 1369:1–5]. Other than his self-serving statements, there is no other evidence to support such an accusation and, in fact, substantial evidence to the contrary. First, Mr. Kaffenbarger testified that no one from Wendy's threatened to terminate Defendant's Wendy's franchise if he didn't sign the Cognovit Note:

> Q. During the discussions that you had with Mr. Levy, did you at any time ever threaten to terminate his franchise business if he didn't sign his cognovit note?
>
> A. Never.
>
> Q. Do you know if anyone else at Wendy's ever threatened to terminate this?
>
> A. Not that I'm aware of.

[*Id.* at PageID #1368:24–25, 1369:1–5].

Further, Defendant could not identify any document that he or his counsel sent to Wendy's suggesting he was being "pressured" to sign the Cognovit Note, because there are no such written communications or documents.

> Q. Is there a written document from you saying, hey, I feel like I'm being pressured into this?
>
> A. I don't know.
>
> Q. You don't know?
>
> A. I don't know.
>
> Q. Do you know if your lawyers drafted any such document?
>
> A. I don't know, sir.

[*Id.* at PageID # 1383:13–19; *see also* PageID # 1385:13–15, 1387:7–19].

8

Instead, all the documents and communications in the record show that Wendy's was at all times cooperating with Defendant and attempting to reach a compromise for the benefit of Defendant—so he could be successful at paying back his debt and focus on the success of his U.S. franchises. [*See id.* at PageID # 1352:16–22, 3151:3–5; *see also* Plaintiff's April 18 Hearing Exhibits 2–6].

Indeed, on February 17, 2020, Defendant's counsel indicated that there was no issue in Defendant signing the document, and Defendant consequentially signed on February 23. [*See* Plaintiff's April 18 Hearing Exhibits 6 & Exhibit 9]. Defendant's mere unhappiness to sign a Note that detailed an obligation he was already liable for does not evidence duress. *See Blodgett*, 49 Ohio St.3d at 246 (finding that duress is not established by a showing that "one assented merely because of difficult circumstances that are not the fault of the other party.").

Finally, it would be illogical for Wendy's to threaten termination of Defendant's U.S. franchises. Defendant was one of Wendy's largest franchisees. [*See* April 18 Tr. at PageID # 1373:5–9]. Both Defendant and Wendy's not only received great revenue from these restaurants, but both parties had invested a lot of money and time into Defendant's franchises. [*See id.* at PageID # 1352:23–25, 1353:1–2 ("Q. Was it important for him to focus on his U.S. franchise? A. It was important to both of us. Q. Why is that? A. It's 178 restaurants which is a lot of investment on his part, investment on Wendy's as well.")]. Wendy's would not have jeopardized hundreds of restaurants to enter into a Cognovit Note for a debt that Wendy's was already owed repayment under the Guarantee.

### III. CONCLUSION

For all of the foregoing reasons, as with the evidence presented at the April 18, 2025 Hearing, Wendy's respectfully requests that the Court deny Defendant's Motion to Vacate the Cognovit Judgment.

Respectfully submitted,

/s/ Keith Shumate
Keith Shumate (0056190)
Brittany Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: +1 614 365 2834
Fax: +1 614 365 2499
keith.shumate@squirepb.com
brittany.silverman@squirepb.com

*Attorneys for Plaintiff Wendy's Netherlands B.V.*

## **CERTIFICATE OF SERVICE**

On May 5, 2025, this document was filed electronically with the Clerk of the United States Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties.

*/s/ Keith Shumate*
Keith Shumate

*An Attorney for Plaintiff Wendy's Netherlands B.V.*
