# WBR PARTICIPAÇÕES LTDA.

## SOCIEDADE LIMITADA AGREEMENT

This Sociedade Limitada Agreement (as amended, modified, supplemented or restated from time to time, this "Agreement") of WBR PARTICIPAÇÕES LTDA., a Brazilian Sociedade Limitada (the "Company"), is entered into as of April 2nd, 2015 (the "Effective Date"), in the City of São Paulo, State of São Paulo, by and among each of the persons listed below, as the Members of the Company (collectively, the "Members" and each a "Member"):

**I – INFINITY HOLDING E PARTICIPAÇÕES LTDA.,** a limited liability company with headquarters at Av. Pacaembu, 1886, Pacaembu, São Paulo/SP, Zip Code 01234-000, represented herein by its managers, Mrs. **Marcel Gholmieh**, Brazilian, civil engineer, divorced, bearer of Identity Card No. RG 19.233.983-7 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 265.142.258-45, resident and domiciled at Rua Correia Dias, Apt. 123, City of São Paulo, State of Paulo, Zip Code 04104-000, **Diego Pagliusi Gomes de Oliveira Sala**, Brazilian, businessman, single, bearer of Identity Card No. RG 27.696.397 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 292.148.768-35, resident and domiciled at Rua Ubatuba, nº 86, City of São Paulo, State of São Paulo, Zip Code 01248-030 and **Bruno Laporta**, Brazilian, businessman, married under the conventional regime of the separation of property, bearer of Identity Card No. RG 20.386.014 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 214.978.458-07, resident and domiciled at Rua da Consolação, nº 3240, Apt. 91, City of São Paulo, State of São Paulo, Zip Code 01416-000;

**II – STARBOARD INTERNATIONAL HOLDINGS B.V.,** a company organized and existing under the laws of the Netherlands, with headquarters at Strawinskylaan 411, WTC, Tower A, 4th floor, 1077XX, Amsterdam, the Netherlands, enrolled with the CNPJ/MF under No. 21.501.394/0001-31, represented herein by its attorney-in-fact, Mr. **Lucas Hernandez do Vale Martins**, Brazilian, single, lawyer, enrolled in the Brazilian Bar Association, São Paulo Section, under No. 250.073 and with the CPF/MF under No. 316.921.318-00, resident and domiciled in the City of São Paulo, State of São Paulo, with address on Avenida Brigadeiro Faria Lima, 1,461, 4th floor, suite 41, CEP 01452-002;

**III – WENDY'S NETHERLANDS HOLDINGS B.V.,** private company with limited liability with headquarters at Naritaweg 165, 1043 BW Amsterdam, the Netherlands, represented herein by its attorney-in-fact, Mr. **Roberto Toshiyuki Ioshioca**, Brazilian, single, business manager, bearer of Identity Card No. RG 25.787.544-X SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 266.852.128-96, resident and domiciled at Rua Nicolau Zarvos,

428, Parque Jabaquara, City of City of São Paulo, State of São Paulo, Zip Code 04356-080;

And, as intervening and consenting party, the Company:

**IV – WBR PARTICIPAÇÕES LTDA.**, a limited liability company with headquarters at Avenida Paulista, 1756, 7th floor, rooms 71 and 72, CV. 7703, São Paulo, São Paulo, Zip Code 01311-200, represented herein by its manager, Mr. **Marcel Gholmieh**, Brazilian, civil engineer, divorced, bearer of Identity Card No. RG 19.233.983-7 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 265.142.258-45, resident and domiciled at Rua Correia Dias, Apt. 123, City of São Paulo, State of Paulo, Zip Code 04104-000.

## RECITALS

WHEREAS, the Company was formed pursuant to the Brazilian applicable Law, as amended from time to time, by the filing of the Articles of Organization with the Board of Trade on January 15, 2015;

WHEREAS, the Company was initially formed under the name of WBR Participações Ltda. as a holding company; however, in order to fulfill the primary purpose initially intended by the Members of owning and operating Wendy's® restaurants in Brazil and for such other purposes as provided in the First Amended and Restated Articles of Organization attached hereto as Schedule B (the "Amended and Restated Articles of Organization") which the Members undertake to execute and duly register before the Board of Trade of the State of São Paulo upon the execution of the lease agreement corresponding to the address for the first Wendy's® restaurant owned by the Company (which shall also be the Company's headquarters address set forth in Section 1 of the Amended and Restated Articles of Organization), this Agreement shall be construed according to the terms and conditions set forth in the Amended and Restated Articles of Organization, considering it reflects the true intention of the Members;

WHEREAS, the Company was initially formed as a holding company; however it will subsequently change its corporate purpose in accordance with Section 3.1 to reflect that it was formed for the primary purpose of owning and operating Wendy's® restaurants in Brazil and for such other purposes provided in the Articles of Organization as the Members from time to time may unanimously agree, all on the terms and subject to the conditions set forth herein;

WHEREAS, the Members wish to preserve the present and future social interests as well as preserve the legality of their activities and still achieve the social objectives defined in the constitution of Company;

WHEREAS, the Members aspire to begin the process of implementing good corporate governance practices, to support the business in long term and therefore the fulfillment of the

- 2 -

social function of the Company in relation to the Members, employees, government agencies, and the community in which it operates;

WHEREAS, the Members now desire to enter into this Agreement to memorialize their respective ownership interest in the Company and the respective rights and obligations of the Directors, Officers and Members of the Company.

AGREEMENT

NOW, THEREFORE, in consideration of their mutual agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members, intending to be legally bound, hereby agree as follows:

SECTION 1
DEFINED TERMS

Section 1.1    **Definitions**.  Unless the context otherwise requires, the terms defined in this Section 1 shall, for the purposes of this Agreement, have the meanings herein specified.

"Act" means the Brazilian Law 10.406/2002.

"Additional Quotas" has the meaning set forth in Section 4.2.

"Affiliate" means, with respect to a specified Person, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Person. For purposes of this Agreement, each of the Members will not be deemed an Affiliate of the other Members and the Company will not be deemed an Affiliate of any Member and no Member will be deemed an Affiliate of the Company.

"Affiliate Loan" has the meaning set forth in Section 5.2.1.

"Agreement" has the meaning set forth in the preamble hereto.

"Articles of Organization" means the "Contrato Social" of the Company as registered with the applicable Board of Trade, as amended from time to time by unanimous agreement of the Members.  Upon execution of the Amended and Restated Articles of Organization, all references in this Agreement to "Articles of Organization" shall mean the Amended and Restated Articles of Organization, as amended from time to time by unanimous agreement of the Members.

"Board of Directors" means one of the governance bodies of the Company with the powers and attributions described in Section 6.

- 3 -

"Brazilian GAAP" means Brazil generally accepted accounting principles, consistently applied.

"Breaching Member" has the meaning set forth in Section 10.2(c).

"Breaching Owner" has the meaning set forth in Section 10.2(c).

"Business Day" means any day other than a day that is a Saturday, a Sunday or other day on which banking institutions in São Paulo, Brazil, the State of Ohio or the State of Florida are required or authorized by applicable law to be closed.

"Capital Account" means, with respect to the Company, the account maintained in accordance with the provisions of Section 7.1.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company pursuant to Section 7.1 with respect to such Member's Quotas. The Capital Contributions of the Members are listed on Schedule A. To the extent the Gross Asset Value of the initial Capital Contribution of any Member is later found to be incorrect, the Member responsible for such Capital Contribution will take all necessary corrective actions.

"Cause" means, with respect to any Director and/or Officer, (i) such person's conviction of, or pleading of guilty or nolo contendere to, a felony or any crime involving moral turpitude, or (ii) the breach by any Director and/or Officer of his or her fiduciary duties to the Company or its Members (as such fiduciary duties are modified by this Agreement), or (iii) such Director's and/or Officer's performance of any material act of theft, embezzlement, fraud, malfeasance, dishonesty or misappropriation of the property of the Company or its Subsidiaries.

"Closing" has the meaning set forth in Section 10.4(a).

"Company" has the meaning set forth in Section 2.2, including any branches held by the Company, and any Subsidiaries Controlled through the ownership of voting securities.

"Confidential Information" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), including all information, whether oral or written or in the form of documents, drawings, specifications, data or otherwise, relating to the business, operations, performance, assets or contracts owned and operated directly or indirectly by the Company and/or its direct or indirect Subsidiaries, including (i) any oral or written communications received from the Company or any of its Affiliates or otherwise in connection with this Agreement, and (ii) any information gained from the inspection of any record or documents provided by the Company or any of its Affiliates, and (iii) any of a Member's conclusions or opinions reached in connection with this Agreement or any work product prepared by a Member in connection with this

Agreement, and (iv) any other information or documents, relating to the objectives, scope, work effort or results of this Agreement, except the following:

      (a)    Information that a Member can demonstrate by written record was actually known to such Member prior to its disclosure in connection with this Agreement that is, to the knowledge of such Member, not subject to any confidentiality restriction;

      (b)    Information that a Member can demonstrate was available to the general public or general industry knowledge at the time of its disclosure to such Member; or that thereafter becomes available to the public or becomes general industry knowledge, without a breach of this Agreement by such Member;

      (c)    Information that a Member can demonstrate was legally furnished to such Member by a third party who, to the knowledge of such Member, had the right to so disclose without restriction on its further disclosure; or

      (d)    Information to the extent that a Member may, upon advice of counsel, be compelled by legal requirements to disclose, provided such Member uses all reasonable efforts, and to the extent permitted by applicable legal requirements, will have afforded the Company the opportunity, to obtain an appropriate protective order other satisfactory assurance of confidential treatment at the Company's expense, for the information compelled to be disclosed.

Notwithstanding anything herein to the contrary, the Members recognize and acknowledge that the Company will be entering into the Franchise Agreement with Franchisor, an Affiliate of Wendy's BV, pursuant to which Franchisor shall be providing confidential information that is proprietary to Franchisor and which shall be protected as confidential information pursuant to the terms of the Franchise Agreement, but for purposes of this Agreement none of such information shall be deemed to be Confidential Information and no provision herein shall affect Franchisor's ownership rights with respect to such information.

"Control" means, as to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The terms "Controlled by" and "under common Control with" shall have correlative meanings.

"CPA Firm" has the meaning set forth in Section 11.1(d).

"Debt Financing" has the meaning set forth in Section 5.2.1.

"Defaulting Member" has the meaning set forth in Section 7.3(f).

"Director" means the person designated by the Members to be part of the Board of Directors.

"Dispute" has the meaning set forth in Section 15.12.

"EBITDA" means earnings before depreciation, interest, taxes, depreciation and amortization.

"Effective Date" has the meaning set forth in the preamble hereto.

"Executive Board" means one of the governance bodies of the Company responsible for the day-to-day activities and operations of the Company with the powers and attributions described in Section 6.

"Financing Agreement" has the meaning set forth in Section 5.2.1(a).

"Fiscal Month" means a period of four (4) or five (5) consecutive weeks, each ending on the Saturday closest to the last day of the calendar month.

"Fiscal Quarter" means a period of three (3) consecutive Fiscal Months, each ending on the Saturday closest to March 31st, June 30th, September 30th and December 31st. For the purposes of any reports and/or financial statements prepared per Section 11, Fiscal Quarter shall mean a period of thirteen (13) consecutive weeks beginning with the 1st day after the end of each Fiscal Year or immediately preceding Fiscal Quarter, except with respect to the 4th Fiscal Quarter of a Fiscal Year consisting of fifty-three (53) weeks, which the 4th Fiscal Quarter will consist of 14 weeks.

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31st of such year, or (ii) any subsequent period starting on January 1st and ending on December 31st, or (iii) any portion of the period described in clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 8. For the purposes of any Reports and/or Financial Statements prepared per Section 11, Fiscal Year shall mean (i) the period commencing upon the formation of the Company and ending on the Sunday closest to December 31st of such year, or (ii) any subsequent 52/53-week period ending on the Sunday closest to December 31st, or (iii) any portion of the period described in clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 8.

"Franchise Agreement" means the franchise agreement for the Restaurants to be issued by the Franchisor and to be executed by the Company after review and consideration of the Offering Circular.

"Franchisor" means Wendy's Global Restaurants, LLC.

"Franchisor Services Agreement" has the meaning set forth in Section 15.6.

"Gross Asset Value" means, with respect to any asset, such asset's gross fair market value.

"Indemnified Person" means each present and former Director, Officer and Member of the Company and/or any of its Subsidiaries, each Affiliate of such Director, Officer or Member.

"Infinity" means Infinity Holding e Participações Ltda., above qualified, its successors and permitted assignees.

"Intended Internal Transfer" has the meaning set forth in Section 10.8.

"Internal Transfer" has the meaning set forth in Section 10.8.

"LSA" means Law No. 6,404, as of December 15, 1976, as amended.

"Majority Members" has the meaning set forth in Section 10.7.

"Member" means an owner of one or more Quotas as reflected on the Company's books and records and as set forth on Schedule A, individually, when acting in the capacity of each as a Member of the Company, and "Members" means the Persons set forth on Schedule A, collectively, when acting in their capacities as Members of the Company.

"Notice" has the meaning set forth in Section 10.2(a).

"Offering Circular" has the meaning set forth in Section 15.15.

"Officer" means a person elected by the Members to compose the Executive Board and be responsible for and conduct the Company's day-to-day activities and operations.

"Other Members" has the meaning set forth in Section 10.8.

"Permitted Transfer" or "Permitted Transfers" has the meaning set forth in Section 10.1.

"Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Brazilian GAAP.

"Purchaser" has the meaning set forth in Section 10.4(a).

"Quotas" has the meaning set forth in Section 4.1.

"Remaining Members" has the meaning set forth in Section 10.2(a).

- 7 -

"Restaurant" means each Wendy's® restaurant owned or Controlled by the Company or any of its Subsidiaries, pursuant to the Franchise Agreement (including Regional-franchised Restaurants as defined in the Franchise Agreement).

"Selling Member" has the meaning set forth in Section 10.2(a).

"Starboard" means Starboard International Holdings B.V., above qualified, its successors and permitted assigns.

"Starboard Affiliate Loan" has the meaning set forth in Section 5.2.1(e).

"Starboard Management" has the meaning set forth in Section 15.6.

"Starboard Services Agreement" has the meaning set forth in Section 15.6.

"Subsidiary" means any Person Controlled by the Company.

"Third Party Loan" has the meaning set forth in Section 5.2.1.

"Transfer" has the meaning set forth in Section 10.1.

"Transferring Member" has the meaning set forth in Section 10.8.

"Transferring Member Notice" has the meaning set forth in Section 10.8.

"Usufruct Agreement" means the Usufruct Agreement that may or may not be entered into between Infinity and Starboard in connection with this Agreement.

"Wendy's BV" means Wendy's Netherlands Holdings B.V., above qualified, its successors and permitted assigns, and any Affiliate of Wendy's BV (and its successors and permitted assigns) that may hold Quotas after the Effective Date.

Section 1.2    **Headings**.    The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

SECTION 2
FORMATION AND TERM

Section 2.1    **Formation**.

(a)    The Members hereby agree that the Company shall be a Brazilian *Sociedade Limitada* formed under and pursuant to the provisions of the Brazilian laws and agree that the rights, duties and liabilities of the Members shall be as provided in the Articles of Organization, except as otherwise provided herein.

(b)     In case of conflict, the provisions of this Agreement shall always prevail over any other provisions contained in the Articles of Organization.

(c)     As of the Effective Date, each of the Members owns the Quotas set forth on Schedule A.

(d)     The name and mailing address of each Member together with such Member's Capital Contribution and the Quotas held by such Member shall be listed on Schedule A. The Members shall be required to provide notice of any change of address to the Executive Board. The Secretary (or other Officer) of the Company shall be authorized and required to update Schedule A from time to time as necessary to accurately reflect the information therein, including to reflect any Transfers of Quotas and admissions of new Members pursuant to Section 10. Any amendment or revision to Schedule A made in accordance with this Agreement shall not require the consent of the Members. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

Section 2.2     **Name**. The name of the Company is "WBR Participações Ltda."; provided, however, that in accordance with Section 3.1, the name of the Company shall subsequently be amended to be "WBR Franquias e Participações Ltda." The business of the Company may be conducted, upon compliance with all applicable laws, under any other name designated by unanimous agreement of the Members.

Section 2.3     **Term**. The term of the Company commenced on the date of the registry of the Articles of Organization before the Board of Trade of the State of São Paulo and shall continue until dissolved in accordance with the provisions of this Agreement and the Act.

Section 2.4     **Principal Place of Business**. The principal place of business of the Company as of the Effective Date shall be the address set forth in the Articles of Organization.

Section 2.5     **Qualification in Other Jurisdictions**. The Executive Board shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business in which such qualification, formation or registration is required or desirable, and will cause each Subsidiary to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Subsidiary transacts business in which such qualification, formation or registration is required or desirable. Any Officer of the Company, subject to obtaining any approval required by Section 6 as an authorized person within the meaning of the Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

## SECTION 3
## PURPOSE AND POWERS OF THE COMPANY

Section 3.1 **Purpose**. The Company was initially formed as a holding company under the name "WBR Participações Ltda."; however, upon execution of the Amended and Restated Articles of the Organization, which will occur upon the execution of the lease agreement corresponding to the address for the first Wendy's® restaurant owned by the Company (which shall also be the Company's headquarters address set forth in Section 1 of the Amended and Restated Articles of Organization), the Company will change its name to "WBR Franquias e Participações Ltda." and it will change its corporate purpose to reflect that it was formed for the purpose of, and the nature of the business to be conducted and promoted by the Company is, owning and operating Wendy's® restaurants in Brazil. In furtherance and in connection with such purpose, the Company is authorized to: (i) hold equity interests in other companies as a member or a shareholder; (ii) sell food and alcoholic and non-alcoholic beverages to customers in the Restaurants; (iii) sell diner, coffee shop, fast-food, patisserie, bakery and candy store products to customers in the Restaurants; (iv) sublicense the right to use trademarks and patents; (v) sublicense the right to use technology and procedures to implement, expand, conduct and manage the subfranchisee network; (v) format and manage subfranchising systems and royalties; (vi) provide services for its subfranchisees and/or the Franchisor; and (vii) perform any other activities related to the above and which may be necessary to accomplish the above purpose.

