**$8,000,000**

**CREDIT AGREEMENT**

dated as of October 20, 2015

between

**WENDY'S NETHERLANDS B.V.**

**as Lender,**

and

**WBR PARTICIPAÇÕES LTDA.**

**as Borrower**

*Execution Version*

# CREDIT AGREEMENT

This private instrument is entered by the following parties ("**Parties**" and, individually, "**Party**") in the city of São Paulo on October 20, 2015:

**(1)** **WBR PARTICIPAÇÕES LTDA.**, a Brazilian limited liability company (*sociedade limitada*) with headquarters at Avenida Paulista, No. 1,765, 7th floor, suite 71 and 72, CV. 7703, Bela Vista, Zip Code 01311-200, City of São Paulo, State of São Paulo, enrolled with CNPJ/MF under No. 21.824.541/0001-04, represented herein by Marcel Gholmieh ("**Borrower**"); and

**(2)** **WENDY'S NETHERLANDS B.V.**, a company organized and existing pursuant to the laws of the Netherlands, with headquarters at Naritaweg 165, 1043 BW Amsterdam, the Netherlands, represented herein by Roberto Toshiyuki Ioshioca ("**Lender**").

WHEREAS, the Borrower proposes to borrow from the Lender, and the Lender propose to lend to the Borrower, the aggregate principal amount up to but not exceeding $8,000,000 (eight million US Dollars).

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements herein contained, the Parties agree to enter into this Credit Agreement (this "**Agreement**"), which shall be governed by the following terms and conditions:

**1.** **DEFINITIONS; INTERPRETATION**

**1.1.** Certain Defined Terms.

As used herein, the following terms shall have the following meanings (and other capitalized terms shall have the meanings given to them elsewhere in this Agreement):

"**Applicable Law**" means, as to any Person, all applicable constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules and regulations of any Governmental Authority, including any Governmental Approval, binding upon such Person or to its property, whether in effect as of the date hereof or hereafter.

"**Affiliate**" means, with respect to a specified Person, any Person that directly or indirectly Controls, is Controlled by, or is under common Control with, the specified Person.

"**Articles of Organization**" means the Borrower's articles of organization (*contrato social*), as the same may be amended and/or restated from time to time.

"**Brazilian Civil Code**" means the Brazilian federal law No. 10,406, dated of January 10, 2002, as amended.

"**Business Day**" means any day (excluding Saturdays and Sundays) other than a bank holiday in the City of São Paulo, State of São Paulo, Brazil and/or Netherlands.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any Applicable Law, (b) any change in, or in the interpretation of, any Applicable Law, or in the administration, interpretation,

1

*Execution Version*

implementation or application thereof by any Governmental Authority, or (c) the making or issuance of any Applicable Law, including any request, rule, guideline or directive by any Governmental Authority.

"**Control**" means, as to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by" and "under common Control with" shall have correlative meanings.

"**Dollars**" or "**$**" means the lawful money of the United States of America.

"**Governmental Approval**" means any action, order, authorization, consent, approval, license, lease, ruling, permit, tariff, rate, certification, exemption, filing or registration from, by or with any Governmental Authority.

"**Governmental Authority**" means any nation or government, any state or municipality, any branch of power acting as such of any state, or any other agency, instrumentality or political subdivision thereof and any entity exercising executive, legislative, judicial (including any arbitration body), monetary, regulatory or administrative functions of or pertaining to government (including the respective nation or government's central bank).

"**Limitada Agreement**" means the Sociedade Limitada Agreement of the Borrower dated April 2, 2015, as the same may be amended and/or restated from time to time.

"**Loan Documents**" means this Agreement, the Quota Pledge Agreement, the Guarantees, the Notes and any other agreements or documents executed pursuant to this Agreement.

"**Payment Date**" means the fifteenth (15th) of every March, June, September and December, beginning on the fifteenth (15th) day of March, 2016, as well as the Maturity Date; provided, however, that whenever any payment hereunder shall be stated to be due on a day other than a Business Day (defined above), then, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

"**Person**" means any person or entity of any nature whatsoever, specifically including an individual, a firm, a company, a corporation, a partnership, a limited liability company, a trust or other entity.

"**Quotaholders**" means quotaholders of the Borrower.

"**Tax**" or "**Taxes**" means (i) all taxes, however denominated, including any deficiencies, assessments, governmental charges, interest, additions to tax or penalties that may become payable in respect thereof, imposed by any national, state, provincial, county, municipal, local or foreign Governmental Authority, which taxes shall include, without limiting the generality of the foregoing, all income taxes, alternative or add-on minimum, escheat, capital, ad valorem, profits, license, privilege, inventory, capital stock, capital gain taxes, PIS, COFINS, CSL, ISS, IOF, ICMS, IPI, social contribution taxes, payroll taxes and employee withholding taxes (INSS and FGTS), employment severance premium, value

2

*Execution Version*

added customs, unemployment insurance, social security, sales and use taxes, excise taxes, import taxes, environmental taxes, franchise taxes, gross receipts taxes, occupation taxes, real and personal property taxes, estimated taxes, stamp taxes, documentary taxes, transfer taxes, withholding taxes, and other obligations of the same or of a similar nature; and (ii) any liability in respect of any clause described in clause (i) payable by reason of contract, transferee liability, operation of Applicable Law or otherwise.

**1.2.**  <u>Other Interpretive Provisions</u>.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and any subsection, Section, Article, Annex, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, written agreements, certificates, indentures, notices and other writings, however evidenced (including electronically).

