# EXHIBIT 2

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

MARCOS F. SILVA,                                    CASE NO: CACE-20-005552

    Plaintiff,

v.

ANDREW LEVY,

    Defendant.

_____/

## COUNTERCLAIM

The defendant/counter-plaintiff, Andrew Levy ("Levy") commences counterclaims against the plaintiff/counter-defendant, Marcos F. Silva ("Silva"), and in support, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this dispute, as this is an action seeking damages in excess of $150,000.00, exclusive of interest, attorneys' fees and costs.

2. Silva is an individual who resides in Broward County, Florida, and is otherwise sui juris.

3. Levy is an individual who resides in Broward County, Florida, and Summit County, Utah, and is otherwise sui juris.

4. Venue is proper in Broward County, because the acts and events giving rise to the claim alleged occurred in Broward County, Florida.

## GENERAL ALLEGATIONS

5. Levy met Silva in 1998. Levy and Silva developed not only a professional relationship, but also a personal relationship. Levy's and Silva's families vacationed together; they were in each other's wills and were guardians for each other's children.

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

6.     In 2008, Levy expanded the Wendy's restaurant business (the "Companies") and hired Silva to run the Companies.

7.     Levy offered Silva the president position for the Companies, with an opportunity for him to have an equity stake in the Companies to have his interests aligned with Levy's.

8.     After conferring trust and confidence in Silva to run the Companies as president, Levy focused on the strategy to continue expanding the business.

9.     Silva delivered to Levy all financial and operational information, and Silva controlled the communication with all other department heads including the information from the Chief Financial Officer.

10.     Under Silva, the Companies experienced a revolving door for its personnel at all levels; the turnover enabled Silva to maintain control and conceal his mounting failures.

11.     Levy's decision making depended on the information Silva provided, and Levy relied on Silva's duty to provide true and accurate information.

12.     Silva breached the trust Levy conferred on him. After obtaining equity in the Companies, Silva engaged in misrepresentations and omissions to overinflate the Companies' value and, therefore, inflated the value for his minority interest, which led to Levy and Silva executing the Notes at issue in this case when Levy acquired Silva's interest.

## Misrepresentation Concerning Brazil Project

13.     Because Silva had Brazilian roots and spoke Portuguese, the Companies, under his full supervision and control, decided to expand into Brazil.

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

14. Silva controlled that deal including negotiating the contracts with Wendy's, doing all the financial modeling, approving the building designs, menu, hiring, and firing, as well as myriad other decisions required to launch the business in that market.

15. Silva also negotiated the expansion into the Brazilian market.

16. Silva was responsible to supervise and oversee the operations team in Brazil. Silva provided all information required to make decisions about the Brazil expansion.

17. Levy conferred his trust in Silva and relied on the information provided because the relationship had developed over the many years to the point where they shared a close personal relationship.

18. Levy also did not speak or read Portuguese, and he therefore relied on Silva as the direct liaison for all business matters in the Brazil market.

19. Silva engaged in material misrepresentations and omissions regarding the Brazil project.

20. Silva represented Levy with multiple scenarios showing there were buyers for the Companies' Brazil restaurants, and that Levy would receive his investment back, keep equity, and make profits.

21. In 2017, allegations arose that the Companies' Brazilian partners engaged in fraud by bribing government officials to get permits for the Companies' locations in Brazil. Silva was running the Brazil expansion, including communications with the Brazilian partners.

22. Silva knew about the alleged bribery.

23. Silva failed to report the alleged bribery.

24. Silva denied knowing about the alleged bribery.

*CASE NO: CACE-20-005552*

25.     In July 2018, Silva also presented Levy with two scenarios for the business in Brazil demonstrating no losses for the Companies or Levy: (a) the business would flourish with capital from a funding source Silva would secure, and (b) the funding source fails and the restaurants shutdown. According to Silva, both scenarios would have a positive financial result for the Companies and Levy.

26.     On or about July 31, 2018, Silva presented Levy with a PowerPoint presentation showing the Companies would achieve cash flow projections and profitability. Silva did not base the presentation on facts or accurate financial information.

