IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
-----------------------------------x

WENDY'S NETHERLANDS B.V.,

                    Plaintiff,

          -against-                    Civil Action No.
                                       2:24-cv-03077
ANDREW LEVY,

                    Defendant.

-----------------------------------x
                    May 18, 2026
                    10:05 a.m.


          Videotaped Deposition of BRIAN

DAUGHNEY, taken by Defendant, pursuant to

Notice and Subpoena, held at the offices

of Becker & Poliakoff P.A., 45 Broadway,

New York, New York, before Joseph R. Danyo,

a Shorthand Reporter and Notary Public

within and for the State of New York.



A P P E A R A N C E S :

    HOLLAND & KNIGHT LLP
    Attorneys for Plaintiff Wendy's Netherlands B.V.
        150 N. Riverside Plaza, Suite 2700
        Chicago, Illinois 60606

    By:   ELIN I. PARK, ESQ.

            -and-

    HOLLAND & KNIGHT LLP
        701 Brickell Avenue, Suite 3300
        Miami, Florida 33131

    By:   CARY ARONOVITZ, ESQ. (Via Zoom)

            -and-

    HOLLAND & KNIGHT LLP
        100 North Tampa Street
        Suite 4100
        Tampa, Florida 33602

    By:   MITCHELL L. McBRIDE, ESQ. (Via Zoom)


    BECKER & POLIAKOFF P.A.
    Attorneys for Defendant
        1 East Broward Boulevard, Suite 1800
        Fort Lauderdale, Florida 33301

    By:   JON POLENBERG, ESQ.
          GABRIELLE O. SLIWKA, ESQ. (Via Zoom)


Also Present:

    SILVIO FACCIO, Videographer

            ~oOo~



Daughney

THE VIDEOGRAPHER:  This is the video-recorded deposition of Brian Daughney in the matter of Wendy's Netherlands B.V. versus Andrew Levy taken in New York City, New York, on May 18, 2026.  My name is Silvio Faccio.  I am a certified legal video specialist, the Court Reporter is Joe Danyo, and we are both representing Esquire Deposition Solutions.

We are going on the record with media 1.  The time is 10:05 a.m.  Counsel will state their appearances for the record.

MR. POLENBERG:  Jon Polenberg on behalf of Andrew Levy, the Defendant in this case.

MS. PARK:  Good morning.  This is Elin Park appearing on behalf of Wendy's Netherlands B.V.

THE VIDEOGRAPHER:  Will the Court Reporter please swear in the witness.

B R I A N   D A U G H N E Y, having been first duly sworn by Joseph R. Danyo, a Notary Public, was called as a witness and testified as follows:



BRIAN DAUGHNEY                                    May 18, 2026
Wendy's Netherlands B.V. vs Andrew Levy                    4

Daughney

MS. PARK:  Before we get started, can I just put something on the record?  Thank you.  I would like to put on the record that Brian Daughney used to work at Becker & Poliakoff, the same law firm as Attorney Jon Polenberg who noticed today's deposition.  Mr. Daughney represented Andrew Levy in negotiating the Cognovit note, which is at dispute in this action.  Mr. Polenberg also represented and continues to represent Andrew Levy.

To the extent either of these lawyers reveal attorney-client privileged communications, we expect each party to produce all attorney-client e-mails and communications between themselves and Mr. Levy as it relates to the Cognovit note.

An abundance of Sixth Circuit law supports this where a party chooses to use attorney-client privileged communications as a sword, then they can no longer rely on that privilege as a shield.  Thank you.

MR. POLENBERG:  I object to your instruction because there has been no

10:06

10:06

10:06

10:07

10:07



Daughney

disclosure of attorney-client privilege, and this deposition is not intended to disclose any attorney-client privilege.

EXAMINATION BY MR. POLENBERG:                     10:07

Q.   So, Mr. Daughney, I'm going to start with that instruction.  I'm going to ask you a series of questions.  Okay?

A.   Okay.

Q.   Actually please state your full name for the record.                                      10:07

A.   Brian Daughney.  D-a-u-g-h-n-e-y.

Q.   Thank you.  I'm going to ask you a series of questions.  If you think I'm asking you a question that is asking you about a communication you had with Mr. Levy, you misunderstood the question.  Okay?       10:07

A.   Okay.

Q.   Let me know you didn't understand the question, and then I will rephrase it.  Fair?   10:07

A.   Okay.

Q.   All right.  So I want to go over additional ground rules that are more specific to sitting for a deposition.  Okay?

A.   Sure.                                        10:08



Daughney

Q.   All right.  You understand you're under oath, right?

A.   Yes.

Q.   You must tell the truth?

A.   Yes.

Q.   The whole truth?

A.   Yes.

Q.   Nothing but the truth, right?

A.   Yes.

Q.   And you'll do that?

A.   Yes.

Q.   You understand that your testimony you give here today is just as important as testimony you give in court?

A.   Yes.

Q.   Before a judge and maybe a jury?

A.   Yes.

Q.   You understand that the judge and jury may well hear and see your deposition testimony today?

A.   Yes.

Q.   So you understand you must give truthful, complete and accurate testimony, right?

A.   Yes.



Daughney

Q.    And you'll do that?

A.    To the extent I can.

Q.    Okay.  All right.  You'll do that though, right?

A.    I'll do that.  It has been six years. There's not going to be much that I remember, so.

Q.    All right.  If there's a question you don't understand, let me know.  Okay?

A.    Yes.

Q.    If you answer, then you understood the question, correct?

A.    Yes.

Q.    If you want to take back, add to, correct, modify any answer you give during the testimony, let me know.  Fair?

A.    Yes.

Q.    And I'll let you do that.  Okay?

A.    Thank you.

Q.    That's another way that we can make sure that we get your truthful, accurate and truthful testimony today, okay?

A.    Okay.

Q.    I'll take a break about every hour, okay?



Daughney

A.   Yes.

Q.   If you need a break before that hour, let me know and I'm happy to take it.  Okay?

A.   Yes.

Q.   You understand that the Court Reporter is taking down everything that's said, right?

A.   Yes.

Q.   And you understand that the Court Reporter will create a transcript from today's testimony?

A.   Yes.

Q.   And you'll have the ability to read that transcript to make corrections.  Do you understand that?

A.   Okay.  Yes.

Q.   Bear in mind that if you make corrections and changes to your testimony after we conclude today, that I get to learn that. Fair?

A.   Yes.

Q.   And that if you do make those changes, I can tell the judge and/or jury that you made those changes.  Okay?



Daughney

A.   Okay.

Q.   And that's another reason why it's important to give your truthful, complete and accurate testimony today.  Fair?

10:10

A.   Okay.

Q.   Is there any reason, medical or otherwise, that prevents you from giving truthful, complete and accurate testimony today?

A.   No.

10:10

Q.   If that ever changes, will you please let me know immediately?

A.   Sure.

Q.   All right.  Now you started off by saying, "I don't know what I'm going to remember," but let's start off with what you do remember.

10:10

A.   Okay.

Q.   So what do you remember?

A.   An open-ended question.

10:10

Q.   Yeah.

A.   We did a couple of transactions for Andrew and his companies.  I don't know which transaction this is about.

Q.   Okay.

10:10



Daughney

A.   I remember I think he bought 85 or so, I think it was less than that, franchises from another franchise owner and got financing in connection with that.

Q.   Okay.  What about in or around 2020 when -- let me ask that differently.  Okay?

A.   Okay.

Q.   Yes?

A.   Yes.

Q.   Do you remember there coming a time when there was a Brazil venture?

A.   I remember it was discussed.  Yes.

Q.   Okay.  The Brazil venture -- let me ask it this way.  Okay?  Do you remember Kerry Green?

A.   No.

Q.   Do you remember any attorneys at Wendy's?

A.   Not in a vacuum, no.

Q.   Okay.  Do you remember there came a time when Wendy's was trying to have Andrew sign a promissory note related to the Brazil venture?

A.   Yes.  That sounds familiar.  Yes.

Q.   Okay.  What do you remember about



Daughney

that?

A.    I remember it was tied to the other, the main deal I was working on.  They wanted him I think to start one or two or five franchises in Brazil.

Q.    Okay.

A.    It was related to that.

Q.    When you say "they," who's that?

A.    Wendy's.

Q.    When do you remember that discussion with Wendy's?

A.    It was during the transaction I was working on.

Q.    The one for the 50 or so?

A.    Yes.  And again, I don't remember if it was 42 or 62, whatever the number of franchises.

Q.    Those franchises, does that relate to expansion in Michigan?

A.    Yes.

Q.    How was that connected to Brazil?

A.    I think it was part of the -- they were going to let him buy more franchises, but they wanted him to also expand into Brazil,

10:12
10:12
10:12
10:12
10:12



800.211.DEPO (3376)
EsquireSolutions.com

Daughney

because they wanted to.  That's what I remember.

Q.   Okay.  What happened with the Brazil franchises?

A.   I don't think it happened.  I don't remember.

Q.   Okay.  When you say you don't think it happened, what do you mean?

A.   I know there was talk about it, but I don't think they ever completely finished, if he was going to start with one or five, and I don't know if he ever actually set them up.

Q.   Let me start off with a document that may help refresh your recollection.

A.   Okay.

Q.   I'm going to mark this document as Exhibit 1 to your deposition.

(Exhibit 1, Document Bates stamped Levy_0009107 through 9144, marked for identification, as of this date.)

Q.   Go ahead and take a look --

A.   Should I look through it?

Q.   Yeah, take a look through it, and let me know when you're done.

A.   Okay.  Do you want me to look at



Daughney

everything?

Q.   Whatever you need to be comfortable.

A.   Okay.

Q.   Okay.  Now, looking at Exhibit 1,    10:19
what is it?

A.   A note by Andrew Levy in the amount
of $5-1/2 million roughly to Wendy's.

Q.   Okay.  What's the date?

A.   The date is February 23rd, 2020.    10:19

Q.   Looking at this document, how were
you involved in negotiating this document with
Wendy's?

A.   I believe that we represented Andrew
in this note as part of the larger transaction.    10:19

Q.   Okay.  You see there's exhibits
attached to the note?

A.   Yes.

Q.   What do you remember about those
exhibits?  Specifically Exhibit B?  It starts at    10:20
Bates number -- you see the Bates numbers at the
bottom of the page?

A.   Yes.

Q.   Check 9113.

A.   Oh.  The guarantee.    10:20



Daughney

Q.    The guarantee.  What about those documents?

A.    They look familiar, but I don't remember particulars, but they look familiar like it was part of the entire package of documents related to the note.

Q.    Okay.  When you say related to the note, what do you mean by related?

A.    Well, he had a guarantee outstanding, and it was tied to an original amount that he owed, I guess owed to Wendy's, related to he partially owned or through an entity partially owned an entity that was running or supposed to run the franchises in Brazil.

Q.    Okay.  What do you remember about the guarantee versus the promissory note that you were just looking at?

A.    I would be speculating.  I don't remember much.

Q.    Okay.  So let's clarify.  Do you mean speculating, or do you mean you don't remember?

A.    I don't remember.  I would have to speculate.  I don't remember.

Q.    Okay.  What would be the reason that



Daughney

Wendy's -- let me ask that differently.  Okay?