## SECTION 4
## QUOTAS

Section 4.1 **The Quotas**. The equity interests in the Company shall be represented by quotas ("Quotas"). The record of the ownership of each Quota shall be listed in the Articles of Organization.

Section 4.2 **Issuance of Additional Quotas**. In addition to the Quotas issued and outstanding as of the Effective Date, the Members are hereby authorized, subject to the terms of Section 6.1.4(a)(i) and/or (ii), as the case may be, to cause the Company to issue additional Quotas (collectively, the "Additional Quotas") at any time or from time to time, to the Members or to other Persons for such consideration and on such terms and conditions as shall be established by the Members in their sole and absolute discretion.

The issuance of Additional Quotas is subject to the Members' pre-emptive rights as provided in this Agreement.

## SECTION 5
## MEMBERS

Section 5.1 **Powers of Members**. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of the Articles of Organization or as otherwise required by the Act. Except as otherwise

specifically provided by this Agreement or required by the Act, no Member shall have the power to act for or on behalf of, or to bind, the Company.

      5.1.1   **Representation of Member(s)**. Any Member shall have the ability to exercise its powers as described above by granting power of attorney to its respective appointed attorney(s)-in-fact, who shall be entitled to act on behalf of the respective Member(s) upon receipt of any written instructions/approvals, including by email messages.

      Section 5.2   **Obligations of Members**. The Members have agreed that each Member shall have the following obligations to the Company and to the other Members, and the Company shall have the following obligations, in each case, as applicable:

      (a)   Each Member acknowledges and agrees that it or its Affiliate will be responsible, subject to the terms and conditions herein as specified in Section 7.1, for the funding of the Company according to its equity participation; and

      (b)   Infinity acknowledges and agrees that it will be responsible, subject to the terms and conditions herein, for the management of the day-to-day operations of the Restaurants. Infinity or its Affiliate shall also be responsible for the investigation of locations for new Restaurants, to provide market analysis and site selection, and subject to the approval of the Members, to coordinate and supervise the construction and development of the Restaurants. Starboard shall also be responsible for management oversight of the operations of the Company and the Restaurants, including availability of operating systems, through an Affiliate.

      5.2.1   **Debt Financing**. Subject to the determination by the Board of Directors of the Company's need for financing and subject to the approval requirements of Section 6.1.4(a)(i), the Members agree to use their commercially reasonable efforts to procure financing for the Company, either through a third party (a "Third Party Loan") or through a Member or a Member's Affiliate (an "Affiliate Loan") for the development, construction and operation for the first five (5) Restaurants to be developed by the Company any Third Party Loan or Affiliate Loan hereinafter referred to as, the "Debt Financing").

      (a)   The Members will cooperate in good faith to obtain Debt Financing on terms and conditions reasonably acceptable to all Members subject to this Section 5.2.1. The terms and conditions of the Debt Financing such as (but not limited to) amount to be borrowed, collateral, interest rates and payment terms shall be negotiated in good faith between the Company and the Debt Financing lender, and shall be part of a separate agreement to be executed between the Company and the Debt Financing lender ("Financing Agreement").

      (b)   The Members agree to use their best efforts to protect the Company's interests under the terms and conditions of the Financing Agreement

and ensure that the Financing Agreement to be executed will be in the best interest of the Company.

(c)     The Members will contact the Franchisor and Debt Financing lender on behalf of the Company, provide all requisite information in compliance with all applicable laws, and obtain all necessary approvals to effect the execution of the Financing Agreement. The Company shall be responsible for any expenses incurred with respect to the Company's procuring the Debt Financing and execution of the Financing Agreement.

(d)     Notwithstanding anything to the contrary herein, in the event the Company receives an Affiliate Loan, such Affiliate Loan will be structured in the Financing Agreement as an arm's length transaction in all respects in accordance with all applicable laws and after obtaining all necessary approvals (including any approvals/registrations required by the Brazilian Central Bank). The Financing Agreement will also require that each Member be severally liable for payment of the Affiliate Loan in an amount equal to the percentage of Quotas owned by such Member at the time of the issuance of such Affiliate Loan. In order to provide for proper enforceability of the guarantees provided herein, each Member shall sign the Financing Agreement related to the Affiliate Loan as guarantor, offering its Quotas at the time of the signature of such Financing Agreement, as a guarantee to the payment of such Affiliate Loan at that time. A guarantee of Quotas will only be offered in relation to an Affiliate Loan.

(e)     In the event the Company receives an Affiliate Loan from Starboard (or its Affiliate) (the "Starboard Affiliate Loan"), Infinity shall, as a condition of any Affiliate Loan by Starboard (or its Affiliate), enter into the Usufruct Agreement. Upon full payment of the Starboard Affiliate Loan in accordance with the Financing Agreement, the Usufruct Agreement will terminate automatically in accordance with its terms.

(f)     Nothing contained in this Section 5.2.1 will affect the Franchisor's rights under the Franchise Agreement or be deemed to amend or otherwise affect any provisions of the Franchise Agreement.

Section 5.3     **Transfer and Admission of New Members**. Except as otherwise set forth in this Agreement, a Member may not Transfer all or any part of such Member's Quotas to any Person except in accordance with Section 10 and after giving effect to any required approvals under Section 6.1.4(a)(i). Any assignee or transferee of Quotas pursuant to a Transfer in accordance with Section 10 shall be entitled to the allocations of Profits and Losses under Section 8 and distributions under Sections 9 and 13 to which the assignor or transferor was entitled with respect to such Quotas. Following or coincident with any such admission, as and to the extent appropriate, the Members shall amend this Agreement to reflect such event and the terms of such admission. Any assignee or transferee of Quotas

pursuant to any transfer or issuance of new Quotas as set forth in this Agreement, shall be bound to its provisions and undertake to comply with all of its terms and conditions.

Section 5.4 **Resignation**. Except as otherwise provided by the Act, no Member shall have the right or power (a) to resign as a Member (except in the case of a Permitted Transfer pursuant to Section 10) or (b) to demand or receive property other than cash in accordance with the terms of this Agreement in return for such Member's Capital Contributions. Except as otherwise set forth in this Agreement or in any agreement permitted to be entered into under this Agreement with respect to the purchase, redemption, retirement, or other acquisition of Quotas, no Member shall have priority over any other Member either as to the return of such Member's Capital Contributions or as to Profit, Loss or distributions. Other than upon the termination and dissolution of the Company as provided by this Agreement, there has been no time agreed upon when the Capital Contributions of any Member shall be returned.

Section 5.5 **Meetings and Voting by Members**.

(a) Meetings of the Members may be called at any time by the Executive Board, Board of Directors and/or by any Member that owns Quotas representing ten percent (10%) of all outstanding Quotas. Notice of any meeting, including the date, time and location, shall be given to all Members not less than eight (8) days prior to the date of such meeting. Each Member may authorize any other Member or any attorney-in-fact to act for it by a specific proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the relevant Member or such Member's attorney-in-fact.

(b) In accordance with Section 15.1, the call shall be deemed made upon confirmation of its receipt at the addresses given in the preamble hereof, and/or Schedule A. The Members undertake to update their addresses, taking responsibility, and exempting the other Members and the Company, for any losses arising from the delivery of the call at a non-updated address.

(c) The formalities indicated herein shall be dismissed when all Members are present at the meeting, or expressly declare themselves aware of the issues to be discussed, as well as the date, time and place of the meeting. Members meetings shall not be required, however, in case of Members' express and unanimous decision on the matters to be discussed.

(d) The meeting of Members shall occur whenever necessary, but at least once a year, within four (4) months following the end of the Company's Fiscal Year, to: (i) examine the annual reports of the Officers and Directors, and discuss and approve financial statements of the Company, (ii) decide upon allocation of net income from the Fiscal Year and payment of dividends, (iii) elect the members of the management bodies, if applicable, and (iv) discuss any other relevant matter in the interest of the Company.

(e)     A quorum for a Members meeting shall be deemed to exist, on the first call, with the presence of Members holding at least eighty five percent (85%) of the Company's outstanding Quotas, and on a second call, with any number in attendance. The meetings shall be chaired by Starboard with Infinity acting as Secretary (or equivalent Officer).

(f)     Minutes of the decisions and resolutions adopted shall be drawn up and signed by those chairing over the meeting and by the Members present at the meeting. Notwithstanding the foregoing, such minutes shall not for Brazilian law purposes be considered formal minutes of the Members and shall not be required to be registered with the Board of Trade or other governmental authority of Brazil, unless otherwise expressly required by law.

Section 5.6    **Representations and Warranties**. Each Member hereby represents and warrants to the Company on and as of the Effective Date as follows:

(a)     Such Member has all requisite power and authority to execute and deliver this Agreement and to carry out all of the actions required of such Member pursuant to the terms hereof, including the making of the Capital Contributions previously made by such Member, as described in Section 7.1;

(b)     This Agreement has been duly executed and delivered by such Member and constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, except as enforceability thereof may be limited by any applicable bankruptcy, reorganization, insolvency or other laws affecting creditors' rights generally or by general principles of equity;

(c)     The execution and delivery by such Member of this Agreement and the completion by such Member of the Capital Contributions and such Member's other actions contemplated hereby will not (i) violate or conflict with any provisions of the organizational documents of such Member, or (ii) constitute a violation of, or be in conflict with, constitute or create a default under, or result in the creation or imposition of any lien upon any property of such Member pursuant to (A) any material agreement or instrument to which such Member is a party or by which such Member or any of its properties is bound or to which such Member or any of its properties is subject, or (B) any statute, judgment, decree, order, regulation or rule of any court or governmental authority to which the Member is subject or otherwise bound, which violation, default or breach would have a material adverse effect on such Member;

(d)     There is no action, proceeding or investigation pending or, to the knowledge of the Member, threatened against such Member, that, if adversely determined, would adversely affect such Member's performance of its obligations

- 14 -

under this Agreement or the consummation of the transactions contemplated hereby;

(e)     Each Member acknowledges and agrees as follows: (i) prior to acquiring its Quotas, it has made an investigation of the Company and its business and had made available to it all information with respect thereto needed to make an informed decision to acquire the Quotas, and (ii) it considers itself to be a Person possessing experience and sophistication, as an investor, adequate for the evaluation of the merits and risks of its investment in the Company, and (iii) its determination to acquire Quotas has been made independently of the other Members, and independently of any statements or opinions as to the advisability of such acquisition or as to the properties, business, prospects, or condition (financial or otherwise) of the Company that may have been made or given by the other Members or by any agent or employee of the other Members, and (iv) the other Members have not acted as its agent in connection with making its acquisition of Quotas and the other Members will not be acting as its agent in connection with monitoring such Member's investment in the Quotas, and (v) it may be required to bear the financial risks of an investment in the Company for an indefinite period of time;

(f)     Each Member shall remain solvent as long as it is a Member of the Company; and

(g)     Each Member agrees that (i) it will not permit any change in the direct or indirect ownership interest in such Member by its shareholders, quota holders, members or other holders of equity interest unless such change in ownership interest is approved by the Franchisor, as provided for in the Franchise Agreement; and (ii) in the event the direct or indirect change of ownership of a Member constitutes a change of more than 50% of either its equity interests or the Control (including as a result of a change in the right to elect or designate management), the consent of the other Members is also required.  The Members agree each year to certify to the Executive Board the name, address and percentage of ownership of each owner of the Member (and whether such ownership interest has changed).

SECTION 6
MANAGEMENT & GOVERNANCE

Section 6.1     **Management of the Company**.

(a)     A meeting of Members of the Company will determine, subject to the terms of Section 6.1.4(a)(i), the remuneration of the members of the Board of Directors and Executive Board, in an annual or lump sum amount, and the Board of Directors shall allocate such amounts among its members and members of the Executive Board.

- 15 -

(b)     Members of the Board of Directors and Executive Board, whether they are Members or not, shall be as designated in the Articles of Organization or by a separate act, and shall not be required to post any bond or other security to assume such role. Directors and/or Officers shall be reelected and invested in office at the Members meeting.

(c)     A Director may only be removed (i) by the Member who designated such Director, upon written notice to the Board of Directors, or (ii) by the Members in a Members' Meeting for Cause or by a unanimous vote of the Members in a Members meeting. If at any time Cause exists to remove a Director, such determination to remove such Director shall be made by a majority vote of the Members who did not designate such Director. An Officer may only be removed by the Members holding at least 50% plus one (1) Quota of the Company's outstanding Quotas.

### 6.1.2   Management of the Company by the Board of Directors.

(a)     **Management by the Board of Directors**.  Subject to any limitations and restrictions expressly set forth in this Agreement, and subject to the consent, approvals and recommendations of the Board of Directors and the decisions of the Members (including as contemplated by Section 6.1.4(a)(i) and/or (ii)), (1) the Members shall conduct the activities and affairs of the Company through the Board of Directors, which will set the guidelines that the Executive Board shall be subject to, and (2) all powers of the Company, except those specifically reserved to the Members by the Act and LSA or this Agreement, are hereby granted to and vested in the Executive Board, which will be subject to the guidelines established by the Board of Directors when conducting the business of the Company.  Subject to the limitations and restrictions set forth herein, the control of the management of the Company shall be vested in the Executive Board, but no Officer of the Executive Board, except as provided for herein, shall be authorized to take actions to exercise such control or responsibility, to the extent a consent, decision or recommendation of the Board of Directors is required to take such actions and the Board of Directors has not acted to provide such consent, decision or recommendation.  The Board of Directors may adopt such rules and regulations for its decisions and actions of the Company not inconsistent with this Agreement or the Act and/or LSA.

(b)     **Authority of the Board of Directors**.  The Board of Directors shall be vested with all authority and powers necessary to set the guidelines, consent, decide upon or recommend the activities and operations of the Company (subject to compliance with this Section 6.1.2) to the extent necessary, convenient or incidental to the accomplishment of the purposes of the Company.  Except when the approval of the Members is required by this Agreement or by non-waivable provisions of applicable law, the Board of Directors will consent, decide upon or recommend actions with respect to the matters set forth in Section 6.1.2(c) for the Executive Board to take action for the Company on such matters.

Such Board of Directors' consent, decision or recommendation may be formalized by means of any written form, including email messages, in which circumstances a meeting of the Board of Directors or any other corporate act or document for such purposes shall not be required.

(c)     **The Board of Directors Duties**.    Subject to the Members' approval rights under Sections 6.1.4(a)(i) and (ii) and/or other limitations in this Agreement with respect to the following matters (including but not limited to Section 11.1(d) with respect to the CPA Firm), the Board of Directors shall be competent to approve any of the following matters, as well as any other matters determined by the Members; provided, however, that, for the avoidance of doubt, to the extent any of the following matters are subject to approval of, or have been approved by, the Members pursuant to Section 6.1.4(a)(i) or (ii) or otherwise as provided in this Agreement, then the Board of Directors shall not be authorized or required to approve any of such matters:

(i)     determining the general direction of the Company's business under the terms and conditions presented by the Members and/or in this Agreement;

(ii)     supervising the management of the Officers;

(iii)     examining, at any time, the books and papers of the Company, and requesting information on agreements executed or to be executed, and any other acts;

(iv)     calling a Members meeting when deemed convenient;

(v)     opining on the management report and the accounts of the Executive Board;

(vi)     selecting and removing independent auditors;

(vii)     incurring or modifying any debt or lease financing undertaken for or on behalf of the Company and/or any Subsidiary in excess of R$20.000,00 in any instance (not covered by applicable warranty or insurance) or annually in the aggregate which is in excess of R$100.000,00 (not covered by applicable warranty or insurance) or as may be modified by a resolution of the Members;

(viii)     incurring capital expenditures and/or maintenance expenses for or on behalf of the Company or any Subsidiary in excess of R$50.000,00 in any instance (not covered by applicable warranty or insurance) or as may be modified by a resolution of the Members;

- 17 -

(ix)     entering into or modifying any contract, transaction or arrangement by or on behalf of the Company and/or any Subsidiary not in the normal and ordinary course of business thereof (including, without limitation, any contract or arrangement with the Franchisor, any contract or arrangement for the management or supervision of any Subsidiary and/or any contract or arrangement for which the Company and/or any Subsidiary has any contingent liability, any liability as surety, or any liability for the acts or omissions of any other person or party);

(x)     entering into or modifying of any contract with or on behalf of the Company and/or any Subsidiary that is for a stated period in excess of twelve (12) months or that is not cancellable by the Company and/or such Subsidiary without penalty upon advance notice of no more than ninety (90) days;

(xi)     commencement and/or defense of any litigation, arbitration or other legal proceeding by or on behalf of the Company and/or any Subsidiary with a value in excess of R$10.000,00;

(xii)     entering into any contract, transaction, payment or other arrangement (and/or any modification thereto) with, on behalf of or otherwise involving the Company and/or any Subsidiary not expressly provided for under this Agreement that either (a) is between Infinity and/or its Affiliate and the Company and/or any Subsidiary or (b) that otherwise directly or indirectly benefits Infinity and/or its Affiliates;

(xiii)     selecting, compensating, and replacing the primary store-level manager for each Restaurant;

(xiv)     structuring, terms, coverage and placement of all insurance policies covering or protecting the Company, any Subsidiary, any Restaurant, any associated premises thereof, and/or any personnel who work at any Restaurant; provided, however, that the various insurance coverages for the Company, its Subsidiaries in effect as of the Effective Date are acceptable for purposes of this clause with respect to the risks and requirements of the Company as of the Effective Date;

(xv)     recommending from time to time any additional Capital Contributions that are required to be made with respect to funding of operations expenses of the Company and for the Restaurants;

(xvi)     opening bank accounts and establishing cash management policies;

(xvii)     developing employee handbooks;

(xviii) establishing Restaurant level budgets;

(xix) establishing compensation levels for Restaurant level employees and management personnel; and

(xx) approving the Company's annual business/operating plan and annual budget.

(d) **Board of Directors Composition; Number of Directors**. The Board of Directors (and the Board of Directors of each Subsidiary) shall initially be composed of five (5) Directors:

(i) For every twenty percent (20%) of the outstanding Quotas of the Company held by a Member, such Member shall be entitled to appoint one (1) Director. However, in the event any Member holds the majority of the then outstanding Quotas of the Company (50% plus one (1) Quotas), such Member will be entitled to appoint three (3) Directors and the remaining Members holding the minority of the outstanding Quotas of the Company, independently of the percentage held by each minority Member, will be entitled to jointly (by a consensus between such Members) or independently appoint the two (2) remaining Directors. For the avoidance of doubt, but subject to the immediately foregoing sentence, a Member that has the right to appoint a Director or Directors pursuant to this clause (i) will not lose such right unless and until such Member no longer holds any Quotas in the Company.