(d)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(e)    Unless otherwise expressly provided herein: (i) references to a Person acting in a particular capacity shall include its successors or permitted assigns in such capacity, (ii) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by any of the relevant documents, and (iii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

**2.**    **COMMITMENTS; DISBURSEMENT; PROMISSORY NOTES**

**2.1.**  <u>Commitment to Lend</u>. On the terms and subject to the conditions set forth herein, the Lender agrees to lend to the Borrower an aggregate principal amount (each such amount lent being a "**Loan**") of up to, but not exceeding, $8,000,000 (eight million US Dollars) ("**Maximum Principal Amount**"). Amounts repaid or prepaid with respect to the Loan may not be reborrowed.

**2.2.**  <u>Drawdown Requests</u>.

(a)    The Maximum Principal Amount may be drawn down from time to time until October 20, 2018 in one or more Loans made prior to the Maturity Date (each a "**Drawdown**"), upon prior written request of at least ten (10) Business Days from the Borrower to Lender (each, a "**Drawdown Request**"), which Drawdown Request must

3

*Execution Version*

state the amount requested to be drawn down - provided that the representations and warranties made by the Borrower in <u>Section 9</u> below shall be true and correct at the time of the delivery of the Drawdown Request and upon the making of such Drawdown. Such Drawdown Request shall constitute the Borrower's irrevocable commitment to borrow the amount specified in the Drawdown Request. Subject to the satisfaction of the foregoing, the Lender shall fund an amount specified by each Drawdown Request within ten (10) Business Days after receipt of a Drawdown Request. Notwithstanding anything to the contrary, in no event shall the Lender be obligated to fund a Loan that will result in the aggregate outstanding principal amount of all Loans made under this Agreement, to exceed the Maximum Principal Amount.

(b) Drawdowns made by the Borrower shall be evidenced by one or more accounts or records maintained by the Lender in the ordinary course of business; provided that the failure of the Lender to make any such recordation (or any error in such recordation) shall not affect the obligations of the Borrower hereunder. The Lender may also attach schedules to this Agreement and endorse thereon the date and amount of the Drawdowns and payments with respect thereto, as indicated in <u>Schedule A</u>. The Borrower may keep evidence of Drawdowns made by the Lender, which may, upon mutual agreement of the Borrower and the Lender, be used in substitution of the Lender's records.

**2.3.** <u>Notes</u>. Along with each Drawdown Request, the Borrower, as issuer, shall execute and deliver two (2) promissory notes for the Lender, evidencing the amount required in such request as a Loan, and the other evidencing the amount of interest to be accrued to such Loan (such promissory notes, together with any promissory note issued in substitution or replacement of all or a portion thereof, the "**Notes**"), governed by Brazilian Applicable Law. In the event of a conflict between the terms of this Agreement and the Notes, the terms of this Agreement shall prevail. To the extent necessary to properly reflect the terms of this Agreement, promptly, at Lender's request from time to time, and at the expense of the Borrower, the Borrower shall execute and deliver to the Lender, in exchange for any of the Notes theretofore delivered to such Lender, a new Note. Without prejudice to the foregoing, in the event the Borrower, at any time, makes any payment that is applied to principal and accrued interest (as a result of the principles of payment provided for in <u>Section 3.1(a)</u>) that results in complete payment and satisfaction of amounts owed under any Notes, the Lender shall surrender the Notes corresponding to the amount paid by the Borrower in such event for cancellation. Any Notes cancelled pursuant to this <u>Section 2.3</u> will not be reissued or assigned to any Person.

**2.4.** <u>Use of Proceeds</u>. The Borrower shall use the proceeds of this Agreement in order to fulfill the corporate purposes set forth in the Articles of Organization, including the construction, development and operation of Wendy's® restaurants. The proceeds of this Agreement may also be used to make distributions or pay dividends to the Quotaholders in accordance with the Limitada Agreement so long as (a) no Event of Default has occurred which is continuing or is occurring, (b) a Drawdown is not made solely or with the intent to make such distributions or pay such dividends, and (c) the Borrower will have sufficient funds to support items (a), (b) and (c) of <u>Section 8.4</u> of the Limitada Agreement after making any such distributions or paying any such dividends.

4

*Execution Version*

3.    **PRINCIPAL REPAYMENT; COMMITMENT FEE**

    **3.1.**    <u>Payment of Principal</u>.

        (a)    The unpaid principal balance of the Drawdowns and all accrued but unpaid interest thereon shall be due and payable in full in cash in immediately available funds on October 20, 2020 (the "**<u>Maturity Date</u>**").

        (b)    All payments under this Agreement will be made in Dollars and pursuant to <u>Section 8</u> hereof. The Borrower may, in its sole discretion, upon at least ten (10) Business Days' prior written notice to the Lender, prepay the outstanding amounts under this Agreement in whole or ratably in part, without premium or penalty. For the avoidance of doubt, interest shall accrue on any outstanding principal amount, in accordance with <u>Section 4.1</u> below, until prepayment of such outstanding principal amount is made. Any amount prepaid under this Agreement shall be applied in the following order: first, towards any amounts outstanding for items other than accrued interest and principal amounts, second, towards accrued interest and remaining amount towards principal. The Loan is available only on the terms and conditions specified herein and, once repaid, in whole or in part, at the Maturity Date or by prepayment, may not be reborrowed in whole or in part, unless otherwise mutually agreed by the Lender and the Borrower. Nothing herein shall restrict the Borrower from refinancing the Loan resulting in payment in full of all principal interest and other amounts under this Agreement with a third party at any time during the term of the Loan, provided that all actions are taken in accordance with the Master Franchise Agreement, the Limitada Agreement and Applicable Law, and provided further that any consent from Quality Is Our Recipe or Wendy's Holdings thereunder may not be unreasonably withheld.