27.     The Companies' cashflows proved to be much worse than Silva presented to Levy on or about July 31, 2018.

28.     Silva's misrepresentations and omissions resulted in the Brazil project failing under both scenarios, costing the Companies and Levy millions in losses rather than the good result Silva presented.

29.     Despite these failures, the valuation Silva prepared for Levy to acquire the interest in the Companies hid the losses from the Brazilian business.

## Other Misrepresentations and Omissions Concerning the Valuations

30.     Aware the Companies' financials were declining, Silva, while Levy was on a trip to Italy, insisted that Levy buy Silva's interest in the Companies.

31.     Silva was seeking to avoid having personal liabilities from the guarantees to Wendy's and lenders, and therefore, demanded Levy consummate the purchase agreement as soon as possible.

32. On June 11, 2018, Silva had previously represented that there were no tax consequences to get the deal done.

33. On June 20, 2018, Levy laid out the necessary steps to value the interest and the Companies before they could reach an agreement.

34. Levy required any agreement include clearing up the tax liabilities for the Companies – issues Silva denied were present – which required addressing tax years 2016 and 2017.

35. Silva presented a draft agreement that he claimed covered all tax scenarios.

36. Levy later learned there were about $14 million in tax liabilities that Silva omitted from addressing in the purchase agreement.

37. In August 2020, Levy learned that when the Companies decided to sell the stores in Tampa, Florida, and Richmond, Virginia, Starboard would incur $5,124,890.00 in tax liabilities.

38. Silva's misrepresentations and omissions were not limited to the tax liabilities.

39. Wendy's, as the franchisor, requires its franchises owned by the Companies to change and improve the aesthetics of each Wendy's restaurant based on a schedule.

40. The aesthetic improvement obligations imposed by the franchisor require capital expenditures to execute substantial changes to the appearance for each location.

41. Failure to make the improvements according to the franchisor's schedule constitutes a default under the several franchise agreements.

42. Silva represented the improvement was on schedule and was not a liability that would affect the Companies' valuation or his interest.

43.     That representation proved false because the aesthetic improvements, according to the franchisor's schedule, had fallen behind and exposed the Companies to substantial liability affecting valuation.

44.     In June 2018, and specifically on June 15, 2018, Silva represented to Levy complicated valuation models.

45.     Silva made daily and substantial changes to the models depicting a rosy picture of the Companies' financials.

46.     The values Silva used swung by several millions of dollars with each iteration. The representations in the summaries and projections were false.

47.     Silva knew the representations about values were false when he made them.

48.     The falsity came to light after Levy took over control of the Companies.

49.     Examples of such misrepresentations are listed below:

   a.     Silva used Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") disconnected from any actual financial performance;

   b.     Silva understated the management fees;

   c.     Silva used inflated valuation multiples; and

   d.     There was no discount factored for minority shareholder interest, yet the professional valuation Silva had done for tax purposes a year earlier reflected that discount.

50.     The Companies had hired a consultant to conduct a valuation for the Companies. As indicated in the valuation company's letter dated April 25, 2017, it received all the financial information from the Companies' executive—Silva—without independently verifying the financial forecasts and projections he provided.

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

51.     Relying on Silva's representations, Levy agreed to the amount Silva valued for membership and equity interest and executed two promissory notes in the amounts of $357,641.25 and $1,634,786.75, respectively.

52.     Silva procured those promissory notes by fraud, fraudulent omission, and fraudulent concealment because he did not provide full and complete information regarding the Companies' valuations and financial status.

53.     Silva had a duty to disclose all the information fully and accurately because he had the superior knowledge of that information.

54.     When Silva undertook to disclose to Levy the Companies' finances, he was required to disclose all the facts without omitting any.

55.     The information omitted was material to Levy's decision to agree to acquire Silva's membership and equity interest and execute the promissory notes.

56.     All conditions precedent to this action have occurred, been satisfied, or been waived.

57.     Levy has retained undersigned counsel to represent it in connection with this action and has agreed to pay a reasonable fee for the services rendered.

## COUNT I
### Fraudulent Omission (Concealment)

58.     Levy realleges and re-incorporates the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

59.     To induce Levy to execute the Notes, Silva disclosed some information he possessed about the Companies.

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

60. But Silva concealed other material information as alleged in paragraphs 1 through 57.

61. The information Silva omitted was material to Levy's decision to purchase Silva's interests based on the values Silva calculated.