A.   Sure.

Q.   Why do you think Wendy's would want a note if it already had a guarantee?

A.   Based on the language, because he wasn't a full owner of the Brazilian operation.

Q.   Okay.  What does that mean?

A.   Well, the guarantee says he's a 40 percent owner.  Well, 40 percent of a pledge agreement.  So I don't remember if that meant he owned 40 percent of the Brazilian entity which was owned by I guess at least 40 percent by other people, and Wendy's owned a piece of it as well.

Q.   Okay.  So why do you think Wendy's would want a note instead of a guarantee under those circumstances?

A.   To make it more enforceable.

Q.   What does that mean?

A.   Well, a note is more directly enforceable than a guarantee.

Q.   Okay.  What do you recall about cross-defaults between the credit agreement documents that are attached to this Cognovit note and the North American franchise operations?



Daughney

A.   I'd have to look more thoroughly at the document, but I remember that being a big issue that they wanted a cross-default on everything, and Mr. Levy's position, and I don't remember how it ended, but his position was why would he put at risk all the North American assets he had, franchises, to a situation in Brazil, which wasn't working as far as I know.

Q.   How did you communicate that to Wendy's?

A.   How did I communicate?

Q.   Yes.

A.   These were usually joint business calls with Mr. Levy on the line, and that was certainly discussed.

Q.   With who?  Who else was on the line?

A.   I don't remember if it was inside or outside counsel for Wendy's.

Q.   Okay.  From Wendy's?

A.   Yeah, and usually business people were on too.

Q.   Okay.

A.   But I don't remember who.

Q.   Okay.  How many of those, quote



Daughney

unquote, business calls were there?

A.    Anything I say would be a guess.

Q.    Okay.

A.    Many.  More than ten.

Q.    And what did you communicate to Wendy's as far as Andrew Levy's position about cross-defaults?

A.    Well, I do remember we were trying to protect, as I said before, why would the Brazilian operation, which I believe from Mr. Levy was not working out well for everybody, why would that put at risk his operating the franchises especially the new ones he was buying in Michigan.

Q.    Looking at the date, February 23rd, 2020 on the note, page 1 of Exhibit 1.

A.    Yes.

Q.    So when do you recall having calls with Wendy's, given that date is the date that this was signed?

A.    To be honest with you, I'm sure this transaction in these documents lasted probably three months I would guess.

Q.    So starting somewhere at the end



BRIAN DAUGHNEY
Wendy's Netherlands B.V. vs Andrew Levy

May 18, 2026
18

                    Daughney

of --

        A.    November.

        Q.    2019?

        A.    Yeah.                                    10:25

        Q.    What did you express to Wendy's as
the position as far as the need to sign a
Cognovit note?

        A.    I don't remember.  I don't remember.

        Q.    Okay.  When you met with people at      10:26
Wendy's on these business calls, how long would
those calls last usually?

        A.    I would say the shortest was probably
half an hour.  They usually ran an hour or so.

        Q.    Okay.                                   10:26

        A.    It depended on what we were doing.
If we were reviewing a document, it could have
been longer, but I would say half an hour or an
hour was probably the norm.

        Q.    During those calls, would Mr. Levy     10:27
speak to people at Wendy's?

        A.    Yes.

        Q.    And you would speak to people at
Wendy's?

        A.    Yes.                                   10:27



Daughney

Q.    And Wendy's people would speak to you?

A.    Yes.  We would all speak with each other.                                                      10:27

Q.    Okay, including the attorneys and the business people?

A.    Yes.

Q.    How contentious were these calls?

A.    Some were contentious.  I think this topic was very contentious.  Some calls went perfectly well, because we were just dealing with other normal document transactional discussions.                                                      10:27

Q.    Why were discussions about Exhibit 1 contentious?                                                      10:27

A.    I don't remember specifically the note itself, but I remember the topic of again why is he being made to put at risk all these franchises here in the U.S. on the venture in Brazil.                                                      10:27

Q.    Does the name Kris Kaffenbarger mean anything to you?

A.    I seem to recall he was a Wendy's businessperson.

Q.    Okay.  Do you remember any other                                                      10:28



Daughney

Wendy's business people?

A.   No.  If you say a name maybe, but not off the top of my head, no.

Q.   What about a meeting between Andrew and the CEO?

10:28

A.   I know he spoke to lots of people and very high-level people at Wendy's, but I don't remember a name.

Q.   How adamant was Wendy's about having this note signed?

10:29

A.   Very.

Q.   What does that mean?

A.   They were insistent.  They weren't going to approve the new transaction without tying it to Brazil.

10:29

Q.   What was Wendy's saying to you and Mr. Levy about proceeding forward?

MS. PARK:  Objection to form.

A.   Do I answer?

10:29

Q.   Yes.  So let me say, counsel may object to a question, and, if counsel objects to a question, you still answer the question.

A.   Okay.

Q.   Unless counsel is asking a question

10:29



Daughney

and asks a question about something that's privileged, and then I instruct you not to answer, and then at that point I'm sure we'll have a discussion, but at that point you wouldn't answer. Okay?

A. Understood. Can you repeat what you asked?

Q. Yeah. What was Wendy's saying as the consequences for not signing this promissory note?

A. I don't remember there ever being a definitive if you don't do X, then Y will happen, but it was pretty clear that the Brazil operations and him signing this note and a guarantee, or if the guarantee had already been signed, that they were tied together with approval of him buying the new franchises that he wanted to buy.

Q. All right. So let's look at that again on page 9114.

A. Okay.

Q. You see at the bottom it says the guarantee is October 20, 2015? Did I read that correctly?

10:29

10:30

10:30

10:30

10:30



Daughney

A.   Yes.

Q.   Okay.  So when was this guarantee put in place?

A.   October 20, 2015.                                    10:30

Q.   And the Cognovit note was signed?

A.   February 23rd, 2020.

Q.   About five years later, right?

A.   Yes.

Q.   When you say Wendy's wasn't going to              10:31
let him proceed with Brazil, do you know if
Wendy's was stopping its Brazil operations?

A.   I don't remember.  I remember that
things weren't going well, but I don't know what
that -- I don't recall what that meant.                   10:31

Q.   Did there come a time where you heard
Wendy's say that, if Mr. Levy doesn't sign this
Cognovit note, it would terminate its franchise
agreements?

A.   I don't remember that.                           10:31

Q.   Let's see if we can -- I'm going to
move on to another exhibit, Mr. Daughney.

A.   Okay.

Q.   Showing you a document marked as
Exhibit 2 to your deposition.                             10:32



Daughney

(Exhibit 2, Document Bates stamped Levy_0009409 through 9413, marked for identification, as of this date.)

Q.   Go ahead and review the document, and let me know when you're done.          10:33

A.   Okay.

Q.   Looking at Exhibit 2, you've had a chance to review it all?

A.   Yes.          10:34

Q.   On page 9410, do you see that?

A.   Yes.

Q.   There's an e-mail from a Ms. Kerry Green.  True?

A.   Yes.          10:34

Q.   Dated February 4, 2020, right?

A.   Yes.

Q.   And it's to you?

A.   Yes.

Q.   And it copies a person Stephanie Niehaus from Squire Patton Boggs?          10:34

A.   Yes.

Q.   Looking at this string of e-mails, do you remember what was going on at the beginning of February 2020?          10:35



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Daughney

A.   Well, I believe he was again trying to buy additional franchises, and there were outstanding obligations from existing agreements with Wendy's tied to other franchises.                 10:35

Q.   Okay.  Looking at the first e-mail from Ms. Green, she provides a table of accounting for money, right?

A.   Yes.

Q.   And this would be the amount for the          10:35
Cognovit note, true?

A.   Well, it doesn't say.  It just says credit agreements.  Oh, you mean if that's what resulted in the Cognovit?

Q.   Yes.                                          10:36

A.   It appears, yes.  $5,550,360.55.

Q.   Okay, and this e-mail is one that you initiated with Ms. Green starting on
February 3rd, 2020.  If you look at page 9412,
you can see that.                                 10:36

A.   Yes, I see that.

Q.   And that's where you're talking about having received a draft note, right?

A.   Yes.

Q.   You see right after you sent that          10:36



Daughney

e-mail Ms. Green sent you an e-mail?

A.   Yes, on February 3rd at 6:02, that one?

Q.   Yeah.

A.   Yes.

Q.   All right.  So I'm going to read a sentence.  "That being said, I know my business team has wanted to have these discussions jointly with Mr. Levy present."  Did I read that correctly?

A.   Yes.

Q.   What was going on that that was important for the next step?

MS. PARK:  Objection to form.

A.   Based on the e-mails, it seems as though they were having discussions or trying to have discussions about outstanding amounts, and they wanted to have everybody on the same page or in the same room to discuss how to handle them.

Q.   Did you have a subsequent conversation with Ms. Green?

A.   I don't remember.  I'm sure I must have, because we were in the middle of the transaction, but I don't remember.



Daughney

Q.   When you say the transaction, that's the one you were referring to earlier about Michigan, right?

A.   Yes.                                                           10:37

Q.   Do you know whether Michigan -- strike that.  Michigan, the franchises in Michigan sold before this date, correct?

A.   I don't remember.

Q.   But it was Mr. Levy selling the        10:38
Michigan franchises, right?

A.   I don't remember if he was buying or selling.  I worked on several transactions.  So it's hard to remember which was which.

Q.   And the buyer was TSFR?                 10:38

A.   I don't remember.

Q.   Do you remember the name Schostak?

A.   Yes.

Q.   The buyer was the Schostak family?

A.   That sounds correct.                    10:38

Q.   In Michigan, right?

A.   Yes.

Q.   And that closed pre-COVID, right?

A.   I don't remember.

Q.   I'm showing you a document marked       10:39



Daughney

Exhibit 3 to your deposition.  Please take a look through this exhibit, and let me know when you're done.

(Exhibit 3, Document Bates stamped Levy_0009689 through 9692, marked for identification, as of this date.)

A.    Okay.

Q.    Exhibit 3 is an e-mail string, right?

A.    Yes.

Q.    The e-mail on page 9690, the first e-mail shown, is from Kerry Green, correct?

A.    Yes.

Q.    Dated February 14, 2020, right?

A.    Yes.

Q.    What was going on with the Brazil location as it relates to Wendy's and Mr. Levy starting based on this e-mail exchange?

A.     It appears from the e-mails, again, I mentioned before they were ceasing the operation of the franchise, and they were looking to the other owners for their obligations related to those franchise credit agreements.

Q.     I asked earlier why do you think Wendy's was asking to change a guarantee into a



Daughney

promissory note, and you said you think because it's more enforceable.

Given this exchange, does that help you remember any other factors?                    10:41

A.   I recall that things in Brazil hadn't worked out or weren't working out.  They were looking to wrap up the franchise operation.  I don't remember if it was one site or more than one, and they wanted to hold Andrew Levy and I          10:42 think the other partial owner responsible for -- partially responsible for obligations under their agreements.

Q.   Looking at this e-mail exchange, what was your understanding of what Wendy's would do          10:42 if Mr. Levy didn't sign the note?