(ii) In addition to the Directors appointed according to Section 6.1.2(d)(i), Wendy's BV shall be entitled to have one (1) observer attend meetings of the Board of Directors and act as a non-voting observer, provided however, that the presence of such observer shall not be considered for purposes of determining if the quorum needed for a meeting of the Board of Directors is satisfied, and the absence of such observer shall not affect the validity or regularity of the decisions of a meeting of the Board of Directors held without the presence of such observer unless any of the other Directors affirmatively attempt to prevent such observer from attending any such meeting. The non-voting observer of Wendy's BV shall be subject to the same confidentiality and other obligations to which the Director designated by Wendy's BV is subject to under the terms of this Agreement and the Articles of Organization. Notice given to the Director designated by Wendy's BV in accordance with Section 6.1.7 shall be deemed notice to the non-voting observer of Wendy's BV.

(e) **Voting and Decisions of the Board of Directors**. Subject to the Members' approval rights under Sections 6.1.4(a)(i) and (ii) and/or other limitations in this Agreement, all consents, decisions or recommendations of the

Board of Directors shall require the affirmative vote of four (4) of the five (5) Directors then in office (whether in writing or at a meeting in person or by proxy) and shall constitute the act or decision of the Board of Directors. In the event a decision of the Board of Directors is to be taken by less than five (5) members according to Section 6.1.7(b), the majority of the Directors then present shall make the decisions of the Board of Directors, provided however, that no decision shall be taken without the presence of at least three (3) Directors representing at least two (2) different Members. Except as provided for in Section 6.1.2 hereof, if and for so long as the Usufruct Agreement is in effect, Infinity agrees to cause its then appointed Directors to vote the same as the Directors then appointed by Starboard in all matters regarding the Company and/or any Subsidiary, and as a result all such matters requiring an affirmative vote of four (4) of the five (5) Directors shall require only the consent of the Directors then appointed by Starboard (whether in writing or at a meeting in person or by proxy), and shall constitute the consent decision or recommendation of the initially constituted Board of Directors requiring an affirmative vote of four (4) of the five (5) Directors.

6.1.3   **Management of the Company by the Executive Board**.

(a)      Subject to the consent, approvals and recommendations of the Board of Directors and the decisions of the Members (including as contemplated by Section 6.1.4(a)(i) and/or (ii)), the powers, the business and affairs of the Company shall be performed by the Executive Board. The Executive Board shall act by a vote of the majority of Officers (but in the event of a deadlock in voting by the Executive Board on a particular matter, the Board of Directors shall be authorized to vote on such matter instead). Such Executive Board's decision may be formalized by means of any written form, including email messages, in which circumstances a meeting of the Executive Board or any other corporate act or document for such purposes shall not be required. Officers shall observe in their acts, the guidelines of the Board of Directors and obtain any authorization required to be obtained from the Members in accordance with Section 6.1 (including Section 6.1.4(a)(i)), and shall have powers to perform all acts necessary or convenient for the administration of the Company, including, but not limited to:

(i)      representation of the Company in court or out, actively or passively, before third parties, federal, state or municipal authorities as well as independent agencies and government controlled companies;

(ii)     administration, guidance and direction of corporate business within the terms and limits established in this Agreement and the Articles of Organization;

(iii)    the signing of any documents implying liability or obligation of the Company, such as deeds of any nature, checks, promissory notes, bills of exchange, money orders, debt instruments in general, including loan documents and other unspecified documents, within the limits established in this Agreement and the Articles of Organization;

(iv)    preparation of annual balance sheets to be submitted for approval at a meeting of Members;

(v)    the call of meeting of Members when deemed necessary, or advisable, in accordance with the law;

(vi)    incurrence or modification of any debt or lease financing for or on behalf of the Company and/or any Subsidiary which does not exceed R$20.000,00 in any instance (not covered by applicable warranty or insurance) or annually in the aggregate which does not exceed R$100.000,00 (not covered by applicable warranty or insurance) or as may be modified by a resolution of the Members;

(vii)    incurrence of capital expenditures and/or maintenance expenses for or on behalf of the Company or any Subsidiary which does not exceed R$50.000,00 in any instance (not covered by applicable warranty or insurance) or as may be modified by a resolution of the Members;

(viii)    entering into or modifying any contract, transaction or arrangement by or on behalf of the Company and/or any Subsidiary that is in the normal and ordinary course of business thereof;

(ix)    entering into or modifying any contract with or on behalf of the Company and/or any Subsidiary that is for a stated period of less than twelve (12) months or that is cancellable by the Company and/or such Subsidiary without penalty upon no advance notice; and

(x)    commencement and/or defense of any litigation, arbitration or other legal proceeding by or on behalf of the Company and/or any Subsidiary with a value that is less than R$10.000,00.

(b)    All acts taken by the Executive Board with respect to voting its equity interest or exercising other Control rights over Subsidiaries or other entities in which the Company holds equity interest shall require the prior approval of the Board of Directors or the Members to the extent the actions involving such Subsidiary or other entity if undertaken by the Company would have required such approval pursuant to Section 6.1.2(c) or Section 6.1.4(a)(i) and/or (ii). The vote of the Executive Board or Members required to approve such action shall also be as specified in such Sections.

(c)     The Officers shall to communicate to the officers and directors of the Subsidiaries and other entities in which the Company holds an equity interest the requirements of Section 6.1.3(b) above.

6.1.4   **Management of the Company by the Members**.

(a)     **Voting and Decisions of the Members**.   Notwithstanding anything to the contrary herein and, subject to the Usufruct Agreement if in effect, the following matters of the Company and/or any Subsidiary shall require the consent of the Members (whether in writing or at a meeting) and shall constitute the decision of the Company, as specified herein:

(i)     **Decisions taken by Members holding at least 100% of the Company's outstanding Quotas, which may be formalized by means of any written form, including email messages of an individual or individuals duly authorized by such Member(s), in which circumstances a meeting of the Members or any other corporate act or document for such purposes shall not be required:**

A.     Amending or terminating this Agreement or any agreement executed in connection with this Agreement that Wendy's BV is party to, or any agreement with an Affiliate of the Company;

B.     Creating a lien on the assets of the Company or any of its Subsidiaries other than with respect to the Debt Financing;

C.     Forming Subsidiaries (other than wholly owned Subsidiaries with the sole purpose to operate the Restaurants), opening or closing any branches or establishments of the Company (other than openings or closings consistent with the business of owning and operating the Restaurants or other activities approved pursuant to item F. below), or entering into any joint venture agreements, partnership or other similar profit sharing agreement;

D.     Entering into any exclusive distribution or license or franchise agreement and/or any modification or termination thereof;

E.     Determining from time to time any additional Capital Contributions that are required to be made, other than Capital Contributions to cover the Company's cash deficiency, for funding of operational expenses for the Company or the Restaurants or

for development of Restaurants in accordance with the Company's obligations under the Franchise Agreement;

F.        Modifying the core activities or purpose of the Company, which is to own and operate the Restaurants;

G.        Entering into any credit, loan, guarantee/indemnity, debt or borrowing agreement and/or any modification or termination thereof other than with respect to the Debt Financing;

H.        Except as otherwise provided in Section 6.1.4(a)(ii)(E), granting, reclassifying or acquiring of equity securities by the Company;

I.        Entering into any amendments to the Articles of Organization as well as causing the Officers to exercise, in the name of the Company, the right to vote as shareholder or quotaholder in any Subsidiary, in general meetings, partners meetings, resolutions or deliberations of shareholders or partners when the effect of such vote would be to circumvent those matters which require the approval of Members representing 100% of the Company's outstanding Quotas (provided that the Officers shall be required to communicate to such Subsidiaries the existence of this limitation);

J.        Entering into any agreement between the Company, on one side, and directly or indirectly, on the other side, one of the Officers, one of the Directors, one of the employees or one of the external consultants of the Company and/or their relatives;

K.        Donating or contributing to parties and political organizations, if permitted by the applicable laws;

L.        Appointing attorneys-in fact with powers to perform any of the acts set forth in this clause (i);

M.        Appointing the Company's Chief Executive Officer;

N.        Filing of an extrajudicial reorganization plan, a request for judicial reorganization or bankruptcy by the Company;

O.        Suspending activities of the Company, or terminating or dissolving the Company (other than as a result of the sale of substantially all of the assets of the Company consummated in

accordance with provisions of the Franchise Agreement and this Agreement);

P. Canceling, settling or waiving any claims or rights, or commencing or settling litigation or arbitration, of or against the Company that could reasonably be expected to have an adverse effect on the Wendy's® brand (other than litigation of the Company against the Franchisor for breach of the Franchise Agreement or litigation against Wendy's BV for breach of this Agreement or any agreement executed in connection with this Agreement that Wendy's BV is party to; provided, however, that before commencing any such litigation, the Members will agree on a mediator and engage in good faith mediation to resolve the dispute giving rise to such proposed litigation, which mediation shall be resolved within thirty (30) days of commencement (unless exigent circumstances require the seeking of an injunction to prevent immediate material harm to the Company));

Q. Materially changing any method of financial or tax accounting used by the Company other than changes required by Brazilian GAAP or applicable law;

R. Approving the Company's financial statements and income tax returns; and

S. Taking any of the above actions with respect to any Subsidiary.

The Members acknowledge and agree that there may be other matters or activities described in this Agreement, but not described in clause (i) above, that expressly require the unanimous agreement of the Members, and clause (i) above is not intended to limit or affect such requirements in any manner.

(ii) **Decisions taken by Members holding at least 75% of the Company's outstanding Quotas, which may be formalized by means of any written form, including email messages of an individual or individuals duly authorized by such Member(s), in which circumstances a meeting of the Members or any other corporate act or document for such purposes shall not be required:**

A. the designation of any Director and/or Officer (other than the Chief Executive Officer of the Company) that is not to be designated by a Member;

- 24 -

B.          subject to Section 6.1(c), the removal of any Director that is not to be designated by a Member and that is designated in the Articles of Organization of the Company and/or any Subsidiary;

C.          any corporate development activity with respect to the Company or any Subsidiary including any merger, acquisition, or disposition, other than those implicated by a matter addressed in Section 6.1.4(a)(i), and except as provided for in and subject to the requirements of Section 10, provided however, that any Member that does not consent to any such applicable activity shall have the right to have the purchase price of the assets being sold, if not done so, be determined in accordance with Section 10.2(b) or 10.3;

D.          the development, acquisition and disposition of any Restaurant in accordance with the Franchise Agreement;

E.          the admission of any private equity members and/or partners for the purpose of the development, construction and operation of new Restaurants; and

F.          the declaration or payment of distributions or dividends by the Company or any Subsidiary;

G.          entering into any contract, transaction, payment or other arrangement (and/or any modification thereto) that is not expressly provided for under this Agreement or subject to the consent requirements of Section 6.1.4(a)(i) that either (a) is between Starboard or any Affiliate thereof and the Company, any Subsidiary and/or any Restaurant or (b) otherwise directly or indirectly benefits Starboard and/or any Affiliate thereof;

H.          subject to the Franchise Agreement and except as otherwise provided in Section 6.1.4(b) and Section 10, the sale of substantially all of the assets of the Company or substantially all of the assets of all of the Subsidiaries;

I.          the determination of fair value of a Restaurant and/or the Company and/or any Affiliate and the selection of a valuation firm, each as contemplated by Section 11.5; and

J.          the determination from time to time of any additional Capital Contributions required to be made to cover the Company's cash deficiency, for funding of operational expenses for

the Company or the Restaurants or for development of Restaurants in accordance with the Company's obligations under the Franchise Agreement.

(b)　　Notwithstanding the foregoing, and subject to the terms of any existing franchise agreements relating to Wendy's® restaurants, including obtaining the approval of the Franchisor under the Franchise Agreement, if at any time during the term of this Agreement, (1) a parent or Affiliate of Starboard or Starboard itself sells all of the Wendy's restaurants owned or controlled by Starboard's parent or Affiliate to an unaffiliated third-party in an arms-length fair market transaction (e.g., excluding a foreclosure, a liquidation or other distressed sale) and (2) Starboard desires to include the Restaurants owned by the Company or its Subsidiaries in such transaction, Infinity, Wendy's BV, and their respective Directors will approve such sale transaction so long as the net fair market value for the Restaurants owned by the Company is determined either by a separate arm's length third party contract entered into for the Restaurants and by the Company or, if there is not a separate Contract, then net fair market value of the Restaurants by the Company determined by the same method of valuation used to determine the purchase price of the Wendy's Restaurants owned by the Company sold by a parent or Affiliate of Starboard in such transaction.

6.1.5　**Consultation Matters**.　Subject to the applicable terms and conditions of the Franchise Agreement and without limiting the foregoing, upon the request of any Director or Officer, the Directors and Officers will consult with each other in good faith from time to time and in connection with, among other things, the following matters regarding each Restaurant: (1) Restaurant performance, (2) Franchisor relations, (3) recruitment, compensation and retention of management and employees for such Restaurant, (4) facility maintenance and necessary or appropriate capital expenditures for such Restaurant, (5) advertising campaigns for such Restaurant (including, without limitation, selection and use of billboards), (6) product pricing strategy at such Restaurant, (7) operating hours for such Restaurant, (8) strategy and implementation of the breakfast menu and service at such Restaurant, and (9) new products introductions at such Restaurant.

6.1.6　**Resignation; Removal**.　Any Director and/or Officer of the Company may resign at any time by giving written notice to the Members and to the Company. The resignation of any Director and/or Officer shall take effect upon receipt of such notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation by the Company, the Members and/or the remaining Directors shall not be necessary to make such resignation effective. In the event of a vacancy on the Board of Directors due to the resignation, death or removal of a Director, the Member who designated the Director whose resignation, death or removal gave rise to such vacancy may designate and appoint a replacement Director.

6.1.7 **Meetings**.

(a) **Notices**. The Board of Directors may hold meetings either within or outside of São Paulo, Brazil, at such time and at such place as from time to time may be determined by the Board of Directors. Meetings of the Board of Directors may be called by any Director. Meetings of the Board of Directors, on the first call, shall be called by prior notice of not less than eight (8) days given to all Directors (or such shorter time period as is practicable in the event of an emergency meeting). In the event a quorum for a Meeting of the Board of Directors has not been satisfied on the first call in accordance with Section 6.1.7(b), the Directors shall issue a second call by means of a prior notice of not less than five (5) days given to all Directors following the same procedures required for the first call. Each Director who calls any meeting of the Board of Directors, including any emergency meeting, shall use commercially reasonable efforts to notify each of the Directors of such meeting in advance, and shall use commercially reasonable efforts to hold any such meeting at a time and location that can accommodate all Directors. Such notices shall be delivered in writing (which may be by facsimile or email) to each Director. Such notice may be given by any Director of the Company who called the meeting. Such notice shall specify the purpose, the day, time and place of the meeting. Notice of any meeting of the Directors need not be given to any Director who signs a waiver of notice of such meeting or a consent to holding the meeting, before the meeting, or who attends the meeting without protesting prior to such meeting or at the commencement thereof. All such waivers, consents and approvals shall be filed with the records of the Company and those which need to produce effects before third party shall be filed before the Board of Trade.

(b) **Quorum**. For the first call, the presence (in person, by proxy, telephonically, or other electronic communication) of at least one (1) Director appointed by each Member which has the right to appoint a Director according to Section 6.1.2(d) will be necessary to constitute a quorum for purposes of conducting business, and for a second call, the presence of any three (3) Directors in attendance representing at least two (2) Members will be sufficient to constitute a quorum. If a quorum is not present at any meeting of the Board of Directors, then the Directors present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present herein specified.

(c) **Adjournment**. Any meeting of the Board of Directors, whether or not a quorum is present, may be adjourned to another time and place by the affirmative vote of a majority of the Directors present. If the meeting is adjourned for more than twenty-four (24) hours, notice of such adjournment to another time or place shall be given prior to the time of the adjourned meeting to the Directors who were not present at the time of the adjournment.

(d) **Telephonic Meetings**. Directors may participate in a meeting of the Board of Directors by means of a conference telephone or similar communications equipment by means of which all Directors participating in the meeting can hear each other and

participation in a meeting in accordance with this Section 6.1.7(d) shall constitute presence in person at such meeting.

(e) **Action by Written Consent**. Any decision that could be taken at a meeting of the Board of Directors may be taken without a meeting, without prior notice and without a vote, if a consent in writing describing the decision is signed by the Directors required to take such action hereunder, provided that a copy thereof shall be promptly provided to all Directors that did not consent thereto in writing.

(f) At the end of each meeting, the minutes shall be recorded and signed by all Directors physically present at the meeting. The votes cast by Directors who attended the meeting remotely in accordance with Section 6.1.7(d) shall be omitted from the minutes, and instead a copy of the letter, facsimile or electronic mail, as applicable, which contains the vote of the Director shall be attached.

Section 6.2  **Officers; Committees**.

(a) **Appointment of Officers**. The Members from time to time will appoint Officers of the Company and will cause, through its Officers, each Subsidiary to appoint officers of each Subsidiary. The Executive Board will be composed of at least one (1) and up to five (5) Officers, including a Chief Executive Officer. Once appointed and as authorized by the Members, such Officers shall have the authority (subject to obtaining separate Board of Directors approval as, when and to the extent required by Section 6.1.2) to contract for, negotiate on behalf of and otherwise represent the interests of the Company. Any single individual may hold one or more of the foregoing Officer titles, provided that he or she must be a Brazilian resident (including a foreigner with a permanent visa.) The initial Officers shall be as designated using a separate act (and will be designated to serve as the officers of each Subsidiary), and shall have the duties as prescribed.

(b) **Tenure of Officers**. All Officers shall hold office at the pleasure of the Members and may be removed and replaced by the Members consistent with the terms of this Agreement. For avoidance of doubt, the respective rights, powers and authority of the Officers are subject to the direction of the Members and subject to obtaining separate Board of Directors approval as, when and to the extent required by Section 6.1.2 and/or Section 6.1.4(a)(i) and/or (ii).