        (c)    Notwithstanding anything to the contrary hereinabove, in the event that the Borrower has timely paid all accrued interest payments and no Event of Default has occurred and is continuing hereunder prior to the Maturity Date, Borrower shall have the right upon notice to the Lender within one hundred and twenty (120) days prior to the Maturity Date, to defer the Maturity Date until October 20, 2021 at the same terms and conditions as provided herein, except that the interest rate may be adjusted by the Lender to  an acceptable commercially reasonable  market rate.

        (d)    In case of deferment of the Maturity Date or prepayment of outstanding amounts under this Agreement in whole or ratably in part, the Borrower shall be responsible for obtaining all authorizations, approvals of, filings with, or notices to, any third party, entity or authority that may be required for such deferment or prepayment, as the case may be, including, but not limited to, amendments to the registry of the Loans with the Central Bank of Brazil (*Banco Central do Brasil*) (the "**<u>Central Bank</u>**"), performance of symbolic currency exchange transactions and payment of all applicable taxes within the time period required by Applicable Law and deliver evidence of same to Lender.

    **3.2.**    <u>Commitment Fee</u>. The Borrower agrees to pay to the Lender, for the period commencing on the date hereof through October 20, 2018 with respect to the Lender's commitment to lend the

*Execution Version*

Maximum Principal Amount, a commitment fee equal to one tenth percent (0.10%) of the sum of the average daily difference between aggregate outstanding amount of Loans made hereunder and the Maximum Principal Amount (whether or not then available), as calculated by the Lender, payable in arrears in cash on each Payment Date through October 20, 2018, commencing on the first Payment Date.

## 4. INTEREST AND PENALTY

### 4.1. Payment of Interest.

(a)     Interest shall accrue daily at a rate equal to six and half percent (6.5%) per annum (the "**Interest Rate**") beginning on the date of receipt by the Borrower of the proceeds of the Drawdowns ("**Interest Commencement Date**") on the unpaid principal balance of the Drawdowns and shall be payable on the Payment Dates; provided that Lender may, at its discretion, upon at least ten (10) Business Days' prior written notice to the Borrower, defer the Payment Dates at any time. Interest will be calculated on the basis of a 365-day year and the actual number of days elapsed by multiplying the unpaid principal balance of the Drawdowns by the interest rate, multiplying the product thereof by the actual number of days elapsed and dividing the product so obtained by 365.

(b)     Without prejudice to Section 4.1(a), so long as an Event of Default established in Section 12.1(a) has occurred and is continuing, default interest shall be deemed to accrue at one percent (1%) per month over the unpaid principal balance of the Drawdowns, on a simple interest basis, retroactive to the date of the Event of Default established in Section 12.1(a) on the unpaid principal amount of this Agreement, outstanding from time to time through the date on which such Event of Default ceases to exist. So long as any other Event of Default has occurred and is continuing, a default penalty of two percent (2%) over the unpaid principal balance of the Drawdowns shall apply until the date on which such Event of Default ceases to exist.  Notwithstanding the foregoing, the payment of any default interest is subject to the any limitation as provided by Brazilian Applicable Law.

(c)     In no event shall the amount of interest or default interest due or payable under this Agreement exceed the maximum rate of interest or default interest, as the case may be, allowed by Brazilian Applicable Law and, in the event any such payment is inadvertently paid by Borrower or is inadvertently received by the Lender, then such excess sum shall be credited as a payment of principal, unless the Borrower shall notify the Lender in writing that the Borrower elects to have such excess sum returned to it forthwith.  It is the express intent of the parties hereto that the Borrower not pay and the Lender not receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be lawfully paid by the Borrower under Applicable Law.

6

*Execution Version*

**5.    Intentionally Omitted**

**6.    OTHER MATTERS RELATING TO THE LOAN**

**6.1.    Illegality.** Notwithstanding any other provision of this Agreement, if any Change in Law makes it unlawful for the Lender to perform its obligations hereunder including to make any Loan hereunder, (a) the obligation of Lender to make the relevant Loans shall be suspended until the circumstances causing such suspension no longer exist and (b) if such Change in Law shall so mandate, the Loans shall be prepaid by the Borrower, together with accrued and unpaid interest thereon and all other amounts payable by the Borrower under this Agreement, on or before such date as shall be mandated by such Change in Law.

**6.2.    Increased Costs.**

(a)    If on or after the date of this Agreement, any Change in Law shall increase the cost to Lender of making or maintaining any Loan or reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or other amount), then the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered, provided that Section 4.1(c) is observed with respect to interest.

(b)    Failure or delay on the part of Lender to demand compensation pursuant to this Section 6.2 shall not constitute a waiver of Lender's right to demand such compensation; *provided* that, the Borrower shall not be required to compensate Lender pursuant to this Section 6.2 for any increased costs or reductions incurred more than 180 days prior to the date that Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation.