62. When Silva undertook to disclose material information concerning the Companies, he bore the duty to disclose all the related information.

63. Silva breached the duty by fraudulently omitting the material facts.

64. Silva's breach caused Levy harm.

65. The harm Levy suffered resulted in an amount to be determined at trial.

WHEREFORE, Andrew Levy demands judgment for damages against Marcos Silva, including accrued interest, attorneys' fees and costs, and all other such relief as this Court deems just and proper.

## COUNT II
### Fraudulent Misrepresentations

66. Levy realleges and re-incorporates the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

67. To induce Levy to execute the Notes, Silva made false statements about the Companies as alleged in paragraphs 1 through 57.

68. Silva knew the representations were false when he made them.

69. Silva intended Levy would rely on the false statements.

70. Levy relied on the false statements.

71. Silva's false statements caused Levy harm.

72. The harm levy suffered resulted in damages in an amount to be determined at trial.

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

WHEREFORE, Andrew Levy demands judgment for damages against Marcos Silva, including accrued interest, attorneys' fees, and costs, and all other such relief as this Court deems just and proper.

## COUNT III
### Negligent Misrepresentation

73.    Levy realleges and re-incorporates the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

74.    To induce Levy to execute the Notes, Silva made false statements about the Companies as alleged in paragraphs 1 through 57.

75.    Silva was negligent in making the statements because he should have known the statements were false, because, among other reasons, he had superior knowledge about the information.

76.    Silva intended Levy would rely on the misrepresentations.

77.    Levy justifiably relied on the misrepresentations.

78.    Silva's misrepresentations caused Levy harm.

79.    The harm levy suffered resulted in damages in an amount to be determined at trial.

WHEREFORE, Andrew Levy demands judgment for damages against Marcos Silva, including accrued interest, attorneys' fees, and costs, and all other such relief as this Court deems just and proper.

## COUNT IV
### Breach of Fiduciary Duty

80.    Levy realleges and re-incorporates the allegations contained in paragraphs 1 through 57 above as if fully set forth herein.

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

81.   Silva, as a member, director, and officer of the Companies, owed a fiduciary duty to Levy.

82.   Silva breached his duty when he failed to act with good faith and fair dealing, honesty, and loyalty, by, including without limitation, the wrongful acts alleged in paragraphs 1 through 57.

83.   Silva's breach caused Levy harm.

84.   The harm suffered resulted in damages to Levy in an amount to be determined at trial.

WHEREFORE, Andrew Levy demands judgment for damages against Marcos Silva, including accrued interest, attorneys' fees, and costs, and all other such relief as this Court deems just and proper.

Dated: December 23, 2020.

BECKER & POLIAKOFF, P.A.
*Counsel for Defendant/Counter-Plaintiff*
1 East Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Telephone:  954.364.6037
Facsimile:  954.985.4176
jpolenberg@beckerlawyers.com
ydaneshfar@beckerlawyers.com

By:_____

Jon Polenberg
Florida Bar No. 653306
Yasin Daneshfar
Florida Bar No. 105092

*CASE NO: CACE-20-005552*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that pursuant to Fla. R. Jud. Admin. 2.516(b)(1), a true and correct copy of the foregoing was electronically filed with the Clerk of Court via the Florida Courts E-Filing Portal on this 23rd day of December 2020, which sends a copy via email to all counsel of record in the above-captioned matter as follows: George S. LeMieux, Esq. and Lauren A. Shumate, Esq., Gunster, Yoakley & Stewart, P.A., *Counsel for Plaintiff*, 450 E. Las Olas Blvd., Suite 1400, Fort Lauderdale, FL 33301 [glemieux@gunster.com; lshumate@gunster.com; eservice@gunster.com; cjames@gunster.com; nallen-mondesir@gunster.com].

Jon Polenberg
Florida Bar No. 653306

LAW OFFICES
BECKER & POLIAKOFF
1 EAST BROWARD BLVD. • SUITE 1800 • FT. LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

ACTIVE 13815668v.2