A.   It doesn't specifically say in the e-mails, but I assume they would consider enforcing whatever obligations they had.

Q.   What about terminating his U.S.                    10:42 franchises?

MS. PARK:  Objection to form.

A.   It doesn't say in the e-mails, but again, I would believe they were all tied          10:42 together.



Daughney

Q.    What makes you believe that?

A.    Just what I'm recalling from the conversations over the month or two or three.

Q.    How many franchises did Andrew Levy or his companies control in February of 2020?          10:43

A.    I don't recall the exact number.  I have a number in my head, but I don't know if it's accurate.

Q.    Okay.  I am showing you a document marked Exhibit 4 to your deposition.          10:43

(Exhibit 4, Document Bates stamped Levy_0008202 through 8230, marked for identification, as of this date.)

Q.    Go ahead and read through Exhibit 4.          10:44

A.    Okay.  Okay.

Q.    All right, so on Exhibit 4 on the first page there's an e-mail from Kerry Green, true?

A.    Yes.          10:47

Q.    Dated February 15, 2020, right?

A.    Yes.

Q.    It's addressed to Mr. Levy, yes?

A.    And me.

Q.    And you?          10:47



Daughney

A. Yes.

Q. And several people from Wendy's, right?

A. Yes.

Q. Including Mr. Kaffenbarger?

A. Yes.

Q. Peter Koumas, yes?

A. Yes.

Q. Aaron Kale?

A. Yes.

Q. And outside counsel Stephanie Niehaus, right?

A. Yes.

Q. Now you've had an opportunity to read the e-mail from Ms. Green?

A. Yes.

Q. I'm going to read the last sentence, okay, in the first paragraph, okay?

A. Yes.

Q. "For that reason, unless the offer is accepted and all documents are fully executed at Wendy's offices in Dublin, Ohio, by the end of business on Wednesday, February 19, this offer will automatically expire, and we will consider



Daughney

our discussions to be terminated."  Right?

A.   Yes.

Q.   I read that correctly?

A.   Yes.                                          10:48

Q.   What did you understand that to mean?

A.   Take it or leave it.

Q.   Okay.  Now, if you look at the last document that is attached to this e-mail, it starts on page 8223.                               10:48

A.   Yes.

Q.   It says at the very top it says, "Draft:  Not for execution, subject to CPLR 4547/Rule 408 (or equiv.)," right?

A.   Yes.                                          10:49

Q.   Did I read that correctly?

A.   Yes.

Q.   In the middle of the page, it says, "Notice of non-compliance with re-imaging requirements and agreement of forbearance of default."  Did I read that correctly?          10:49

A.   Yes.

Q.   What did you understand attaching this letter to this e-mail to mean?

A.   That he was in non-compliance        10:49



Daughney

according to Wendy's with franchise obligations of the numerous entities, stores that are listed.

Q. What would that do?

A. Well, they would have the right to seek costs and expenses or terminate his franchises.

Q. And earlier you were testifying that you understood that Wendy's was threatening Mr. Levy that, if he didn't sign the note, that they would terminate his franchise agreement, right?

MS. PARK: Objection to form.

A. Yes. I would say that they were tying in his obligations, claimed obligations, on other stores to settling the disputes going on in Brazil and signing this note.

Q. Had you worked on any other franchises when you represented Starboard or Mr. Levy for him?

A. Yes. I'm pretty sure we did at least one, if not two other transactions.

Q. For Wendy's or different brands?

A. I think it was a different brand.

Q. What brand?

A. I don't remember.



Daughney

Q.   Okay.  If you look at the page number 8203, this is the start of a markup of the promissory note, right?

A.   Yes.  It looks that way.                          10:51

Q.   You see up top there's the word "secured" is crossed off, and "Cognovit promissory note" is underlined?

A.   Yes.

Q.   What do you understand was the change          10:51
to this note?

A.   I remember that they wanted certain personal assets of Mr. Levy securing the note like I believe his house in Utah or Montana, and, looking at the stricken language, I believe          10:52
that's one of the things that was being objected to, and it looks like they accepted it.

Q.   What do you know about Cognovit notes?

A.   I would be speculating.                          10:52

MR. POLENBERG:  We've been going just a little under an hour.  I need a comfort break.  So let's go ahead and take a break.

THE VIDEOGRAPHER:  We are now going          10:52



Daughney

off the record.  The time now is 10:52 a.m.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record with media number 2.  The time is 10:58 a.m.

BY MR. POLENBERG:

Q.   Mr. Daughney, I'm showing you a document marked as Exhibit 5 to your deposition.

(Exhibit 5, Document Bates stamped Levy_0009726 through 9731, marked for identification, as of this date.)

A.   Okay.

Q.   Please read through it, and let me know when you're done.

A.   Okay.  Okay.

Q.   The first e-mail in this package appears on page 9729, correct?

A.   Yes.

Q.   And it's from Kerry Green, true?

A.   Yes.

Q.   Dated February 18, 2020, right?

A.   Yes.

Q.   And Ms. Green is responding to an



Daughney

e-mail that you sent earlier that day, right?

A.   Yes.

Q.   And it references another e-mail that you had sent and you were touching base with her. Right?     11:00

A.   Yes.

Q.   What was the discussions around this time now that the circulated red-lined note had been exchanged?     11:00

A.   Yeah.  It appears that I sent them comments on the documents that had been forwarded to us, and we were looking for a response, and they were trying to line up Mr. Levy to get to go to headquarters of Wendy's and sign the documents.     11:00

Q.   What was important about going to Ohio to sign these documents?

MS. PARK:  Objection to form.

A.   I'm assuming that it was they wanted him present in Dublin so that they had a jurisdictional basis.     11:00

Q.   Is it fair to say that on February 18, 2020 the parties hadn't reached agreement on what the terms would be yet?     11:01



                          Daughney

          A.    Certainly from our end of the

transaction, yes.

          Q.    And is it also fair to say that Ms.

Green was intent on having Mr. Levy commit to a          11:01

travel date to Ohio?

               MS. PARK:  Objection to form.

          A.    Yes.

          Q.    How often was that stressed in the

communications between the parties?          11:01

          A.    I don't remember.

          Q.    Well, would you consider it was

frequent or infrequent?

          A.    I would say certainly more than once,

but I can't tell you if it's eight times or four          11:01

times.

          Q.    Okay.  More than once?

          A.    Yes.

          Q.    Showing you a document marked as

Exhibit 6 to your deposition, please take a look          11:02

at it, and let me know when you're done reading

it.

          A.    Okay.

               (Exhibit 6, Document Bates stamped

               Wendy_0001075 through 1081, marked for          11:02



Daughney

identification, as of this date.)

A.    Okay.

Q.    All right.  So let's start at the back at page 1080.          11:04

A.    Okay.

Q.    Looking at that, there's a date at the top February 13, 2020.  True?

A.    I see that.  Yes.

Q.    Who drafted this?          11:04

A.    I don't remember.  I'm assuming Wendy's, but I don't know.

Q.    Let's look at it.  You see the interest rate is 2.25 percent per annum?

A.    Yes.          11:05

Q.    What did the final Cognovit note end up being?  That's Exhibit 1.

A.    4-1/2 percent.

Q.    Okay.  So who do you think this term sheet came from?          11:05

A.    I think we drafted it.  I think I drafted it.

Q.    All right.  Look at the term of the note.  You see it reads there "eight-year repayment term"?          11:05



Daughney

A.   Yes.

Q.   "(October 2028)."

A.   Eight-year period.  Yes.

Q.   I read that correctly?                          11:05

A.   Yes.

Q.   What was the period on the Cognovit note?

A.   Four and a half years roughly.

Q.   Okay.  You see it says the fourth          11:06
line down under "Terms of Note," it says, "No
cross-default linking performance under U.S.
franchise operations"?

A.   Yes.

Q.   I read that correctly?                      11:06

A.   Yes.

Q.   Was there a cross-default in the
final Cognovit note?

A.   I believe there was, yes.

Q.   You see it says, the last paragraph,        11:06
"U.S. franchise operations:"?

A.   In the term sheet?

Q.   This would be 1081.

A.   Yes.

Q.   There's a paragraph there that talks         11:06



Daughney

about U.S. operations, right?

A. Yes.

Q. What terms were you trying to negotiate with Wendy's there?

A. I believe it tied back to no cross-default, but he was also trying to give himself room for operating the existing franchises he was keeping.

Q. And what would happen if Wendy's terminated his franchise agreements in the United States?

MS. PARK: Objection to form.

Q. I'm sorry. Under this term sheet.

A. What would happen?

Q. Yeah.

A. Well, we were proposing that it -- well, it's open-ended.

Q. Well, let me read the last sentence. It says, "Termination of franchise operations for other than parameters agreed upon will result in waiver of payment of note without tax effect upon Andrew Levy." Did I read that correctly?

A. Yes.

Q. What would happen if Wendy's



Daughney

terminated the franchise agreements under the proposed terms?

MS. PARK:  Objection to form.

A.   Under the franchise agreements, I believe he would be subject to damages claims.

Q.   What about the note?

A.   Well, normally, if you have a waiver of a note, you have a tax effect for the amount of the waived note principal and interest.

Q.   Well, one of the terms proposed was waive the note and no tax effect, right?

A.   Right.

Q.   How was that received by Wendy's?

A.   I don't believe that was acceptable, or they were less concerned about his personal issues than their franchise issues.

Q.   All right.  So now let's look at page 1077 to Exhibit 6.

A.   Okay.

Q.   In an e-mail from you to Kerry Green copying me and Stephanie Niehaus, you were informing Ms. Green that the business call should wait, right?  All the way at the bottom.

A.   No.  What I was saying is the meeting

11:08

11:08

11:08

11:09

11:09



Daughney

with either just the lawyers or all parties should wait until Andrew met with Todd.

Q. Right, and who is Todd?

A. I believe he's the CEO of Wendy's.

Q. Todd Penegor?

A. I would be guessing.

Q. You suggested that the business meeting hold off, right?

MS. PARK: Objection to form.

A. Well, I would say they're both business meetings. I would say the meeting including the lawyers should wait until Mr. Levy had spoken to Todd and they get some parameters to us.

Q. Okay. So how was that received by Wendy's?

MS. PARK: Objection to form.

A. It looks like by the e-mails they kept pushing to have the meeting.

Q. Why do you think they were pushing?

A. I believe they wanted, based on the other e-mails, they wanted to get things signed. They weren't going to negotiate that much.

Q. When you say they weren't going to

11:09

11:10

11:10

11:10

11:10



Daughney

negotiate that much, what do you mean?

         A.   Well, we had sent this term sheet, which obviously they weren't very receptive to, and, based on the other e-mails, there was a lot of pressure to get things signed, and they had said final offer.  So they were trying to just try to meet, get things done as much as they were willing to go and then have Andrew sign whatever it is they were presenting.

         Q.   And what would happen if Andrew didn't sign?

                MS. PARK:  Objection to form.

         A.   I believe they were threatening the rest of the franchise operations.

         Q.   What do you base that belief on?

         A.   Just the e-mails back and forth and the term sheet language that we had proposed which didn't make it into the final documents.