(c) **Signing Authority for and Access to Bank Accounts**. Notwithstanding the foregoing, the Chief Executive Officer and, if and when appointed, at least one (1) other Officer of the Company designated from time to time by the Members will be named as a signer on each bank account of the Company and will have access to all statements and other information with respect to such accounts.

Section 6.3  **Reliance by Third Parties**. Any Person dealing with the Company, the Board of Directors or the Executive Board may rely upon a certificate signed by any Officer of the Company as to:

(a)     the identity of any Officer or Director of the Company;

(b)     the existence or non-existence of any fact or facts that constitute a condition precedent to acts by the Executive Board or in any other manner germane to the affairs of the Company; and

(c)     the Persons who are authorized to execute and deliver any agreement, instrument or document of or on behalf of the Company.

Section 6.4     **Reimbursements**.

(a)     The Company shall promptly reimburse the Members, Directors and/or the Officers of the Company for all ordinary and necessary reasonable out-of-pocket expenses incurred by the Members, Directors and/or the Officers of the Company, as applicable, on behalf of the Company after the Effective Date for such expenditures that arose after the Effective Date.

(b)     Reimbursements pursuant to this Section 6.4 shall be treated as an expense of the Company and shall not be deemed to constitute a distributive share of the Profits or a distribution or return of capital to any Member.

(c)     Any Members, Directors and/or the Officers seeking reimbursement from the Company for expenses as provided in this Section 6.4 shall file an expense report certifying that such expenses are legitimate and appropriate business expenses of the Company and/or its Subsidiaries. Once submitted, expense reimbursement requests under this Section 6.4 will be paid in accordance with the Company's customary and normal expense payment processes to establish the accuracy and legitimacy of such expenses.

Section 6.5     **The Use of Goods, Services and Employees**.

(a)     Only upon prior approval of all Members, may any Member, Director or Officer use the goods and services of the Company to serve its particular interests, provided that the minutes of the decision of the Members sets forth the goods and services that may be used for such purposes, as well as the form and term of use. All Directors and Officers shall be prohibited from using the infrastructure or facilities of the Company for personal purposes or private business.

(b)     Employees of the Company shall not be used to perform personal services, during the workday, regardless of the area in which they operate in the Company, for any of the Members, Directors or Officers.

Section 6.6     **Use of Trademarks**.  Starboard and Infinity and their Affiliates and the Directors and Officers shall be prohibited from using for private purposes the names, trademarks (current or future), symbols or any signs of expression owned or licensed by the Company pursuant to the Franchise Agreement.

- 29 -

(a)     The protection provided for the use of trademarks and other items described above shall be observed by the signatories, regardless of formal registration of the trademark or symbol with the official organs.

(b)     The prohibitions and protections mentioned above include, but are not limited to, the brand Wendy's®, and each of the other trademarks of the Company in connection with that brand (regardless of whether owned, held or licensed), unless permitted with the prior written consent of Wendy's BV.

SECTION 7
CAPITAL CONTRIBUTIONS, SECURITIES AND CAPITAL ACCOUNTS

Section 7.1    **Capital Account Balance**.  The Capital Account balance of each Member as of the Effective Date is set forth in the Articles of Organization and reflected in Schedule A.  Notwithstanding anything to the contrary herein, each Member agrees that it will make a Capital Contribution of one (1) Brazilian Reais (R$) per Quota owned by such Member.

Section 7.2    **Member's Quotas**.  A Member's Quotas shall for all purposes be personal property.  A Member has no interest in specific Company property.

Section 7.3    **Status of Capital Contributions**.

(a)     No Member, Director or Officer shall receive any interest, salary or draw with respect to his, her or its Capital Contributions or his, her or its Capital Account or for services rendered on behalf of the Company, the Board of Directors, the Executive Board or otherwise in his, her or its capacity as a Member, Director or Officer, as the case may be, except: (1) dividends duly authorized and paid with respect to Quotas in accordance with this Agreement (including Section 6.1.4(a)(i)), (2) as otherwise specifically provided in this Agreement, and/or in accordance with this Agreement, and (3) for any salary or other compensation paid by the Company for services rendered on an arm's length basis for the Company, with such compensation (if any) to be determined from time to time by the Members in accordance with Sections 6.1.2 and 6.1.4(a)(i), as applicable.

(b)     Except as otherwise provided in this Agreement and by applicable Brazilian law, the Members shall be liable only to have made their Capital Contributions prior to the Effective Date pursuant to Section 7.1, and no Member shall be required to lend any funds to the Company, or, after a Member's Capital Contributions have been fully paid pursuant to Section 7.1, to make any additional Capital Contributions to the Company.

(c)     Notwithstanding the limitation on required additional Capital Contributions in Section 7.3(b) or otherwise provided in this Agreement, if the Members, in accordance with Section 6.1.4(a)(i) or (ii), determine that additional Capital Contributions are required, then each Member must make an additional Capital Contribution in the amount of

such Member's pro rata share of the Company's capital, within thirty (30) days from the Members meeting that has determined such additional Capital Contribution is necessary.

(d)     If and to the extent the additional Capital Contribution has been approved by Members in accordance with Section 6.1.4(a)(i) or (ii), and any Member does not , in whole or in part, subscribe for the Quotas issued in connection with such additional Capital Contribution within the terms set forth in Section 7.3(c), the Company shall offer the non-subscribed Quotas to the contributing Members. Within fifteen (15) days from the receipt of the notice from the Company, the contributing Members may subscribe for the non-subscribed Quotas in substitution of the non-contributing Member according to their pro rata share of the Company's capital (without taking into account the Quotas of the non-contributing Member).  In the event a contributing Member waives all or part of its right to subscribe for the non-subscribed Quotas, the other contributing Members, if any, may subscribe for all non-subscribed Quotas according to their pro rata share in the Company's capital as described above.  *For the avoidance of doubt, the pro rata share of the non-contributing Member or the contributing Member which has waived its rights to subscribe for the non-subscribed Quotas, shall be disregarded for purposes of calculating the amount of Quotas that each contributing Member may be entitled to subscribe.*

(e)     In the event there are still remaining Quotas to be subscribed after the completion of the procedure set forth in Section 7.3(d), the majority of the contributing Members, at their sole and absolute discretion, may cause the Company to:

(i)     approve the partial capital increase of the Company according to the amount of Quotas already subscribed by the Members; or

(ii)     repeat the procedures set forth in Sections 7.3(c) and (d) until all Quotas have been subscribed by the Members.

(f)     In the event a Member subscribes but does not pay-in the Quotas issued in connection with the Capital Contribution within the term set forth in Section 7.3(c) ("Defaulting Member"), the Company shall notify the Defaulting Member to pay-in its subscribed Quotas within thirty (30) days from the default. If the Defaulting Member does not pay-in its subscribed Quotas within that time period, the majority of the other Members which have duly paid-in their subscribed Quotas, at their sole discretion, may:

(i)     subscribe and pay-in the Quotas correspondent to the outstanding amount subscribed and not paid-in by the Defaulting Member, according to their pro rata share in the Company's capital as described above;

(ii)     terminate the issuance of the Quotas subscribed but not paid-in by the Defaulting Member; or

(iii)    subject to the limitations set forth in the Franchise Agreement, offer the Defaulting Member's Quotas to any interested third parties under the same terms and conditions.

(g)    In order to grant the perfect execution of the procedures set forth in Sections 7.3(c), (d), (e) and (f), the Members hereby completely waive their pre-emptive rights under the terms of Section 10.6.

(h)    Pursuant to Sections 683, 684 and 685 of the Brazilian Civil Code, the Members mutually grant irrevocable and irreversible necessary powers to sign any documents or perform any mandatory procedure necessary to perform the transfers, capital increases, and any other actions necessary to the perfect execution of the terms and conditions set forth in this Section 7.3.

Section 7.4    **Advances**.  Subject to the approval of the Members in accordance with Section 6.1.4(a)(i) and (ii), and subject to all applicable laws and after obtaining all necessary approvals (including any approvals/registrations required by the Brazilian Central Bank), a Member may lend or advance funds to or on behalf of the Company.  If any Member shall lend or advance any funds to the Company (for the avoidance of doubt, other than as a Capital Contribution or the Affiliate Loan), the amount of such loan or advance shall neither increase such Member's interest in the Company's Capital Account or the number of Quotas held by such Member nor entitle such Member to any increase in such Member's share of the distributions of the Company.  The amount of any such advance shall be a debt obligation of the Company to such Member and shall be repaid to such Member by the Company with interest at a rate equal to the lesser of (i) a rate established by the Board of Directors in good faith and (ii) the maximum rate permitted by applicable law, and upon such other terms and conditions as shall be determined by the Board of Directors in good faith.  Any such advance shall be payable and collectible only out of Company assets, and the other Members shall not be personally obligated to repay any part thereof except as and to the extent that any Member may have separately agreed in writing to be liable to such investing Member for repaying some or all of any such advances not satisfied by the Company.  No Person who makes any nonrecourse loan to the Company shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor.

SECTION 8
ALLOCATIONS

Section 8.1    **General Allocations of Profits and Losses**.  Except as otherwise decided unanimously by the Members, all Profits and Losses of the Company for each Fiscal Year shall be allocated in proportion to each Member's Quotas.

Section 8.2    **Allocations in Event of Sale of Quotas**.  If any Member's Quotas are Transferred in accordance with this Agreement, the Executive Board, at its option and if permitted by applicable law, may close the Company's books (as though the Company's

Fiscal Year had ended) or otherwise make allocations of the Profits and Losses and other items of Company income, gain, loss and deduction to the Members so as to take into account the varying interests of the Members of the Company. This Section 8.2 shall apply for Brazilian income tax purposes.

Section 8.3    **Forfeiture Allocations; Deficit Capital Account Balances**.  Except as required by applicable laws, the Members shall not be obligated at any time to repay or restore to the Company all or any part of any lawful distributions made to the Members (and received in good faith) by the Company. Except as otherwise provided in this Agreement no Member shall be required to restore a deficit Capital Account balance to the Company.  Bad faith will be presumed when distributions are made without use of a balance sheet or there exists among the Members a disagreement with the results reflected in the financial statements of the Company.

Section 8.4    **Cash Flow**.    Members, Directors and Officers agree to use their reasonable commercial efforts to develop and maintain, at any time, cash on hand or in bank accounts of the Company and its Subsidiaries that may be available for distribution to the Members under the terms of Section 6.1.4(a)(ii), taking into account: (a) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise); (b) the amount of cash deemed necessary to establish prudent a reserve for the payment of future capital expenditures, improvements, retirements of indebtedness, operations and contingencies, known or unknown, liquidated or unliquidated, including liabilities that may be incurred in litigation and liabilities undertaken pursuant to the indemnification provisions of this Agreement; and (c) the amount of cash required for the payment of any Debt Financing or any other obligation which is not a common obligation of the Company.  For purposes of establishing the reserve component of cash under clauses (b) and (c) above, such reserve will be set at a minimum of (R$70.000) Brazilian Real per Restaurant, or such other amount as determined by resolution of Members.

SECTION 9
DISTRIBUTIONS

Section 9.1    **Discretionary Distributions**.  Except as otherwise provided in Section 13 (relating to the dissolution of the Company), and subject to any restrictions in any agreements governing indebtedness for borrowed money of the Company or other contractual restrictions, the Company may make distributions to the Members in such amount by vote of the Members in accordance with Section 6.1.4(a)(ii) and, to the extent so distributed, in proportion to their Quotas. Notwithstanding the foregoing, prior to making any distributions to any Member pursuant to this Section 9.1, the Company will first satisfy all payments required to be paid for any loan (and all accrued but unpaid interest thereon) owed to any Member, including any Affiliate Loan, or pursuant to Section 7.4.

Section 9.2    **Amounts Withheld**.  All amounts withheld pursuant to applicable Brazilian law, as amended, or any provisions of any applicable local or foreign tax law with respect to any distribution to the Members shall be treated as amounts distributed to the Members for all purposes under this Agreement.

Section 9.3    **Distributions in Kind**.  No Member shall have the right to receive as a distribution from the Company property other than cash.

Section 9.4    **Limitations on Distributions**.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member with respect to such Member's Quotas if such distribution would violate applicable Brazilian law.

Section 9.5    **Offsets**.  Notwithstanding the provisions of this Section 9 or Section 13.2, to the extent that any Member is otherwise entitled to receive distribution payments under this Section 9 or pursuant to Section 13.2, but has outstanding financial obligations owing to the Company pursuant to the terms of this Agreement, or any other agreement between such Member and the Company, subject to applicable law, such distribution payments will be offset to the extent of such outstanding financial obligations.

SECTION 10
RESTRICTIONS ON TRANSFER OF QUOTAS

Section 10.1    **Transfer**.  The Members acknowledge and agree that Sections 13.2 and 13.4 of the Franchise Agreement are hereby incorporated by reference into this Agreement.  Subject to the foregoing and except as otherwise provided in this Agreement, the issuance or sale of any Quotas by the Company is subject to the pre-emptive rights as provided in the Articles of Organization and in this Agreement.  Except as otherwise provided in this Agreement, and subject to the applicable provisions of the Franchise Agreement (including with respect to the Transfer of any ownership interest in the Company), no Member may, directly or indirectly, sell, assign, pledge, hypothecate, encumber or otherwise transfer (a "Transfer") any Quotas or any interest in any Quotas, either voluntarily or involuntarily, by operation of law or otherwise, except:

(a)    to another Member in connection with a transaction consummated pursuant to and in accordance with this Agreement;

(b)    any Transfer in connection with a transaction consummated pursuant to and in accordance with Section 5.2.1 with respect to an Affiliate Loan;

(c)    any Transfer in connection with a transaction consummated pursuant to and in accordance with Section 7.3;

(d)    to another Person (i) who is an immediate family member or a principal of any Member or a parent entity of a Member, (ii) who holds in trust for

the benefit of such immediate family member or principal of such Member or (iii) which is another entity that is wholly owned and Controlled only by such immediate family member;

(e)     to an entity that is wholly owned and Controlled by the principals of a Member or a parent entity of a Member;

(f)     to the Company;

(g)     to the extent required by an applicable governmental rule, law or regulation, or any valid and effective directive or order of any governmental authority;

(h)     to any other Person in connection with a transaction consummated pursuant to and in accordance with Section 10.2; or

(i)     to any other Person in connection with a transaction consummated pursuant to and in accordance with the drag along right provided in Section 10.7.

(each such Transfer permitted by Section 10.1(a)-(i) being a "Permitted Transfer" and, collectively, "Permitted Transfers"); provided, however, that, with respect to any such Permitted Transfer pursuant to this Section 10.1, (1) the restrictions contained in this Section 10 shall continue to be applicable to the Quotas after any such Permitted Transfer, and (2) the transferee of any such Quotas shall be bound by all of the terms and provisions of this Agreement and the Franchise Agreement as applicable.

Section 10.2    **Transfer of a Member's Quotas**.

(a)     Subject first in all events to the Franchisor's rights under the Franchise Agreement (including without limitation Sections 13.2 and 13.4), any Member may Transfer its Quotas in the Company (the "Selling Member"), other than by a Permitted Transfer described in Section 10.1(a)-(g) or (i), by giving written notice to the other Members (the "Remaining Members") and to the Company to purchase its Quotas (the "Notice"). The Remaining Members shall have the right to purchase a pro-rata portion (as described below) of the Selling Member's Quotas at the purchase price and conditions of sale as provided for in Sections 10.3 and 10.4. If within thirty (30) days of the receipt of Notice, any of the Remaining Members gives notice of its desire to acquire its pro-rata portion of the Selling Member's Quotas, the sale shall be consummated as contemplated by Sections 10.3 and 10.4, with each Remaining Member being entitled to acquire a pro-rata share of such Quotas based on the proportion of the Quotas it then owns as compared to all the Quotas then owned by the Remaining Members who have expressed an interest in buying the Selling Member's Quotas. If any of the Remaining Members elect not to purchase the Selling Member's Quotas, such Remaining Member shall be entitled to require the Remaining Members who have elected to purchase the Selling Member's Quotas to purchase all of its Quotas (on a pro-rata basis, as described above) for the same price and on the same terms as those acquired from the Selling

- 35 -

Member by providing written notice to the Remaining Members and the Company within fifteen (15) days after the Remaining Members provide notice of the desire to purchase the Quotas of the Selling Member. If, following the thirty (30) day period above, there are additional Selling Member's Quotas that are not to be acquired by the Remaining Members, the Company shall, within fifteen (15) days thereafter, have the right to purchase the remainder of the Selling Member's Quotas for the price and on the terms set forth in Sections 10.3 and 10.4. If neither the Remaining Members nor the Company purchase all of the Selling Member's Quotas, the Selling Member may (1) sell its Quotas to a third party upon written notice to the Remaining Members within sixty (60) days of the delivery of the Notice (it being understood that if the Selling Member does not consummate the sale in such time period, it will be required to comply with the provisions of this Section 10.2 again before being entitled to sell another third party) or (2) cause the sale of the operating assets of the Company followed by the dissolution of the Company pursuant to Section 10.2(b) and the Remaining Members agree to vote in favor of the sale of the operating assets of the Company followed by the dissolution of the Company, if the Selling Member so elects. Notwithstanding the foregoing, in the event that the Selling Member is Wendy's BV, and neither the Remaining Members nor the Company purchases all of Wendy's BV's Quotas, Wendy's BV shall not have the right to cause the sale of the operating assets of the Company pursuant to Section 10.2(b), but shall be free to sell its Quotas to a third party upon written notice to the Remaining Members on substantially the same terms as previously offered to the Remaining Members.