**7.    TAXES**

**7.1.    Taxes.**

(a)    All payments made by the Borrower hereunder shall be made free and clear of, and without the withholding of, deduction for or on account of, any present or future Taxes of Lender other than pursuant to the laws of the jurisdiction (or any political subdivision thereof) in which it is organized or to the extent that the Lender has benefitted from a tax credit for any Taxes of the Lender withheld pursuant to Applicable Law (all such excluded taxes collectively, the "**Excluded Taxes**"). If any such Taxes that are not Excluded Taxes ("**Non-Excluded Taxes**") are required to be withheld from any amounts payable to Lender hereunder, then (i) the amounts payable to Lender shall be increased by such additional amounts (the "**Additional Amounts**") necessary to yield to Lender (after payment of all Non-Excluded Taxes and Additional Amounts, including any Non-Excluded Taxes levied on Additional Amounts) interest or any such other amounts payable hereunder, and (ii) the Borrower (subject to the right of the Borrower to contest such Taxes in good faith through appropriate proceedings, so long as proper reserves are maintained and Lender is paid the full amounts payable hereunder) shall make the required withholding and pay the full amount withheld for such Non-Excluded Taxes to the appropriate taxing

*Execution Version*

authority in accordance with Applicable Law. Whenever Non-Excluded Taxes are to be withheld and payable by the Borrower, within 30 days after the date of the applicable payment, the Borrower will show to Lender evidence of payment of such withholding taxes. If the Borrower fails to pay and remit evidence of the payment of any Non-Excluded Taxes when due to the appropriate taxing authority, the Borrower will indemnify and forthwith reimburse Lender for incremental Taxes, interest, penalties, loss, liability, claim or expense (including reasonable attorneys and other fees and expenses), if any and only to the extent applicable, that become payable by Lender as a result of any such failure. This indemnity shall survive termination of the Agreement and payment of the Loans.

## 8. PAYMENTS

**8.1.** <u>Making of Payments</u>. Notwithstanding anything contained in this Agreement to the contrary, the Borrower will pay all sums for principal, interest, or other amounts becoming due under this Agreement in Dollars, not later than 1:00 p.m. São Paulo time, on the Payment Date such payment is due and on the Maturity Date, in immediately available funds, in accordance with the payment instructions that the Lender may designate from time to time in writing. Any payment made after 1:00 p.m. São Paulo time on a Business Day will be deemed made on the next following Business Day. All amounts payable under this Agreement shall be paid free and clear of, and without reduction by reason of, any deduction, set-off or counterclaim.

## 9. REPRESENTATIONS AND WARRANTIES

**9.1.** <u>Representations and Warranties</u>. The Borrower represents and warrants on the date hereof and as of the date of each and any delivery of a Drawdown Request and as of the date of each Loan made hereunder (including immediately prior to and upon giving effect to the making of any such Loan) as follows:

    (a)    The Borrower is a limited liability company (*sociedade limitada*), validly existing and in good standing under the laws of Brazil, and has the power and authority to own its property and to conduct its business as currently conducted in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary and to consummate the transactions contemplated in this Agreement.

    (b)    It has the requisite corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate action on its part and no other corporate proceedings on its part are necessary to authorize the execution and delivery of this Agreement or to perform its obligations hereunder, including, to the extent applicable, the issuance of new quotas of the Borrower, except for the amendment to the Articles of Organization required to reflect the issuance of such new quotas and the registry of such amendment with the Board of Trade of the State of São Paulo (*Junta Comercial do Estado de São Paulo*). This Agreement has been duly executed and delivered to the Lender by the Borrower.

*Execution Version*

(c)     The execution, delivery and performance of this Agreement by the Borrower will not (a) conflict with or violate the Articles of Organization, (b) conflict with or result in any material violation of any law applicable to the Borrower or by which the Borrower or any of its properties is bound or affected or (c) conflict with or result in any material breach of or constitute a default (or an event that with or without notice or lapse of time or both would become a default) under, or impair the material rights of the Borrower or alter the material rights or obligations of any Person under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement executed by the Borrower.  No waiver, consent, approval, order or authorization of, or registration, declaration or filing with, or notice to, any third party or entity is required to be obtained or made by the Borrower in connection with the valid execution, delivery and performance by it of this Agreement, except for the registration of the terms and conditions of this Agreement with the Central Bank prior to the funding of the Loans, as well as the respective payment conditions, to enable the Borrower to make the payments pursuant to this Agreement, which registration shall be the responsibility of the Borrower.

(d)     This Agreement constitutes the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with its terms.

(e)     The quotas representing the capital stock of the Borrower are free from any lien other than those resulting from the establishment of the Collateral (as herein defined) and the Collateral, upon registration of the Quota Pledge Agreement (as defined below) with the competent Registry of Deeds and Documents (*Registro de Títulos e Documentos*), will constitute a perfected security interest which is and will be superior to, and prior to, any rights of any other Persons that exist or may arise in the future.

(f)     The Borrower is complying with, and will continue to comply with, as of the date each Drawdown Request is delivered and, as of the date each Loan hereunder is made (including immediately prior to and upon giving effect to the making of such Loan), with its obligations under the Master Franchise Agreement dated April 2, 2015, as amended, by and between Quality Is Our Recipe, LLC (authorized assignee of Wendy's Global Restaurants, LLC) ("**Quality Is Our Recipe**") and the Borrower (the "**Master Franchise Agreement**").

(g)     There is no Event of Default that has occurred which is continuing or will occur.

(h)     Intentionally Omitted.

(i)     The Borrower is performing and will perform its activities in the ordinary course of business, in a manner consistent with past practices.

(j)     The Notes and the Collateral are, and will be, valid, legal and in full force and effect, without prejudice to Section 10.1(d) below.