         Q.   And from your recollection, right?

         A.   Yes.

         Q.   Before we go take a break, because I think I might be done, I just want to go through some stuff.  Let me ask what did you do to prepare for this deposition?



Daughney

A.   Nothing.

Q.   Okay.  Who did you talk to at Becker about this deposition?

A.   Only you.                                              11:12

Q.   And what did we talk about?

A.   Just that he was being sued, and that was it.

Q.   All right.

A.   No substance.  No anything.  I didn't        11:12
look at any documents.  I didn't see anything.

Q.   You talked to --

A.   Maybe your secretary about scheduling.

Q.   You talked to Rob Rabinowitz, yes?          11:12

A.   Yes.

Q.   What was that discussion?

A.   I asked him why am I being deposed?
It seemed odd to me.

Q.   Okay, and then what about on Friday?        11:13
You e-mailed me, right?

A.   Yes.

Q.   About?

A.   I believe the strike.  The transit
strike.  Are we still going to have it?          11:13

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Daughney

Q.   Okay.

A.   And what do I do if there's no trains.

Q.   Okay.  Anything else that we talked about?                                                    11:13

A.   No.

MR. POLENBERG:  All right.  Let's go ahead and take a break.

THE VIDEOGRAPHER:  Now we're going off the record.  The time is 11:13 a.m.                         11:13

(Recess taken)

THE VIDEOGRAPHER:  We are back on the record with media number 3.  The time is 11:19 a.m.          11:19

MR. POLENBERG:  Mr. Daughney, I have no questions at this time.  I reserve for redirect and tender the witness.

THE WITNESS:  Okay.

EXAMINATION BY MS. PARK:                                                                           11:19

Q.   Mr. Daughney, you used to work at the same law firm as Mr. Polenberg, is that right?

A.   Yes.

Q.   And you've worked with Mr. Polenberg?

A.   Not very directly, no.  I am a                                                                11:19



Daughney

corporate lawyer, he's a litigator.

Q.   Thank you.  Did you work with Mr. Polenberg to represent Andrew Levy in the transaction that we discussed today?

A.   Not in the transaction until I believe things started getting testy between the parties.

Q.   And then he was brought in?

A.   Yes.

Q.   Did you attend firm retreats or meetings with Mr. Polenberg while working at Becker?

A.   Yes.

Q.   He was your partner, right?

A.   I was a non-equity partner.  I believe Jon is an equity partner.

Q.   He was your colleague, right?

A.   Yes.

Q.   And you said you communicated with Mr. Polenberg before today's deposition?

A.   Yes, very briefly, yes.

Q.   Did you communicate twice with Mr. Polenberg?

A.   I believe it was twice.  Yes.



Daughney

Q.    When was the first time?

A.    First would be after I got the subpoena, so I didn't know what it was about. And then secondly, on Friday about the railroad strike and whether this was still going to happen.

Q.    Did the first communication with Mr. Polenberg occur by e-mail or phone call?

A.    I think I e-mailed after I got the subpoena, I don't recall exactly, but we had a brief conversation after that.  Very brief.  A minute maybe.

Q.    What was said during that call?

A.    I just asked why am I being deposed? He gave me a brief background, and that was pretty much it.  I'm sure I communicated this happened five or six years ago.  I'm not sure what I would remember.

Q.    And you mentioned talking to somebody named Robert Benowitz?

A.    Rabinowitz.  Robert is a partner in the New York/New Jersey office.  So I believe I had gotten the subpoena.  So I asked Robert to find out from Jon how come I'm being subpoenaed.



Daughney

Q.   Why did you reach out to him?

A.   Because I'm friends with Robert.

Q.   And --

A.   And I was a partner here, and Robert was a partner here.

Q.   When you say "here," what do you mean?

A.   The New York office of Becker.

Q.   And what did he tell you?

A.   He said, "I'll find out."

Q.   And then?

A.   He called me back and said, "Yeah, it's about this Wendy's loan dispute or fight. So just give Jon a call and see what you got to do.  What's the deposition about."

Q.   What do you know about the dispute between Andrew Levy and Wendy's?

A.   I was guessing that there must have been some sort of default, but that was it.  I had no documents.  I didn't have any substantive discussions with anybody.

Q.   Default of what?

A.   I assumed the loan or franchise agreements that he had entered.  The transaction



Daughney

I worked on.

Q.   Are you referring to the Cognovit note?

A.   I did not know it by name.  I just generally assumed there was some issue between his obligations as a franchisee.

Q.   And you mentioned speaking with Mr. Polenberg's assistant?

A.   Yes.  Only about scheduling.

Q.   Did you speak with anyone else about today's deposition?

A.   No.  Actually, last night I just spoke to Michael Goldstein, a partner here, and just told him I was coming in.  That was it.

Q.   Who is Michael?

A.   Michael Goldstein is a partner in the New York office.

Q.   Okay.  Anything else you discussed with him?

A.   No.

Q.   Was Andrew Levy your client?

A.   No.

Q.   Whose client?

A.   I don't remember his name.  It was

11:23

11:23

11:23

11:24

11:24



Daughney

one of the partners in Florida.  I don't think he's at the firm anymore.

Q.   Was Andrew Levy's company your client?

A.   Again, not my client.  It was a client of the partner in Florida.

Q.   Did you represent Andrew Levy?

A.   Yes.  Andrew and the company.

Q.   What company?

A.   Starboard.

Q.   For how many transactions did you represent Starboard or Andrew Levy?

A.   I think two or three.

Q.   Did you represent Andrew Levy in the case of Marco Silva v. Andrew Levy filed in Florida?

A.   Never heard of it.

Q.   Are you aware that in the lawsuit, Mr. Silva alleged that Mr. Levy stopped paying on a promissory note?

A.   No.

Q.   Are you aware that Mr. Levy countersued Mr. Silva for fraud?

A.   No.



Daughney

Q. Did you represent Andrew Levy in the case of City National Bank of Florida v. Andrew Levy in Florida?

A. No.                                                            11:25

Q. Are you aware that City National Bank in 2026 obtained a judgment against Mr. Levy personally of about $23 million?

A. No.

Q. Are you aware that along with                                 11:25
Starboard Mr. Levy was the CEO of PNX Admin LLC?

A. I don't recall.

Q. Are you aware that in 2024 Ms. Sandy Adler obtained a judgment against Starboard Group for approximately $7 million?                                   11:26

A. No.

Q. Are you aware that Ms. Adler has filed supplementary proceedings seeking to collect that amount from PNX management?

A. No.                                                           11:26

Q. What was your hourly billing rate in 2020 when you represented Mr. Levy?

A. I have no idea.

Q. Above $2,000?

A. Hourly?                                                       11:26



Daughney

Q.   Yes.

A.   No.  Probably more I'm guessing $380, $400.

Q.   Do you know what Mr. Polenberg's hourly rate was in 2019 or 2020?

A.   No.

Q.   Do you know what Mr. Polenberg's hourly rate in 2024 was?

A.   No.

Q.   Did you know that it was $1050 an hour?

A.   No.

Q.   Along with Mr. Polenberg and you, did any other lawyer represent Mr. Levy in relation to the Cognovit note?

A.   There was one other person whose client was Mr. Levy.  I can't remember his name.

Q.   So he was representing Mr. Levy in negotiating the Cognovit note?

A.   He was -- Mr. Levy was his client. Again, I can't remember his name.  So he would have been involved, but I was the day-to-day person I guess.

Q.   Would you have exchanged e-mails with



Daughney

this other person you cannot recall?

A.   I would think so.

Q.   I'm showing you a document marked as Exhibit 7.  Take a moment to look at it.                11:28

(Exhibit 7, Document Bates stamped Wendy_0000625 through 627, marked for identification, as of this date.)

Q.   Let me know once you've reviewed the document.                11:29

A.   Okay.  Okay.

Q.   What is this document?

A.   It looks like some e-mails related to at least one of the franchise locations that Mr. Levy was getting rid of, and the buyer wanted to    11:29 know when they could close.

Q.   What do you recall about this transaction?

A.   Boy.  Nothing really.

Q.   Who were you representing in this                11:30 transaction?

A.   Starboard and Mr. Levy.

Q.   Is this one of the few transactions in which you represented Mr. Levy and Starboard?

A.   Yes.                11:30



                    Daughney

Q.    And what was the date of this e-mail?

A.    They look to be November 12 and 14th of 2019.

Q.    Were you representing Mr. Levy or Starboard before this date?                    11:30

A.    I don't recall.

Q.    I'm showing you an exhibit marked number 8.

(Exhibit 8, Document Bates stamped Wendy_0009378 and 9379, marked for identification, as of this date.)                    11:31

Q.    Take a moment to review this, please.

A.    Okay.

Q.    Let me know once you're done reviewing.                    11:32

A.    Okay.  I'm done.

Q.    What does this document show?

MR. POLENBERG:  Objection to form.

A.    The e-mails talk about I believe the same transaction related to Exhibit 7, which was at least one of the franchise locations being sold or assigned.                    11:32

Q.    Do you see somebody named Rachel Farkas?                    11:32



BRIAN DAUGHNEY
Wendy's Netherlands B.V. vs Andrew Levy

May 18, 2026
54

Daughney

A.    Yes.

Q.    On the e-mail address?

A.    Yes.

Q.    Who is Rachel?                                    11:32

A.    I don't remember.

Q.    Does it show that Rachel was at Becker?

A.    Yes.

Q.    Did you represent Mr. Levy and                    11:32
Starboard in this transaction?

        MR. POLENBERG:  Objection to form.

A.    Yes.

Q.    Okay.  You can set that aside now.
I'm showing you Exhibit 9.                             11:33

        (Exhibit 9, Document Bates stamped
    Levy_0009693, marked for identification,
    as of this date.)

Q.    Take a moment to look at this.

A.    Okay.                                             11:33

Q.    Is it an e-mail from Andrew Levy to
Kerry Green at Wendy's and you?

A.    Yes.

Q.    And it says, "Kerry, I am introducing
Brian, an associate of Jon's to keep things            11:33



Daughney

moving."

A.   Yes.  That's what it says.

Q.   Do you know who Jon was that's being referenced?                                             11:34

A.   I would be guessing, but I assume it's Jon Polenberg.

Q.   And what was your understanding of why you were being introduced to Kerry Green at Wendy's?                                             11:34

A.   Based on the other e-mails, it looks like it would have been related to the Cognovit note and the workout in January/February of 2020 with Wendy's.

Q.   And you represented Mr. Levy in that                11:34
transaction, correct?

A.   And Starboard, yes.

Q.   And Starboard?

A.   Yes.

Q.   I'm showing you Exhibit 10.                        11:35

     (Exhibit 10, Privilege log produced
     by Mr. Levy, marked for identification, as
     of this date.)

Q.   I will represent to you that this is
a truncated copy of the privilege log produced by      11:35



Daughney

Mr. Levy in this litigation, and it shows just the rows where you are on the e-mail to or e-mail from.