(b)     In the event a Selling Member elects to cause the sale of the operating assets of the Company followed by the dissolution of the Company pursuant to Section 10.2(a), prior to the liquidation of the Company, the Members shall first engage an investment bank or business broker for a period of up to six (6) months to manage a sale process for one hundred percent (100%) of the Quotas of the Company, or for all or substantially all of the assets of the Company, and all of the Subsidiaries, so long as such investment bank or broker (1) is internationally recognized and has significant experience selling quick service franchise operations, (2) accepts such engagement on a contingent fee basis for a fee not to exceed 2% of the sales proceeds and with a tail period not to exceed a period of six (6) months beyond the end of such engagement, and (3) is reasonably acceptable to all Members (such acceptance not to be unreasonably withheld, delayed or conditioned). In connection with such sale process, all Members and Officers shall cooperate reasonably and in good faith to facilitate the consummation of a transaction acceptable to the Selling Member so long as the purchaser is a third party not directly or indirectly affiliated with the Selling Member, and the purchase price is payable in immediately available funds at closing (or in such other consideration or payable in installments over such period as is reasonably acceptable to all Members, such acceptance not to be unreasonably withheld, delayed or conditioned) on terms normal and customary in the sale of quick service restaurants. In the event that such sale does not occur prior to the end of such six (6) month period, unless the Members otherwise unanimously agree, the Officers shall then proceed to take appropriate steps to liquidate the Company.

(c)    In the event that any Member causes the provisions of the Franchise Agreement applicable to such Member to be breached (the "Breaching Member"), and the Breaching Member fails to cause the timely cure of such default after notice to such Breaching Member from Franchisor of such default, and pursuant to the Franchise Agreement such default can still be cured upon the termination/elimination of the Breaching Member's Quotas in the Company, all of the Quotas of the Breaching Member shall be terminated/eliminated for cause under the terms of the Articles of Organization upon the due payment of its Quotas. The Breaching Member's Quotas shall be evaluated and paid to the Breaching Member according to the Articles of Organization with a twenty five percent (25%) discount as a fine for such default, and such payment shall not be considered a breach of the provisions of Section 10.3 or any other provision of this Agreement and/or the Articles of Organization. The termination of the Breaching Member's Quotas provided herein shall occur according to the procedures set forth in the Articles of Organization. The Members acknowledge and agree that the resulting damage to the Company and the other Members from an uncured default under the Franchise Agreement, if the Breaching Member's Quotas are not terminated/eliminated is significant, and cannot be determined.  Accordingly, the Members agree that the termination/elimination of the Breaching Member's Quotas in the Company, according to the valuation method provided herein, is fair consideration for the amount of damages that would result on account of such default under the Franchise Agreement, and is to be considered a fair penalty, and the Breaching Member shall not have any recourse or claim against the Company or any of its Subsidiaries, any other Member or any Affiliates of any other Member.  In the event any Person that owns directly or indirectly equity interest in a Member causes a breach of the provisions of the Franchise Agreement applicable to such Person (a "Breaching Owner"), and fails to timely cause a cure of such default after notice from Franchisor of such default, and pursuant to the Franchise Agreement, such default can still be cured upon the termination/elimination of the Breaching Owner's equity interest in the Member, such Member shall cause the Breaching Owner's equity interest in the Member to be terminated/eliminated and revert to such Member. Whether or not the Breaching Owner is entitled to any consideration for such equity interest will be determined pursuant to a separate agreement entered into between each Member and its equity owners which in any event, if paid, shall only be paid by such Member or the owners of such Member.  Other than any consideration agreed to be paid to the Breaching Owner pursuant to such agreement in accordance with its terms, the Breaching Owner shall not have any recourse or claim against the Company or any of its Subsidiaries, any other Member or any Affiliates of any other Member.

Section 10.3  **Purchase Price and Condition of Sale**.

(a)    The purchase price of the Selling Member's Quotas shall be its allocable share of the net fair market value of the assets of the Company as of the last day of the month immediately preceding the date of the Notice.  For purposes of this Agreement, the net fair market value of the assets of the Company shall be determined by an independent appraiser chosen by agreement of the Members, which value shall be reduced by any liability encumbering such assets and other liabilities of the Company, including any Debt Financing.

If an independent appraiser cannot be appointed by agreement of the Members, the Selling Member and the Remaining Members shall each appoint an independent appraiser who will then jointly appoint a third appraiser whose valuation shall be used. The cost of the appraisal shall be borne equally by the Members who are engaged in the transaction.

(b)     In the event that the Selling Member or its Affiliate is the lender of an Affiliate Loan, the purchaser(s) agree to severally guarantee the Affiliate Loan pro rata based upon the percentage of Quotas being acquired from the Selling Member and agree to guarantee such Quotas with respect to the Affiliate Loan. In the event of sale pursuant to Section 10.2, other than on account of Section 10.2(c), the Remaining Members or the Company may use commercially reasonable efforts to release the Selling Member or its Affiliates from any guarantee under the Franchise Agreement and any other obligations of the Company. In the event the Selling Member or its Affiliates is not so released, the Company shall indemnify and hold harmless the Selling Member or its Affiliates from any liability under the guarantees resulting from any future act or omission of the Company.

Section 10.4     **Closing**.

(a)     With respect to Section 10.2 of this Agreement, if any Remaining Member or the Company is to purchase a Selling Member's Quotas, or with respect to Section 10.8 if any Other Member is to purchase a Transferring Member's Quotas, a closing (the "Closing") will take place at the principal offices of the Company (or such other mutually agreed upon location) within the time prescribed in this Agreement on the Business Day and at the time set forth by the Company in a notice delivered at least five (5) days prior to the Closing.

(b)     At the Closing, each purchaser of Quotas (the "Purchaser") shall make payment of the purchase price determined pursuant to Section 10.3(a).

(c)     Subject to Section 6.1.2(d), at the Closing, the Selling Member or Transferring Member shall deliver the resignation of the Director(s) of the Company appointed by such Member according to Section 6.1.2(d).

(d)     At the Closing, the Selling Member shall deliver to the Remaining Member or the Company, or the Transferring Member shall deliver to the Other Members, as the case may be, an assignment of Quotas and amendment to the Articles of Organization duly executed by the Selling Member or the Transferring Member, as the case may be.

(e)     The Members mutually grant irrevocable and irreversible necessary powers to sign any documents or perform any mandatory procedure to complete the purchase option process mentioned in Sections 10.2, 10.3, 10.4 and 10.8, pursuant to Sections 683, 684 and 685of the Brazilian Civil Code.

Section 10.5     **Transfers of Quotas in Breach of this Agreement**. In the event of any Transfer of Quotas in breach of this Agreement, commencing immediately upon the date

of such attempted Transfer (i) such Transfer shall be void and of no effect, (ii) no distribution of any kind, including without limitation, any distribution pursuant to any liquidation, redemption or otherwise, shall be paid by the Company to the purported transferee in respect of the Quotas (all such rights to payment by the transferring Member and/or the purported transferee being deemed waived), (iii) neither the transferring Member nor the purported transferee shall be entitled to exercise any rights with respect to such Quotas until such Transfer in breach of this Agreement has been rescinded.

Section 10.6    **Pre-Emptive Rights**.

(a)    Subject first in all events to the Franchisor's rights under the Franchise Agreement (including without limitation Section 13.2) and except as otherwise provided in Section 7.3(c)-(g), if the Members authorize the increase in capital resulting in issuance or sale of any new Quotas by the Company in accordance with Section 6.1.4(a)(i) or (ii), the Company will first offer to sell such Quotas to each Member then holding Quotas in proportion to the Quotas then owned by each such Member. Each Member will be entitled to purchase all or part of such pro-rata Quotas at the same price and on the same terms as such Quotas are to be offered to any other Persons.

(b)    Each Member entitled to purchase Quotas under this Section 10.6 must exercise such Member's purchase rights hereunder within thirty (30) days after receipt of written notice from the Company describing in reasonable detail the Quotas being offered, the purchase price thereof, the payment terms, such Member's percentage allotment and (if known) the identity of the proposed purchasers who might purchase Quotas that are not subscribed for by existing Members.

(c)    Upon expiration of the offering period described above, the Company will be free to sell such Quotas that the Members entitled to purchase have not elected to purchase during the one hundred eighty (180) days following such expiration on terms and conditions no more favorable to the purchasers thereof, in the aggregate, than those offered to existing Members. Any Quotas offered by the Company after such one hundred eighty (180) day period must be re-offered to the Members entitled to purchase such Quotas pursuant to the terms of this Section 10.6.

(d)    The Members agree that if the issuance or sale of Quotas by the Company was authorized by the Members pursuant to Section 6.1.4(a)(i) or (ii), the following transactions shall be excluded from the pre-emptive rights contemplated by this Section 10.6:

(i)    The issuance of any Quotas (and conversion or exercise thereof) to a third party in connection with any issuance of indebtedness or a financing transaction by the Company or any of its Subsidiaries as approved by the Members (pursuant to Section 6.1.4(a)(i) or (ii)); and

(ii)    Any issuance related to additional Capital Contributions under the terms of Section 7.3(c)-(g).

- 39 -

(iii)    The issuance of any Quotas to a third party in connection with any merger, consolidation or acquisition to which the Company or any of its Subsidiaries is a party as approved by the Members as required by this Agreement and the Franchise Agreement.

Section 10.7   **Joint Sale; Drag Along Right**.  Subject first in all events to the Franchisor's rights under the Franchise Agreement (including without limitation Sections 13.2 and 13.4), if the Members representing seventy five percent (75%) of the Company's outstanding Quotas (the "Majority Members") intend to accept a *bona fide* third party offer to purchase all of their Quotas or substantially all assets of the Company (whether by merger, acquisition, consolidation, or other business combination or transaction) (including the materials terms and conditions of the offer (including the price), the "Offer"), the Majority Members shall give written notice to the non-Majority Members expressing their interest to accept the Offer, and within fifteen (15) days from the receipt of such notice by the non-Majority Members, the Majority Members can require the non-Majority Members to sell their Quotas at the purchase price and under the same material terms and conditions set forth in the Offer, or do all things reasonably required in connection with a sale of substantially all assets of the Company.

Section 10.8   **Member to Member Transfers**.  Subject to the rights of the Franchisor under the Franchise Agreement, in the event of a proposed Transfer of a Member's Quotas to another Member (the "Internal Transfer"; and such Member, the "Intended Internal Transferee"), the Member proposing to Transfer its Quotas (the "Transferring Member") must offer its Quotas for sale to all of the other Members (including the Member it initially proposed to sell its Quotas to) (the "Other Members"), in the same proportion to the Quotas then held by the Other Members without taking into account the Quotas of the Transferring Member, such that each Other Member would maintain, after consummation of such Transfer, its proportionate share of all of the Company's outstanding Quotas without taking into account the Quotas of the Transferring Member. The Transferring Member shall give written notice to the Other Members to sell its Quotas on the same terms and conditions as the Internal Transfer (the "Transferring Member Notice") and each Other Member shall have the right to purchase its pro-rata portion (as described above) of the Transferring Member's Quotas at the purchase price and conditions of sale as provided for in the Transferring Member Notice.  If within thirty (30) days of the receipt of the Transferring Member Notice, any Other Member gives notice of its desire to acquire all or part of its pro-rata portion of the Transferring Member's Quotas, the sale shall be consummated as contemplated by Section 10.4.  If the Other Member that is not the Intended Internal Transferee elects not to purchase its pro-rata portion of the Transferring Member's Quotas, such Other Member shall be entitled to require the Intended Internal Transferee to purchase all of its Quotas for the same price and on the same terms as provided for in the Transferring Member Notice, by providing written notice to the Intended Internal Transferee within fifteen (15) days after receipt of the Transferring Member Notice. After consummation of the Transfer described in this Section 10.8, the Members, if necessary, shall rearrange the

number of Directors appointed by each Member according to its resulting pro-rata share in the Company's capital in accordance with the provisions of Section 6.1.2(d)(i).

## SECTION 11
## REPORTS, FINANCIAL STATEMENTS, BOOKS AND RECORDS, AND VALUATIONS

Section 11.1 **Reports and Financial Statements**. Without limiting the reports and financial statements that may be otherwise required from time to time by the Members, the Board of Directors or pursuant to any other agreement, the Officers shall prepare and furnish to the Board of Directors and the Company (and will afford each Director and Officer an opportunity to provide comment and input thereon) financial statements and other documents relating to the Company and its Subsidiaries as set forth herein. Such financial statements shall be prepared in accordance with Brazilian GAAP consistently applied.

(a) **Monthly Sales Reports**. As soon as practicable after the end of each Fiscal Month, and in any event, within ten (10) business days after the end of each Fiscal Month, a sales report identifying gross sales, net sales, menu mix and other related or relevant information regarding the sales performance of each Restaurant,

(b) **Monthly Financial Reports**. As soon as practicable after the end of the first two (2) Fiscal Months of each Fiscal Quarter, and in any event, within thirty (30) calendar days after the end of each such month, a monthly report including a balance sheet and a Profit and Loss statement for such month reflecting periodic comparative and year-to-date performance information for the Company and each Restaurant, and

(c) **Quarterly Financial Reports**. As soon as practicable after the end of the third month of the first three (3) Fiscal Quarters of each Fiscal Year, and in any event, within forty-five (45) calendar days after the end of such month, (a) a monthly report for the third month of such Fiscal Quarter with similar detail as provided for other monthly periods, and (b) a quarterly report including a balance sheet and a Profit and Loss statement for such Fiscal Quarter reflecting periodic comparative and year-to-date performance information for the Company and each Restaurant along with a calculation of EBITDA and some narrative (or a quarterly verbal report) identifying and explaining performance issues and trends and providing some details about expended and anticipated maintenance and capital expenditures, and

(d) **Annual Reports**. As soon as practicable after the end of each Fiscal Year, and in any event, within one hundred twenty (120) calendar days after the end of the each Fiscal Year, (a) a monthly report for the third month of the fourth Fiscal Quarter of such Fiscal Year with similar detail as provided for other monthly periods, and (b) a quarterly report for the fourth Fiscal Quarter of such Fiscal Year with similar detail as provided for other quarterly periods, and



(c) an annual report including a balance sheet, a Profit and Loss statement and a statement of retained earnings for such Fiscal Year reflecting periodic comparative performance information for the Company and each Restaurant along with a calculation of EBITDA and a narrative identifying and explaining (1) performance issues and trends for the current and next Fiscal Year for each Restaurant, (2) details about expended and anticipated maintenance and capital expenditures for each Restaurant, (3) current status of franchisor relations with each Restaurant, (4) current status of management and employee relations regarding each Restaurant, and (5) regulatory and legal developments affecting or expected to affect the Company and/or any Restaurant. The financial statements of the Company included in the annual report, at the expense of the Company, will be reviewed (or, if required by Franchisor, any lender to the Company or any Subsidiary or otherwise jointly agreed to by the Members, audited) by a reputable firm of independent certified public accountants licensed to do business in Brazil and selected by Starboard and approved by the other Members (with the approval of Infinity not to be unreasonably withheld, delayed or conditioned); provided, however, that if Wendy's BV does not approve the firm selected by Starboard for any reason, Wendy's BV may be entitled to select another firm without approval of the other Members, so long as Wendy's BV is responsible for the difference in fees and expenses between the firm chosen by Starboard and the firm chosen by Wendy's BV (such firm ultimately selected, the "CPA Firm").

Section 11.2  **Books and Records**.

(a)     The Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company business in accordance with Brazilian GAAP consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Such books of account, together with a copy of this Agreement, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times and upon reasonable notice to the Company by each Member and its duly authorized representative for any purpose reasonably related to such Member's role as a Member of the Company.

(b)     The Officers or another Person designated by the Members shall prepare and maintain, or cause to be prepared and maintained, the books of account of the Company. The following financial information, which needs to be examined and certified to by the CPA Firm, shall be transmitted by the Person designated by the Executive Board to each Member within one hundred twenty (120) days after the close of each Fiscal Year:

(i)      A statement of Company Profits and Losses for such Fiscal Year; and

(ii)     if required for United States (or another jurisdiction's) tax purposes, a statement concerning such Member's income tax for United States (or such other jurisdiction's) tax purposes.

Section 11.3   **Required Format for Reports; Other Reports and Filings**. The reports described in this Section 11 shall be (1) on a comparative basis with the corresponding statements for the preceding Fiscal Year when and if appropriate, and (2) prepared in a format consistent with Brazilian GAAP.

Section 11.4   **Accounting Method**. For both financial and tax reporting purposes and for purposes of determining Profits and Losses, the books and records of the Company shall be kept on the accrual method of accounting applied in a consistent manner and shall reflect all Company transactions and be appropriate for the Company's business.

Section 11.5   **Periodic Valuations**. From time to time, at the request of any Member or any Director, the Members will meet and use commercially reasonable efforts to agree (in accordance with Section 6.1.4(a)(ii)) on the fair value of each Restaurant and the Company. If the Members are not able to agree on the fair value of the Restaurants and the Company, then any Member (no more frequently than annually) may request that the Company obtain a valuation prepared by a mutually acceptable, internationally recognized independent valuation firm.

SECTION 12

LIABILITY, EXCULPATION, INDEMNIFICATION, COMPETITIVE ACTIVITIES AND COMPANY OPPORTUNITIES

Section 12.1   **Liability**.

(a)     Except as otherwise expressly required under the terms of the Articles of Organization or this Agreement, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and no Indemnified Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Indemnified Person.

(b)     Except as otherwise expressly required under the terms of the Articles of Organization or as otherwise provided in this Agreement, a Member, individually in its capacity as a Member, or through its designated Directors, shall have no liability in excess of (1) the amount of its Capital Contributions, (2) its share of any assets and undistributed profits of the Company, (3) its obligation to make other payments expressly provided for in this Agreement, and (4) the amount of any distributions wrongfully distributed to it.

(c)     Notwithstanding anything in this Agreement to the contrary, including the provisions of this Section 12, nothing in this Agreement shall limit or otherwise affect the indemnification or other obligations of any Indemnified Person to the Company arising other than in its capacity as a Indemnified Person. Without limiting the generality of the foregoing,

- 43 -



this Agreement shall in no manner limit the rights of the Franchisor under the Franchise Agreement.

Section 12.2 **Exculpation**

(a) No Member, Director, or Officer of the Company or any of their respective Affiliates shall have any personal liability whatsoever to the Company or to any Member of the Company or to any of such Member's Affiliates on account of such Person's status as a Member, Director, or Officer of the Company or by reason of such Person's acts or omissions in connection with the conduct of the business of the Company; provided, however, that nothing contained herein (i) shall protect any such Person against any liability to which such Person would otherwise be subject to by reason of (a) any act or omission of such Person that involves actual gross negligence, willful misconduct, bad faith, fraud, criminal conduct, reckless disregard of duty or a material breach of this Agreement or the Articles of Organization or (b) any transaction from which such Person derives any improper personal benefit or (ii) shall relieve any Person for any obligation pursuant to any other separate agreement owed by any such Person to the Company or to any other Person.