## 10.   SECURITY INTEREST AND GUARANTEE

**10.1.**  Security Interest.

9

*Execution Version*

(a)    <u>Creation of Security Interest and Guarantee</u>. The payment of principal and interest and performance of all other obligations of the Borrower hereunder now or hereafter owed by the Borrower to Lender (the "**Secured Obligations**") are and will be secured and guaranteed by a pledge over the quotas of the capital stock (the "**Collateral**") of the Borrower held by Starboard International Holdings B.V. ("**Starboard Holdings**") Infinity Holding e Participações Ltda. ("**Infinity**") and Wendy's Netherlands Holdings B.V. ("**Wendy's Holdings**") as provided in the quota pledge agreement executed by and among Starboard Holdings, Infinity, Wendy's Holdings and the Lender, as well as the Borrower, as intervening party, on or about the date hereof (the "**Quota Pledge Agreement**") as well as three (3) guarantee agreements executed on or about the date hereof by Lender and (i) Starboard Holdings and Andrew Levy, (ii) Infinity, Bruno Laporta, Diego Sala, Marcel Gholmieh, RKF Participações Ltda., Fernando Fakri de Assis, IFE – Inteligência Financeira Empreendimentos EIRELI and Ricardo Giacomo Maluf, and (iii) Wendy's Holdings (each of the three (3) guarantees being a "**Guarantee**", and collectively "**Guarantees**"). The security interest over the Collateral shall be created and perfected until the date the first Drawdown Request is delivered by the Borrower to the Lender, according to the terms and conditions of the Quota Pledge Agreement. It is acknowledged and agreed that the liability of each of Starboard Holdings, Infinity and Wendy's Holdings under the Quota Pledge Agreement is a several obligation of each Quotaholder and is limited to a percentage of amounts outstanding under this Agreement ("**Outstanding Amounts**") equal to the percentage ownership of the total quotas of the Borrower owned by such Quotaholder (plus certain costs to enforce this Agreement and the other Loan Documents (the "**Enforcement Costs**"). Upon the prior written consent of the Lender, a Quotaholder may substitute the Collateral with substitute securities acceptable to the Lender or cash collateral in an amount acceptable to the Lender (which may not be unreasonably refused by the Lender). It is also acknowledged and agreed that (I) the liability of Starboard Holdings and Andrew Levy under the Guarantee is joint and several but limited to a percentage of the Outstanding Amounts equal to the percentage ownership of the total quotas of the Borrower owned by Starboard Holdings (plus Enforcement Costs); (II) the liability of Infinity, Bruno Laporta, Diego Sala, Marcel Gholmieh, RKF Participações Ltda., Fernando Fakri de Assis, IFE – Inteligência Financeira Empreendimentos EIRELI and Ricardo Giacomo Maluf under the Guarantee is joint and several but limited to a percentage of the Outstanding Amounts equal to the percentage ownership of the total quotas of the Borrower owned by Infinity (plus Enforcement Costs); and (III) the liability of The Wendy's Company under the Guarantee limited to a percentage of the Outstanding Amounts equal to the percentage ownership of the total quotas of the Borrower owned by Wendy's Holdings (plus Enforcement Costs).

(b)    <u>Additional Rights of Lender</u>. The Borrower shall execute and deliver to the Lender concurrently with the Borrower's execution and delivery of this Agreement and at any time thereafter within fifteen (15) business days of the reasonable request of the Lender all documents that Lender may reasonably request, in form reasonably satisfactory to Lender, to perfect and maintain perfected Lender's continuing security interests in the Collateral.

10

*Execution Version*

(c)     No Effect on Obligations. The failure of the Lender to enforce against any Person any of its obligations arising under this Agreement, the Quota Pledge Agreement, the Guarantees or any other Loan Document, whether or not as a result of any agreement or understanding reached with such Person, shall, except as may be provided for in the Guarantees and the Quota Pledge Agreement, not in any manner affect its rights against any other Person under this Agreement, the Quota Pledge Agreement or the Guarantees. Notwithstanding the foregoing, the failure of the Lender to enforce any of the Obligations against any Person shall not in any manner increase the Obligations of any Quotaholder or Guarantor.

(d)     Replacement of the Guarantees or the Collateral. In case (i) any of the Guarantees and/or Collateral are extinguished; (ii) the Collateral is damaged or perished; and/or (iii) any of the Guarantees and/or the Collateral ceases to be enforceable and in full force and effect in any material respect or is declared by a court of competent jurisdiction to be null and void, invalid or unenforceable in any material respect, the Quotaholders shall replace, substitute or reinforce, as the case may be, the Guarantees and/or the Collateral for any equivalent guarantee or other Collateral reasonably acceptable to the Lender, within ten (10) business days following receipt of a notice from the Lender in this regard; provided however that neither the Borrower, any Quotaholder nor any Guarantor is required or obligated to deliver to the Lender any, additional collateral and/or guarantee other than the provided in the Quota Pledge Agreement and the Guarantee Agreement, except in events of replacement, substitution, or reinforcement of the Guarantees and/or Collateral on the terms and conditions set forth in this provision.