A.    Okay.

Q.    If you can flip to the last page of this document.

A.    Okay.

Q.    Do you see a reference to "Client Docs 0243569" near the bottom?  Fifth row from the bottom.

A.    Yes.

Q.    Without getting into what was discussed, who is Nancy Marino at Starboard Wendy's.com?

A.    I don't recall.  Maybe Mr. Levy's assistant.  I'm not sure.

Q.    And then who is Eric Green at BPBCPA.com?

A.    I don't recall.

Q.    Do you recall anyone else assisting you in representing Mr. Levy in relation to the guarantee and the Cognovit note that we've been discussing today?

A.    No.



Daughney

Q. And you testified that Mr. Polenberg got involved once things got contentious. Do you recall that testimony?

A. I remember seeing that. Now I'm looking at the e-mail it looks like he was involved before I was involved. I'm looking at the e-mail of January 31st, 2020.

Q. How did Mr. Polenberg represent Mr. Levy in the guarantee and the Cognovit note?

MR. POLENBERG: Objection to form.

A. I don't think he was directly involved in working on it day to day. I believe that Jon does creditors or borrowers rights in transactions as well. That's how he would have been involved.

Q. Based on the exhibits that we've gone over today, the Cognovit note was executed on February 23, 2020, correct?

A. Yes.

Q. And then, based on Exhibit 10, which you have in front of you, it looks like you were representing Mr. Levy from at least January 31st of 2020, is that correct?

A. Yeah, based on this review of time,



Daughney

yes.

Q. And this exhibit shows dozens of e-mails in which you are the sender or recipient of e-mails, correct?

A. Correct.

Q. This is Exhibit 11. Please take a moment to review it.

(Exhibit 11, Document Bates stamped Levy_0009697 through 9701, marked for identification, as of this date.)

A. Okay. Okay.

Q. We've discussed this earlier today. Do you recall that?

A. Yes. It looks like an exhibit we already spoke about.

Q. If you could turn to the last page Bates stamped Levy 9701.

A. Okay.

Q. Do you see that e-mail date of February 6, 2020?

A. From Kerry Green?

Q. That's correct.

A. Yes.

Q. Is it accurate to say Ms. Green was



Daughney

asking to set up a call with you?

A.   Yes.

Q.   How did you respond?

A.   Based on the e-mail of Thursday, February 6, that I thought we should wait until after the principals, Mr. Levy and Todd, speak.

Q.   And you testified earlier that Todd refers to Wendy's CEO, Todd Penegor?

A.   I believe it does.

Q.   Do you remember why Mr. Levy wanted to have a call with Wendy's CEO?

A.   I would believe like most transactions, principals talk during a transaction.

Q.   Did that call occur?

A.   I assume so, but I don't know definitively.

Q.   If you look at the e-mail date of February 6, 2020 from Kerry Green to you copying Mr. Polenberg?

A.   Yes.

Q.   Do you see that?

A.   Yes.

Q.   Does she say, "Hi, Brian, Yes, there



Daughney

appears to be a recent request from Andrew Levy to speak to our CEO.  We are willing to let our business team call go until Monday, but we have been asking for this larger call for almost two weeks now."  Do you see that?

A.   Yes.  That's what it says.  Yes.

Q.   So is it fair to say that Ms. Green has been asking to set up a call with you and/or Mr. Levy for almost two weeks now?

MR. POLENBERG:  Objection to form.

A.   That's what the e-mail states.  Yes.

Q.   How many calls did you have with Wendy's about the guarantee and the Cognovit note?

A.   I have no idea.

Q.   Many?

A.   I would think many.

Q.   How about with Mr. Kris Kaffenbarger?

A.   I assume he was on a lot of the calls.  I don't recall.

Q.   And do you see that you copied in Jon Polenberg --

A.   Yes.

Q.   -- in your e-mail.  Why did you copy



Daughney

him in?

A.   Well, again, Jon was involved before I was with this particular transaction, but he represents borrowers and creditors in borrower and creditor disputes, and he was one of the lawyers involved for Becker.

Q.   Do you recall testifying earlier today that Mr. Polenberg is litigation counsel?

A.   Yes.

Q.   And you're corporate counsel?

A.   Yes.

Q.   So Mr. Levy had both corporate counsel and litigation counsel involved in this transaction?

A.   Yes.

Q.   I am showing you Exhibit 12.  Please take a moment to review.

(Exhibit 12, Document Bates stamped Levy_0009409 through 9413, marked for identification, as of this date.)

A.   Okay.  Okay.

Q.   Do you recall seeing this document, a similar document, as an exhibit earlier today?

A.   Yes.



800.211.DEPO (3376)
EsquireSolutions.com

Daughney

Q.   You asked Ms. Green for underlying documents, the loan agreement and joint venture agreement.  Is that correct?

A.   Yes.                                         11:45

Q.   Did she provide them?

A.   I believe so.

Q.   And did Ms. Green respond on February 4th of 2020 with background on the debt?

MR. POLENBERG:  Objection to form.               11:45

A.   Yes.  She responded stating with the principal and interest outstanding under two credit agreements.

Q.   What were the two credit agreements at issue?                                        11:46

A.   I don't recall the names of them.

Q.   You don't recall the names of them, but what do you recall about them?

A.   I'm guessing, but it looks to me in light of all the exhibits that one credit    11:46 agreement had to deal with U.S. franchise operations and one Brazil, and the amounts on the February 4th appear to be because it says 40 percent what was claimed to be Mr. Levy's portion of those amounts.                        11:46



Daughney

Q.   Right, and Ms. Green talks about Andrew's guarantees.  Is that correct?  I'm referencing the sentence that says, "This information should square with the two credit agreements and Andrew's guarantees."                     11:47

A.   Yes.

Q.   And earlier today you saw exhibits showing the guarantee, correct?

A.   Yes.                                              11:47

Q.   So Mr. Levy had guarantees to Wendy's, is that correct?

A.   Correct.

Q.   Do you see the reference to Ms. Green's e-mail where she says, "We haven't brought the deferred royalties or any other outstanding amounts into the note we have offered"?                                            11:47

A.   Yes, I see that language.

Q.   What is your understanding of that?     11:47

A.   I believe this was tied to the current operations and amounts that were claimed due by Starboard under the franchise agreements.

Q.   Do you see a reference to "Also, our offer includes a discount near the end for prompt    11:48



Daughney

payment.  This is explained in the note itself"?

A.   Yes, I see that.

Q.   What is your understanding of this?

A.   I believe that they were giving Mr. Levy/Starboard a discount on amounts claimed to be due.  That's it.

Q.   How much was the discount?

A.   It doesn't say in this e-mail chain, but I believe it was a million dollars or a million 2.  I think that's in another document we've seen today.

Q.   So this e-mail reflects that the $1.2 million discount was at the end for prompt payment.  Is that correct?

MR. POLENBERG:  Objection to form.

A.   That's what the language in the e-mail says.  Yes.

Q.   Do you recall negotiating this discount and applying it at the beginning of the payment?

A.   I don't recall.

Q.   If you negotiated this discount to apply at the beginning of the term, would that be better than having the discount apply at the end



Daughney

of the term?

MR. POLENBERG:  Objection to form.

A.  I'm not Mr. Levy's financial expert, but I would think it would be better to have money now than later or a discount now than later.

Q.  So that would be beneficial to Mr. Levy, right?

MR. POLENBERG:  Objection to form.

A.  In a vacuum, yes.

Q.  Would you negotiate terms that are not favorable to your client?

MR. POLENBERG:  Objection to form.

A.  Hopefully not.

Q.  Would you push for terms that are unfavorable to your client?

A.  No.

Q.  On behalf of Mr. Levy, did you push for proposals that were unfavorable to Mr. Levy?

MR. POLENBERG:  Objection to form.

A.  No.

Q.  I'm showing you Exhibit 13.

(Exhibit 13, Document Bates stamped Levy_0009408, marked for identification,



Daughney

as of this date.)

A.    Okay.

Q.    Is this an e-mail dated February 13, 2020?

11:51

A.    Yes.

Q.    Is it from Ms. Green to Mr. Kaffenbarger, Mr. Koumas, Mr. Kale, Mr. Levy, you, Mr. Polenberg?

A.    And Stephanie Niehaus, yes.

11:51

Q.    And does the subject say, "Brazil Loan Guarantee Promissory Note"?

A.    Yes.

Q.    And is this setting up a phone conference?

11:51

A.    It appears to be, yes.

Q.    So Wendy's had its in-house counsel and Mr. Niehaus on the call.  Is that correct?

A.    I don't know if they actually were on the call, but the e-mail was inviting all the persons you named to the call.

11:52

Q.    And do you recall what was discussed during this conference call?

A.    No.  I would assume it was the subject matter of the e-mail.

11:52



800.211.DEPO (3376)
EsquireSolutions.com

Daughney

Q.   I'm showing you Exhibit 14.

(Exhibit 14, Document Bates stamped Wendy_0006045 and 6046, marked for identification, as of this date.)   11:52

Q.   Please take a moment to review it.

A.   Okay.  Okay.

Q.   Do you recall seeing this document earlier today?

A.   Yes.   11:53

Q.   Is this an e-mail from you to Ms. Green copying Mr. Polenberg and others?

A.   Yes.

Q.   Is Mr. Levy copied on this e-mail?

A.   Yes.   11:53

Q.   Is this e-mail dated February 13 of 2020?

A.   Yes.

Q.   And did you write, "Ability to repay is tied to principal amount being finalized,   11:54 interest rate and also the franchise obligations, since a primary goal is for Starboard to keep updating restaurants"?  Do you see that?

A.   Yes, I see that.

Q.   What did you mean by "primary goal is   11:54



Daughney

to keep updating Starboard restaurants"?

A.   This was to keep Starboard current or get them current with operations of the franchise restaurants that Mr. Levy was operating.  Since he has obligations under his franchise agreements, it was to free up cash at least in part so he could keep renovating stores is usually the way franchise agreements work.

Q.   So Mr. Levy had contractual obligations under the franchise agreements?

MR. POLENBERG:  Objection to form.

A.   Yes, or Starboard did.  Either one of them.

Q.   And it was the primary goal of Starboard to keep updating restaurants or to keep renovating restaurants?

A.   That would be a goal.  Yes.

Q.   Well, did you put primary goal in your e-mail here?

A.   Well, it says a primary.

Q.   So it is a primary goal?

A.   Yes.

MR. POLENBERG:  Let me ask you how many more you have, because if it's just a



Daughney

few, I don't need a break, but if it's a

lot, I'm going to need a break.

MS. PARK:  We can break now.

THE VIDEOGRAPHER:  We are going off    11:56

the record.  The time is 11:56 a.m.

(Recess taken)

THE VIDEOGRAPHER:  We are back on the

record with medium number 4.  The time is

12:01 p.m.    12:01

BY MS. PARK:

Q.  All right.  I'm showing you Exhibit

15.  It should look familiar as we've been

through this or a similar document earlier today,

but please take a moment to review it.    12:01

(Exhibit 15, Document Bates stamped

Wendy_0013345 through 13373, marked for

identification, as of this date.)

A.  Okay.  Okay.

Q.  All right.  Does this document    12:02

reflect an e-mail that Ms. Green sent on

February 14th of 2020?