(b) An Indemnified Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnified Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

Section 12.3 **Insurance**. Subject to and consistent with any requirements contained in the Franchise Agreement, the Company may purchase and maintain insurance, to the extent and in such amounts as the Board of Directors shall, in its sole discretion, deem reasonable, on behalf of Indemnified Persons and such other Persons as the Board of Directors shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement. Subject to the provisions of Section 6.1.4(a)(i), the Executive Board and the Company may enter into indemnity contracts with Indemnified Persons and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations and containing such other procedures regarding indemnification as are appropriate.

Section 12.4 **Waiver of Fiduciary Duties**.

(a) To the maximum extent permitted by applicable law, no present or former Director and/or Officer or any of such Director and/or Officer's Affiliates shall be

liable to the Company or to any other Indemnified Person (including any Member) for any act or omission performed or omitted by such Person in its capacity as a Director and/or Officer of the Company or otherwise taken in good faith (whether or not any such action or omission would constitute a breach of a duty of care or any other fiduciary duty, other than the duty of loyalty), except that such Person shall be liable for such acts or omissions to the extent the related loss, damage or claim arose by reason of such Person's actual gross negligence, willful misconduct, bad faith, fraud, criminal conduct, reckless disregard of duty or a material breach of this Agreement or the Articles of Organization. The Executive Board may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents. The Executive Board shall be entitled to rely upon the advice of legal counsel, independent public accountants and other experts, including financial advisors, and any act of or failure to act by the Executive Board in good faith reliance on such advice shall in no event subject any Director and/or Officer or any of their Affiliates to liability to the Company or any Member.

(b)     Whenever in this Agreement or any other agreement contemplated herein the Board of Directors or Executive Board is permitted or required to take any action or to make a decision in its "sole discretion" or "discretion", with "complete discretion" or under a grant of similar authority or latitude, the Board of Directors or Executive Board shall be entitled to consider only such interests and factors as it desires; provided, however, that the Board of Directors and Executive Board shall in any event act in good faith.

(c)     Whenever in this Agreement the Board of Directors or Executive Board is permitted or required to take any action or to make a decision in its "good faith" or under another express standard, the Board of Directors or Executive Board shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated herein, and so long as the Board of Directors or Executive Board acts in good faith, the resolution, action, or terms so made, taken or provided by the Board of Directors or Executive Board shall not constitute a breach of this Agreement or any other agreement contemplated herein or impose liability upon any Director or Officer or any of their Affiliates.

(d)     A Director or Officer does not, in any way, guarantee the return of a Member's Capital Contributions or a profit for the Members from the operations of the Company and shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of improper receipt of personal benefits, actual gross negligence, willful misconduct, bad faith, fraud, criminal conduct, reckless disregard of duty or a material breach of this Agreement or the Articles of Organization by the Director or Officer.

(e)     To the maximum extent permitted by applicable law, each Member hereby waives any claim or cause of action against any Director or Officer and their Affiliates, for any breach of fiduciary duty to the Company by such Person as a result of a conflict of interest between the Company and the Member that designated such Person as a

Director or Officer, except to the extent such Person's actions constituted actual gross negligence, willful misconduct, bad faith, fraud, criminal conduct, reckless disregard of duty or a material breach of this Agreement or the Articles of Organization, as determined by a court of competent jurisdiction in a final and non-appealable decision. Each Member acknowledges and agrees that in the event of any such conflict of interest, each such Person may, in the absence of bad faith, act in the best interest of the Member that designated such Person as a Director or Officer. The Directors or Officers shall not be obligated to recommend or take any action as Directors or Officers that prefers the interests of the Company or the other Members over the interests of the Member that designated such Directors or Officers or their Affiliates and the Company and the Members hereby waive the fiduciary duty, if any, to the Company of such Directors or Officers in the event of any such conflict of interest.

Section 12.5 **Indemnification**. To the fullest extent permitted by applicable law, the Company shall indemnify (solely from assets of the Company) each Indemnified Person against any and all losses, liabilities, damages or expenses (including amounts paid for reasonable attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such Persons may directly or indirectly become subject for action taken or omitted to be taken on behalf of the Company or in connection with any involvement with the Company or in connection with any involvement with any other Person at the Company's request (including serving as a manager, officer, director, consultant or employee of the Company or any such other Persons), except to the extent the Indemnified Person's actions constituted actual gross negligence, willful misconduct, bad faith, fraud, criminal conduct, reckless disregard of duty or a material breach of this Agreement or the Articles of Organization, as determined by a court of competent jurisdiction in a final and non-appealable decision. To the fullest extent permitted by applicable law, expenses (including reasonable attorney's fees and expenses) incurred by any such Indemnified Person in investigating and/or defending a proceeding shall be paid by the Company after the final disposition of such proceeding, including any appeal therefrom, upon receipt of an undertaking by or on behalf of such Indemnified Person to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by the Company. The right to indemnification conferred in this Section 12.5 shall not be exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, by-law or otherwise. Any indemnity under this Section 12.5 shall be provided out of, and to the extent of, Company assets only, and no Indemnified Person shall have any personal liability on account thereof. Subject to the provisions of Section 6.1.4(a)(i), the Company may, from time to time, enter into separate indemnity agreements with any of the Indemnified Persons or certain other parties. In the event that any damages under the Franchise Agreement or the Debt Financing are caused by the individual act of a Member or any owner of a Member, the offending party shall be liable for the entire amount of such liability. The provisions of this Section 12.5 shall survive the termination of this Agreement or the cessation of a Member as an owner in the Company.

Section 12.6 **Competitive Activities; Company Opportunities**. The Members, Directors, or Officers, and their Affiliates, directly or indirectly (whether as director, officer, shareholder, owner, employee, agent, representative, security holder, member, consultant or otherwise), independently or with others, may not engage in, have any interest in, manage, operate or advise in any manner, or provide or arrange any financing for, (a) any Person, business, activity or project in the country of Brazil that might be the same as or similar to the Company's business and that might be in direct competition with the Company's business or (b) any competitive activity prohibited under the Franchise Agreement. Neither the Company nor any Member shall have the right to engage in any other ventures or activities because of such Person's relationship with the Company, unless previously approved in writing by the Company. No Member shall be obligated to present any permitted investment opportunity or prospective economic advantage to the Company or any other Member even if the opportunity is one of the character that, if presented to the Company or any other Member, could be taken by the Company or any of the other Members. Each Director, Officer and Member shall have the right to hold any permitted investment opportunity or prospective economic advantage for their own account or to recommend such opportunity to Persons other than the Company or the Members. Each Member acknowledges that the Directors, Officers, the other Members and their respective Affiliates may own and/or manage other businesses, including businesses that may compete for the Members' time. Each Member hereby waives any and all rights and claims that he/she/it may otherwise have against any Director, Officer, any other Member and their respective Affiliates as a result of any such activities. Notwithstanding the foregoing, (i) any restrictive covenant provisions of the Franchise Agreement, applicable to any Member, as well as the exclusions set forth in Schedule 9.4 of the Franchise Agreement, shall be incorporated herein, and (ii) the Members acknowledge and agree that if the remedies set forth in Section 2.7 of the Franchise Agreement are exercised by the Franchisor, then neither the Franchisor nor Wendy's BV shall be in violation of this Section 12.6.

SECTION 13
DISSOLUTION, LIQUIDATION AND TERMINATION

Section 13.1 **Dissolution**. The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

(a) The entry of a decree of judicial dissolution;

(b) The sale or disposition of all or substantially all of the assets of the Company in accordance with the provisions of this Agreement and the Franchise Agreement;

(c) The written determination of all the Members; or

(d) The written request of either Starboard or Infinity (in its capacity as a Member) if a sale process pursuant to and in accordance with Section 10.2(b), subject to the provisions of Section 10.2(a), does not result in a consummated sale

transaction, provided that such written request by either such Member is made within one hundred eighty (180) days after the unsuccessful completion of such process under Section 10.2(a).

The legal representatives, if any, of any Member shall succeed as assignee to such Member's interest in the Company upon the death, incapacity, incompetence, bankruptcy, insolvency or dissolution of such Member, but unless otherwise expressly provided in this Agreement, shall be admitted as a substitute Member only in accordance with the terms and conditions of the Franchise Agreement and with the prior written consent of Members holding at least a majority of the then outstanding Quotas (such consent to be given in the exercise of each Member's sole discretion). Nothing in this Section 13 shall affect the rights of the Franchisor under the Franchise Agreement.

Section 13.2 **Liquidation**. Upon dissolution of the Company, an Officer designated by the Members, as liquidating trustee, shall immediately commence to wind up the Company's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors, so as to enable the Members to minimize the normal losses attendant upon a liquidation. The liquidation will proceed under the terms provided in the Brazilian civil code (Sections from 1.102 to 1.112). In case of the liquidation of the Company, the Members agree to use their commercially reasonable efforts to give priority to the payment of any Affiliate Loan, observing, however, the provisions of applicable Brazilian laws.

Section 13.3 **Termination**. The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in this Section 13, and the registry with the Board of Trade and other actions are taken under the Brazilian law to cancel enrollments and licenses.

Section 13.4 **Claims of the Members**. Members and former Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members and former Members shall have no recourse against the Company or any other Member, except to the extent otherwise expressly provided in this Agreement.

SECTION 14
AMENDMENTS

Section 14.1 **Amendments**.

(a) Except as otherwise provided herein, any amendments to this Agreement shall be adopted and be effective as an amendment hereto only if approved by all Members in writing as contemplated by Section 6.1.4(a)(i). Any amendment made in accordance with this Section 14.1 shall be binding upon all of the Members.

(b)     The Company shall furnish copies of amendments to this Agreement pursuant to this Section 14.1 to each Member after the effectiveness thereof.

## SECTION 15
### MISCELLANEOUS

Section 15.1   **Notices**.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered by an internationally recognized overnight commercial courier service (with evidence of delivery requested), as follows:

(a)     If given to the Company, in care of the Chief Executive Officer at the Company's principal place of business address set forth in the Articles or Organization, with a copy to each Member at its address set forth on the books and records of the Company.

(b)     If given to any Member, at its address set forth on the books and records of the Company.

All such notices shall be deemed to have been given when received.

Section 15.2   **Confidentiality**.  Each Member agrees that any and all Confidential Information shall be treated as confidential and proprietary to the Company and its Subsidiaries and shall in no event disclose such Confidential Information to any party without the express written consent of the Company, except that each Member shall be permitted to disclose Confidential Information:

(a)     To those of its agents, legal counsel, accountants, representatives, employees and Affiliates that need to be familiar with such information in connection with such Member's investment in the Company and who are informed of such information's confidential nature; and

(b)     To the extent necessary for the enforcement of any right or the performance of any obligation of such Member arising under this Agreement.

No Member shall directly or indirectly use such Confidential Information for any other purpose, including for its own business transactions or marketing purposes.  Each Member also agrees to treat as confidential and proprietary the confidential information of the Franchisor.

Section 15.3   **Failure to Pursue Remedies**.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation from having the effect of an original violation.

- 49 -

Section 15.4 **Cumulative Remedies**. The rights and remedies provided by this Agreement are cumulative and the use of anyone right or remedy by any party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 15.5 **Binding Effect**.

(a) This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, heirs, legal representatives and assigns.

(b) In the event of any corporate restructuring, all the provisions contained in this Agreement shall apply automatically to the new companies in the group, which shall be considered as controlled companies or associated companies of the Company, or its eventual successor at the time.

(c) The Members agree not to establish, from the Effective Date, any other shareholders or quotaholders agreement or any other agreement of similar nature to this Agreement regarding their rights and obligations as a Member of the Company, either among themselves or with other future members of the Company, unless all signatories of this Agreement also signatories to the new shareholders or quotaholders agreement.

(d) The Company undertakes to immediately communicate to the Members any agreement, act or omission which may imply violation of this Agreement and to adopt the necessary measures that the supervening law may require to maintain this Agreement valid and effective.

(e) This Agreement once signed, shall be irreversible, irrevocable and unconditional among the Members, replacing all prior understandings, commitments, or previous correspondence relating to the matters addressed herein, written or verbal, and may not be amended or supplemented, except as provided in this Agreement. Nothing contained herein shall impair any obligation under the Franchise Agreement and if applicable the Usufruct Agreement.

Section 15.6 **Services Agreements**. In connection with this Agreement and the Franchise Agreement, the Company and the Franchisor are entering into a Services Agreement whereby the Franchisor provides certain services to the Company for the purposes of keeping its management, commercial and marketing policies and standards consistent with those adopted worldwide by the Franchisor (the "Franchisor Services Agreement"). The Members hereby agree to take any actions necessary to extend the term of the Franchisor Services Agreement, from time to time, as the Franchisor may require in order that the Franchisor Services Agreement remain in effect. In connection with this Agreement, the Company and an Affiliate of Starboard ("Starboard Management") are entering into a Services Agreement whereby Starboard Management provides financial and managerial

- 50 -

services to the Company (the "Starboard Services Agreement"). After the expiration of the initial term of the Starboard Services Agreement, if the Members unanimously agree, the Members will take any actions necessary to extend the term of the Starboard Services Agreement, from time to time, in order that the Starboard Services Agreement remain in effect for so long as Starboard Management is providing such services to the Company.

Section 15.7 **Interpretation**. Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. All references herein to "Sections", and "Schedules" shall refer to corresponding provisions of this Agreement. The words "include", "includes", and "including" shall be deemed to be followed by the phrase "without limitation". Any reference in this Agreement to a "day" or number of "days" (without the explicit qualification of "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until, or may be taken or given on, the next Business Day.

Section 15.8 **Severability**. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

Section 15.9 **Counterparts**. This Agreement may be executed in any number of counterparts with the same effect as if parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

Section 15.10 **Integration**. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understanding pertaining thereto, provided however, this Agreement shall not in any manner impair the obligations under the Franchise Agreement and in the event that any of the provision of this Agreement could be construed to modify or supersede any provision of the Franchise Agreement, such provision of this Agreement shall not be given effect.

Section 15.11 **Governing Law**. This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of Brazil, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

Section 15.12 **Dispute Resolution**. All controversies, disputes or claims arising between a Member or any Affiliate thereof or any Company or such Affiliate's officers, directors, Officers, Directors, agents, employees or attorneys, on the one hand, and any other Member or any of Affiliate thereof or any Company or such Affiliate's officers, directors, Officers, Directors, agents, employees or attorneys, on the other hand, arising out of or related to the relationship of the Members or this Agreement, including any question regarding its existence, validity or termination (the "Dispute"), shall be referred to and finally resolved by arbitration under the International Arbitration Rules of the International Centre

for Dispute Resolution by one (1) or three (3) arbitrators appointed pursuant to such rules. The proceeding will be subject to the following procedural rules:

      (a)    The arbitration proceedings shall be conducted in the English language in São Paulo, Brazil.

      (b)    The arbitrators shall be bound by, and shall strictly enforce the terms of, this Agreement and shall not limit, expand or otherwise modify its terms. The arbitrators shall endeavor to conclude the proceedings and issue their award within 210 days from their appointment, and shall adopt such reasonable procedures regarding evidence and briefing as may be appropriate towards achieving that end. The arbitrators shall have sole authority to resolve any and all issues as to the legitimacy of use of arbitration in resolving any Dispute, including the application or running of any statute of limitations and all questions involving issue preclusion. The arbitrators shall have the power to determine the nature and extent of any discovery and to resolve all issues of admissibility of evidence. The arbitrators shall not have the power to award damages in connection with any Dispute in excess of actual compensatory damages, which may include interest on unpaid amounts from date due, consequential damages and recovery of legal fees and costs. The arbitrators shall not have the power to award punitive damages or to multiply actual damages (except in connection with willful violations of intellectual property rights). The arbitrators shall be permitted, where warranted, to also award specific performance and/or injunctive relief.

      (c)    The decision and award of the arbitrators shall be in writing and state the reasons for such decision and award. The decision and award shall be conclusive and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction. The arbitrators, the Parties, their representatives and participants shall hold the existence, contents and result of any arbitration in confidence, except to the limited extent necessary to enforce a final settlement agreement, to obtain enforcement of the arbitrators' decision and award, or as otherwise required by law. Any Member, its Affiliates and their respective officers, Directors, agents, employees and attorneys, as well as the Company, and its Affiliates and their respective officers, Directors, agents, employees and attorneys, hereby waive any right to contest the validity or enforceability of such award, except to the extent permitted by applicable law. Any monetary damages included in the award shall bear post-award interest at rates determined by the arbitrators to be appropriate and enforceable. Damages and interest shall be awarded in United States Dollars. This provision shall continue in full force and effect subsequent to and notwithstanding expiration or termination of this Agreement.

      (d)    As an alternative or supplement to arbitration pursuant to this Section 15.12, the Members and/or the Company may obtain in any court of

competent jurisdiction in São Paulo, Brazil any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause irreparable harm. Subject to the Franchisor's rights under the Franchise Agreement, the Members and the Company agree that the existence of any claim that they or one of their Affiliates and/or owners may have against each other, whether or not arising from this Agreement, shall not constitute a defense to the enforcement of any of its provisions.

Section 15.13 **Legal Representation**. Each of the parties acknowledges that such party has been advised to seek independent counsel with regard to the preparation of this Agreement and has had the opportunity to seek and/or has sought such counsel.

Section 15.14 **Enforcement Costs**. In connection with any legal action or proceeding relating to the enforcement of this Agreement, the non-prevailing party shall reimburse the prevailing party for his, her or its costs and expenses (including reasonable fees and costs of legal counsel) incurred in connection with the prosecution, defense and/or settlement of such action or proceeding. For purposes of this Section 15.14, the prevailing party shall be determined by the judge, chancellor or arbitrator (as applicable) based upon which party prevailed on the significant issues in such action or proceeding.