## 11.  COVENANTS

### 11.1.  Affirmative Covenants.

The Borrower covenants and agrees with the Lenders that, until the payment in full of all amounts outstanding under this Agreement, it will perform or cause to be performed the obligations set forth below. The Borrower shall:

(a)     use the proceeds of the Loans in accordance with Section 2.4 hereof;

(b)     maintain all of its material properties, and rights and interests therein, useful to the business of the Borrower in good working order and condition, ordinary wear and tear excepted;

(c)     preserve and maintain its legal existence and maintain all material Governmental Approvals, rights, privileges, licenses and franchises necessary for the maintenance of its corporate existence, provided however that in no event any delay caused by any Governmental Authority shall be considered as an Event of Default, so long as the Borrower has taken appropriate steps with the Governmental Authorities;

(d)     promptly obtain, and maintain in full force and effect, all Governmental Approvals, if any, from time to time necessary for the authorization, execution and delivery of the Loan Documents, and the due performance of all of its obligations thereunder, provided however

11

*Execution Version*

that in no event any delay caused by any Governmental Authority shall be considered as an Event of Default so long as the Borrower has taken appropriate steps with the Governmental Authorities;

(e)       comply in all material respects with the requirements of all Applicable Laws and orders of any Governmental Authority; and

(f)       promptly file the Quota Pledge Agreement and the instrument for the Guarantee of Infinity for registration with the competent Brazilian Registry of Deeds and Documents (*Registro de Títulos e Documentos*), pursuant to their applicable terms.

**11.2.** Negative Covenants.

The Borrower covenants and agrees with the Lender that, until the Maturity Date:

(a)       except as otherwise permitted under the Quota Pledge Agreement or the Limitada Agreement (but only as long as no Event of Default has occurred which is continuing or is occurring), the Borrower will not (i) consolidate or merge with or into (or permit any subsidiary to consolidate or merge with or into) any other Person other than a subsidiary, provided that, in the case of any consolidation or merger by the Borrower with or into a subsidiary, the Borrower shall be the surviving entity, or (ii) sell or otherwise dispose of (or permit any subsidiary to sell or otherwise dispose of) a material portion of its property or assets in one or more transactions, in each case, for so long as this Agreement is in force; provided, however, that if any such consolidation, merger, sale or disposition occurs pursuant to and in compliance with the provisions of the Limitada Agreement and the Master Franchise Agreement, such event shall not be deemed an Event of Default so long as the principal, interest, and other amounts owed under this Agreement are paid to the Lender at the closing of the respective event; and

(b)       for as long as this Agreement is in force, the Borrower shall not (a) declare or pay any dividend or make any distribution on or in respect of its capital stock; (b) make any principal payment on, redeem, repurchase, or retire any outstanding debt; or (c) increase the compensation (including bonuses and incentive compensation) paid to any consultant or employee other than in the ordinary course of business consistent with past practice, in each case, provided that the Borrower may declare or pay a dividend or make such a distribution if (i) no Event of Default has occurred which is continuing or is occurring, (ii) a Drawdown is not made solely or with the intent to make such distributions or pay such dividends, and (iii) the Borrower will have sufficient funds to support items (a), (b) and (c) of Section 8.4 of the Limitada Agreement after making any such distributions or paying any such dividends. The parties hereto, including the Quotaholders acknowledge and agree that Section 8.4(c) of the Limitada Agreement is not to be interpreted to provide for a reserve for the payment of the entire principal amount, but only a reserve for the current interest payment of the Debt Financing for the next 12 months (as such term is defined in the Limitada Agreement). Notwithstanding anything to the contrary hereinabove, distributions shall be allowed to be made to Quotaholders to pay any resulting tax liability that may be

*Execution Version*

assessed against such Quotaholder with respect to income of the Borrower attributable to a Quotaholder which is not paid by the Borrower.

## 12. EVENTS OF DEFAULT

**12.1.** <u>Events of Default</u>. If any of the following events takes place before the Maturity Date (each, an "**Event of Default**"), Lender at its option may declare all unpaid principal and accrued and unpaid interest thereon and all other amounts payable under this Agreement immediately due and payable; provided, however, that this Agreement shall automatically become due and payable without any declaration in the case of an Event of Default specified in clauses (b), (c), (e), (f), (g), (h) or (m) below:

(a) Borrower fails to make payment of any amount (principal, interest or other amounts) when due and payable under this Agreement and such payment is not made within ten (10) days after written notice of such failure is given to the Borrower; or

(b) A receiver, liquidator, judicial administrator or trustee, as applicable, of the Borrower, Starboard Holdings or Infinity or any substantial part of the Borrower's, Starboard Holdings' or Infinity's assets or properties is appointed by a court order, which has not been dismissed within ninety (90) days; or

(c) The Borrower, Starboard Holdings, or Infinity is adjudicated bankrupt or insolvent; or

(d) Any of the Borrower's, Starboard Holdings' or Infinity's property is sequestered (or otherwise held in escrow or as security) by or in consequence of a court order and such order remains in effect for more than ninety (90) days, so long as the applicable Person has taken appropriate steps and provided appropriate security with respect to courts and/or the Governmental Authorities; or

(e) The Borrower, Starboard Holdings or Infinity files a petition in voluntary bankruptcy or requests judicial or extrajudicial recovery or reorganization under any provision of any bankruptcy, reorganization or insolvency law or consents to the filing of any petition against it under such law; or

(f) Proceedings for the appointment of a receiver, judicial administrator, trustee or custodian, as applicable, of the Borrower, Starboard Holdings or Infinity or of all or a substantial part of the assets or property thereof, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Borrower, Starboard Holdings or Infinity or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered or such proceeding shall not be dismissed or discharged within ninety (90) days of commencement or the term provided in Applicable Law, whichever occurs first, so long as the applicable Person has taken appropriate steps and provided appropriate security with respect to courts and/or the Governmental Authorities; or

13

*Execution Version*

(g)     The Borrower, Starboard Holdings or Infinity makes a formal or informal general assignment for the benefit of its creditors, or admits in writing its inability to pay debts generally when they become due, or consents to the appointment of a receiver, judicial administrator or liquidator of Borrower, Starboard Holdings or Infinity or of all or any part of its property; or