A.  Yes.

Q.  Did she send this e-mail to Andrew

Levy, you, copying others?    12:02



Daughney

A.   Yes.

Q.   And does the subject line say "Brazil Loan Guarantee"?

A.   Yes.

12:03

Q.   And in this e-mail did Ms. Green write, "Further to our recent discussions, I include with this e-mail Wendy's settlement package, which represents our best offer to resolve the outstanding issues related to the Levy/Starboard Guarantee"?

12:03

A.   Yes.

Q.   And she also mentions, "I've also added a red-line to the prior version of the note that was sent in January"?

12:03

A.   Yes.

Q.   If you could flip to Bates stamp Wendy 13354, which is a red-line of the Cognovit promissory note?

A.   Yes.

12:04

Q.   This should be a little easier to review since it actually shows coloring.  So do you see the red-line here to the Cognovit promissory note?

A.   Yes.

12:04



Daughney

Q.   So the red lines based on the e-mail that you just reviewed show the changes that were made from the January draft to the February draft.  Is that correct?

A.   It would appear so, yes.

Q.   Let's take a look at some of the red lines here.  It might be a little difficult to see, so you can take your time with this, but do you see that the interest rate was lowered from 5 to 1-1/2 percent?

A.   Yes.

Q.   And that's in the first paragraph, is that correct?

A.   Yes.

Q.   Then if you look at the second paragraph which has a lot more red line so take your time with this, but do you see that the $1.2 million discount that we discussed a little earlier is now placed at the beginning of the term rather than at the end, is that correct?

A.   It appears that way, yes.

MR. POLENBERG:  Objection to form.

Q.   Then if you could flip to the next page, please look at the red line on that page in



Daughney

conjunction with the red line that continues onto the following page.

A.    Okay.

Q.    Have you had time to review that?          12:05

A.    Yes.

Q.    Do you see that Mr. Levy's personal mortgage of his home has been struck out?

A.    Yes.

Q.    If you could take a look at the page          12:06 with Bates stamp Wendy 13357.

A.    Okay.

Q.    Take a minute to review that, please.

A.    Okay.

Q.    Do you see that the release has been          12:06 changed to mutual release?

MR. POLENBERG:  Objection to form.

A.    In the last paragraph of page 4 of this note, yes.

Q.    So these are concessions that Wendy's          12:07 made to Mr. Levy, correct?

MR. POLENBERG:  Objection to form.

A.    It appears so, yes.

Q.    Because you negotiated on behalf of Mr. Levy, correct?          12:07



Daughney

A.   Either I did or Mr. Levy did, yes.

Q.   If you could go back to the first page of this exhibit, please.

A.   Okay.                                          12:07

Q.   Here Ms. Green says the settlement package represents Wendy's best offer to resolve the outstanding issues related to the Levy Starboard guarantee.

A.   I see that.                                    12:07

Q.   Did this end up being Wendy's best and final offer?

A.   I would have to look at what ended up being the final note to figure that out.

Q.   We'll get there.                              12:08

A.   Okay.

Q.   Now, if you could go back to the first page, please, in that same e-mail, Ms. Green asked for the Cognovit note to be executed on February 19th.  Is that correct?          12:08

A.   Yes.

Q.   Do you recall when the Cognovit note was executed?

A.   I believe it was February 23rd.

Q.   Then if you could flip to Wendy 13359          12:08



Daughney

which shows Exhibit A Amortization Schedule.  Are you there?

A.  Yes.

Q.  Take a minute to look at this, please.

12:09

A.  Okay.

Q.  Do you see that the scheduled payment does not begin on January 15, 2020?  It says zero for schedule payment for January 15, 2020?

12:09

A.  Yes, I see that.

Q.  Do you also see that it says schedule payment of zero dollars for April 15th of 2020?

A.  Yes.

Q.  Do you see scheduled payment of $50,000 for payment date of July 15th of 2020?

12:09

A.  Yes.

Q.  So do you see that scheduled payment has been deferred until July 15th of 2020?

A.  Yes.

12:10

Q.  And was that to help Mr. Andrew Levy re-image his stores, which was a primary goal to update his restaurants?

A.  Yes.

Q.  Then, if you could flip to the second

12:10



                    Daughney

page which is Bates stamped Wendy 13346?

          A.    Okay.

               THE VIDEOGRAPHER:  We are now going

          off the record.  The time is 12:11 p.m.          12:11

               (Recess taken)

               THE VIDEOGRAPHER:  We are back on the

          record with media number 5.  The time is

          12:17 p.m.

BY MS. PARK:                                                12:17

          Q.    Mr. Daughney, could you please look

at Exhibit 15 again.

          A.    Okay.

          Q.    In this e-mail, Ms. Green says, "We

believe the settlement package is fair to both             12:17

sides and fully takes into account and responds

as best we are able to the concerns you have

raised."  Did I read that correctly?

          A.    Yes.

          Q.    Wendy's made a concession of               12:18

providing $1.2 million in a discount to Mr.

Andrew Levy.  Is that correct?

          A.    It appears that way from the note,

yes.

          Q.    $1.2 million is a lot of money.           12:18



Daughney

MR. POLENBERG:  Objection to form.

Q.   Is that correct?

MR. POLENBERG:  Objection to form.

A.   I have no way of answering that question.   12:18

Q.   Why do you --

A.   To some people it is, and some people it isn't.

Q.   Do you think $1.2 million is a lot of money?   12:18

A.   To me it is, yes.

Q.   Do you have any reason to think it would not be a lot of money to Mr. Andrew Levy?

MR. POLENBERG:  Objection to form.   12:18

A.   I'm speculating.  I assume it was.

Q.   And then, sorry, if you could go back to page 1.  Thank you.  And then in the last sentence of Ms. Green's e-mail she writes, "We sincerely hope that the issues related to the   12:19 guarantee can be resolved without escalation and/or litigation."

A.   I see that.

Q.   What is your understanding of the litigation that might occur?   12:19



Daughney

A.   That Wendy's would sue Mr. Levy and/or Starboard under the guarantees and franchise agreements.

Q.   So you're saying Wendy's had the right to sue Mr. Andrew Levy for defaulting on the guarantee?

MR. POLENBERG:  Objection to form.

A.   I'm not saying that.  I'm saying that they made a threat that they would sue.

Q.   For defaulting under the guarantee agreement?

MR. POLENBERG:  Objection to form.

A.   For their claims under the franchise and guarantee agreements.

Q.   You said under the franchise agreement and guarantees?

A.   Their claims under the franchise and guarantee agreements.

Q.   If you could flip to the next page and take a moment to review this letter from Wendy's to Andrew Levy that says, Notice of non-compliance With Re-imaging Requirements and Agreement of Forbearance of Default."

A.   Yes, I see that.



Daughney

MR. POLENBERG:  Objection to the exhibit as characterized.

Q.  Take a moment to review this letter, please.                    12:20

A.  Okay.

Q.  Then please also review Exhibit A attached to this letter which begins on the next page.

A.  Okay.  That's the list of restaurants?                          12:21

Q.  Yes.  The list of restaurants that need to be re-imaged.  If you could flip back to the letter, so Bates stamp Wendy 13346 continuing on to 13347.                                              12:21

A.  Okay.

Q.  Now starting on the bottom of that first page of the letter, does it say, "The Image Activation initiative, supported by Wendy's Brand Sustainability requirements, has been in place     12:22 since 2014 and requires that you have remodeled 50 percent of your restaurants by December 31st of 2019 and 10 percent additional restaurants by December 31st of 2020."  Did I read that correctly?                                                         12:22



Daughney

A.   Yes, I see that.

Q.   Then it continues.  "Notwithstanding these requirements, according to the letter of agreement dated December 3rd, 2018 between                12:22
franchisor and franchisees, you agreed to a reinvestment plan whereby certain the timely completion of all required work to perform reimaging would be performed according to the reinvestment completion dates agreed to therein."      12:23
Did I read that correctly?

A.   Yes, I see that.

Q.   And it says, "You were required to make all reasonable efforts to schedule and complete the re-image of 40 percent of your             12:23
restaurants by the end of calendar year 2020 and at the rate of 10 percent of your existing portfolio per year in addition to other requirements."  Did I read that correctly?

A.   Yes.                                                  12:23

Q.   Finally, it says, "As of December 31, 2019, you have only remodeled 19 of your restaurants and only have another six restaurants scheduled for reimaging in 2020 resulting in a breach of the franchise agreements."  Did I read       12:23



Daughney

that correctly?

    A.   Yes.

    Q.   Now I will let you read the following paragraph.  Please take a moment with it.

    A.   Okay.  I've read it.

    Q.   So is it fair to say that, despite Mr. Levy failing to abide by the reinvestment completion dates that he agreed to with Wendy's, Wendy's was willing to forbear default to provide Mr. Levy an opportunity to complete the re-imaging requirements?

    MR. POLENBERG:  Objection to form.

    A.   That is what the language says.  Yes.

    Q.   Isn't that a concession made by Wendy's?

    MR. POLENBERG:  Objection to form.

    A.   If it was true, it would appear to be, yes.

    Q.   Do you have reason to believe that it's not true?

    MR. POLENBERG:  Objection to form.

    A.   I have no way to know whether it is or isn't true.  I didn't represent Wendy's.  I don't know what their claimed defaults were or

12:24
12:24
12:24
12:25
12:25



Daughney

him in not being in default.

Q. Did you represent Mr. Levy in this transaction?

A. Not in whether there was a default or not.

Q. Did you represent Mr. Levy in the guarantee of the Cognovit note?

A. Yes.

Q. And you said earlier today, you testified earlier today that the Cognovit note was tied to Mr. Levy's obligations for the U.S. restaurants. Is that correct?

MR. POLENBERG: Objection to form.

A. Yes.

Q. If you believe that the counterparty to a contract was pushing an obligation on your client that your client did not have, would you have raised that as an issue?

MR. POLENBERG: Objection to form.

A. That would be for the client to tell me whether they have an issue or not or if they're just trying to work out a deal in their best interests.

Q. So, while you were negotiating this



Daughney

transaction, you had absolutely no idea whether Mr. Levy owed obligations under the franchise agreement?

MR. POLENBERG:  Objection to form.    12:26

A.   Yeah, I have no idea whether he was in default or not.  It was not part of my representation.

Q.   Did you know whether he had obligations under the franchise agreement?    12:26

MR. POLENBERG:  Objection to form.

A.   Yes.

Q.   In fact, you testified to that effect earlier today, did you not?

A.   I believe so.  Yes.    12:26

Q.   And you testified earlier today that Mr. Levy had obligations to renovate his restaurants under the franchise agreement, correct?

MR. POLENBERG:  Objection to form.    12:27

A.   That is under the franchise agreements that I've seen, yes.

Q.   So that's a contractual right that Wendy's has.  Is that correct?

MR. POLENBERG:  Objection to form.    12:27



Daughney

A.   Under the documents I have seen.
Yes.  Had seen.

Q.   If you could look at the exhibit
that's attached to this letter?

A.   The list of restaurants?

Q.   That's correct.

A.   Okay.

Q.   Now do you recall testifying earlier
today that Mr. Levy had many franchise locations
with Wendy's?

A.   Yes.

Q.   Approximately how many?

A.   I don't remember exactly.  60, 80.  I
don't remember exactly.

Q.   Okay.  So you don't recall exactly
how many restaurants Mr. Levy had with Wendy's?

A.   No, I don't.  It's six years ago.

Q.   So you do not know or you do not
recall, sitting here today, whether Wendy's was
taking the position that every single restaurant
that Mr. Levy owned had to be re-imaged?