Section 15.15 **Franchise Offering Circular**. Each Member acknowledges and agrees that it has received the Franchise Offering Circular of the Franchisor (the "Offering Circular") for review, and hereby waives any claim it or the Company may now or hereafter have against the Franchisor or any of its Affiliates as a result of the fact that the financial statements of Wendy's International, LLC, and not the Franchisor, are disclosed in the Offering Circular.

Section 15.16 **Compliance**. Each Member agrees to abide by, and be responsible that the Directors and Officers designated by it abide by, and operate the Company in compliance with, all Company policies and procedures in effect. The Directors, Officers and other employees of the Company shall be required from time to time to attend training sessions related to the Company's policies and procedures and to acknowledge in writing his or her receipt, understanding of, and compliance with, existing, modified or new Company's policies. Without limiting the obligations in the foregoing sentence, each Member expressly agrees that it and its Affiliates will at all times act in strict compliance with all laws, rules, regulations, requirements and orders, including, but not limited to the anti-bribery and anti-corruption provisions of the Foreign Corrupt Practices Act of the United States and of the Clean Companies Act of Brazil. If the Directors or Officers of the Company have any doubts about whether any proposed decision or action may violate any applicable law, including the Foreign Corrupt Practices Act and Clean Companies Act, they shall be instructed promptly to consult with the Members before taking any such decision or action. Any breach by a Director or Officer of this Section 15.16 shall be deemed to be "Cause" as defined in this Agreement. Without limiting the generality of the foregoing, each Member agrees to comply

with, and to cause its Affiliates (including any Directors or Officers designated by it) to comply with, Section 20.13 of the Franchise Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

**STARBOARD INTERNATIONAL HOLDINGS B.V.**

By: LUCAS HERNANDEZ DO VALE MARTINS
Title: ATTORNEY-IN-FACT

**INFINITY HOLDING E PARTICIPAÇÕES LTDA.**

By: MARCEL GHOLMIEH
Title: MANAGER

By: BRUNO LAZZATA
Title: MANAGER

By: DIEGO SALA
Title: MANAGER

**WENDY'S NETHERLANDS HOLDINGS B.V.**

By: ROBERTO TOSHIYUKI IOSHIOCA
Title: ATTORNEY-IN-FACT

**WBR PARTICIPAÇÕES LTDA.**

By: MARCEL GHOLMIEH
Title: MANAGER

**Witnesses:**

1. Name:
Identity Card (RG):
Tax ID No. (CPF/MF):

Ágnes Ilona Keresztes Bigatto
RG. 8.111.023
CPF 006.308.628-00

2. Name:
Identity Card (RG):
Tax ID No. (CPF/MF):

Elisabet Facchini
11.049.175-0 SSP/SP
030.611.458-50

- 55 -

## SCHEDULE A

### NAMES, ADDRESSES, CAPITAL CONTRIBUTIONS, NUMBER OF QUOTAS,
### PERCENTAGE OF QUOTAS IN COMPANY AND CAPITAL ACCOUNT BALANCES OF MEMBERS
### (AS OF EFFECTIVE DATE)

| NAME | MAILING ADDRESS | NUMBER OF QUOTAS | PERCENTAGE OF QUOTAS HELD IN COMPANY | CAPITAL ACCOUNT BALANCES |
|---|---|---|---|---|
| STARBOARD | 12540 W Atlantic Blvd. Coral Springs, FL, USA 33071 | 6,000 | 40% | R$6.000,00 |
| INFINITY | Av. Pacaembu, 1886, Pacaembu, São Paulo/SP, Zip Code 01234-000 | 6,000 | 40% | R$6.000,00 |
| WENDY'S BV | One Dave Thomas Blvd. Dublin, OH, USA 43017 | 3,000 | 20% | R$3.000,00 |
| | | | | |
| TOTALS | | 15,000 | 100% | R$15.000,00 |

CLI-20226135744

**SCHEDULE B**

AMENDED AND RESTATED ARTICLES OF ORGANIZATION

(See attached)

# FIRST AMENDED AND RESTATED ARTICLES OF ORGANIZATION OF

# WBR FRANQUIAS E PARTICIPAÇÕES LTDA.

By this private instrument, the undersigned:

**(1)** **STARBOARD INTERNATIONAL HOLDINGS B.V.**, a company organized and existing under the laws of the Netherlands, with headquarters at Strawinskylaan 411, WTC, Tower A, 4th floor, 1077XX, Amsterdam, the Netherlands, enrolled with the CNPJ/MF under No. 21.501.394/0001-31, represented herein by its attorney-in-fact, Mr. **Lucas Hernandez do Vale Martins**, Brazilian, single, lawyer, enrolled in the Brazilian Bar Association, São Paulo Section, under No. 250.073 and with the CPF/MF under No. 316.921.318-00, resident and domiciled in the City of São Paulo, State of São Paulo, with address on Avenida Brigadeiro Faria Lima, 1,461, 4th floor, suite 41, CEP 01452-002;

**(2)** **INFINITY HOLDING E PARTICIPAÇÕES LTDA.**, a limited liability company with headquarters at Av. Pacaembu, 1886, Pacaembu, São Paulo/SP, Zip Code 01234-000, enrolled with the Board of Trade of the State of São Paulo under No. 3522833457-7 and with the CNPJ/MF (Brazilian Corporate Tax Identification Number) under No. 20.156.739/0001-02 ("Infinity"), represented herein by its managers, Mrs. **Marcel Gholmieh**, Brazilian, civil engineer, divorced, bearer of Identity Card RG No.–19.233.983-7 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 265.142.258-45, resident and domiciled at Rua Correia Dias, Apt. 123, City of São Paulo, State of Paulo, Zip Code 04104-000, **Diego Pagliusi Gomes de Oliveira Sala**, Brazilian, businessman, single, bearer of Identity Card RG No. 27.696.397 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 292.148.768-35, resident and domiciled at Rua Ubatuba, 86, City of São Paulo, State of São Paulo, Zip Code 01248-030, and **Bruno Laporta**, Brazilian, businessman, married, bearer of Identity Card RG No. 20.386.014 SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 214.978.458-07, resident and domiciled at Rua da Consolação, 3240, Apt. 91, City of São Paulo, State of São Paulo, Zip Code 01416-000 ; and

**(3)** **WENDY'S NETHERLANDS HOLDINGS B.V.**, a corporation duly organized and existing under the laws of The Netherlands, with head office address at Naritaweg 165, 1043 BW Amsterdam, The Netherlands, enrolled with the CNPJ/MF (Brazilian Corporate Tax Identification Number) under No. 21.105.847/0001-00 ("Wendy's", and together with Starboard and Infinity, the "Members"), represented herein by its attorney-in-fact, Roberto Toshiyuki Ioshioca, Brazilian, single, business

1

manager, bearer of the Identity Card RG No. 25.787.544-X SSP/SP, enrolled with the National Individual Taxpayers Register (CPF/MF) under No. 266.852.128-96, resident and domiciled at Rua Nicolau Zarvos, 428, Parque Jabaquara, City of São Paulo, State of São Paulo, Zip Code 04356-080;

RESOLVE, by mutual agreement, to organize a limited liability company ("Company"), which shall be governed by the following clauses and conditions:

## NAME, HEADQUARTERS AND GOVERNING LAW

**SECTION 1:**     The Company, organized as a limited liability company, has the corporate name of **WBR FRANQUIAS E PARTICIPAÇÕES LTDA.** with headquarters and jurisdiction in the City of São Paulo, State of São Paulo, at *[INSERT COMPLETE ADDRESS WITH DISTRICT AND POSTAL CODE]*.

**Sole Paragraph:**     The Company may establish branches, agencies, offices or representations anywhere in the country of Brazil, consistent with the corporate purpose set forth in Section 3 below, by means of resolution of the Board of Directors, subject to Section 16, item (ii), of these Articles of Organization.

**SECTION 2:**     The Company shall be governed by the provisions set forth in Law No. 10,406, of January 10, 2002, as amended ("Brazilian Civil Code") particularly in accordance with the Chapter IV of Subtitle II of Book II "Corporate Law" and, in case of any omission, in accordance with the Law No. 6,404, of December 15, 1976, as amended ("Corporations Law").

## CORPORATE PURPOSE

**SECTION 3:**     The Company's purpose is to own and operate Wendy's® restaurants in Brazil ("Restaurants"). In furtherance and in connection with such purpose, the Company may:

(i)       hold equity interests in other companies as a member or a shareholder;

(ii)      sell food and alcoholic and non-alcoholic beverages to customers in the Restaurants;

(iii)     sell diner, coffee shop, fast-food, patisserie, bakery and candy store products to customers in the Restaurants;

(iv)     sublicense the right to use trademarks and patents;

(v)      sublicense the right to use technology and procedures to implement, expand,

2

conduct and manage the subfranchisee network;

(vi)    format and manage subfranchising systems and royalties;

(vii)    provide services for its subfranchisees and/or its franchisor; and

(viii)    perform any other activities related to the above and which may be necessary to accomplish the above purpose.

## TERM OF DURATION

**SECTION 4:**    The duration of the Company shall be indefinite.

## CAPITAL

**SECTION 5:**    The capital, fully subscribed and paid-in by all Members in Brazilian currency, is R$ 15.000,00 (fifteen thousand reais), divided into 15.000 (fifteen thousand) quotas with the par value of R$1,00 (one real) each, distributed among the Members, as follows:

| MEMBERS | QUOTAS | PERCENTAGE OF TOTAL QUOTAS | AMOUNT (R$) |
|---|---|---|---|
| STARBOARD | 6.000 | 40% | 6.000,00 |
| INFINITY | 6.000 | 40% | 6.000,00 |
| WENDY'S | 3.000 | 20% | 3.000,00 |
| TOTAL | 15.000 | 100% | 15.000,00 |

**Paragraph 1:**    The liability of each Member is limited to the amount of its own quotas; however, all Members are jointly liable for the payment of the total subscribed capital, pursuant to Article 1,052 of the Brazilian Civil Code.

**Paragraph 2:**    After the totality of the quotas is paid up, the capital of the Company may be increased. Subject to the applicable legislation, the Members will have preemptive rights to subscribe for new quotas, based on the respective ownership proportion.

3

## MANAGEMENT

**SECTION 6:**     The Company shall be managed by a Board of Directors and an Executive Board, whose respective powers shall be granted by these Articles of Organization as well as by applicable law. The members of the Board of Directors and Executive Board, respectively Directors and Officers, are not required to provide security for the performance of their duties.

**Paragraph 1:**     All Directors and Officers shall be appointed/elected and/or removed by the Members in these Articles of Organization or by means of a separate instrument and, subject to the applicable term of office, shall remain in their respective positions until the date of their resignation, replacement or removal, as the case may be.

**Paragraph 2:**     A meeting of the Members of the Company will determine the remuneration of the members of the Board of Directors and Executive Board, which shall be taken to the Company's general expenses account. The Board of Directors shall allocate such amounts among its members and members of the Executive Board, as determined.

## BOARD OF DIRECTORS

**SECTION 7:**     The Board of Directors shall be composed of at least three (3) and up to five (5) Directors, resident or not in the country, all elected by the Members, in these Articles of Organization or by means of a separate instrument for a term of office of three (3) years, with re-election permitted.

**Paragraph 1:**     The members of the Board of Directors shall take office by means of the signature of a term of office, whether in these Articles of Organization or by means of a separate instrument, whereby all members shall declare not to be incurred in any of the crimes that could prevent them from exercising the management of the Company pursuant to the applicable law.

**Paragraph 2:**     Non-resident members of the Board of Directors shall take office subject to the appointment of an attorney-in-fact resident in the country, in compliance of the provision set forth in Paragraph 2 of Article 146 of the Corporations Law. The relevant powers-of-attorney shall be duly filed at the Company's headquarters.

**Paragraph 3:**     The Board of Directors shall meet whenever the interests of the Company so require and may be called by any Director. All consents, decisions or recommendations of the Board of Directors shall require the affirmative vote of four (4) of the five (5) Directors. In the event a decision of the Board of Directors is taken by

4

less than five (5) of its members, the majority of then present Directors shall decide, provided however, that no decision shall be taken without the presence of at least three (3) Directors representing at least two (2) different Members.

**Paragraph 4:**     The Board of Directors shall be vested with all authority and powers necessary to set the guidelines, consent, decide upon or recommend the activities and operations of the Company to the extent necessary, convenient or incidental to the accomplishment of the purposes of the Company. Except when the approval of the Members is required by these Articles of Organization or by non-waivable provisions of applicable law, the Board of Directors will consent, decide upon or recommend actions with respect to the matters set forth below for the Executive Board to take action for the Company on such matters, as applicable. Such Board of Directors' consent, decision or recommendation may be formalized by means of any written form, including email messages, in which circumstances a meeting of the Board of Directors or any other corporate act or document for such purposes shall not be required. For the avoidance of doubt, to the extent any of the matters set forth below are subject to approval of, or have been approved by, the Members pursuant to Sections 16 and/or 17, then the Board of Directors shall not be authorized or required to approve any of such matters.

(i)     determining the general direction of the Company's business under the terms and conditions presented by the Members and/or in these Articles of Organization;

(ii)     supervising the management of the Officers;

(iii)     examining, at any time, the books and papers of the Company, and requesting information on agreements executed or to be executed, and any other acts;

(iv)     calling a Members meeting when deemed convenient;

(v)     opining on the management report and the accounts of the Executive Board;

(vi)     selecting and removing independent auditors;

(vii)     incurring or modifying any debt or lease financing undertaken for or on behalf of the Company and/or any Subsidiary in excess of R$20.000,00 in any instance (not covered by applicable warranty or insurance) or annually in the aggregate which is in excess of R$100.000,00 (not covered by applicable warranty or insurance) or as may be modified by a resolution of

5

the Members;

(viii)    incurring capital expenditures and/or maintenance expenses for or on behalf of the Company or any Subsidiary in excess of R$50.000,00 in any instance (not covered by applicable warranty or insurance) or as may be modified by a resolution of the Members;

(ix)    entering into or modifying any contract, transaction or arrangement by or on behalf of the Company and/or any Subsidiary not in the normal and ordinary course of business thereof (including, without limitation, any contract or arrangement with the Company's franchisor, any contract or arrangement for the management or supervision of any Subsidiary and/or any contract or arrangement for which the Company and/or any Subsidiary has any contingent liability, any liability as surety, or any liability for the acts or omissions of any other person or party);

(x)    entering into or modifying of any contract with or on behalf of the Company and/or any Subsidiary that is for a stated period in excess of twelve (12) months or that is not cancellable by the Company and/or such Subsidiary without penalty upon advance notice of no more than ninety (90) days;

(xi)    commencement and/or defense of any litigation, arbitration or other legal proceeding by or on behalf of the Company and/or any Subsidiary with a value in excess of R$10.000,00, subject to item (xvi) of Section 16;

(xii)    entering into any contract, transaction, payment or other arrangement (and/or any modification thereto) with, on behalf of or otherwise involving the Company and/or any Subsidiary not expressly provided for under these Articles of Organization that either (a) is between Infinity and/or its Affiliate and the Company and/or any Subsidiary or (b) that otherwise directly or indirectly benefits Infinity and/or its Affiliates;

(xiii)    selecting, compensating, and replacing the primary store-level manager for each Restaurant;

(xiv)    structuring, terms, coverage and placement of all insurance policies covering or protecting the Company, any Subsidiary, any Restaurant, any associated premises thereof, and/or any personnel who work at any Restaurant;

(xv)    recommending from time to time any additional capital contributions that

6

are required to be made with respect to funding of operations expenses of the Company and for the Restaurants;

(xvi) opening bank accounts and establishing cash management policies;

(xvii) developing employee handbooks;

(xviii) establishing Restaurant level budgets;

(xix) establishing compensation levels for Restaurant level employees and management personnel; and

(xx) approving the Company's annual business/operating plan and annual budget.

### EXECUTIVE BOARD

**SECTION 8:** The Executive Board shall be composed of, at least one (1) and up to five (5) Officers, Members or not, resident in the country, all elected by the Members, in these Articles of Organization or by means of a separate instrument, for an undetermined term of office, with the specific duties to be determined by the Members from time to time.

**Paragraph 1:** The members of the Executive Board shall take office by means of the signature of a term of office, whether in these Articles of Organization or by means of a separate instrument, whereby all members shall declare not to be incurred in any of the crimes that could prevent them from exercising the management of the Company pursuant to the applicable law.

**Paragraph 2:** For the purposes of this Section, the Members shall appoint an Officer to occupy the position of Chief Executive Officer, and may appoint up to four (4) additional Officers with no specific title(s) for an undetermined term of office.

**SECTION 9:** The Company shall be validly represented and become bound by the signature of the Chief Executive Officer or, in the case of the Chief Executive Officer's temporary absence, by one (1) attorney-in-fact, who shall act within the scope of authority established in his (her) respective power-of-attorney. Subject to the consent, approvals and recommendations of the Board of Directors and the decisions of the Members, as provided in these Articles of Organization, the powers, the business and affairs of the Company shall be performed by the Executive Board. The Executive Board shall act by a vote of the majority of Officers (but in the event of a deadlock in

7

voting by the Executive Board on a particular matter, the Board of Directors shall be authorized to vote on such matter instead). Such Executive Board's decision may be formalized by means of any written form, including email messages, in which circumstances a meeting of the Executive Board or any other corporate act or document for such purposes shall not be required. Officers shall observe in their acts, the guidelines of the Board of Directors and obtain any authorization required to be obtained in accordance with these Articles of Organization, and shall have powers to perform all acts necessary or convenient for the administration of the Company, including, but not limited to:

(i)    representation of the Company in court or out, actively or passively, before third parties, federal, state or municipal authorities as well as independent agencies and government controlled companies;

(ii)    administration, guidance and direction of corporate business within the terms and limits established in these Articles of Organization;

(iii)    signing of any documents implying liability or obligation of the Company, such as deeds of any nature, checks, promissory notes, bills of exchange, money orders, debt instruments in general, including loan documents and other unspecified documents, within the limits established in these Articles of Organization;

(iv)    preparation of annual balance sheets to be submitted for approval at a meeting of Members;

(v)    call of meeting of Members when deemed necessary, or advisable, in accordance with the law;

(vi)    incurrence or modification of any debt or lease financing for or on behalf of the Company and/or any Subsidiary which does not exceed R$20.000,00 in any instance (not covered by applicable warranty or insurance) or annually in the aggregate which does not exceed R$100.000,00 (not covered by applicable warranty or insurance) or as may be modified by a resolution of the Members;

(vii)    incurrence of capital expenditures and/or maintenance expenses for or on behalf of the Company or any Subsidiary which does not exceed R$50.000,00 in any instance (not covered by applicable warranty or insurance)or as may be modified by a resolution of the Members;

8

(viii)   entering into or modifying any contract, transaction or arrangement by or on behalf of the Company and/or any Subsidiary that is in the normal and ordinary course of business thereof;

(ix)   entering into or modifying any contract with or on behalf of the Company and/or any Subsidiary that is for a stated period of less than twelve (12) months or that is cancellable by the Company and/or such Subsidiary without penalty upon no advance notice; and

(x)   commencement and/or defense of any litigation, arbitration or other legal proceeding by or on behalf of the Company and/or any Subsidiary with a value that is less than R$10.000,00, subject to item (xvi) of Section 16.