(h)     Either of the Notes, any Guarantee or the Collateral ceases, for any reason, to be enforceable and in full force and effect in any material respect or is declared by a court of competent jurisdiction to be null and void, invalid or unenforceable in any material respect and, with respect to any Guarantee or the Collateral, is not replaced, substituted or reinforced, as the case may be, within the term provided in Section 10.1(d) hereof; or

(i)     An attachment or execution is levied against any substantial part of the Borrower's, Starboard Holdings' or Infinity's assets that is not released within sixty (60) days, so long as the applicable Person has taken appropriate steps and provided appropriate security with respect to courts and/or the Governmental Authorities; or

(j)     The Borrower, Starboard Holdings or Infinity dissolves, liquidates or ceases business activity except for an event involving Borrower as contemplated by Section 10.2(b) of the Limitada Agreement, provided that the proceeds received from any sale of the assets of the Borrower are used to pay principal, interest, and other amounts owed under this Agreement before any distribution is made to a Quotaholder; or

(k)     The Borrower, Starboard Holdings or Infinity transfers any major portion of its assets other than in the ordinary course of business, except as permitted under the Limitada Agreement, provided that in such case permitted by the Limitada Agreement the outstanding principal amount of all Loans under this Agreement and all accrued but unpaid interest thereon are paid to the Lender immediately prior to or simultaneous with the respective event; or

(l)     The Borrower, Starboard Holdings or Infinity breaches any covenant or agreement on its part contained in this Agreement, the Quota Pledge Agreement, any of the Guarantees or any other Loan Document, and such breach has not been cured within fifteen (15) days after written notice of such failure is given to Borrower; or

(m)     The Borrower, Starboard Holdings or Infinity undergoes any of the events set forth in Articles 333 and 1,425 of the Brazilian Civil Code; or

(n)     There is any material inaccuracy or untruthfulness of any representation or warranty of or relating to, the Borrower, Starboard Holdings or Infinity set forth in this Agreement, the Quota Pledge Agreement, any of the Guarantees or any other Loan Document.

**12.2.**   Notwithstanding the foregoing or anything to the contrary herein, the Parties agree that if an Event of Default is caused solely and exclusively by the act or omission of a legal entity that is controlled by the Lender and/or one of its Affiliates, including any Affiliate which is also an owner of record of the Borrower or any individual acting on or on behalf of such entity or Affiliate and,

14

*Execution Version*

except as provided for hereinbelow, such act or omission is in breach of the Limitada Agreement, the Master Franchise Agreement and/or the Articles of Organization, then the Lender may not declare an Event of Default by the Borrower under this Agreement. It is further acknowledged and agreed that an Event of Default shall not occur hereunder on account of the unreasonable refusal or failure of any Affiliate of the Lender to consent to any refinancing or sale of assets of the Borrower, on commercially reasonable terms with a reputable lender or purchaser, where the purpose of such refinancing or sale of assets is to pay principal, interest, and other amounts owed under this Agreement.

## 13. GENERAL PROVISIONS

**13.1.** <u>Notices</u>. Unless specifically provided otherwise herein, all notices, consents, directions, approvals, instructions, requests and other communications required or permitted by the terms of this Agreement to be given to a Party shall be in writing and delivered (i) personally, (ii) by an internationally recognized courier service (with proof of delivery), or (iii) by electronic mail followed up with an internationally recognized courier service (with proof of delivery), in each case directed to the address of the Party as indicated below, or to such other address as may be hereafter notified by any Party:

    (i)    To the Lender:

        **WENDY'S NETHERLANDS B.V.**
        c/o One Dave Thomas Blvd.
        Dublin, OH 43017
        At.: Legal Department

    (ii)    To the Borrower:

        **WBR PARTICIPAÇÕES LTDA.**
        Avenida Paulista, No. 1,765, 7th floor, suite 71 and 72, CV. 7703
        Bela Vista, Zip Code 01311-200, São Paulo/SP
        At.: Chief Executive Officer

        With a copy to the Quotaholders as follows:

        **INFINITY HOLDING E PARTICIPAÇÕES LTDA.**
        Av. Pacaembu, 1886, Pacaembu
        Zip Code 01234-000, São Paulo/SP
        At.: Marcel Gholmieh, Administrator

        **STARBOARD INTERNATIONAL HOLDINGS B.V.**
        c/o 12540 W. Atlantic Blvd.
        Coral Springs, FL 33071
        At.: Andrew Levy

        **WENDY'S NETHERLANDS HOLDINGS B.V.**
        c/o One Dave Thomas Blvd.

15

*Execution Version*

Dublin, OH 43017
At.: Legal Department

**13.1.1.** All notices and other communications made pursuant to the preceding section shall be deemed to have been given (i) if delivered personally, upon delivery, (ii) if electronically mailed, upon receipt by the receiver of the electronic email and (iii) if mailed by internationally recognized courier service on the second business day after delivery (with confirmation of such delivery received by the sender). From time to time, any Party may designate a new address for the purposes of notice hereunder by written notice to each of the other Parties hereto in accordance with this Section 13.1.

**13.2.** No Impact from Exercise of Rights Under Other Agreements. Any exercise by Quality Is Our Recipe of its rights under the Master Franchise Agreement and/or by Wendy's Holdings under the Limitada Agreement shall not in any way impair or otherwise affect the rights of Lender under this Agreement, the Quota Pledge Agreement, the Guarantees or the other Loan Documents.