MR. POLENBERG:  Objection to form.

A.   No, I don't recall that, and, looking
at the letter, I don't think it says that.



Daughney

Q.    What does the letter say?

MR. POLENBERG:  Objection to form.

A.    It says you've remodeled 50 percent and you have to do 10 percent more by December 2020 and 40 percent by the end of the calendar year 2020.

Q.    Right.  So Wendy's does not say in this letter that Mr. Levy had to re-image all of his restaurant locations.  Is that correct?

MR. POLENBERG:  Objection to form.

A.    I don't think it says "all."  No.

Q.    And how many restaurants are listed in Exhibit A?

A.    I don't think I miscounted, but I think it's 102.  I will count it again.  100.

Q.    So, if Mr. Levy and Starboard had a total of 180 Wendy's franchise locations, 100 out of 180 is not all of his restaurant locations. Is that correct?

MR. POLENBERG:  Objection to form.

A.    Correct.

Q.    And do you recall testifying earlier today that you weren't sure, but you thought maybe Mr. Levy had about 60 locations with



Daughney

Wendy's?

A.   I think I said 60 or 85.

Q.   Correct.  So your recollection was not accurate, correct?

A.   Yes.  Correct.

Q.   Okay.  We can put that aside for now. So, if Wendy's had the right to enforce re-imaging obligations, was there something wrongful about asking Mr. Levy to comply with those re-imaging obligations?

MR. POLENBERG:  Objection to form.

A.   If they had a contractual right, they can do whatever they want as a contracting party.

Q.   I'm showing you Exhibit 16.

(Exhibit 16, Document Bates stamped Wendy_0006050 through 6052, marked for identification, as of this date.)

Q.   Just let me know once you're done reviewing.

A.   Okay.

Q.   Does this exhibit reflect e-mail exchanges between you and Ms. Green in February of 2020?

A.   Yes.



Daughney

Q. So, if you look at the earliest in time e-mail, is it an e-mail from Ms. Green to you and Andrew Levy copying others in which she says, "I include with this e-mail Wendy's settlement package, which represents our best offer to resolve the outstanding issues related to the Levy/Starboard guarantee"?

A. Yes, it says that.

Q. Then, if you flip to your e-mail dated February 17, 2020, you wrote, "Kerry, Couple of points. As an initial point, Andrew will execute the documents, but requests some changes that we thought had been agreed upon. So not signing is not an issue." Do you see that?

A. Yes.

Q. What did you mean by "not signing is not an issue"?

A. Well, if I recall, there was a contention going around between the parties, is he willing to sign, not willing to sign? Is he willing to work this out or not, and that's what that was addressing.

Q. And you wrote, "not signing is not an issue," correct?



Daughney

A.   Yes, meaning he's willing to sign if they can finish off final comments or whatever comments were being worked on at the time.  He intended to sign.  He was trying to show good faith.

Q.   And you listed seven items in your e-mail response to Ms. Green.  Is that correct?

A.   Yes.

Q.   If you will look at number 6.

A.   Yes, I see it.

Q.   So you want language to be equal in terms of who is being released, is that correct?

A.   Yes.

Q.   How did Wendy's respond here?

A.   They responded, "We can add this language."

Q.   So despite Ms. Green saying on February 14th of 2020 that the settlement package represents Wendy's best and final offer, Wendy's still continued to make edits in response to your proposal, is that correct?

A.   Yes, it appears that way from the e-mail.  Yes.

Q.   Why did you ask for the guarantee



Daughney

language to be equal in terms of who is being released?

A.   I believe that was because there were other owners of the Brazilian operation.  So I believe that Mr. Levy wanted to make sure -- well, maybe that's not right.  I believe it was, if they released other people from obligations, he should get the same treatment.  I believe that's what it's about.

Q.   So you wanted to make a proposal that was beneficial to Mr. Levy?

MR. POLENBERG:  Objection to form.

Q.   Is that correct?

A.   Yes, that he would have been treated equally, which would have been beneficial.

Q.   Now, despite Ms. Green asking for Mr. Levy to execute the Cognovit note by no later than February 19th of 2020, you responded that Mr. Levy will execute the Cognovit note on February 23rd of 2020.  Is that correct?

A.   Well, the e-mail refers to a Wednesday.  I don't know if that was what that date is, but.

Q.   So Wendy's was willing to move the



Daughney

date of execution from February 19th to February 23rd of 2020, is that correct?

A.   It appears that way, yes.

Q.   And when was the Cognovit note executed?

A.   February 23rd, 2020.

Q.   Okay.  You can put that aside.  Thank you.  Mr. Daughney, are you admitted to practice law in New York?

A.   Yes.

Q.   Have you ever been disciplined by the New York bar?

A.   No.

Q.   Have you ever been sued for malpractice?

A.   No.

Q.   Have you ever engaged in wrongful conduct?

A.   No.

Q.   Have you ever advised a client to engage in wrongful conduct?

A.   No.

Q.   At the time Mr. Levy signed the Cognovit note, did you believe he was capable of



Daughney

satisfying his obligations under the note?

MR. POLENBERG:  Objection to form.

A.   I have no idea.  I'm not his financial advisor.  I have no knowledge of his personal finances, nor did I ever.

Q.   Did you have any reason to suspect that Mr. Levy at the time of signing the Cognovit note would not be able to satisfy his obligation under the note?

A.   Again, I have no -- I had no knowledge of his personal finances.  I wouldn't be able to answer that.  I have no idea.

Q.   Did you believe that Mr. Levy was fraudulently entering into the Cognovit note?

MR. POLENBERG:  Objection to form.

A.   No.

Q.   Did you believe that Wendy's engaged in wrongful conduct in negotiating the Cognovit note?

MR. POLENBERG:  Objection to form.

A.   I have no idea.

Q.   Do you have reason to suspect that Wendy's did?

A.   No.



Daughney

Q.    When Mr. Levy and Wendy's negotiated the Cognovit note, were both parties represented by counsel?

A.    Yes.                                              12:43

Q.    In fact, you represented Mr. Levy. Is that correct?

A.    Yes.

Q.    During the negotiation of the Cognovit note, did Wendy's engage in conduct that        12:44 it was not contractually permitted to do?

MR. POLENBERG:  Objection to form.

A.    I don't know.

Q.    Do you have reason to suspect that it did so?                                           12:44

MR. POLENBERG:  Objection to form.

A.    I have no reason to suspect either way.

Q.    Did you believe that Mr. Levy signing the Cognovit note was wrongful?                   12:44

MR. POLENBERG:  Objection to form.

A.    No, if that was the business terms of what was negotiated.

Q.    Did Wendy's ever say to you that it would terminate Mr. Levy's franchise locations     12:44



Daughney

that were in full compliance with the re-imaging obligations?

MR. POLENBERG: Objection to form.

A. I don't recall that. No. I think the documents say otherwise. I don't recall that in a direct conversation.

Q. Have you ever counseled a client to fraudulently sign a contract?

A. No.

Q. Have you ever counseled a client to engage in a transaction that is unlawful?

MR. POLENBERG: Objection to form.

A. No.

MS. PARK: Can we take a two-minute break.

THE VIDEOGRAPHER: We are now going off the record. The time is 12:46 p.m.

(Recess taken)

THE VIDEOGRAPHER: We are back on the record with media number 6. The time is 12:49 p.m.

BY MS. PARK:

Q. Mr. Daughney, I have what I hope is my last question. When I asked you a few minutes



Daughney

ago whether Wendy's ever told you that it would terminate Mr. Levy's franchise locations that were fully compliant with re-imaging obligations, your answer was no, based on the documents that we just saw?

MR. POLENBERG: Objection to form.

A. No. My answer was, based on the documents, it appears they were going to terminate all his franchise relationships. I don't recall that language ever being used, but if you look at one of the exhibits, it seems to say that.

Q. It seems to say?

A. They would terminate.

Q. Every single one of his franchise locations?

A. It doesn't say every. It just says they'll terminate his -- he's in default, and they'll terminate.

Q. Does it say that Wendy's intends to terminate all of Mr. Levy's 180 franchise locations?

MR. POLENBERG: Objection to form.

A. Well, the draft letter of February

12:49

12:49

12:50

12:50

12:50



Daughney

blank that says not for execution has the sentence, "As of December 31, 2019, you have remodeled only 19 of your restaurants and only have another six restaurants scheduled for re-imaging in 2020 resulting in a breach of the franchise agreements."

If they can terminate for any reason, they could terminate the whole relationship. That's my recollection of the franchise agreement.

Q.   Did Wendy's say that it will terminate all of his franchise locations?

MR. POLENBERG:  Objection to form.

A.   I don't recall that.  No.  I don't recall hearing that, those explicit words, but, based on the letter, it appears that way to me.

Q.   Where in the letter does it say that Wendy's will terminate all 180 locations of Mr. Levy's Wendy's?

MR. POLENBERG:  Objection to form.

A.   It is my recollection that the franchise agreement covers all operations.  So if you're in default, whether it's because of two stores or 92 stores, they can terminate.



Daughney

Q. So you're saying Wendy's has the right to exercise?

A. I'm saying under their franchise agreements, they would have a contractual right to declare a default and do whatever it is they're going to do after a default.

Q. Which includes terminating his franchise locations?

A. Yes.

Q. So your testimony is that that is Wendy's right under the franchise agreement?

MR. POLENBERG: Objection to form.

A. That is the language under the contract.

Q. So, if that is the language under the contract, then that means that Wendy's has the right to exercise that right, is that correct?

MR. POLENBERG: Objection to form.

A. They have a right to declare a default. I can't tell you that they're -- that's what you guys are litigating over. That's not me. Okay?

Q. All right, and, off the top of your head, $1.2 million discount off of a $5.5 million



Daughney

obligation, what percentage is that discount?

MR. POLENBERG:  Objection to form.

A.    20 percent roughly.

MS. PARK:  All right.  No further
questions at this time, but I know Mr.
Polenberg has some questions.

THE WITNESS:  Okay.

EXAMINATION (Continued)

BY MR. POLENBERG:

Q.    Go back to Exhibit 11, please.

A.    Got it.

Q.    All right.  If you go to page 9700.

A.    Okay.

Q.    In the middle, you were testifying
when Ms. Park was asking you some questions about
the e-mail from Ms. Green to you copying others
on February 6, 2020.

A.    Yes.

Q.    Are you there?

A.    Yes.

Q.    Okay, and maybe I heard it wrong, but
Ms. Park asked Ms. Green was trying to get a
meeting with either you or Mr. Levy for some
time.  Do you remember that testimony?



Daughney

A.   Yes.  That's what the e-mail says.
Yes.

Q.   But it's with either/or, or was it
requiring both?  12:54

A.   I believe it would have included Mr.
Levy, because she says in the e-mail "We've been
asking for this larger call," which I assume
means more than just lawyers.