**Paragraph 1:**   All acts taken by the Executive Board with respect to voting its equity interest or exercising other control rights over Subsidiaries or other entities in which the Company holds equity interest shall require the prior approval of the Board of Directors or the Members to the extent the actions involving such Subsidiary or other entity if undertaken by the Company would have required such approval pursuant to Section 16 or 17. The vote of the Executive Board or Members required to approve such action shall also be as specified in such Sections.

**Paragraph 2:**   The Officers shall communicate to the officers and directors of the Subsidiaries and other entities in which the Company holds an equity interest the requirements of Paragraph 1 above.

**Paragraph 3:**   The acts performed by any of the Officers, attorneys-in-fact or employees of the Company on its behalf and/or involving the Company in any business unrelated to its corporate purpose are expressly prohibited and shall be considered null and void in respect of the Company.

**Paragraph 4:**   The Company, upon signature of the Chief Executive Officer and, if and when appointed, at least one (1) Officer of the Company designated from time to time by the Members (unless unanimous approval of the Members is required pursuant to Section 16(xii)), may appoint attorneys-in-fact, vested with special powers to represent the Company, subject to the provisions of this Section 9. Powers of attorney granted by the Company shall specify the powers conferred upon it and, except those for legal purposes, shall have a limited validity period and shall not be delegated.

**Paragraph 5:**   Notwithstanding the foregoing, the Chief Executive Officer and, if and when appointed, at least one (1) Officer of the Company designated from time to time by the Members will be named as a signer on each bank account of the Company

9

and will have access to all statements and other information with respect to such accounts.

## MEETINGS OF THE MEMBERS

**SECTION 10:** Meetings of the Members may be called at any time by the Executive Board, Board of Directors and/or by any Member that owns quotas representing ten percent (10%) of all outstanding quotas. Notice of any meeting, including the date, time and location, shall be given to all Members not less than eight (8) days prior to the date of such meeting. Each Member may authorize any other Member or any attorney-in-fact to act for it by a specific proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the relevant Member or such Member's attorney-in-fact.

**SECTION 11:** The call shall be deemed made upon confirmation of its receipt at the addresses indicated in the preamble hereof. The Members undertake to update their addresses, taking responsibility, and exempting the other Members and the Company, for any losses arising from the delivery of the call at a non-updated address.

**SECTION 12:** The formalities indicated herein shall be dismissed when all Members are present at the meeting, or expressly declare themselves aware of the issues to be discussed, as well as the date, time and place of the meeting. Members meetings shall not be required, however, in case of Members' express and unanimous decision on the matters to be discussed.

**SECTION 13:** The meeting of Members shall occur whenever necessary, but at least once a year, within four (4) months following the end of the Company's fiscal year, to: (i) examine the annual reports of the Officers and Directors and discuss and approve financial statements of the Company, (ii) decide upon allocation of net income from the fiscal years and payment of dividends, (iii) elect the members of the management bodies, if applicable, and (iv) discuss any other relevant matter in the interest of the Company.

**SECTION 14:** A quorum for a Members meeting shall be deemed to exist, on the first call, with the presence of Members holding at least eighty five percent (85%) of the Company's outstanding quotas, and on a second call, with any number in attendance. The meetings shall be chaired by Starboard with Infinity acting as the secretary or equivalent officer.

**SECTION 15:** Minutes of the decisions and resolutions adopted shall be drawn up and shall be signed by those chairing over the meeting and by the Members present at the meeting. Notwithstanding the foregoing, such minutes shall not for Brazilian law

10

purposes be considered formal minutes of the Members and shall not be required to be registered with the Board of Trade or other governmental authority of Brazil, unless otherwise expressly required by law.

**SECTION 16:** Notwithstanding the other provisions in these Articles of Organization, and applicable law which may require a certain quorum for approval, the performance of the following acts on behalf of the Company shall always require the approval of Members representing the totality (100%) of the Company's outstanding quotas, which may be formalized by means of any written form, including email messages of an individual or individuals duly authorized by such Member(s), in which circumstances a meeting of the Members or any other corporate act or document for such purposes shall not be required:

(i) amending or terminating any agreement executed in connection with these Articles of Organization that Wendy's is party to or any agreement with an Affiliate of the Company;

(ii) creating a lien on the assets of the Company or any Subsidiary;

(iii) forming Subsidiaries (other than wholly owned Subsidiaries with the sole purpose to operate the Restaurants), opening or closing any branches or establishments of the Company (other than openings or closings consistent with the business of owning and operating the Restaurants or other activities approved pursuant to item (vi) below), or entering into any joint venture agreements, partnership or other similar profit sharing agreement;

(iv) entering into any exclusive distribution or license or franchise agreement and/or any modification or termination thereof;

(v) determining from time to time any additional capital contributions that are required to be made, other than capital contributions to cover the Company's cash deficiency, for funding of operational expenses for the Company or the Restaurants or for development of Restaurants;

(vi) modifying the core activities or purpose of the Company, which is to own and operate the Restaurants;

(vii) entering into any credit, loan, guarantee/indemnity, debt or borrowing agreement and/or any modification or termination thereof;

(viii) except as otherwise provided in Section 17(v), granting, reclassifying or

11

acquiring of equity securities by the Company;

(ix)    entering into any amendments to these Articles of Organization as well as causing the Officers to exercise, in the name of the Company, the right to vote as shareholder or quotaholder in any Subsidiary, in general meetings, partners meetings, resolutions or deliberations of shareholders or partners, when the effect of such vote would be to circumvent those matters which require the approval of Members representing 100% of the Company's outstanding quotas (provided that the Officers shall be required to communicate to such Subsidiaries the existence of this limitation);

(x)    entering into any agreement between the Company, on one side, and directly or indirectly, on the other side, one of the Officers, one of the Directors, one of the employees or one of the external consultants of the Company and/or their relatives;

(xi)    donating or contributing to parties and political organizations, if permitted by the applicable laws;

(xii)    appointing attorneys-in fact with powers to perform any of the acts set forth in this Section 16;

(xiii)    appointing the Company's Chief Executive Officer;

(xiv)    filing of an extrajudicial reorganization plan, a request for judicial reorganization or bankruptcy by the Company;

(xv)    suspending activities of the Company, or terminating or dissolving the Company;

(xvi)    canceling, settling or waiving any claims or rights, or commencing or settling litigation or arbitration, of or against the Company that could reasonably be expected to have an adverse effect on the Wendy's® brand;

(xvii)    materially changing any method of financial or tax accounting used by the Company other than changes required by Brazilian GAAP or applicable law;

(xviii)  approving the Company's financial statements and income tax returns; and

(xix)    taking any of the above actions with respect to any Subsidiary.

12

**SECTION 17:** Notwithstanding the other provisions in these Articles of Organization, and applicable law which may require a certain quorum for approval, the performance of the following acts on behalf of the Company shall always require the approval of Members representing seventy-five percent (75%) of the Company's outstanding quotas, which may be formalized by means of any written form, including email messages of an individual or individuals duly authorized by such Member(s), in which circumstances a meeting of the Members or any other corporate act or document for such purposes shall not be required:

(i) the designation of any Director and/or Officer (other than the Chief Executive Officer of the Company) that is not to be designated by a Member;

(ii) the removal of any Director that is not to be designated by a Member and that is designated in these Articles of Organization of the Company and/or any Subsidiary;

(iii) any corporate development activity with respect to the Company or any Subsidiary including any merger, acquisition, or disposition, other than those implicated by a matter addressed in Section 16;

(iv) the development, acquisition and disposition of any Restaurant;

(v) the admission of any private equity members and/or partners for the purpose of the development, construction and operation of new Restaurants;

(vi) the declaration or payment of distributions or dividends by the Company or any Subsidiary;

(vii) entering into any contract, transaction, payment or other arrangement (and/or any modification thereto) that is not expressly provided for under these Articles of Organization or subject to the consent requirements of Section 16 that either (a) is between Starboard or any Affiliate thereof and the Company, any Subsidiary and/or any Restaurant or (b) otherwise directly or indirectly benefits Starboard and/or any Affiliate thereof;

(viii) the sale of substantially all of the assets of the Company or substantially all of the assets of all of the Subsidiaries;

(ix) the determination of fair value of a Restaurant and/or the Company and/or any Affiliate and the selection of a valuation firm; and

13

(x)     the determination from time to time of any additional capital contributions required to be made to cover the Company's cash deficiency, for funding of operational expenses for the Companyor the Restaurants or for development of Restaurants.

## DISSOLUTION AND LIQUIDATION OF THE COMPANY, WITHDRAWAL OF MEMBERS AND DETERMINATION OF ASSETS

**SECTION 18:**     The incapacitated, disqualified or bankrupt Member, as well as one that is endangering the continuity of the Company by virtue of acts of undeniable gravity, may be terminated from the Company for cause, by resolution of the Members representing the majority of the Company's capital. Due to the Company's primary purpose of owning and operating Wendy's® Restaurants, for purposes of the termination of a Member according to this Section 18, except as otherwise expressly permitted by the other Members and/or the Company, the performance of the following acts by the any Member shall be presumably considered cause:

(i)     the practice of any activities that might directly or indirectly be in competition with the business of the Company;

(ii)    the disclosure of any confidential data and/or information of the Company; and

(iii)   performance of fraudulent, negligent and/or malicious acts resulting in damage to the Company.

**Paragraph 1:**     The termination of a Member for cause shall be performed in a Members meeting exclusively called for that purpose. The defaulting Member shall be notified of the reasons of its termination within ten (10) days in order to provide for its attendance to such meeting, when the defaulting Member shall be given the chance to defend itself before the remaining Members and the Company.

**Paragraph 2:**     The terminated Member's quotas shall be evaluated according to the the net fair market value of the assets of the Company by an independent appraiser chosen by agreement of the Members, which value shall be reduced by any liability encumbering such assets and other liabilities of the Company, and payments by the Company for such quotas shall begin within ninety (90) days from the Members meeting that has determined its termination. Payments by the Company will be made monthly in sixty (60) equal installments.

**SECTION 19:**     Except as otherwise specifically provided by law under Sections

1.077 and 1.114 of the Brazilian Civil Code (acts of merger, incorporation, transformation and the substantial amendment of these Articles of Organization), the Members shall not have the right to resign from the Company.

**Paragraph 1:**     The quotas of the resigned Member shall be evaluated according to the the net fair market value of the assets of the Company by an independent appraiser chosen by agreement of the Members, which value shall be reduced by any liability encumbering such assets and other liabilities of the Company, and payments by the Company for such quotas shall begin within ninety (90) days from the Member's resignation.  Payments by the Company will be made monthly in sixty (60) equal installments.

**SECTION 20:**     The Company shall be liquidated and dissolved according to the law or by a decision of the Members representing the entirety (100%) of the capital of the Company.

**SECTION 21:**     The withdrawal, incapacity, disqualification, death or exclusion of any Member shall not dissolve the Company, which shall continue with the remaining Members, except as otherwise decided by the remaining Members representing seventy five percent (75%) of the Company's capital.

## FISCAL YEAR

**SECTION 22:**     The fiscal year shall begin on January 1 and end on December 31 of each year.

**Paragraph 1:**     Except as otherwise decided unanimously by the Members, all profits and losses of the Company for each fiscal year shall be allocated in proportion with each Member's quotas. Disproportional distribution of profits is expressly admitted upon unanimous decision of the Members.

**Paragraph 2:**     Members may order raising trial balances on a semiannual or shorter basis for verification purposes, based on which profits may be distributed, and reserves or funds for provisions deemed necessary may be created.

## FINAL PROVISIONS

**SECTION 23:**     All Members, Directors, Officers and the Company shall comply with and ensure compliance with any joint venture, quotaholders' or any similar agreement among the Members duly filed at the Company's headquarters, provided that the presiding members at any meeting of the Members or of the Board of Directors shall be prohibited from abiding by any vote of any Member or Director that is cast in disagreement with the provisions of any such agreement. Any transfer of quotas in

15

breach of any joint venture, quotaholders' or any similar agreement shall be void and with no legal effect. In case of any conflict, the provisions of any joint venture, quotaholders' or any similar agreement shall always prevail over these Articles of Organization. The Members may amend the provisions of these Articles of Organization in order to reflect the provisions of any such joint venture, quotaholders' or any similar agreement that it is in conflict with.

**SECTION 24:** For purposes of these Articles of Organization: (i) "Affiliate" means, with respect to a specified Person, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Person. As used in this definition, the term "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. For purposes of these Articles of Organization, each of the Members will not be deemed an Affiliate of the other Members and the Company will not be deemed an Affiliate of any Member and no Member will be deemed an Affiliate of the Company; (ii) "Subsidiary" means any Person Controlled by the Company; (iii) "Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

## ARBITRATION

**SECTION 25:** These Articles of Organization shall be governed by, construed and enforced in accordance with the laws of Brazil.

**SECTION 26:** All controversies, disputes or claims arising between any Member(s), any of its Affiliates or any of such Affiliates' or the Company's respective officers, directors, Officers, Directors, agents, employees and attorneys, on the one hand, and any other Member(s), any of its Affiliates or any of such Affiliates' or the Company's respective officers, directors, Officers, Directors, agents, employees and attorneys, on the other hand, arising out of or related to the relationship of the Members or these Articles of Organization, including any question regarding its existence, validity or termination ("Dispute"), shall be referred to and finally resolved by arbitration under the International Arbitration Rules of the International Centre for Dispute Resolution by one (1) or three (3) arbitrators appointed pursuant to such rules. The proceeding will be subject to the following procedural rules:

(i) The arbitration proceedings shall be conducted in the English language in São Paulo, Brazil.

(ii) The arbitrators shall be bound by, and shall strictly enforce the terms of, these Articles of Organization and shall not limit, expand or otherwise modify its terms. The arbitrators shall endeavor to conclude the proceedings

16

and issue their award within two hundred and ten (210) days from their appointment, and shall adopt such reasonable procedures regarding evidence and briefing as may be appropriate towards achieving that end. The arbitrators shall have sole authority to resolve any and all issues as to the legitimacy of use of arbitration in resolving any Dispute, including the application or running of any statute of limitations and all questions involving issue preclusion. The arbitrators shall have the power to determine the nature and extent of any discovery and to resolve all issues of admissibility of evidence. The arbitrators shall not have the power to award damages in connection with any Dispute in excess of actual compensatory damages, which may include interest on unpaid amounts from date due, consequential damages and recovery of legal fees and costs. The arbitrators shall not have the power to award punitive damages or to multiply actual damages (except in connection with willful violations of intellectual property rights). The arbitrators shall be permitted, where warranted, to also award specific performance and/or injunctive relief.

(iii)    The decision and award of the arbitrators shall be in writing and state the reasons for such decision and award. The decision and award shall be conclusive and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction. The arbitrators, the parties, their representatives and participants shall hold the existence, contents and result of any arbitration in confidence, except to the limited extent necessary to enforce a final settlement agreement, to obtain enforcement of the arbitrators' decision and award, or as otherwise required by law. Any Member, its Affiliates and their respective officers, directors, agents, employees and attorneys, as well as the Company, and its Affiliates and their respective Officers, officers, Directors, directors, agents, employees and attorneys, hereby waive any right to contest the validity or enforceability of such award, except to the extent permitted by applicable law. Any monetary damages included in the award shall bear post-award interest at rates determined by the arbitrators to be appropriate and enforceable. Damages and interest shall be awarded in United States Dollars. This provision shall continue in full force and effect subsequent to and notwithstanding termination of these Articles of Organization.

(iv)    As an alternative or supplement to arbitration pursuant to this Section 26, the Members and/or the Company may obtain in any court of competent jurisdiction in São Paulo, Brazil any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available

17

or which may cause irreparable harm. Subject to the rights of the Company's franchisor, the Members and the Company agree that the existence of any claim that they or one of their Affiliates and/or owners may have against each other, whether or not arising from these Articles of Organization or any other related agreement, shall not constitute a defense to the enforcement of any of its provisions.

## STATEMENT OF NO IMPEDIMENT

The Directors and Officers, declare, under penalty of law, that they are not prevented from exercising the management of the Company, by special law, or due to criminal conviction, or are under the effects of the penalty of which prohibits, even temporarily, access to public office; or by criminal bankruptcy, malfeasance, bribery, embezzlement, or against the economy, against the national financial system, against antitrust rules, against consumer relations, public faith, or property.

And, in witness whereof, the parties execute these Articles of Organization in four (4) counterparts of equal content and form in the presence of the two witnesses below.

São Paulo, [●] [●], 2015.

_____

**STARBOARD INTERNATIONAL HOLDINGS B.V.**
By: Lucas Hernandez do Vale Martins
Title: Attorney-in-fact

_____

**INFINITY HOLDING E PARTICIPAÇÕES LTDA.**
By: Marcel Gholmieh / Diego Pagliusi de Oliveira Sala / Bruno Laporta
Title: Managers

_____

**WENDY'S NETHERLANDS HOLDINGS B.V.**
By: Roberto Toshiyuki Ioshioca
Title: Attorney-in-fact

18

**Signature of lawyer:**

_____
Name: [___]
Brazilian Bar Association [OAB/SP n° _____]

**Witnesses:**

1. _____          2. _____
Name:                               Name:
Identity Card (RG):                 Identity Card (RG):
Individual Taxpayer ID (CPF/MF):    Individual Taxpayer ID (CPF/MF):

19