**13.3.** Judgment Currency. This is an international loan transaction in which the specification of Dollars is of the essence, and the obligations of the Borrower hereunder to the Lender to make payment in Dollars shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any other currency or in another place except to the extent that on the Business Day following receipt of any sum tendered or adjudged to be so due in the judgment currency the payee may in accordance with normal banking procedures purchase Dollars in the amount originally due to the payee with the tendered or judgment currency. If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder to any party hereto in Dollars into another currency (the "**Judgment Currency**"), then the rate of exchange that shall be applied shall be that at which in accordance with normal banking procedures the payee could purchase such Dollars at New York, New York with the Judgment Currency on the Business Day preceding the day on which such judgment is rendered.

**13.4.** Replacement of the Notes. Upon the loss, theft, destruction or mutilation of any Note and (a) in the case of loss, theft or destruction, upon receipt by the Borrower of indemnity or security reasonably satisfactory to it or (b) in the case of mutilation, upon surrender to the Borrower of the mutilated Note, the Borrower shall execute and deliver in lieu thereof a new Note, dated as of the date hereof, in the same amount.

**13.5.** Cancellation. After all principal, premiums (if any) and accrued interest at any time owed on this Agreement have been paid in full, the Notes will be surrendered to the Borrower for cancellation and will not be reissued or assigned to any Person.

**13.6.** Maximum Legal Rate. If at any time an interest rate applicable hereunder exceeds the maximum rate permitted by Applicable Law, such rate shall be reduced to the maximum rate so permitted by Applicable Law.

**13.7.** Successors. This Agreement shall inure to the benefit of the Lender and its successors and permitted assignees, and shall be binding upon the Borrower and its respective successors and permitted assignees.

*Execution Version*

**13.8.** <u>Right of Lender to Assign</u>.  The Lender may, from time to time, assign and transfer any and all rights arising from this Agreement, without the need of any prior authorization or notice to the Borrower.

**13.9.** <u>No Assignment by the Borrower</u>.  The Borrower is not allowed to assign and/or transfer any rights or obligations set forth in this Agreement.

**13.10.** <u>Amendment, Modification, Termination or Waiver</u>.  No amendment, modification, termination or waiver of any provision of this Agreement shall in any event be effective without the written agreement of the Lender.

> **13.10.1.** Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

> **13.10.2.** No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

**13.11.** <u>No Continuing Waiver</u>.  No failure or delay on the part of the Lender in the exercise of any power, right or privilege under this Agreement shall impair such power, right or privilege or be construed to be an amendment to the terms of this Agreement, a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude any other or further exercise thereof or of any other right, power or privilege. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law or otherwise available.

**13.12.** <u>Invalidity</u>.  The invalidity, illegality or unenforceability of any provision in or obligation under this Agreement shall not affect or impair the validity, legality or enforceability of the remaining provisions or obligations under this Agreement.  If any provision of this Agreement is held invalid, illegal or unenforceable, the Parties shall use their best efforts to replace such provision with a valid, legal and enforceable provision to provide the Parties to the extent possible the same rights and benefits as provided by the provision held to be invalid, illegal or unenforceable.

**13.13.** <u>Final Agreement</u>.  This Agreement constitutes the final expression and the complete and exclusive statement among the Parties with respect to the subject matter hereof. There are no writings, conversations, representations, warranties or agreements that the Parties intend to be a part of this Agreement, except as expressly set forth herein or to be set forth in the instruments and other documents delivered or to be delivered hereunder.

**13.14.** <u>Governing Law</u>.  This Agreement shall be governed by and construed for all purposes in accordance with the laws of the Federative Republic of Brazil.

**13.15.** <u>Jurisdiction</u>.  The Parties hereby elect the central courts of the City of São Paulo, São Paulo State, Brazil to settle any disputes, doubts or controversies that may arise in connection with this Agreement.

> (a)    For the purposes hereof, this Agreement, its annexes and any amendments hereto or thereto constitute an extra-judicial executive title, as provided for under Article 585, item II of the Brazilian Law No. 5,869, dated as of January 11th, 1973, as amended ("**Brazilian**

17

ni

*Execution Version*

ARISING OUT OF OR RELATED TO THIS AGREEMENT, IN ANY ACTION, LITIGATION OR OTHER PROCEEDING OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY OTHER PERSON, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE.  EACH OF THE PARTIES HERETO AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED IN A COURT TRIAL WITHOUT A JURY.  WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR ANY PROVISION HEREOF. THE AGREEMENT OF EACH PARTY HERETO TO THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH OF THE OTHER PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

[Remainder of this page intentionally left blank.]

[Signature page to follow]

19

In witness whereof, the Parties executed this Agreement in three (3) counterparts of identical form and content, to one sole effect, in the presence of the two (2) undersigned witnesses on the place and date first written above.

**WBR PARTICIPAÇÕES LTDA.**
as Borrower

By: _____

Name: Marcel Gholmieh
Title: Officer


**WENDY'S NETHERLANDS B.V.**
as Lender

By: _____

Name: Roberto Toshiyuki Ioshioca
Title: Attorney-in-fact


**WITNESSES**

1. _____
   Name
   Identity:   Ágnes Ilona Keresztes Bigatto
               RG. 6.111.023
               CPF 006.308.628-00

2. _____
   Name
   Identity:   Susana Kotaki Botelho
               RG: 15.559.793-0 SSP-SP
               CPF: 051.179.558-03

*Execution Version*

## SCHEDULE A

### DRAWDOWNS AND PAYMENTS WITH RESPECT TO LOANS

| Date | Currency and Amount of Drawdowns | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|------|------|------|------|------|------|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

21