Q.   All right, so if I understand your  12:54
testimony, Mr. Daughney, it was Ms. Green was
looking for a meeting, right?

A.   Yes.

Q.   Of the larger group, true?

A.   Yes.  12:54

Q.   The group would include you, yes?

A.   Yes.

Q.   Mr. Levy, right?

A.   It would appear so, yes.

Q.   And others from the Wendy's side,  12:54
right?

A.   Yes.

Q.   And that meeting had taken at least
two weeks, according to Ms. Green, correct?

A.   Yes.  12:55



Daughney

Q.   All right.  Now let's go back to the infamous Exhibit 15.  That's the last document you were talking with Ms. Park about.

A.   Okay.                                                   12:55

Q.   Ms. Park asked you a lot of questions about Wendy's rights, and you remember that testimony?

A.   Yes.

Q.   Looking at the bottom of page 13345?          12:55

A.   Yes.

Q.   It talks about escalation and/or litigation, correct?

A.   Yes.

Q.   Sitting here, how does litigation        12:55
turn out on a case like this before there's a Cognovit note signed?

MS. PARK:  Objection to form.

A.   To be honest with you, I'm not sure I understand the question.  I would assume a party   12:56
with claims would sue another party.

Q.   Right, and how does that litigation end?  Who wins?

MS. PARK:  Objection to form.

A.   I don't know how to answer that          12:56

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Daughney

question.

Q.   Sitting here, do you know who would win that case?

A.   No.                                                     12:56

Q.   Earlier you testified that when Ms. Park asked you questions about the personal guarantee that Mr. Levy owed a personal guarantee to Levy's.  Do you remember that testimony?

A.   Yes.  I would say it differently.  He    12:56 had a personal guarantee for monies owed I guess by Starboard to Wendy's.

Q.   What about a personal guarantee for monies that's owed by the Brazilian joint venture to Wendy's?                                            12:56

A.   I'm sorry, when I meant Starboard, I meant the collective Starboard including Brazil.

Q.   Okay.  Specifically as it relates to the personal guarantee for the Brazil, what law governs that personal guarantee?               12:57

MS. PARK:  Objection to form.  Calls for a legal conclusion.

A.   I don't have the document anyway.

Q.   You have the guarantee.

A.   Oh.                                                     12:57



Daughney

Q.   It's attached to the Cognovit note that was signed.  You can go to Exhibit 1.  Go to page 9124.  I'm sorry, 9123.

A.   According to the guarantee agreement, it says New York law governs.

Q.   Sitting here today, do you know how New York law treats personal guarantees versus how Ohio treats Cognovit notes?

A.   No, I don't.  I'm not a litigator.

Q.   So, sitting here today, do you know how that litigation under the personal guarantee would turn out versus how a Cognovit note would turn out?

A.   No.

Q.   All right.  Turning to the next page, 13346.  Oh, I'm sorry.  Go back to Exhibit 15. Page 13346.

A.   Okay.

Q.   Ms. Park asked you a lot of questions about, quote unquote, the letter.  Do you see that?

A.   Yes.  The draft letter.  Yes.

Q.   Yes.  In fact, this letter is a draft letter, right?



Daughney

A.   That's what it says.

Q.   It specifically says, "not for execution," right?

A.   Yes.

Q.   So the things that Ms. Park read you in this letter, without having them signed, are they -- do you know if they're true or not?

A.   No, I don't know if they're true. Even if it were signed, I wouldn't know if it was true.

Q.   Fair, but sitting here, does Wendy's assert that they're true?

A.   Yes.

Q.   Even though it's not signed?

A.   This seems to me to be a threat.

Q.   And, when you say this seems to you to be a threat, what do you mean?

A.   That, if we don't come to a resolution, you're going to get this letter very soon.

Q.   And, if you would go to on the same exhibit page 13354, remember Ms. Park asked you about whether the $1.2 million was in front or behind or in the end?  Do you remember?



800.211.DEPO (3376)
EsquireSolutions.com

Daughney

A.   Yes, I remember that question.

Q.   And then she said being in front was better, right?

A.   Yes, I remember that.

Q.   Okay.  Take a look at that sentence. It says -- I'm going to read it for the record. All right?  I'm going to read, "This amount includes a reduction in the amount of $1,200,000 ($1,200,000.00) provided in payment 1, which is offered as a condition of compliance with the terms and conditions contained herein including timely payment of all principal and interest due hereunder in accordance with the immediately preceding two sentences and no other default or event of default has occurred (whether or not cured or waived)."

So the edits that were suggested, does this that $1.2 million come at the beginning or the end?

A.   It seems like it's waived until the end as long as there's no defaults.

Q.   So, in other words, at the end of the payment of all principal Mr. Levy would get a discount, right?



Daughney

A.    Right.

Q.    And you were negotiating, according to Ms. Park, for a discount at the beginning, right?

01:02

A.    Yes, the goal was to free up cash so he could satisfy his obligations to remodel stores.

Q.    Right, but, in other words, so that the goal was to have the note be $3 million, according to Ms. Park, $3,600,000 and change at the beginning, right?

01:02

A.    Yeah, reducing it from the $5,319,000.

Q.    And that didn't happen, right?

01:03

A.    I don't know.

Q.    The reduction didn't happen at the beginning, right?

MS. PARK:  Objection, form.

A.    I don't recall.

01:03

Q.    Well, you're looking at it.  The reduction only happens at the end after all the principal payments are made.

A.    Right.  It's only effective at the end.

01:03



Daughney

Q.   Right.  So you negotiated it, according to Ms. Park, for it to be a discount at the beginning, right?

A.   Right.

Q.   And they didn't do it, right?

A.   It was held in abeyance until the end.

Q.   Okay.  Is $3.6 million a lot of money?

A.   To me it is, yes.

Q.   Do you know if Mr. Levy wanted to pay any of this money back?

A.   I'm speculating, but I assume he did. I don't know.

Q.   Okay.  So, sitting here today, you don't know whether Mr. Levy was negotiating with Wendy's to not have to pay any of this money?

A.   I don't recall.

MR. POLENBERG:  I tender the witness, but not beyond my redirect.

MS. PARK:  Of course.

EXAMINATION (Continued)

BY MS. PARK:

Q.   Looking at Exhibit 1.  Just one more



Daughney

question.

A.   You said that already.

Q.   But it's limited to Mr. Polenberg's question.  So the second paragraph, does it say with respect to the $1.2 million that it is being provided as a credit and payment, number 1, which is offered as a condition of compliance with the terms and conditions contained herein?  Did I read that correctly?

A.   Yes.

MS. PARK:  No further questions.

BY MR. POLENBERG:

Q.   For the record, can you read the rest of that sentence.

A.   I will read the whole thing.  "This amount includes a reduction in the amount of $1,200,000 (numerical) provided as a credit in payment number 1, which is offered as a condition of compliance with the terms and conditions contained herein including timely payment of all principal and interest due hereunder in accordance with the three immediately preceding sentences and no other default or event of default has occurred (whether or not cured or



                    Daughney

waived)."

          Q.    Which is the edits that were in
Exhibit 15, correct?

          A.    Yes.  They appear to be the same.

               MR. POLENBERG:  No further questions.

               MS. PARK:  No further questions at
          this time.  We reserve all objections to
          the extent required by the typical rules
          except as to form, which we put on the
          record today.

               MR. POLENBERG:  Mr. Daughney, you
          have an opportunity to read your
          deposition.  If you want to read it, you
          will get a letter from the Court Reporter
          giving you an opportunity to read the
          deposition transcript, and then you'll
          have an errata sheet next to you, and you
          can look at, which I discussed with you at
          the beginning of the deposition, you get
          to look at the deposition, and if the
          Court Reporter took down anything that you
          think was inaccurately taken down or that
          you think your testimony was wrong, you
          get to make a change on that errata sheet



Daughney

and then give it to the Court Reporter.
Ms. Park gets it, I get it, and then we
can call you back to ask you questions
about the changes, or we can just call
those out to the judge or jury at the time
of trial.

THE WITNESS:  Okay.

MR. POLENBERG:  Do you want to read
your deposition or do you want to waive
reading your deposition?

THE WITNESS:  I'll read it to make
sure.

MR. POLENBERG:  Okay.  Very good.

THE VIDEOGRAPHER:  We're now going
off the record.  The time is 1:07 p.m.
This is the end of media labeled number 6
and also the end of the video-recorded
deposition.

(Time noted:  1:07 p.m.)

_____

Subscribed and sworn to

before me this____day of_____, 2026.

_____



C E R T I F I C A T I O N

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of May, 2026.



_____

JOSEPH R. DANYO

STATE OF NEW YORK

My Commission Expires 2/20/2027

                        I N D E X

WITNESS                 EXAMINATION BY               PAGE

BRIAN DAUGHNEY          Mr. Polenberg               5, 96, 105

                        Ms. Park                    44, 104


                      E X H I B I T S

NO.                                                  PAGE

    Exhibit 1   Document Bates stamped               12
                Levy_0009107 through 9144

    Exhibit 2   Document Bates stamped               23
                Levy_0009409 through 9413

    Exhibit 3   Document Bates stamped               27
                Levy_0009689 through 9692

    Exhibit 4   Document Bates stamped               29
                Levy_0008202 through 8230

    Exhibit 5   Document Bates stamped               34
                Levy_0009726 through 9731

    Exhibit 6   Document Bates stamped               36
                Wendy_0001075 through 1081

    Exhibit 7   Document Bates stamped               52
                Wendy_0000625 through 627

    Exhibit 8   Document Bates stamped               53
                Wendy_0009378 and 9379

    Exhibit 9   Document Bates stamped               54
                Levy_0009693

    Exhibit 10  Privilege log produced by Mr.        55
                Levy

    Exhibit 11  Document Bates stamped               58
                Levy_0009697 through 9701



Exhibit 12    Document Bates stamped            61
              Levy_0009409 through 9413

Exhibit 13    Document Bates stamped            65
              Levy_0009408

Exhibit 14    Document Bates stamped            67
              Wendy_0006045 and 6046

Exhibit 15    Document Bates stamped            69
              Wendy_0013345 through 13373

Exhibit 16    Document Bates stamped            85
              Wendy_0006050 through 6052
                    ~oOo~



DEPOSITION ERRATA SHEET

Our Assignment No. 14847430

Case Caption: Wendy's Netherlands B.V. v Andrew Levy

Witness: BRIAN DAUGHNEY

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____day of_____ 2026.

_____

BRIAN DAUGHNEY

Subscribed and sworn to on the_____day of _____, 2026 before me.

_____

Notary Public in and for the State of New York.



DEPOSITION ERRATA SHEET

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

SIGNATURE:_____ DATE:_____

                BRIAN DAUGHNEY



BRIAN DAUGHNEY

May 18, 2026

Wendy's Netherlands B.V. vs Andrew Levy

113

DEPOSITION ERRATA SHEET

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

Page No.____ Line No.____ Change to:_____

_____

Reason for Change:_____

SIGNATURE:_____ DATE:_____

        BRIAN DAUGHNEY

