## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
CIVIL ACTION NO.  2:24-cv-03077

WENDY'S NETHERLANDS B.V.,

                 Plaintiff,

vs.

ANDREW LEVY,

                 Defendant,

_____/


REMOTE VIDEOTAPED TELECONFERENCE DEPOSITION OF
ROBERT DEAN WRIGHT

NON-CONFIDENTIAL PORTIONS
TUESDAY, MAY 12th, 2026
WESTERVILLE, DELAWARE COUNTY, OHIO
10:07 a.m. - 3:02 p.m.


STENOGRAPHICALLY REPORTED BY:
VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
ESQUIRE DEPOSITION SOLUTIONS
FORT LAUDERDALE OFFICE

## Page 2

APPEARANCES:

APPEARING BY VIDEO TELECONFERENCE ON BEHALF OF THE
PLAINTIFF:

    HOLLAND & KNIGHT, LLP.
    BY:  CARY ARONOVITZ, ESQUIRE.
    BY:  MITCHELL L. MCBRIDE, ESQUIRE.
    701 BRICKELL AVENUE, SUITE 3300
    MIAMI, FLORIDA  33131
    (305)789-7520
    cary.aronovitz@hklaw.com
    mitchell.mcbride@hklaw.com


APPEARING BY VIDEO TELECONFERENCE ON BEHALF OF THE
DEFENDANT:

    BECKER & POLIAKOFF, P.A.
    BY:  JON POLENBERG, ESQUIRE.
    BY:  GABRIELLE SLIWKA, ESQUIRE.
    1 EAST BROWARD BOULEVARD, SUITE 1800
    FORT LAUDERDALE, FLORIDA  33301
    (954)987-7550
    jpolenberg@beckerlawyers.com
    gsliwka@beckerlawyers.com


ALSO PRESENT:
    DANIEL SHUEY, ESQUIRE
    IN-HOUSE COUNSEL FOR WENDY'S
    BELLA ARCHER/VIDEOGRAPHER

## Page 3

INDEX

WITNESS                               PAGE

ROBERT DEAN WRIGHT

DIRECT EXAMINATION BY MR. POLENBERG       5


CONFIDENTIAL PORTIONS BOUND UNDER SEPARATE COVER
Page 59,  Line 11 - Page 85, Line 25
Page 86,  Line 17 - Page 89, Line 13
Page 91,  Line 1  - Page 104, Line 21
Page 141, Line 8  - Page 164, Line 5


INDEX TO EXHIBITS
DEFENDANT'S                              PAGE
EXHIBIT 4  LEVY 0004033-0004035         123
EXHIBIT 5  LEVY 0008153-0008156         121
EXHIBIT 6  LEVY 0008978-0008979         128


(ORIGINAL EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)

## Page 4

REMOTE VIDEOTAPED TELECONFERENCE DEPOSITION OF
ROBERT DEAN WRIGHT
MAY 12th, 2026
- - - - -

THE VIDEOGRAPHER:  So we are now on the record.  The time is 10:07 a.m. Eastern Time on May 12th, 2026 taken in the matter of Wendy's Netherlands B.V. versus Andrew Levy filed in Ohio, civil action number 2-24-cv-03077.

My name is Bella Archer.  I am your videographer today.  I do represent Esquire Deposition Solutions.  The reporter is Valerie Lehto.

As a courtesy will everyone who is not speaking please mute your audio and please remember to unmute your audio when you're ready to speak.

Will everyone present please identify themselves and state whom you represent after which the witness will be sworn in.

MR. POLENBERG:  Jon Polenberg on behalf of Andrew Levy and with me I have my colleague Gabrielle Sliwka.

MR. ARONOVITZ:  Cary Aronovitz on behalf of Wendy's Netherlands B.V.

MR. SHUEY:  And Dan Shuey, in-house counsel



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
5–8

Page 5

with Wendy's.

- - - - -

(Whereupon, the court reporter read a statement on the record for the administration of oath remotely via Zoom video teleconference)

MR. POLENBERG:  Jon Polenberg on behalf of Andrew Levy.  So stipulated.

THE COURT REPORTER:  Mr. Aronovitz?

MR. ARONOVITZ:  Yes.  I'm sorry.  Can you repeat the question.

- - - - -

(Whereupon, the court reporter read a statement on the record for the administration of oath remotely via Zoom video teleconference)

MR. ARONOVITZ:  Yes.

THE WITNESS:  I agree.

- - - - -

ROBERT DEAN WRIGHT

having been first duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MR. POLENBERG:

Q.   Good morning.

A.   Good morning.

Q.   Please state your full name for the record.

Page 6

A.   Robert Dean Wright.

Q.   Mr. Wright, I want to go over some ground rules for us with you this morning.  Is that okay?

A.   Of course.

Q.   You understand that you're under oath, right?

A.   Right.

Q.   You understand you must tell the truth?

A.   Yep.

Q.   The whole truth?

Yes?

A.   Yes.

Q.   And nothing but the truth?

A.   Yes.

Q.   And you'll do that, right?

A.   Yes.  Of course.

Q.   Do you understand that your testimony you give here today is just as important as testimony you give in court before a judge or a jury, right?

A.   I do.

Q.   Do you understand that a judge and a jury may - may well hear your - hear and see your deposition testimony that you're giving today, right?

A.   I do.

Q.   You also understand that you must give truthful, complete and accurate testimony today,

Page 7

correct?

A.   I do.

Q.   You'll do that too, right?

A.   That's correct.

Q.   If there's any question you don't understand let me know, okay?

A.   I will do that.

Q.   If you answer a question then you understood it, fair?

A.   Yes.

MR. ARONOVITZ:  Object to form.

BY MR. POLENBERG:

Q.   And in exchange if you want to take back, add to, correct, modify an answer you've already given let me know, okay?

A.   All right, that sounds good.

Q.   And I'll let you do that, fair?

A.   That seems fair.

Q.   That's another way that we can make sure that get - that you get an opportunity to give truthful, complete and accurate testimony, okay?

A.   That makes sense.

Q.   All right, we'll take breaks about once an hour, fair?

A.   Yes.

Page 8

Q.   But if you need a break before that let me know, okay?

A.   Okay.

Q.   And I'll let you do that, fair?

A.   Yes.

Q.   Do you understand the court reporter's taking down everything that's being said, right?

A.   I do.

Q.   And that the court reporter will prepare a transcript of your testimony today, right?

A.   I do.

Q.   And you'll have the ability to read that transcript and make corrections, right?

A.   Okay.

Q.   Bear in mind that if you make corrections I may decide to tell the jury or the Judge that you've made those changes, fair?

A.   Yeah, that's reasonable.

Q.   And that's another way that we can make sure that you give your truthful, complete and accurate testimony today, right?

A.   Yes.

Q.   Is there any reason medical or otherwise that prevents you from giving truthful, complete and accurate testimony today?



Page 9

A.   No.

Q.   If that ever changes you must tell me immediately, okay?

A.   Of course.

Q.   What did you do to prepare for your deposition today?

A.   I reviewed a few e-mails and I had a prep call with - with Cary.

Q.   Okay, I'm not asking what you talked about with Mr. Aronovitz, but in your preparation did you talk to anyone else?

A.   No.

Q.   When you said you reviewed some e-mails, do you remember which e-mails they were?

A.   No.  I mean I could be reminded because, you know, I did review them but, you know, this is an old situation, so I was just trying to refresh my memory of - of some of what may have transpired.

Q.   Where did you get the e-mails from?

A.   From - from Cary.

Q.   How many e-mails were there?

A.   I think there were -- Well, I think there were fifteen, yeah.

Q.   Do you remember any particular e-mail that you reviewed?

Page 10

A.   No.

MR. ARONOVITZ:  I'm going to object to form.
BY MR. POLENBERG:

Q.   In preparing for your deposition did you use any AI tools?

A.   I did not.

Q.   Do you have counsel other than Mr. Aronovitz representing you in any other capacity related to this deposition?

A.   I have no counsel of my own privately.

Q.   Okay.

A.   No.

Q.   All right, let's turn to your background in reverse order because it's usually easier.  Can you tell me where you currently work.

A.   I'm not currently working.  My most recent role was the CEO of Potbelly Corporation.  That - that service ended at the end of the year in 2025 because we had an unsolicited bid to take the company private which we consummated in October of 2025, so I worked a transition through the end of the year.  I'm doing board work today.  I'm on the board of El Pollo Loco, I'm on the board -- Which is a public restaurant company, I'm on the board of a technology company who has clientele in the restaurant space as well as hotel and other

Page 11

retail, multi unit retail by the name of Xenia, I'm on the board of trustees at Taylor University in Indiana.

Q.   Starting with your board work before we get to Potbelly, okay?

A.   Okay.

Q.   How long have you been doing board work?

A.   Not for profit board work dates back several years.  El Pollo Loco is the first time I've been an independent director on a public company board and that officially started at the beginning of this year.

Q.   Fair.

The other boards that you're currently sitting on, those are volunteer boards?

A.   No.  Xenia is a for profit company but it's private equity owned, so it's a private for profit company and, yes, Taylor University it's a - it's a private liberal arts higher education institution in Indiana and I'm on the board of trustees there.

Q.   And that's a volunteer position?

A.   It is.

Q.   And Xenia, that's not a volunteer position?

A.   That's correct.

Q.   How long have you been on the board at Xenia?

A.   Since the fourth quarter of last year.

Q.   Before then you mentioned you worked at

Page 12

Potbelly, right?

A.   Right.  Five and a half years.  I started in June of 2020 and worked through, you know, the end of last year, so I took over in the middle of the pandemic as CEO.

Q.   Before that where did you work?

A.   At Wendy's.

Q.   How long?

A.   Almost six years.  I started in the - at the end of the year in 2013 and I worked through April of 2019.  I was the COO, the chief operations officer during that entire time.  Now I had varying versions of that job with ever increasing responsibility, including related to this case.  I ran International for about three years.

Q.   What years were that?

A.   Let's see.  My best recollection is that started - because that started when the CEO change came about, so that would have been around 2016, I think.  Maybe - maybe it was late '15.  I'm sorry.  I don't have the exact date.

Q.   That's okay.  Your best recollection is all I can ask for.

A.   Yeah.

Q.   And what was the reason you left Wendy's?



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
13–16

Page 13

A.   They reorganized the company and installed two presidents and no longer had a COO position as a result of that, so I was - I was exited through reorganization.

Q.   Before Wendy's where were you?

A.   I was the president and COO and for about half the time the interim CEO of Charlie's Philli Steaks. Charlie's is a privately held company, cheese steaks, chicken wings and I did that for oddly enough exactly three years before I left and - and was invited back to Wendy's.  Prior to Charlie's I was the executive vice-president --

Q.   I wasn't going to go back.  Sorry.  I wasn't going to go back further.  I don't want to tax you.

A.   Okay.

Q.   That's enough background.

A.   Okay.

Q.   I'm trying - I'm going to try to make your day go as short as possible.

A.   Jon, I'll give you the headline:  I've been in the restaurant business for thirty-nine years, I started delivering pizzas at Domino's and if there's a job in franchise or company ops or corporate leadership I've - I've likely done it.

Q.   Fair.  Thanks for the headline.

A.   You're welcome.

Page 14

Q.   Now you mentioned that while at Wendy's you worked at the International Division, right?

A.   Right.

Q.   And what was your role there?

A.   I ran International.  You know, because I was already C -- If you're looking for a title because I was already COO I had been elevated to executive vice-president along with the gentleman who became the CEO and when he became the CEO as part of his restructuring the responsibility for all of International was moved over to me and we simply added an and International to my title.  I think you'll see that in some of these e-mails.  So what had been a president's position in International really was just all of my responsibility and I think today it's back to an isolated individual responsibility to - to a president, but I - I ran it all.

Q.   Who was the person that made the changeover that then grafted International onto your obligations?

A.   His name's Todd Penegor.  Todd was the - was the CEO that succeeded Emil Brolick.

Q.   What was the - the position you held as it relates to entering the Brazil market?

A.   I didn't really hold a position as it relates to entering the - the market.  You know, if you're

Page 15

talking about, you know, career position title or - or point of view when you say position?

Q.   Well, let's - let's start -- We're going to get to both.  So --

A.   Okay.

Q.   -- in your role in charge of International was Brazil already underway?

A.   Yeah.  Okay, sorry.  Thanks for the clarification.

Yes, Brazil had already been entered, so when I took over the JV was in place, the market was underway, if you will.

Q.   How long?

A.   I can't say exactly because I don't - I don't -- I wasn't involved in that startup.  I think it had been, you know, at least a couple years, maybe a little bit longer.

In fact, I guess by the -- If you go back to the genesis of the company it probably would have been more than a couple of years because the - you know, the construction of the restaurants and - and the development of the market was well underway when I took over.

Q.   How many restaurants were operating in Brazil when you took over?

Page 16

A.   I think the first one was open and the second one was about to open, if I recall that correctly.

Q.   And who was involved with that Brazil venture?

A.   Well, the JV, you know, was - the partners in the JV were Andrew Levy and his partner Marcos Silva and then Infinity was the local partner, they had forty percent interest in the JV and then Wendy's directly was the other twenty percent owner.

Q.   Okay, and how did Starboard fit into that picture?

A.   Well, Starboard was Andrew and Marcos, so I'm just, you know, referring to them personally but, yeah, they were -- It was Starboard, Infinity and Wendy's.

Q.   Great.

A.   And my recollection is that it was forty/forty -- I know it was forty/forty/twenty.  You know, gosh, I'd have to go back and look at some of the corporate documents around the JV as exact - as you know sometimes you name a different company and I honestly don't recall if someone chose a different entity to own the forty percent, but those were the three groups.

Q.   Okay, when was it that you first got involved with the JV?

A.   You know, I would say -- I mean immediately suggests literally in the first minutes that I took over



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
17–20

Page 17

responsibility.  That's not accurate, but fairly immediately.  I mean I took the responsibility of taking on International seriously and this was a - a big venture.  We didn't have a lot of JVs.  I can't name another one.  In fact -- And so this one was unique which - which, you know, I thought required my attention, tried to learn as much as I could.  I do not remember when I took my first trip there, but it was early in my responsibility and so, you know, it was - it was fairly -- I guess one could say fairly soon, fairly early when I took over International.

Q.   And what year would that have been?

A.   Again -- I guess I could have looked back at the calendar.  I now -- I think it was '15, but I - I honestly can't remember, you know, if I looked it up.  It's - it's after Todd got elevated to the CEO position.  That's when he reorganized and gave me that responsibility.

That might have been '16, now that I think about it, but because we announced it at the convention which is usually in October that would have been -- Yeah, it would have probably been the end of that year because I think Emil left towards the end of the year as we kind of closed out the calendar year, so I think it was '15.

Page 18

Q.   Okay, so let me -- 2015 you take over International, fair?

A.   Right.

Q.   Soon after that you get involved with the joint venture in Brazil, right?

A.   Yeah.  I mean to be clear I had responsibility for all of International so, you know, I didn't just get involved with the JV.  I -- You know, I'm the - I'm the senior executive responsible for that division of the company and so I'm involved in all of our international markets and - and businesses and including the - the JV in Brazil.

Q.   Right.

A.   Of course I knew --

Q.   Go ahead.

A.   I knew Starboard as well, you know, so that there's - you know, they were already a domestic franchisee which I had previously had responsibility for all of the domestic franchise business.

Q.   Thank you.

I'm just trying to get - get a little bit clarity on the timeline you gave.

So 2015 you take over International, fair?

A.   Yeah.

Q.   And part of that role in International was as

Page 19

I think you testified you got involved with the JV almost instantly?

A.   Yeah.

Q.   And being involved with the JV meant you were involved with Infinity, right?

A.   Right.

Q.   And Starboard, right?

A.   Right.

Q.   Which included Andrew Levy and Marcos Silva, correct?

MR. ARONOVITZ:  Object to form.

BY MR. POLENBERG:

Q.   You -- So, Mr. Aronovitz is going to object to form on questions from time to time and unless he instructs you not to answer you can go ahead and answer the question, okay?

A.   Yeah, sorry.  I think we may have spoke at the same time.

Yeah, that's correct.  That's correct.

I -- The only thing I'd say, Jon, is that, you know, as a leader this is -- And I get that this is very JV focused, but for me as a leader it was the business.  It was the brand in another - one country.  The organizational structure of - of the company that was operating that brand certainly was unique because it was

Page 20

a JV, but my focus was on the brand and the success of the business and, you know, the development of that business in any of the countries that we were in or had planned to enter so, you know, I want to make sure you understand it wasn't - it wasn't a significant amount of my early efforts into the - the capitalization, the organization structure of the JV, it was about the business of --

Q.   Okay.

A.   -- you know, building --

Q.   When --

A.   -- Wendy's restaurants and our hamburgers.

Q.   When did you get involved with the capital structure for the JV in Brazil?

A.   Well, that was immediate as well.  I'm just talking to you about - about primary focus.  I mean I - I certainly did my homework and understood that we had a different structure there, so I had awareness to that and certainly sensitivity to where the money was coming from for the development and that was - that was also media.  I wasn't suggesting that didn't happen early on.  I just was trying to give you a sense of primary focus.

Q.   What were the high level expectations International had for the Brazil market?

A.   Look, we believe that it was a - it was a --



Page 21

This is what was told to me when I took over and sort of the thesis behind the development.  Much of it, you know, I got from - I had heard from the outgoing president in - in meetings that we had.  I certainly heard it from Andrew, I certainly heard it from my team that I took over you've got a - a beef friendly market, beef eating market, lots of population and up until that time a robust economy it looked like a great market to develop in another western hemisphere country where - where we could potentially do really well and so there was just - there were - there were hopes and expectations for success.

Q.  And how long did Wendy's International expect it to take to realize those - those objectives?

A.  There's no finite answer to that question.

Q.  There was no projection that you can recall about where this project would yield profits for Wendy's?

A.  Yeah, I mean I remember seeing projections that had been made before I took over, but they were more unit level projections which is typically what you see when you're entering a new market in the franchise business.  The franchisees, in this case the franchisee is the JV and the JV had done some projections on what it would cost to build units, what it would cost to

Page 22

operate those units, what - you know, what the marginal profitability would be, sales estimates and those types of things but, no, I don't recall the very early days of a - of a high level review of the master, you know, timeline that would - would have the business itself yielding profitability.  I don't recall seeing anything like that in the early days and I can't recall seeing it.  We kind of reviewed the current status more often than we were looking at a long-term plan like I would have done when I was the CEO of Potbelly.

MR. POLENBERG:  Mr. Aronovitz, do you want to make the appearance for another attorney who - who seems to have appeared?

MR. ARONOVITZ:  Yes.  Mitch McBride also with Holland & Knight will - is also here in the Zoom room.

MR. MCBRIDE:  Good morning.

BY MR. POLENBERG:

Q.  All right, let's turn to Infinity.  How did - how did Wendy's International find Infinity?

A.  I don't think Wendy's International did.  I don't know that for sure, but the - my recollection of the - the - the history story of - of the JV was that actually Starboard and Andrew and Marcos found Infinity.

Q.  How did you come to that understanding?

Page 23

A.  That's what I was told.

Q.  Who told you that?

A.  My recollection is it was Andrew and Marcos.

Q.  All right, and what due diligence did Wendy's International do for bringing Infinity in as a joint venture partner?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't know because I wasn't there when they were brought in.

BY MR. POLENBERG:

Q.  What - what characteristics was -- Let me ask that a different way, okay?

A.  Sure.

Q.  Why was Infinity selected as the JV partner?

A.  I probably have the same answer.  I don't know.  I -- You know, my job at the time was to take over what was there and try to build from there and so, you know, I know what I was told at the time and including my first visit to the market.  You know, we - we met with - with Infinity and it was at one of their restaurants and I heard about the restaurant experience they had in the market of not only building chains that had American history but building their own chains and so that was - you know, it was - it was a restaurant based experience in the market who understood

Page 24

restaurants and also understood Brazil.  That was -- You know, generally speaking that's kind of the narrative that supported them as the partner.

Q.  Let's talk - walk me -- Let's walk through 2016, okay?

A.  Okay.

Q.  So what was the high level results that you saw from the JV in Brazil in 2016?

A.  Yeah, high level from the beginning I saw, you know, a lot of aspiration around the power of the brand and how it could penetrate the market, the power of the hamburger, the elevation of the hamburger and - and really appealing to the - the core consumer but on the higher end of scale so, you know, there were - there was a frosty stand that was literally outside on the sidewalk right in front of the location.  Very very well designed, beautiful restaurant.  It was big, but it was - it was beautiful and, you know, what - what I - as I - as I sought to understand the business as - as things were starting was, you know, an understanding that, hey, listen, we've got - we've got a lot of capital invested in this first location, a lot of design work that went into it, all of that preceded me, a lot of really, I think, interesting ideas with the menu to take the - the core menu in America and push it to, you



Page 25

know, the very best version of that quality you can deliver including some sauces and things that you would - you know, you would allow people to put on their - their sandwiches.

I recall reviewing the decisions against what had been done in terms of, you know, a desire to understand that marketplace and they seemed to align so, you know, they seemed to be kind of on market and unfortunately I also recall that the sales estimates that were - that were developed by the partners for those first couple of units were not being achieved and the cost estimates for the operation of the business were not being achieved and I recall many good discussions between me and the partners and my team primarily, the International team and the partners about, you know, how do you close that gap, what are the things you think you see or, you know, you're all seasoned operators, we're all seasoned operators, where do we see opportunity for improvement and that was a - that was a -- To be clear that was an open dialogue among everybody involved as is the case when you enter a new market.  You know, I had that experience in a lot of International markets because you're breaking in.  You have to say, all right, well, obviously we've got a little miss on sales, how do we match the sales with the

Page 26

capital and what can we do with the menu?  Is there anything, you know, in terms of the - the - service model that may be a little labor intensive, can we adjust that and then made some adjustments to drinks and, you know, a lot of those types of things, so I remember the business.  I remember the - you know, the full engagement of the business, I remember the enthusiasm of the partners and the excitement they had for what they could build there and - and certainly my team's engagement.  We - we invested a lot on what - not through the JV but the company itself because, you know, I - I led that team and so, you know, we sent people to the market frequently and - and invested time while we were there digging into things and - and trying to help, you know, at - at the core.

I know you probably know this.  It's been engrained in my DNA that this business lives and dies by the unit level of economics and so it lives by the brand, it dies by the unit level of economics, so I mean you've got - you've got to keep dialing that in and there was a lot of early attention to that.  There wasn't much panic, to be honest with you, because it was - it was a market entry, so --

Q.   How did --

A.   -- that's my recollection.

Page 27

Q.   How did the - one of the first facts you mentioned was the design.  Do you remember that?

A.   Oh, yeah.

Q.   How did the design compare with the design for Wendy's in - in the United States?

A.   In terms of scale it was very large and there had been some other markets that had gone large, too.  I think the Republic of Georgia was one that that franchisee had a real passion for what they could do in that market and designed very large locations.  It's not unusual.  I mean you see this with Pizza Hut and KFC and other brands that have gone International.  There's some Pizza Hut locations that are three and four-stories tall out there, so that certainly was different for me as a new leader of International to, you know, to come in.  I had seen the designs on paper, but when you arrive I mean beautiful locations.  I thought some of the color schemes were really interesting.  There were some - some things about the service model that I thought were cutting edge and you actually see them in the States today that's also not unusual.  McDonald's pioneered many of the things they did internationally over in Australia and it would bring them back, so the ordering cue with a series of kiosk types of orders can be a very efficient way to - to gather a lot of orders and then,

Page 28

you know, having the kitchen deliver that food, so it was big, it was really really well done, really beautiful, it was attractive, people wanted to be there and come in and, you know, there were - there were some, I think, advancements in terms of operational efficiency that were there.

Q.   How was the service model different than what was in the United States?

A.   The U.S., I mean, sure, everybody on this call has been to fast food restaurants.  When you go inside, because this is a lot of inside business internationally, not nearly as drive-thru dependent because the rest of the world doesn't live in their cars kind of the way we do, at least not everywhere.  So inside visit in - in domestic Wendy's at the time was almost exclusively walk up to the counter, place your order, wait for the food to be gathered, prepared, made for you, put on a tray and then you can take your own food back to the dining room and eat.  There's usually two registers.  I could - I could bore you for hours about the - you know, by the second efficiency that's - that's baked into that.

The Brazil model was different because there were - I want to say there was - there was a much larger number of order points and I think it was eight.  It



Page 29

could have been six or seven.  It doesn't matter.  It was a multiple of what you get in the U.S. and when you walk in the door you were brought into a cue where on either side there were these POSs that were manned by people that would help take your order, they also had kiosk capability, so some of those could be eventually turned into self service order, but instead of taking one or two orders at a time like you do in the U.S. you can take six, seven, eight orders at a time, so it was built for capacity.  The beauty of that is the order time is often the slowest part of the QSR experience, so when I said breakthrough, that - that was - that was breakthrough thinking to take multiple orders so you didn't choke capacity and then the kitchen would - would take those orders from there.  It was nearby but remote, not necessarily connected directly to the order station and it wasn't necessary that that was going to be the case, and then the food was prepared on a tray and just delivered to the table.  A little - a little taste of fast casual, what we call fast casual in America, a little taste of that brought into that experience down there.

Q.   Just so we're clear, you mentioned an abbreviation POS.

A.   Sorry.  Point of sale.  That's the register.

Page 30

Q.  Okay.

A.   In whatever form it may take.  You see a lot of them are - are customer operated kiosks that's still - you know, the guts of that is still a POS.  Someone - someone has to put the order in whether it's the employee or the customer.

Q.   And how did the number of people needed to provide this table service that you just described compared to the U.S.?

A.   Well, all of the table service is incremental and I recall as the - as the relationship matured it was - it was something that we all put a spotlight on including my team is that, you know, that's incremental labor to - to walk that tray out to the customer.  It was a wonderful experience, but you really kind of test whether the model's working and it can support that incremental labor and so it - you know, it's -- Most of the labor is tied up in the kitchen and in the restaurant business the open and close, post rush, equipment cleanliness, all that sort of stuff and that's kind of consistent across most restaurants in the same brand and then there's always prep involved and then the service labor is running that kitchen, making the food, preparing the food, so the delivery is certainly incremental, but it really is a relatively small

Page 31

incremental investment compared to all the rest of the labor involved.  It's - it is made a little more complicated in the Brazil situation because they chose in those first two buildings to do a three-story and a two-story building so, look, if you're delivering somewhere on foot, the farther you have to go the longer it takes and, you know, this is a business of seconds, so that stuff adds up.

Q.   Who was the - who was the -- Which partner decided that it should be a three or two-story design?

A.   That's a great question.  I - I don't know.  My - my belief based on the way everyone discussed it was it was a - it was a board decision that was taken by the board of the JV which means, you know, it would have to be everybody.

I can remember the first meeting about Brazil that I had with Andrew and Marcos and they were very excited about this new design.  They were very excited about this sort of elevated entry point into Brazil and they saw -- You know, in restaurants you get a little enamored with the building, but they - you know, they were talking about the design of the building.

Q.   In - in the world of Wendy's different building who has to approve a building?

A.   Well, I think the rules of the road are

Page 32

different domestically because there's a pretty heavy hand in - in a mature domestic brand like Wendy's or, you know, any of the other brands that I've operated.  Even in my most recent experience at Potbelly we approved each location.  We even have approval for site selection.

I don't think you can isolate approval of this building.  I don't think you can isolate approval even of - of site selection.  There was a lot of -- The JV leaned very heavily on the local partner and Infinity and Starboard's relationship with Infinity.  I mean at the end of the day, you know, every vote -- They got eight and the company got two, so it was a consensus for sure, but I think, you know, it would be hard to pin it on any one party, certainly one person.

Q.   Who -- Let me ask that a different way, okay?  Okay?

A.   Sure.

Q.   What was Wendy's role in establishing standards and specifications for the design in Brazil?

A.   Again broadly speaking, brazil included, International design control was nowhere near what it was in the U.S. and so there was a lot of freedom in the country for operators and franchisees to make different decisions about how to develop the brand.



Page 33

While Wendy's had been in the International markets for a long time, that portion of the company was candidly not well developed for that - that level of control and I think that was the design was that, look, you're not at the control stage yet, this is at the growth stage and every country is different and so you have to explore what's going to work in that country and so there was a lot of deference to the local expertise and the local franchisees.

Q.   You just mentioned that Wendy's had long been in the International marketing space; is that right?

A.   Yeah, but I also added to that comment.  Even though they had been in it a long time you're still talking about market entry, so unlike the amount of time that Wendy's had been in the U.S. and that maturity had yielded a very high level of - of clarity on expectations, on control, on standards especially around design because, you know, we long since understood how the brand functions at its best in the U.S.  That understanding doesn't exist across International.  Let's face it.  International is just an accumulation of a bunch of very very different markets.  I mean one of the other markets we don't need to talk about, but one of the other markets I inherited was India.  I mean a completely different consumer base, completely different

Page 34

economy, completely different dietary elements and so there was a lot of deference as I said to the local operator on what fit that market the best and in Brazil's case that deference was to the JV.

Q.   Well, how long had Wendy's been in the International - or International space when you took over?

A.   Oh, I'm not sure.  I mean years and years, maybe - maybe decades.  It's still a fairly small business though.  Even before I took over I already had Canada, and - and just to give you a sense of - of the, you know, sort of small nature of the International division, Canada wasn't even counted in International, it was wrapped up in what we call North America and we were a little unclear on that language because North America didn't include Mexico, you know, so the non Canadian international not U.S. markets, you know, we broke five hundred units for the first time in the history of the company when I ran International and so it was a fairly small division and - and unsophisticated compared to the - the domestic business.  As I said, when I say unsophisticated, to be clear around those things like tight design standards, controls, processes, and again I just recently took over but, you know, I think the decisions had been made by Wendy's leadership

Page 35

that in order to have that level of - of control you have to have that level of expertise, and the brand, the company didn't have that level of expertise in any one country outside the U.S. except for Canada, so...

Q.   You also in your initial answer when you give the high level view of - of Brazil in 2016 mentioned that sales were not at the level that - that was anticipated.  Do you remember that testimony?

A.   Yeah.  Yeah.

Q.   What was the analysis in 2016 about why sales were falling short?

A.   Well, I recall a lot of questions around value.  I mean I think the - the best analysis is what was explored versus what was concluded.  Certainly - and we got this from Infinity and from Starboard that the economy was in a - in a really precarious situation that was kind of unprecedented.  I think they said something like in the last fifty or sixty years the Brazilian economy hadn't been that weak and it was really hitting the broad based consumer very very hard.  Well, you know, you still try to lift and apply experience, so you're saying, well, is - is the economic pressure on the broad based consumer in the Wendy's customer as a whole creating pressure on those sales or because its early market entry stage is there something about the

Page 36

brand that's making it less successful?  Is there more competition in the area?  Is - is, you know, the food not resonating in some way?  So you've - you've got - you've got to leave every one of those variables, it's a multi varying equation to try to figure out where you can get sales to where they are.

You come out the other way too because a standard that we look at in the restaurant business is sales to investment so, you know, a five million dollar restaurant in terms of five million U.S. dollars in a year's worth of volume can be a great thing, it can be a horrible thing.  It depends on what you built to get the five million dollars and so these - these units were doing nice volumes but not the type of volume that I think would make the investment - the investor who built the building excited about that and I think that's, you know, some of the stuff that -- When I say sales were disappointing compared to the investment and the expectations for such a big and capacity rich building it wasn't achieving those objectives.

Q.   Okay, so earlier in that testimony you mentioned something about conclusions versus analysis or assessment.  What were the conclusions at the end for 2016?

A.   I don't think you ever reach a conclusion at



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
37–40

Page 37

that early stage of market development.  You make decisions rooted in what you believe are the most likely answers to the question and it was a combination of things, so conclusions about sales were that, hey, the - the economy's having a very large impact on sales.  There's pressure there at the consumer, at the consumer level.  Is there anything you can do to make the brand more approachable from a price point perspective?  And, you know, looking at, you know, as you do in the restaurant business are there value options, menu additions.  I don't remember any of the specific answers we had for that, but you can lift and apply some - some experience from other countries and all the partners would have had the ability to do that.

As I recall Infinity was experiencing the same type of dramatic pressure on their other businesses in - in the market too, so that was part of the - part of the conclusion that the economy was having an outsized impact on - on those sales pressures.

What do you do about it?  You know, you can try to can I add a million dollars in sales or you can try to figure out how to operate within the sales that - that the market is delivering to you today and that usually is the - one of the early pivots that most businesses will make when they're in a market entry

Page 38

position is, all right, well, if this is - if this is the sales level we know we have today can we make that work better for us and if we're losing money can we lose less or can we possibly turn this into profitable so that we can move on to the next version of the Wendy's and grow our way through this and that's, you know - that's - that's where we spent a lot of time also is on the cost side.

Q.   I was going to get there next, but the conclusions that you reached or the decisions that you made were to - were to what as it relates to the sales numbers?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yeah, I mean I - I don't think I can offer you anything more than the conclusion.  The conclusion is that the economy had a significant impact on the sales pressure and I don't think there were - I don't recall anyway significant brand misses with the value equation, the quality of the food, the delivery of the food.  There were some dryness issues that, you know, you discover with your supply chain and try to work on those things, but the - those are -- You're nibbling around the edges in, you know, forever challenging elements of the restaurant business.

Page 39

Are we getting the same quality in the back door that we want to send out the front door and if not you adjust.  Those aren't things that have, you know, kind of multi million dollar pressure on sales models the way that this - these first units were - were underperforming their forecast and that's a -- I think that's a really important detail.  The forecast was created out of what model I don't know.  I know the JV created the forecast, so to miss that forecast doesn't necessarily mean there's a sales problem, it could be a forecasting problem, and I think there was a lot of enthusiasm around what the forecast could be.  I have no information really that I - that I recall really digging back into the forecast because frankly at the time I - I know myself well enough to know that you're just retracing history for no good reason.  It is what it is at that point.  What are we going to do about making this business viable?

BY MR. POLENBERG:

Q.   Okay, now the last component was the cost factor.  What was --

A.   Sure.

Q.   What was - what was the analysis as it relates to the cost factor?

Page 40

A.   The rent was high because, you know, you've - you've got to pay for this building that - that is outsized compared to the sales revenue.  The food was high, labor was high all higher than estimates, all higher than forecasted and, you know, what - what my domestic team is really good at is managing those costs and so, you know, we brought some support from some of my ops services team that was in the International Division to say, all right, well, let's tear this apart.  Is there anything we can do to help this franchise group find ways to - to look for some efficiency?  And, you know, you point at things and then you - you start working on testing those.

I honestly don't think that we - we activated most of those ideas until, you know, frankly the problem got worse and years went by.  There was a hesitance by the - by the local operator and by the JV to act swiftly on some of those things because, you know, they still believed in the concept that they had created.

Q.   When you say the JV, are you taking Wendy's out of that equation?

A.   No.  I'm just putting their - them in their proper place as a twenty percent partner in the JV.  We were not the operator.  We were not - we were not the operating partner of the franchise.  We



Page 41

weren't the majority owner of the franchise.  We had a lot of money invested because we were backing - backstopping the loans, but the Wendy's company, we were the franchisor primarily and we were an investor in this JV, but just like any JV if the twenty percent investor is truly an investor they're going to - and then they're losing money, their business is losing money they're going to get engaged and ask questions and offer support.  We had that role and we had the franchisor role.

But, no, the -- I mean, look, Infinity and - and Starboard carried - you know, they carried the mantel for operating this business and finding solutions that would help create profitability on returns on investment.

Q.   You mentioned that Wendy's was the franchisor and a partner, right?

A.   Uh-huh.  (Affirmative response).  Uh-huh. (Affirmative response).

Q.   Yes?  That was a yes?

A.   Yes.

Q.   Okay, sometimes during the deposition you might say uh-huh or hu-huh and if I - if I ask you is that a yes I'm not intending to be rude.  I'm just trying to make sure I have a clear record in your

Page 42

answer, okay?

A.   I don't take it that way at all, Jon.  I appreciate you helping --

MR. ARONOVITZ:  Mr. Wright, also let Jon finish his question and then you can give an answer.  That will also create a clearer transcript.  I know you can anticipate what he's asking, but let him ask the question and then you give your answer.

THE WITNESS:  Yeah, thank you both for the coaching.

BY MR. POLENBERG:

Q.   The --

MR. POLENBERG:  I'm sorry, Miss Lehto.  Could you tell me where -- I lost my question.  Can you tell me where I left off.

(Whereupon, the requested portion of the record was read back).

BY MR. POLENBERG:

Q.   Okay, so that was a yes, right?

A.   Yes.

Q.   Okay, Wendy's was also a lender, correct?

A.   Oh, gosh.  I would have to -- I would have to have the help of some records on that.  I - I think we lended directly, but I remember that the cash was moving

Page 43

around, I think this is where Wendy's of the Netherlands came in and then I think we backstopped a loan.  I say backstopped.  I think we - we I don't want to say guaranteed, but I think we were - we were the - the support for one of the loans that came through another bank, so either directly or indirectly through our - our credit facilities we were able to - to support the - the cash flow through the lending that came in.

Q.   Okay.

A.   I think that's right.

Q.   Okay, so let's now turn to 2017, okay?

A.   Okay.

Q.   I think - I think your testimony earlier mentioned, if I'm not mistaken, that the issues got a little worse as time progressed; is that right?

A.   Yeah, I mean, look, I - if I said that what I meant was we - we - we built another unit, the JV built another unit and it also disappointed in terms of the sales to investment that was necessary to make it a profitable investment and so what got worse was that the JV was still growing and using more cash than it was generating and - and I think that, you know, that was - that was at the source of a lot of the anxiety of the JV was the cash burn.

Q.   But the design is the design, right?

Page 44

A.   No.  I don't think that's a fair statement.

Q.   Okay, the design for the second store was whatever the parties agreed to, right?

A.   Oh, yes.  Yeah.  Yeah.

Q.   And that - that's a fixed cost now, right?

A.   Correct.  Yes.

Q.   And how were sales performing in 2017?

A.   Similarly.  Again both of those first two units were doing nice volumes but not enough volume to - to offset the investment that it took to build, you know, those - those two locations.

Q.   And how were the costs?  How was the cost experienced?

A.   My recollection is that the - the operating costs may have improved slightly but hadn't made the step change necessary to - to unlock the other way of developing cash flow by controlling those costs.

Q.   You mentioned the magic word cash flow.  How were the cash flows for the two stores that were opened in 2017?

A.   I can't give you specifics on those two stores, but I know the business as a whole was still burning cash and - and yet there - you know, there was still an effort to keep funding development because you - you know, there was - there was desire in those



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
45–48

Page 45

days to develop another, a third model smaller.  You know, we were looking at malls and strip centers and things like that.

Q.   When you say there was -- Well, first of all let me ask -- Let me break that down a little bit smaller, okay?

A.   Uh-huh.  (Affirmative response).

Q.   Yes?

A.   Sure.  Yes.

Q.   The cash flows -- When I said how were cash flows you said I don't remember specifically but they were burning cash.  Do you remember that testimony?

A.   Yes.

Q.   Does that generally mean that cash flows were negative?

A.   Yes, cash flows were negative.  Burning cash.  Sorry for the slang but, yes, burning cash and negative cash flow were synonymous.

Q.   Okay, and there was discussion about opening a third location, right?

A.   That's correct.  I mean there were discussions about opening more than three.

Q.   But before you get to more than three first you need three, right?

A.   Yeah.  Yeah.

Page 46

Q.   Okay, and so there was I think you mentioned discussion about changing the design to something smaller.  Do you remember that?

A.   Yes.

Q.   What was the thinking behind that?

A.   It's the same as the thinking I've already shared.  If you believe that you're getting a per unit volume that the market will deliver to you for that brand can you do so with a smaller building and therefore less expensive to build or in a different type of location that's significantly less expensive to build and try to right, you see my hands, but try to right size or balance the sales to the investment ratio.  This is -- I mean this - this work in the restaurant space is new to no one.  The notion of trying to get the best sales out of the building that you can get and the lowest cost out of the building you can put in is your best starting place for financial success on a per unit basis so, yes, absolutely.  We - you know, we had some experience now.  I say we.  The JV had experience now and - and - and the franchisor is obviously evaluating this as well and there was I think the right thinking by the - by the JV partners, well, can we pivot to an even smaller building or even some leased spaces in malls or other areas.

Page 47

Q.   And how did that round out at the end of 2017?

A.   Gosh, best of my recollection, let me preface that, that we were starting to fill the pipeline with locations that would afford us that type of lowered investment cost but still believed we had, you know, the potential for nice sales volumes that would allow that - that investment to return.

There was another trip that I recall making to Brazil and the Infinity partners were taking us on a tour of locations that they had discovered and they were working letters of intent on and, you know, locations that they thought could really help them improve the investment economics and the operating economics as they continued to build more locations.

Q.   What about Starboard and Mr. Levy's commitment to continue in the JV coming the end of 2017, what can you tell me about that?

A.   My recollection is he was still very committed to it.  There was - there was -- You know, as long as I can recall even after, you know, this business ultimately failed I - I can still recall Andrew in particular and Marcos too when they were still partners talking about their belief in the market.  You know, that's - that's where this - this business drive initially starts is you have someone who says, look, you

Page 48

know, they use language like this, I can't quote them, but they use language of optimism in the market, this is a great market, it's a great economy, the - the - the taste and profile and eating habits of the local consumer base fit, the total addressable market in terms of consumers seems to fit, so Andrew and Marcos and the local partner would often return to that thesis as - as, you know, conversation and dialogue around what they thought could happen in the market even in the most tough and difficult financial times.

Q.   And in the tough and difficult financial times was that towards the end of 2017?

A.   I mean when you're - when you're not producing positive cash flow I think there's a sense of urgency around financials the entire time, so I don't think I can isolate that sense of financial strain and pressure to the end of 2017.  I think the entire JV was acutely aware of the desire to solve for that negative cash flow from the very beginning of my involvement.

Q.   And how was --

MR. ARONOVITZ:  Jon, we've gone for a little over an hour.  Is it time to take a break or do you want to finish this topic?

MR. POLENBERG:  Yeah, let me finish this quick topic, Mr. Aronovitz, but we actually didn't start



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
49–52

Page 49

until ten after, so I think we're - we're perfectly in line to give you that one hour break.

BY MR. POLENBERG:

Q. If you need a break now, Mr. Wright, I'm happy to give it to you now, but if we can just finish this topic I'm fine with that, too.

A. I'm delighted to finish the topic. Let's keep going.

MR. ARONOVITZ: And that's fine with me as well.

BY MR. POLENBERG:

Q. All right, at the end of 2017 how aware were you of financial strain that Starboard and Mr. Levy were expressing with the Brazil JV?

A. I was aware. Yeah, these are ongoing -- As with any good franchisor or franchisee relationship even if we weren't involved in the JV these are conversations that are normal, ongoing, appropriate and expected with franchisees about the financial health of their company, so I was fully aware.

Q. And at the end of 2017 how would you compare that awareness of the financial strain described by Starboard and Mr. Levy to the beginning of 2017?

A. I think it was - you know, I think it was a year -- It was another year mature and therefore another

Page 50

year acute, but I mean I don't - I don't remember any - any significant emotional difference to it. It was -- You know, we're talking facts and figures and numbers and so we - we continued to talk about it.

MR. POLENBERG: Okay, let's go ahead and take that break.

THE WITNESS: Okay, great.

MR. POLENBERG: We'll come back at 11:10. Let's make it 11:20, okay?

THE WITNESS: Perfect.

MR. ARONOVITZ: Sounds good.

MR. POLENBERG: Thank you.

THE WITNESS: Thank you.

(Whereupon, there was a brief recess observed)

THE VIDEOGRAPHER: All right, we are back on the record.

The time is 11:22 a.m.

BY MR. POLENBERG:

Q. Mr. Wright, when we - when we took the break we were - we rounded out the end of 2017. Do you remember?

A. I do remember that.

Q. All right, so let's talk about your high level recollection of how 2018 turned out for the joint venture.

Page 51

A. High level recollection is that it was a continuation of the same business performance and I think it was in '18 that you know, there was - there was even more ongoing discussion about the partnership.

Q. What does that mean?

A. Many of the calls that Andrew made to me were related to the funding to the JV when he paid, you know, particular attention to how to sustain the funding necessary to - to keep the business going.

Q. When you talk about his conversations about how to sustain the business with funding on a go forward basis, how was that - how was that a problem?

A. How was it a problem you say?

Q. Yeah. Yeah.

MR. ARONOVITZ: Object to form.

THE WITNESS: Generally speaking, if a business loses cash long enough, it loses money long enough then it's not a viable business, so I think that was - that was his concern and I - you know, I think that's the primary focus is - you know, is there a path to getting the business healthy, but the secondary element was the continued pro rata share contributions of - of funding to - to keep that business going.

BY MR. POLENBERG:

Page 52

Q. What was Wendy's view on the requirement to keep the funding going?

A. Well, it evolved and, you know, as - as was often the case there was discussion among the partners and the JV, certainly me internally in the company about, you know, our - our - our common desire to make this market work and belief in many of those high level entry point considerations that I shared with you earlier about the market, the size of the market, consumer demand, hamburgers and all of that and so there was a - you know, there was a common desire to fight our way through these early stage development issues and - and find a model that could be expanded and grown.

Q. And how did that fit with Mr. Levy's expressed view that the business may not be viable?

A. I don't recall him expressing that view.

Q. Okay, earlier you testified that it became - you know, there came a time asking questions of whether the business was viable given the negative cash flow. Do you remember that?

MR. ARONOVITZ: Object to form.

THE WITNESS: Yeah, I mean I think there's always questions about the viability of a business and it's no different than this one, but I - the way I heard your - your question just now is when



Page 53

did - when did Andrew's position pivot to his challenge of - of the viability of the business and I don't recall that happening.  Those are in my mind two different approaches to managing the business.  We were always talking about cash flow and cash flow by definition is a threat to the business, but there was no - there was no recollection I have of some pivot where Andrew is raising his hand and saying, hey, I don't think we're going to make it.

BY MR. POLENBERG:

Q.   What was - what was Wendy's position regarding funding - in 2018 regarding funding the negative cash flow with capital contributions?

MR. ARONOVITZ:  Object to the form.

THE WITNESS:  I can only - I can only speak generally because the - the general concern was is there a path forward to a viable development model that allows you to grow your way and out of the - the investment costs that have been put into the market so far and so, you know, any conversation I had with people outside of my International team that most of the discussion was how's the business, you know, where - where are the opportunities to improve, what can be done about the cost model and

Page 54

it was - it was a dialogue between me and anybody that I would speak to about where we thought those opportunities were and, of course, what the team was doing to work on it.

I do not recall when it happened.  That's - that's I'll call it the operating model.

Now the funding model I can't - I cannot tell you when this became a specific concern, but it was clear that occasionally Infinity was very slow to put forth their pro rata contribution to the capital necessary to keep moving forward.  Andrew again to my recollection took a lot of responsibility for that, but that was - it was probably in that 2018 timeframe where while the business you could see the potential for continued development, it was going to require the continued investment to get there and I think there was some early indications that Infinity may be the partner that's struggling the most to get that done.

BY MR. POLENBERG:

Q.   What was the capital contributions in 2018 that you recall the - the JV members making?

A.   I don't recall specific numbers.

Q.   Okay, you mentioned that Infinity was having trouble with its pro rata share of the capital

Page 55

contribution?

A.   Yeah, I mean -- Well, I would say that Infinity was the - the - the partner that - that seemed to have trouble to do that because there were times when Andrew would communicate with me that he's - he's talking to Marcel, he's going to make sure that Marcel brings his - his investment forward and there's certainly times where, you know, I - I certainly let Andrew do -- And you do this with partners.  I certainly let Andrew convey that to Marcel because, you know, if we were going to underwrite any additional loans or if Wendy's was going to make any additional contributions, it was certainly going to be contingent upon the rest of the partners carrying their pro rata portion of the investment necessary to keep the business going so, you know, we - we made that clear to one another that we needed everybody to - everybody, this is a JV, everybody in the JV needs to participate in moving forward.

Q.   What would happen if Infinity didn't give its pro rata contribution?  What would - what would Wendy's do between Starboard and itself on a go forward --

A.   I don't know.  I'd be speculating.

MR. ARONOVITZ:  Object to form.

Bob.

THE WITNESS:  Yes.

Page 56

MR. ARONOVITZ:  Mr. Wright, let me -- You know, provide a moment after Mr. Polenberg's question so I can give an objection for the record and then - and then go ahead and answer it, but for that question object to form.

THE WITNESS:  Yes, thank you.

Sorry for stepping in too quickly, but I -- I can't speculate on what Wendy's would have done under a multitude of circumstances.  It's just not how we operated the business.

BY MR. POLENBERG:

Q.   What did Wendy's do?

A.   We continued to maintain the position that we were - we were prepared to keep building this business as long as the JV was also prepared to keep building the business.

Q.   Well, what did Wendy's do when Infinity was not providing its pro rata share of the capital?

A.   Well, as I described a minute ago, you know, that it usually doesn't - doesn't result in a specific action by the company.  In my case it resulted in conversation with the other partner.  You're the one who brought Infinity into this, you're the one that has a relationship with Marcel.  Maybe you have some insight into what's going on and, you know, is there - can you



Page 57

use your relational influence or is there some other element of this that I can't see from Dublin, Ohio that you can work on, so...

Q.  How do you -- You mentioned again that Starboard brought in Infinity to the JV.  Do you remember --

A.  I think I indicated that the early --

Q.  You did.

A.  I apologize.  I did it to you, Mr. Polenberg. I - I started to answer your question and you didn't finish.

Q.  You mentioned that before in your testimony.

What I'm asking is you didn't remember who told you.  I'm asking now do you remember now who told you that information?

A.  No.

Q.  Okay.  All right, so what happened - what happened to the JV in - towards the end of 2018?

A.  I don't recall anything happened to it.  I don't know.

Q.  Were you still involved with the International Division by the end of 2018?

A.  I relinquished responsibility.  I think I held International for approximately three years and so it would have been around that time that Todd moved

Page 58

International over to Abigail Pringle's responsibility, but I do not remember the date.  You know, it's just another organizational shift and it happened around -- I had responsibility for about three years.  I know that because it was some of the most successful in terms of unit growth in the three year history of the company up to that point.

Q.  Okay, so earlier you mentioned that it got - it was announced that you were coming in at the - at the annual meeting in October, 2015, right?

A.  That's not what I intended to say, so if I created any unclarity I apologize.

What I said was in the we called it convention, that's the national meeting of all the franchisees and - and the - the corporate folks that come together, it was that convention where the company announced that Emil was retiring and Todd was ascending to the CEO position and with that ascension Todd began his work of reorganizing the company and giving me responsibility for International because up to that point he had responsibility for International, so I was marking that beginning of my responsibility with Emil's departure and Todd's promotion.

Q.  Okay, so how long after that convention was it that you took the reigns of the International Division?

Page 59

A.  Fairly immediately.  I can't give you a date, but it was - it was fairly immediate.

Q.  Somewhere around October, 2015?

A.  Somewhere around, yeah, the end of 2015.

Q.  Okay, so then that would mean that somewhere around the end of 2018 is about when you relinquished the International Division, fair?

A.  That's right.  It - it comports with that three year responsibility, three years plus or minus responsibility that I had the business.

(Non-Confidential testimony resumes)

Page 86

Q.  What did - what did Wendy's tell the JV partners about this growing interest in the JV?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't know.

BY MR. POLENBERG:

Q.  Do you have any recollection of any provision in the JV foundation documents that discussed that increasing stake in the JV?

A.  I'm sorry.  I do not.

Q.  I'm about to go to a new document and we've been going almost an hour.  Do you want to take a break now or go through this next document?

A.  We can go through the next document if the rest of the parties are comfortable with that.

Q.  This is democracy.  I take a vote.  All right.

Oh, we're lucky.  It's a one pager.



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
1–59

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION
CIVIL ACTION NO.  2:24-cv-03077

WENDY'S NETHERLANDS B.V.,

Plaintiff,

vs.

ANDREW LEVY,

Defendant,
_____/

REMOTE VIDEOTAPED TELECONFERENCE DEPOSITION OF
ROBERT DEAN WRIGHT

CONFIDENTIAL EXCERPTS

TUESDAY, MAY 12th, 2026
WESTERVILLE, DELAWARE COUNTY, OHIO
10:07 a.m. - 3:02 p.m.

STENOGRAPHICALLY REPORTED BY:
VALERIE LEHTO, REGISTERED PROFESSIONAL REPORTER
NOTARY PUBLIC, STATE OF FLORIDA
ESQUIRE DEPOSITION SOLUTIONS
FORT LAUDERDALE OFFICE

Page 2

APPEARANCES:

APPEARING BY VIDEO TELECONFERENCE ON BEHALF OF THE
PLAINTIFF:
    HOLLAND & KNIGHT, LLP.
    BY:  CARY ARONOVITZ, ESQUIRE.
    BY:  MITCHELL L. MCBRIDE, ESQUIRE.
    701 BRICKELL AVENUE, SUITE 3300
    MIAMI, FLORIDA  33131
    (305)789-7520
    cary.aronovitz@hklaw.com
    mitchell.mcbride@hklaw.com

APPEARING BY VIDEO TELECONFERENCE ON BEHALF OF THE
DEFENDANT:

    BECKER & POLIAKOFF, P.A.
    BY:  JON POLENBERG, ESQUIRE.
    BY:  GABRIELLE SLIWKA, ESQUIRE.
    1 EAST BROWARD BOULEVARD, SUITE 1800
    FORT LAUDERDALE, FLORIDA  33301
    (954)987-7550
    jpolenberg@beckerlawyers.com
    gsliwka@beckerlawyers.com

ALSO PRESENT:
    DANIEL SHUEY, ESQUIRE
    IN-HOUSE COUNSEL FOR WENDY'S
    BELLA ARCHER/VIDEOGRAPHER

Page 3

INDEX

WITNESS                                              PAGE
ROBERT DEAN WRIGHT
DIRECT EXAMINATION BY MR. POLENBERG                    5


     CONFIDENTIAL EXCERPTS FROM ORIGINAL TRANSCRIPT

Page 59,  Line 11 - Page 85, Line 25
Page 86,  Line 17 - Page 89, Line 13
Page 91,  Line 1  - Page 104, Line 21
Page 141, Line 8  - Page 164, Line 5


     INDEX TO CONFIDENTIAL EXHIBITS

DEFENDANT'S                                          PAGE

EXHIBIT 1  WENDY 0013888-0013899                      60
     (MARKED CONFIDENTIAL)
EXHIBIT 2  WENDY 0003854 (MARKED CONFIDENTIAL)        91
EXHIBIT 3  WENDY 0003334-0003336                      91
     (MARKED CONFIDENTIAL)
EXHIBIT 7  WENDY 0013861-0013864                     144
     (MARKED CONFIDENTIAL)
EXHIBIT 8  WENDY 0013761-0013764                     148
     (MARKED CONFIDENTIAL)
EXHIBIT 9  WENDY 0003809 (MARKED CONFIDENTIAL)       161

   (ORIGINAL EXHIBITS INCLUDED WITH ORIGINAL TRANSCRIPT)

Page 59

(The testimony from page 59 to page 85 has been marked confidential, excerpted and bound separately).

Q.   Okay.  All right, so let's - let's go into a document that I think might help explain some of the facts that you were testifying about, okay?

A.   Sure.

Q.   So, Mr. Wright, I am sharing my screen. Please let me know if you can see the document.

A.   Okay, I can see the document.

Q.   Okay, so this is a document that is Bates range number WENDY 003 -- I'm sorry.  Strike that. WENDY 0013888 to 13899.  Now what I just said, Mr. Wright, is referring to a document at the bottom here.  You see it says Wendy's with a space and then there's a number?

A.   I do.

Q.   Okay, so that's called a Bates number, okay?



Page 60

A.   Okay.

Q.   And so I'll refer to that page so long as they exist on these documents to help identify where we're looking, okay?

A.   That sounds great.

Q.   Okay, we're going to mark this as Exhibit 1 to your deposition, fair?

A.   Okay.

(Whereupon, Defendant's Exhibit 1 was marked)

BY MR. POLENBERG:

Q.   And why don't you take a look at this first page and read it to yourself and let me know when you're done.

A.   I'm done.

Q.   Okay, and do you see in the e-mail there's a cc and it has a - a name Bob Wright?

A.   Yes.

Q.   Okay, was that your e-mail address at Wendy's?

A.   It - it was, yes.

Q.   Okay and in the subject line it reads Wendy's Brazil background.  Did I read that correctly?

A.   You did.

Q.   All right, do you remember this e-mail?

A.   No.

Q.   Okay, I'm going to scroll through what's in

Page 61

this Exhibit 1 so that you can look at it and I want you to take your time to familiarize yourself with it so that when we ask questions we can go through it together and you can explain it to me, fair?

A.   That sounds great.

Q.   If I'm going too slow or too fast you let me know, okay?

A.   Okay.

Okay.

Q.   Okay, we're at the end of that - that page and for the record each page is specified and - and documented as confidential, so as we talk about this document this part of the transcript has to remain confidential.  The parties will address whether this confidentiality will - will survive or go into - or seeking the Court to make it non-confidential or by agreement of the parties.

Having said that, is there any particular page that you want me to take and read a little bit more carefully before we start talking about this document?

A.   No, I don't think so at this moment.  I may ask you to do that as you ask questions and I want to refer to some of the information in deck.

Q.   Anything - anything you may need to go to you let me know, fair?

Page 62

A.   Fair.  Thank you.

Q.   All right, so you said the word deck.  What does deck mean?

A.   It's a common term for PowerPoint presentations that we use in the business.  This - the e-mail is the first page of this, the attachment would have been this what we refer to as a deck, the PowerPoint presentation.

This looks like a PDF of a PowerPoint to me.

Q.   Okay, and this page 13889, would you consider this the cover page of the deck?

A.   I would.

Q.   All right, and what's the date?

A.   April 4th, 2017.

Q.   And based on that date does this - does this deck refresh your recollection about any of the facts concerning what happened in 2017?

A.   No.

Q.   Okay, and looking back at the e-mail, the e-mail -- You've read this e-mail, true?

A.   Yes.

Q.   The meetings that are discussed that are anticipated in this e-mail, did - do you remember those meetings that followed?

A.   No.

Page 63

Q.   This deck, when did Wendy's share this deck with the JV partners?

A.   I don't know.

Q.   Well, do you know that it was shared?

A.   No.

Q.   All right, so this first page do you see the header?  I'm going to read it.  It says, "In 2014 engaged BCG to evaluate International strategy."  Did I read that correctly?

A.   You did.

Q.   And for the record International is abbreviated Int'l, correct?

A.   Yes.

Q.   Okay, what is BCG?

A.   Boston Consulting Group.

Q.   In 2014 would there have been an entry into the Brazil market at that time?

A.   I don't know.  I didn't work for Wendy's in 2014.

Q.   Okay, based on your review of -- Let me ask that differently, Mr. Wright, okay?

A.   Sure.

Q.   When you took over the International Division do you remember whether there was an entry into the market in Brazil in 2014?



Page 64

A.   No, I don't remember that there was.  I don't.

Q.   Okay.

A.   And just so we're using common language, market entry is often defined, not always, by the first unit being opened because that's the beginning of the relationship with the customer when you start opening for business.  We all know that the beginning of the market entry dates back to, you know, recruiting the franchisees that are going to enter the market and - and all of that, so but in either case regardless of that definition I don't - I don't know of any of this that was done in 2014.  I think this line says it.  I don't know who engaged BCG because it's not specific on the slide, but BCG was engaged in 2014 to evaluate the strategy.

Q.   Okay, and then the line just below that header it says BCG recommendation to accelerate growth through JV with corporate ownership.  Do you see that?

A.   I do.

Q.   What does that mean?

A.   I don't know.  I know what I read it to mean.

Q.   Okay, what do you understand it to mean?

A.   I understand it to mean that BCG made a recommendation, it's what they do, and it appears if this is accurate because this deck was developed by

Page 65

somebody other than BCG, at least according to the e-mail, Wade Guzdanski sent it, he's - he's telling the history here that that was their recommendation to accelerate growth through JV.

Q.   That JV is referring to joint venture, right?

A.   That's my understanding, yeah.

Q.   Okay, and - and what does corporate ownership mean?

A.   I don't know in this case.  I have no idea. My -- Again my - my laymen's read of this historically would be that the corporation, possibly indicating Wendy's, would have an ownership interest in the JV. You know, if - if I weren't in deposition and someone asked me to read this slide and say what do you think that means, that's what I think it means.

Q.   Okay.

A.   What it means is in the minds of the author, not me.

Q.   Okay.  Well, you received this deck, correct?

A.   Yeah, I trust the e-mail record that says I received it, so I'm sure I did.

Q.   Okay, and do you remember receiving it?

A.   No.

Q.   Okay, looking at the information that's on this cover sheet is anything stated here that sticks out

Page 66

to you?

A.   No.

Q.   When it says in the center Wendy's ten percent plus corporate EBITA from International, what does that mean?  Or what -- Let me - let me use your language. What do you think that means?

A.   Again reading this what I think it means, and I think my interpretation would be similar over time, is that there's -- Because this is a slide that seems to indicate a strategy for international development that there is a strategic business objective that International could grow to be ten percent of corporate adjusted EBITA or EBITA for the entire Wendy's corporation from International.  You know, if the company makes five hundred million dollars maybe there's a goal of fifty million dollars coming from International.

Q.   Do you see on the lower left side of page 13890 it - it reads, "Allow localized formats to improve ROI," and then the next line is - "e.g., smaller (low CapEx) formats, complimented w/brand building units in key locations."  Did I read that correctly?

A.   Yes.

Q.   What do you think that means?

A.   I think that means -- Again I take it to mean

Page 67

in my reading is that it's a localized approach to development in International that is a balance of smaller lower cost investment builds, also brand building units.  Some people call those flagship units, some people call them anchor locations, you know, so there's -- It's written as smaller formats complimented with brand building units in - in key locations, so it's not uncommon I read it that way because it's familiar to me in how you develop.

Q.   Let's get some of the terms there so we're dealing with a common vocabulary, okay?

A.   Delighted.

Q.   ROI means what?

A.   Return on investment.

Q.   And capex means what?

A.   Capital expenditure.

Q.   What is capital expenditure?

A.   The cost to build the location in capital.

Q.   Let's move to the next page which is 13891. There's a table on this page, correct?

A.   Yes.

Q.   Three columns indicating phases; is that right?

A.   That's what I see.

Q.   All right, phase 1 at the bottom it says



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
68–71

Page 68

investment.  Do you see that?

A.   Yes.

Q.   In that column one the row for investment it reads, "WEN, W-e-n starts with twenty percent stake." Did I read that correctly?

A.   You did.

Q.   What does WEN mean?

A.   That's the stock ticker for Wendy's, so it's shorthand inside the company for the - the company.

Q.   All right, and what do you - what do you think starts with twenty percent stake means?

A.   Well, I think it's kind of self evident with the - with the structure of the JV.  The - the company would have a twenty percent ownership in the JV and others would have an eighty percent ownership in the JV. That - that seems to be what this table suggests BCG's recommendation was to do a three phase approach with the beginning phase being the company holding a twenty percent position.

Q.   Okay, now this page does not include any discussion of the Brazil JV, correct?

A.   Not that I see and this page, no.  Hu-huh. (Negative response).

Q.   So looking at column two in the investment row, do you see that cell that --

Page 69

A.   Yes.

Q.   -- where those intersect?

A.   I do.

Q.   It says, "WEN provides majority of capital." Did I read that one correctly?

A.   Yes.

Q.   What does that mean?

A.   I take it to mean that the company would provide more than fifty percent of the capital necessary for continued development.

Q.   All right, and then the next line reads, "WEN stake increases to fifty percent."  Do you see that?

A.   Yes.

Q.   What does that mean?

A.   I think that relates to -- I read it to relate to the stake in the JV.  What started as a twenty percent ownership would - would grow to a fifty percent ownership and I'm assuming since those are in the same box they're linked.  Because they're providing more capital they're going to want some more ownership.

Q.   All right.  Well, how does that work if there are other JV members?

A.   Well, it doesn't mean the other -- I mean how can it work?

Q.   How - how does that work?  Not how can it

Page 70

work?  How does that work?

A.   Well, I mean there's no one answer to how anything works in joint ventures.  I think in order to accomplish this goal -- We're talking about a BCG recommendation.  How do you go from twenty percent to fifty percent?  Well, you go that route because you allocate ownership based on capital investment.  You can still have the same partners, but as those what were majority partners in the beginning of the JV migrate to minority partners simply by nature of the amount of capital that's being invested by the individual partners you're going to own - you're going to own more.  It's no different than growing your - your - your capital position in a public company.  There's a bunch of new stock issued and only a few parties buy that stock doesn't mean everybody left.  It just means they have now a larger capital position in the company because they're the ones that invested the capital to get there. That's my assumption of what this indicates, the path from column one to column two.

Q.   What would the minority partners say to make that change?

A.   I have no idea.  I would assume that the joint venture agreement in BCG's model here would contemplate the ability for those shares to reflect the capital

Page 71

investment over time, but I don't know and I - I certainly don't recall any of those details about this specific JV, but that's - that's how that works.

Q.   And if you look at the top of that row - that column, row one it says duration, it says year three to five, right?

A.   Yes, it does.

Q.   I'm going to switch to the next page to focus on which is 13893.  Are you able to see that page?

A.   Yes, I can see it.

Q.   All right, all the way on the right side of the page there's three bullet points.  Do you see those?

A.   I do.

Q.   One's Brazil, right?

A.   Yes.

Q.   So in 2014 BCG's recommendation was that Brazil may be a market to - to enter; is that fair?

A.   Yes.  That's my read of this slide, yes.

Q.   And then there's -- I'm sorry.  You were going to say something?

A.   No, please.  Go ahead, Mr. Polenberg, please.

Q.   There's a series of bullet points in the middle of the page, true?

A.   There are.

Q.   All right, and those are what BCG figured were



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
72–75

Page 72

the reasons why Brazil would be a market to enter; is that fair?

A.   I think it's fair.

What I - what I think I would read is that this is - this is someone's summary of what BCG said, you know, for the sake of continuing to, you know, to lay the groundwork for the history.

Q.   Okay, let's turn to page 13894.

A.   Okay.

Q.   The heading on the top of that page reads, "Three-way JV Partnership."  Did I read that correctly?

A.   You did.

Q.   And on this page there are two - two companies identified, right?

A.   There are.

Q.   Who are they?

A.   The Starboard Group and Infinity.

Q.   Looking at that information do you remember any of those attributes as it relates to each of those JV members?

A.   I do.  Yeah, Starboard, as I mentioned in previous testimony, Starboard was an existing domestic Wendy's franchisee with franchise locations in Florida, Virginia, Alabama, Pennsylvania and New Jersey.  They -- I did not recall until this slide and I may not have

Page 73

known actually the specific date when they entered the system and, you know, they're averaging - those - those seem to comport with my recollection of - of their business.  I don't remember the specific details of - of their business in terms of exact size and scale. Certainly I've mentioned Andrew's name and Marcos' name a few times.

This - the right-hand side of the slide that says Infinity, those bullet points again reference previous testimony about my recollection of Infinity as a local partner and just as the subheader of the slide says "Wendy's experience and local market knowledge" and I think this slide indicates those two things.

Q.   Looking at this slide do you know -- Strike that.

Let me ask that differently, okay?

A.   Okay.

Q.   Looking at this slide does this refresh your recollection as to who might have told you about Infinity's involvement with the JV?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No.  I - I don't know and I don't think it helps with the - the recollection of that, so I -- You know, when I go for a division, you know, I'm immersed in learning as much as

Page 74

possible.  I couldn't possibly remember who told me about the partners in the JV, but I learned about it early.

BY MR. POLENBERG:

Q.   Okay, so let's turn to page 13895.

A.   Okay.

Q.   The heading says Original Brazil JV Execution Plan.  Do you see that?

A.   I do.

Q.   So the first column where the row investment intersects that - do you see that cell that's there?

A.   I do.

Q.   Do you see it says, "WEN starts with twenty percent stake"?  Did I read that correctly?

A.   Yes.  Yes.

Q.   And then it says, "Initial four hundred thousand dollar equity at 1.6 million dollar debt guarantee."  Did I read that correctly?

A.   Yes.

Q.   Next it says, "WEN capex of two million dollars."  Did I read that one correctly?

A.   Yes.

Q.   What do you understand those three bullet points mean in that cell?

A.   My understanding is at a high level this is

Page 75

now a Brazil JV specific lesson for what was a generic BCG slide and this bottom row in that first column reflects something that looks consistent with that BCG recommendation, that in this case Wendy's, the company, as highlighted by WEN, the stock ticker starts with a twenty percent stake, four hundred thousand of that in equity.  That would be in the language I'm familiar with in business that would be a - an equivalent to that twenty percent stake and the - the company WEN would guarantee some debt for the JV.  The total commitment in cash by the company is two million dollars.

Q.   When you say the total commitment in cash is two million --

A.   Yeah.

Q.   -- dollars, do you get that by adding four hundred thousand and 1.6 million?

A.   I do.  I do.

Even with the 1.6 million dollar being a debt guarantee, when Wendy's guarantees its debt it will pay it and it guarantees debt it will pay it, so whether that cash was written in a check or in a guarantee to a loan there's a total commitment here of two million dollars.  Four hundred thousand of it equals the twenty percent initial capital call for Wendy's start in this business and the 1.6 million portion of that two



ROBERT D. WRIGHT  Confidential                    May 12, 2026
WENDY'S NETHERLANDS V. LEVY                        76–79

Page 76

million is Wendy's guaranteeing some debt for the business to get started.  That's my understanding of what this says and it's, you know, fairly consistent language, so I think I've got it right.

Q.   Okay, now as it relates to the 1.6 million dollar debt guarantee --

A.   Yes.

Q.   -- if the JV operates and is a success then Wendy's wouldn't have to pay that 1.6 million, correct?

A.   Correct.

Q.   That would get paid from the cash flows, right?

A.   That's right, yeah.

Yeah, the way I read this is that the debt is to the JV.  This isn't stated here, to be clear.  You're asking my interpretation in this slide.  The debt is granted through the JV but, you know, it just a startup JV and the - and the bank is going to want some assurance that they'll get repaid, so Wendy's offered its guarantee to ensure that that initial cash flowed into the business but, yes, the JV would be responsible for the debt unless, of course, you know, some other agreement is reached in the future I think this again is a contemplation of how this would start.  I don't - I don't think it's fair to say this is exactly the

Page 77

agreement.

Q.   What do you mean by that?

A.   There's -- I'm saying this is a slide that's presented that appears to be in the context of this deck a history lesson on - on International and - and Wendy's in Brazil, so I can't tell you anything about that debt guarantee.  I don't know which bank it was through.  I don't recall.  I don't know if that was renegotiated at any point or, you know, anything else you asked me in an earlier slide how do you get from twenty percent to fifty.  Well, that's with the subsequent developments in that partnership agreement, so this seems to be very clear where the starting place was to be.  I'm not sure I can tell you that's exactly where it started, I wasn't there then, but it seems pretty clear to me, and if we're playing this back for the CFO because I saw the e-mail was sent to the CFO I'm assuming that's where it began.

Q.   All right, looking at column two where that column intersects with the row investment, do you see that cell?

A.   I do.  I do.

Q.   All right, bullet point one says, "WEN provides majority of capital."  Did I read that correctly?

Page 78

A.   You did.

Q.   "WEN stake increases to fifty percent," did I read that correctly?

A.   Yes.

Q.   "WEN capex of nineteen million dollars," did I read that correctly?

A.   You did.

Q.   What do - what do you think these three bullet points mean?

A.   I think they mean if you look at the other two rows or other three rows in the second phase of development as expansion continues into phase 1 and you're beginning to prepare for additional cities and you take into context the comments the question you asked me on an earlier slide about lower capex businesses plus, you know, brands statement locations that these next twenty-five to thirty locations are going to take if -- I'm triangulating here, but if Wendy's stake is going to increase to fifty percent and Wendy's has to put in nineteen million dollars then there's going to have to be additional capital funding that these twenty-five to thirty locations that are on row number three are going to take, you know, some millions of dollars to build and this is forecasting that, you know, Wendy's is going to start investing

Page 79

directly into this business when you get to this phase.  That's my read of - of how all that ties together.

Q.   Now how -- What did the JV partners know about this increase in fifty - increase to fifty percent?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't know.

BY MR. POLENBERG:

Q.   What conversations did you have with the JV partners either in 2016, '17 or '18 about an increase in the - Wendy's increase in its stake to fifty percent?

A.   I don't recall any specific conversations about changing the - the ownership of the JV when I ran International.  I do recall casual conversations and I can't pinpoint when those were is that, you know, once you get past the early stage of development you can get to speed to scale that the business is going to require a lot of capital at that phase and, you know, discussions about - the question any growth phase of any market penetration is the business can support some of that capital for accelerated investment but the rest of the capital has to come from somewhere else outside the company.

This appears to contemplate that Wendy's was going to be a significant contributor to that accelerated capital need for the business growth.



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

Page 80

Q.   What is your understanding of the nineteen million dollars for capex as the funding or as a guarantee on a loan?

A.   The way I read this it's not clear.

Q.   What would you need to know to make it clearer?

A.   Well, I mean I think that you need to know a number of - of capitalization dynamics of the company at the time if - if as you - you know, as you think about where the company held money in different places is it - is it more cash efficient to loan the money or to directly wire the money or to borrow the money and guarantee the loan, so I think it's unclear because for me it's probably uncertain.  I don't know.

Q.   It could be either; is that fair?

A.   I think it could be any combination of those things, yes.

Q.   On page 13898 this page is - has a header, yes?

A.   Yes.

Q.   And the top in bold font and in large - large font says, "Debt funding done to utilize non U.S. excess cash."  Did I read that correctly?

A.   You did.

Q.   What do you think that means?

Page 81

A.   I think it means the source of the funds are - are going to be debt funding so Wendy's can tap into some - some excess cash outside the U.S.

Q.   Do you see the - there's a - there's a bullet point that says specifically for Brazil JV?  Do you see that?

A.   I do.

Q.   All right, below that there's a series of bullet points, true?

A.   Yes.

Q.   The second bullet point reads, "Opportunity for WEN to capitalize debt as we move into phase 2 of JV."  Do you see that?

A.   I do.

Q.   Did I read that correctly?

A.   You did.

Q.   What does that mean?

A.   I don't know what it means.  I know what I read it to mean is that this is connecting this more specific source of the capital to fund phase 2 when it arrives using this non U.S. cash balance that's out there.

Q.   Who would have loaned the money that's the subject of capitalizing the debt?

A.   I don't know.

Page 82

Q.   Well, could Wendy's capitalize debt of a different lender?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yes.

BY MR. POLENBERG:

Q.   Okay, how would it do that?

A.   Well, as described in earlier testimony in the way that they've done before.  They guarantee the debt which effectively puts, you know, a liability on their balance sheet and there's a form of capitalization.

Q.   And then how would that work with moving the stake as you transition from phase 1 to phase 2?

A.   I'm not sure I understand your question.

Q.   Okay, this capitalized debt bullet point is discussing it as, "We move" into phase 2, right?

A.   Yes.

Q.   What's the importance of capitalized debt as you move into phase 2?

A.   The entire bullet says there's an opportunity for Wendy's to capitalize debt as we move into phase 2 of the JV.  I think the opportunity is related to the above part of the slide so, you know, I have to read these things in context.  The above part of the slide is referring to this offshore funding that we have that can be utilized for this capital.  Apparently there's a

Page 83

thought for managing that cash flow through debt from potentially that offsite cash that's then guaranteed and minimizes the moving of the money like it - like it says in - in bullet number one.

The other thing that I think is important is that, you know, verb tense and - and the language that's chosen in - in bullet points in PowerPoint decks may not always pass the - a Harvard grammar review.  So this says, "As we move into phase 2."  I would read a deck like this to say, you know, sort of in the future as we move into phase 2 this is an opportunity for us to fund this, so now I may read that wrong, but that's how I read a lot of this, that this is - this is outlining the benefits.  The key header here is the benefits of reinvesting non U.S. cash and you've got a finance person talking to a finance person in this e-mail outlining how that might be done.  That's how I read this slide.

Q.   As you read the slide is this a third-party lender or is this Wendy's making the loan?

A.   I have no idea.

Q.   What do you think is contemplated?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I have no idea really.  What I think is common is to explore all



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
84–87

Page 84

options and declare the best one for the benefit of - of all parties.

BY MR. POLENBERG:

Q.   Do you see the first bullet point it says, "Minimizes, 'bureaucracy' on approving line of credit with bank within an already very complex environment to operate"?  Did I read that correctly?

A.   Yes.

Q.   Does that - does that sound like it's discussing using a bank for this line of credit?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yeah, I don't know.

BY MR. POLENBERG:

Q.   Do you see the third bullet point it reads, "Personal guarantees from JV partners 'Starboard and Infinity'"?  Did I read that --

A.   Yes.

Q.   -- correctly?

A.   Yes.

Q.   I'm sorry.  I didn't hear you.

A.   You did.  I apologize.

Q.   Okay.  No, it's okay.

Would Wendy's care if personal guarantees were being issued to a third-party lender?

MR. ARONOVITZ:  Object to form.

Page 85

THE WITNESS:  I have no idea.

BY MR. POLENBERG:

Q.   Do you see the second major bullet point Starts Earning?  Do you see that bullet point?

A.   I do.

Q.   And it reads, "Earning a higher interest rate, 'between 6 percent to 7.5 percent' versus the current approximately one percent."  Do you see that?

A.   I do.

Q.   Did I read that correctly?

A.   You did.

Q.   When Wendy's is talking about earning -- Let me ask that differently, okay?

A.   Okay.

Q.   That statement suggests that Wendy's would be earning a higher interest rate, correct?

A.   That's what it reads to me, yes.

Q.   And that interest rate would be on a loan, correct?

A.   Apparently, yes.

Q.   So is it fair to say that on this page Wendy's is discussing a loan rather than obtaining a loan from a third-party lender?

A.   I think that's a reasonable conclusion when you put all this together.

Page 86

(The testimony from page 86 to page 89 has been marked confidential, excerpted and bound separately).

Mr. Wright, I have put a document on the screen.  Are you able to see it?

A.   I am.

Q.   And this has a Bates number of 3854.  Do you see that?

A.   Okay.  I do.

Q.   All right, go ahead and read this to yourself and let me know when you're done.

A.   I'm done.

Page 87

Q.   At the top it says that's to - from, it bears your name, correct?

A.   It does.  It looks like this was extracted from the - the Wendy's exchange server and it must be some way to identify that, but that's -- Yeah, that's my name.

Q.   The date on this is November 28th, 2017, fair?

A.   Yes.  Yes.

Q.   You sent this to Andrew Levy, right?

A.   I did.

Q.   According to this, yeah, and you copied Clara Clevenger?

A.   Clara was my executive assistant.

Q.   And you copied her, right?

A.   I did, yeah, as stated in the e-mail.

Q.   Yes.

A.   That was common for me because my calendar was so hard to manage, so I'd often just include Clara to make sure things got on my calendar.

Q.   Now in the - I'm going to go to the - the last sentence in the full paragraph, the first full paragraph.

"My only interest is to keep the lines of communication open as things develop here in the U.S. and Brazil."  Did I read that correctly?



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
88–92

Page 88

A.  You did.

Q.  What was going on that the lines of communication needed to be kept open?

A.  I can't remember anything specific about this. I really can't.  This is not uncommon for me in - in business to reach out to franchisees especially if they had large businesses or complex situations and - and stay in touch and - and be aware of what was going on and speak to them about that, so Brazil and the JV in Brazil I think it's fair to say was always a part of our business that, you know, it was as I described in earlier testimony it was losing money, so it always got a little bit of my attention and as I read the first couple of sentences what I seem to be suggesting is I hope you had a nice Thanksgiving.  I don't typically send notes like this if I haven't talked to somebody in awhile, so I don't know -- I don't know what was on my mind to reach out, but - but as I say here I take my words at - at face value.  I just want to keep the lines of communication open.

Q.  Okay, were - were there any -- Let me ask that differently, okay?

A.  Okay.

Q.  Right after Thanksgiving in 2017 were there any particular issues with the Brazilian joint venture

Page 89

that you recall were taking place?

A.  No.  I don't recall anything specific especially tied to a particular time in the calendar like that.  I'm sorry, but after all these years my - my memory's a little more general and I just remember generally that this was a business that - that required a lot of attention and communication is my friend when something needs attention, but I can't help you with what's specifically on my mind.

Q.  That's fair.  Mr. Wright, you owe me no apology.  All I can ask is about your recollection. That's it.

A.  Fair.

(The testimony from page 91 to page 104 has been marked confidential, excerpted and bound separately).

Page 91

(Whereupon, Defendant's Exhibit 2 was marked)

BY MR. POLENBERG:

Q.  All right, let's move on.

Mr. Wright, I'm sharing a document with you. Are you able to see it?

A.  I am.

Q.  All right, this is a two page document.  It starts at page 3334 and ends at page 3336.

A.  Okay.

Q.  This document will be marked as Exhibit 3 to your deposition.

A.  Okay.

(Whereupon, Defendant's Exhibit 3 was marked)

BY MR. POLENBERG:

Q.  All right, this is an e-mail that's addressed to you, correct?

A.  Yes.

Q.  The subject is slides for our call this morning, right?

A.  Yes.

Q.  The date is February -- I'm sorry.  Let me ask that differently.

The date is December 22nd, 2017.  Did I read that --

A.  Correct.

Page 92

Q.  -- correctly?

A.  Yes.

Q.  All right, and there's an attachment referenced in this e-mail, right?

A.  There is, yes.

Q.  Okay, I'm going to scroll through that -- I'm sorry.  Did someone say something?

Okay, I'm going to scroll through that attachment like we did with the last attachment.  You can let me know if you need to stop, if I'm going too fast and when we get to the end I can go back to any piece you need, okay?

A.  Thank you.

Okay.

All right, let me study this one for a second.

Q.  Let me put the whole page on so you can have the whole thing.

A.  Okay.

Okay.

Q.  All right, is there any particular part of this two page attachment that you want to look at closer?

A.  No.  I think I've - I've caught it.  I mean if you ask me questions and I need to study particular bullets or whatever I'll do that.



Page 93

Q.   Okay.  All right, let's start with December 22nd the subject says, "Slide for our call this morning."  Do you remember a call with Mr. Levy at the end of December?

A.   I don't.

Q.   Do you remember this two page attachment going through it at any time?

A.   I don't recall it specifically, no.

Q.   Looking at the bottom of page 3335 on the right side this was the five of five phase 1 restaurants opened.  Do you see that?

A.   I do.

Q.   Do you know if those restaurants were open?

A.   Yeah, that matches my recollection.  I wouldn't have been able to recall those dates, so I can't confirm those dates, but that seems - that seems consistent with my recollection.

Q.   During -- When you look at this do you have any reason to doubt the dates that are on there?

A.   I don't.

Q.   Now earlier we looked at in Exhibit 1 we looked at that history and it talked about a phase 2.  Do you remember that?

A.   I do.

Q.   Do you think the phase 2 that's being

Page 94

discussed in this two page attachment is the same phase 2 that was discussed in that history of the project into Brazil?

A.   I don't know, but I assume those are - those are the same phase 2s.

Q.   Do you see the fourth bullet point, the fourth big bullet point?  It reads --

A.   I do.

Q.   -- "WBR is seeking investment partners to complete phase 2."  Did I read that correctly?

A.   I think that's actually the third large bullet point but, yeah, I'm tracking with what you just read.  WBR is seeking investment partners to complete phase 2.

Q.   Yeah, thank you.  If I - if I said the wrong bullet point I appreciate you correcting me.

Do you remember that?

A.   No.

Q.   This is the page you wanted to study a little bit more, correct?

A.   Yeah, only because it had a lot of content on it.  I just wanted to make sure I was ready for your questions.

Q.   Okay, there's a heading called Current Challenges.  Did I read that correctly?

A.   Yes.

Page 95

Q.   Looking at the information that's listed under Current Challenges do you agree that those were the current challenge -- Let me ask that differently, okay, Mr. Wright?

A.   Yes.

Q.   Looking at those challenges do you agree that those were challenges facing WBR at the time?

A.   Yeah, that matches my recollection about the - the Infinity partner.

Q.   Do you see under Cash Flow it says - the first bullet point under the heading Cash Flow says, "Current cash flow forecast estimates existing funds will support operations until the week of January 19th, 2018"?  Did I read that correctly?

A.   You did.

Q.   And this is an e-mail that Mr. Levy sent you at the end of December, correct?

A.   Correct.

Q.   And so cash flows for the JV had a very short horizon?  Is that fair to say?

A.   Yeah.  According to his estimates, yes.

Q.   What did you do to verify any of the estimates from the JV when you received them?

A.   I don't recall.

Q.   So this is Proposed Next Steps there's a

Page 96

heading.  Do you see that?

A.   I do.

Q.   The first point talks about JV sale and new investment partner.  Did I read that correctly?

A.   You did.

Q.   Is it fair to say that Mr. Levy was communicating to you at the end of December 20 - December -- At the end of December, 2017 about selling the JV?

A.   Yes.  I think that's what this says on its face is that he was proposing the JV would be sold.

Q.   And a new investment partner, correct?

A.   Yes.

Q.   What do you recall about that?

A.   It's a very vague memory, but again at a high level I remember him suggesting that maybe there was a path to recapitalizing the JV with a different investor and it was rooted in what he has on the left side of his slide which is his, and I indicated this in previous testimony, his displeasure with Marcel fulfilling his committed responsibility with Infinity and, of course, you know, the realities of the business and the cash flow of the business.

Q.   What was your view on selling the JV?

A.   I don't recall a - a very strong view because



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
97–100

Page 97

there's so many details in it but, you know, I think the one thing that we had in common is, you know, even - even the proposal was the potential paths to keep moving forward with development, how could one continue to develop the market, and so given the struggles of the JV and the capital constraints of - of one of the partners and - and I think frustration on - on -- I don't mean to project emotions on Andrew, but Andrew did share that - that the relationship he had with Marcel at Infinity was - was, you know, difficult for him to manage and it required a lot for him to manage, so I understand that that was a - a desired proposal of his to maybe move on.

Q.   What do you understand difficult to manage to mean?

A.   Well, he states it here.  I'm just - I'm - I'm stating my understanding of his position that Marcel who's the CEO of Infinity was not meeting the operational goals, the standards, you know, the business and - and that he in Andrew's opinion he needed to be replaced and, you know, he did outline some risks because of what Infinity provided to the JV and - and I do recall conversations where he would, you know, articulate frustration that the capital calls were always slow to come from Infinity, so you've got a local partner who's responsible for a lot of the local

Page 98

management of the business and in Andrew's assessment is not delivering.  Marcos, Andrew's partner, was in the market often as well and had a similar - you know, I got that played back from Andrew and that their cash flow issues that they had as a company were now bleeding over into their - their cash commitments to the JV.

Q.   What was your -- What was your view of replacing the CEO?

A.   Look, I was amenable to it given all those same challenges that - that seemed to - to be appropriate for the assessment that - that Andrew was making but, you know, I wasn't in the driver's seat to push that forward, so to speak, because, you know, again we - we were the minority shareholder in the JV.

Q.   Well, who had the majority interest?

A.   Those two partners did.  They both had forty percent interest in the JV each.

Q.   Right.  It's not likely that the CEO would agree to replace himself in the vote of the forty percent, fair?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't know if it's likely or not but, you know, look, you're dealing with multiple points of leverage as is often the case in business and if Andrew believed that he had either

Page 99

relational leverage or historical leverage or the - you know, the strain of the financials or the lack of Marcel's funding as is commensurate with his JV agreement, you know, my belief was and the way Andrew conveyed things to me is that he was working very hard as the other majority partner to try to get Marcel to fulfill his complete role as described in the JV agreement and his assessment was he was falling short.

BY MR. POLENBERG:

Q.   If you added Starboard's forty percent and Wendy's twenty percent that would make up a majority vote too, correct?

A.   That's correct.

Q.   And if you -- Just to finish it out, if you added Infinity's forty percent to Wendy's forty percent that would make sixty percent?  Yes?

A.   Yeah, that's correct.

Q.   So was Wendy's International prepared to vote with Starboard to replace the CEO?

A.   The answer is, you may not like it, but the answer is it depends because replaced with what as is so often the case in business and in franchising, you know, you - you may believe that you're reaching a point of impasse, if you will, with the franchisee, in this case

Page 100

with a - with a partner in a JV but you still have to have a path forward.  This isn't - this isn't a hiring and firing decision.  He's the CEO of a JV, he's also a forty percent investor in the JV with all kinds of responsibilities back to the JV.  He's not simply an employee.

You know, if this JV was funded and this was an outside hire and the outside hire simply wasn't performing, well, then you'd - you'd be back to your scenario, the simple straight vote, was there enough votes to - to agree that we needed to make a change.  He wasn't just -- He was a partner.

Q.   The CEO -- Let me ask a different question, okay?

A.   Sure.

Q.   Did there come a time when the CEO was accused of engaging in bribery?

A.   Not to my knowledge.  Not to my recollection or knowledge.

Q.   Okay, so on the proposed steps the second bullet point under JV Sale and New Investment Partners says, "Engage local Brazilian M&A firm."  Do you see -- Did I read that correctly?

A.   Engage M&A firm.  Where is that?

Q.   Under Proposed Steps.



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
101–104

Page 101

A.   Oh, at the top of the page.  Sorry.  I was looking at the bottom.

Yes, engage local Brazilian M&A firm.

Q.   Okay, did that ever happen?

A.   I don't recall.

I seem to think that it did, but I don't recall the specifics of that.

Q.   Proposed Interim Funding bullet point, do you see that?

A.   I do.

Q.   Go ahead and read those bullet points.

A.   I did.

Q.   All right, what's your recollection about the interim funding strategy after this date?

A.   My recollection is that when it came to funding Andrew's proposals were often along the lines of these four bullets, and I'm going to over generalize because that's how things like this get - get absorbed in a large corporation when this is such a - a small company, but the generalized reception of Andrew's solutions was Wendy's solves the problem with Wendy's money and takes out the - the equity partner in Infinity in this case, funds additional cash and lines of credit and - and then, you know, twenty percent for the new loans provided by Starboard and Wendy's pro rata, so

Page 102

this is a - there's - there's a very heavy expectation that's aligned - that is in these proposed solutions that Wendy's basically fills the - the cash gap necessary to keep moving.

Q.   Did Wendy's fill the cash gap that was needed to keep moving forward?

A.   I can't remember the ticktock of that -- I'm sorry -- The sequence of events of that through every month and every period because, you know, it was - there were often discussions and proposals rooted in forecasts how much cash would it need, under what circumstances would Wendy's be able to loan some more, under what circumstances would we loan into additional equity or just an additional straight loan, what would be some caveats of additional funding not uncommon with lending to a shaky business the lenders tend to want a few more assurances.  I don't remember what those specific assurances are but, yeah, we had a lot of discussions about how to fund it and, you know, my team and I tended to try to be very creative.  You know, our - our belief in the International business was this was the International business. It's hard.  It's often quite inconsistent.  It sometimes uses cash before it generates cash and it requires tenacity and - and a desire to get to growth with sometimes some creativity

Page 103

so that everyone can - can stay together and keep rowing forward, but there also has to be balance in those solutions and I think that, you know, what I'm - I'm refreshing my - my mental memory of this based on this slide and it is consistent with Andrew's approach which is Wendy's has the deepest pockets, Wendy's can solve this problem and, you know, if we all believe in the business like we say we do why doesn't Wendy's just start funding it?  So I understand that.  I mean I think -- You know, I think in retrospect it's maybe easier to see that Andrew was - he was juggling a lot from a cash flow perspective too, so he was looking for the deepest pockets to help solve the problem.

Q.   So sitting here today you don't recall what the funding solution was on a go forward basis?

A.   I don't recall that there was a funding solution.  I think there were several funding ideas each one of which had multiple dependencies and it was my recollection it was in the dependencies that these funding solutions broke down.

Q.   I just had a military helicopter just flying right next to my window, so I apologize if there was noise.

A.   Well, you have a great microphone because it filtered out all of the background noise.

Page 104

Q.   So --

A.   It just flew by.

Q.   -- during your testimony just now you mentioned it would be certain either covenants obligations for Wendy's to loan into - into a shaky business.  Do you remember that testimony?

A.   I do.

Q.   What do you mean by that?

A.   I think I even said like any lender.  I think lending into a business that has no record yet of positive cash flow is going to draw additional scrutiny from the lender.  In this case if Wendy's is going to be the lender or the guarantee of additional lend - guarantor of additional lenders, you know, they're going to start looking for additional assurances besides belief in the business itself that - that some of those loan dollars are going to come back and so, yeah, I mean I think it's just circumstantial that you - if you're going to loan money into something like this you're going to start looking for ways to start feeling a little more comfortable that your loan is secure.



Page 89

(Non-Confidential Testimony Resumes)

MR. POLENBERG:  So given we are at now 12:20 and we finished this document let's go ahead and take our break.

Madam court reporter, I'm going to ask, this deposition is not going to take a long time, but out of respect for you I want to know if you want a lunch break.

THE COURT REPORTER:  I'm doing well.  I don't need a long break.

MR. POLENBERG:  Okay, why don't we take - why don't we take twenty minutes so if someone wants to grab a quick bite they can and we'll come back at

Page 90

12:50.  Fair?

THE WITNESS:  That would be thirty minutes.  Is that - is that your intention, Mr. Polenberg?

MR. POLENBERG:  So I'm a lawyer, not a mathematician.

THE WITNESS:  I just want to make sure I'm back on time.

MR. POLENBERG:  12 - 12:40 is fine with me.

THE WITNESS:  Okay.

MR. POLENBERG:  All right?

THE WITNESS:  Thank you.

MR. POLENBERG:  Thanks.

THE VIDEOGRAPHER:  We're now going off the record.

The time is 12:21.

(Whereupon, there was a lunch recess observed)

THE VIDEOGRAPHER:  Okay, we are back on the record.

The time is 12:42 p.m.

BY MR. POLENBERG:

Q.   When we took our break, Mr. Wright, I failed to identify that last document as an exhibit number, so for the record Bates number 3854 will be Exhibit 2 to your deposition.

A.   Understood.

Page 104

(Non-Confidential Testimony Resumes)

Q.   Okay, so sitting here today what was - what was Wendy's internal strategy for dealing with the joint venture in Brazil going into 2018 now that you've seen how 2017 ended with communications from - about the partners?

Page 105

A.   Yeah, I think - I think strategy is probably a little too elevated a question for me because there were so many technical challenges and immediacy.  There was an immediacy to the challenges that we had as a business reflected in the negative cash flow that stability of the business itself was one of the primary objectives, proof of the growth model and belief in that growth model was - was an additional objective of ours, but I don't think that's a - a strategy.  I think the strategy would - would have been to then get back to growth after solving those near term tactical challenges that the business had.

Q.   Okay, when you - when you distinguish between strategic and tactical, tactical is what period of time that you're referring to?

A.   I mean in this case the here and now.  At that time, you know, right before Christmas in 2017 which is the - the date I'm remembering from your - your e-mail that you're referencing, look, Andrew's estimate in that deck is that there's a few weeks away from running out of cash to keep the business open and, you know, I've seen this in business, especially in a cash business like - like the restaurant business is, you know, you've got to make payroll, you've got to have to pay for that food that gets delivered.  There - there comes a time if



Page 106

cash flow is that tight your - your decision to stay open is no longer a strategic decision, it is a tactical decision, so what are the things that are going to be done to help the business stretch its available cash to operate the business while you continue to own the - the near term tactical work towards the long-term strategy.

Q.   Okay, now keeping the business running for - for 2018, would that be somewhat strategic or tactical?

A.   I think it would be more tactical at this time, yeah.

Q.   Okay, so your tactical decision making had to do with 2018 starting year to end year; is that fair?

A.   Oh, no, that's not fair.  This business has always both.  Sometimes it's just a matter of which layer you're focused on the most because of the demands.

You know, I could give you examples throughout my career where, you know, you've got -- I mean I took over a public company that was losing money and so, yes, we're very tactical, but I also articulated the long-term strategy to keep everyone focused on the vision, and I would say the same thing about the Brazil venture.  The long-term strategy was often the North Star that - that helped everyone understand what we believed was possible.  The near term tactical

Page 107

challenges required serious and aggressive attention in the near term or the strategy was - was nothing more than, you know, nothing more than the paper it was written on.

Q.   Would phase 2 be strategic or tactical?

A.   Phase 2 is part of the long-term strategy. Achieving phase 2 is a tactical challenge.

Q.   Okay, so were you in 2018 working to achieve phase 2?

A.   Unfortunately I think that the successful conclusion of phase 1 and the cash flow issues became the challenge that superseded all other things.  The underpinnings of that challenge were the strained partnership because you had partners that weren't contributing as they had committed or as Andrew outlined in that deck that he sent in that e-mail weren't even fulfilling some of the core responsibilities that they had committed to.

Q.   Now --

A.   So -- Go ahead.

Q.   What was the, as you put it, North Star that you as the leader of the International Division were pointing to in 2018?

A.   Both.  That, you know, it would go back to the - some of the elements on that BCG slide deck that

Page 108

you shared which is - I believe that slide pointed to Brazil, Poland and the third one was TBD, so where are the markets that have large middle class, have strong economies, that have a natural affinity for our type of menu, have the competitive room to - to expand into those markets and have the total addressable market that allows for significant unit growth?  I mean that is the remit for running International is to penetrate the international markets with additional growth under the brand.

Q.   Okay, I'm just going to take a pause because your - your video at least on my end is jumping or freezing.

MR. POLENBERG:  Is anyone else experiencing that?

MS. SLIWKA:  I am as well.

BY MR. POLENBERG:

Q.   Okay, I just don't want your videotape to make you look like Max Headroom from MTV back in the day.

A.   That's a throwback.

Q.   Mr. Aronovitz has no idea what I'm talking about.

MR. ARONOVITZ:  That one I don't recall.

BY MR. POLENBERG:

Q.   It seems to be getting worse.

Page 109

We'll try to muscle through.  If you end up losing connection we'll stop and you'll - you'll have to rejoin, okay?

A.   I'd be happy to if that's the case.

Q.   Well, if we lose you.  We'll keep - we'll keep shouldering on.

Now you mentioned the North Star for the International Division.  What about the North Star that you would focus on for Brazil for that market?

A.   I think what I was saying is it is the same. It is taking advantage of the growth opportunity that was initially contemplated when we entered the market and, you know, phase - phase 2 is described in those slides would be another twenty-five to thirty units that - that took all of phase 1 learning translated into a profitable nice return on invested capital investment or return on investment investment to show that you could grow at a much rapid - more rapid pace in the country and - and, you know, grow to a level of penetration across the country.

Q.   Then why not contribute the nineteen million dollars in capital necessary for the capex for that expansion that was contemplated by phase 2 in the BCG slide that we talked about?

MR. ARONOVITZ:  Object to form.



Page 110

THE WITNESS:  Yeah, why not?  It sounds to me like a lot of that's written into the slides for all the problems that the business was facing and the - and the person who's supposed to be running the JV not solving those problems and having some funding issues, cash flow issues as well as operational challenges that weren't being overcome at a pace that would - that would continue to build confidence in that.

BY MR. POLENBERG:

Q.   So Wendy's was not interested in contributing that capital until the - the joint venture stabilized; is that fair?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yeah, I don't think that's true. I think Wendy's was, you know, trying to do two things at once which is, you know, strategize how that capital investment would work and under what form and, of course, there's multiple permutations of that form depending on what happened to the JV these are independent decisions and at the same time affirming in our own minds that we - we still believed in that growth model and doing so in partnership with the - the partners of the JV that were actively involved like Andrew and like Marcos

Page 111

and - and others so, no, it's not a -- It's not that transactional growth.  Restaurant growth is not that transactional.  We were more than a lender.  We were a partner in the JV plus we're franchisor and I was still committing great resources to the success of the market just through my own departmental G&A.

BY MR. POLENBERG:

Q.   Right.

What conversations did you have with any of the JV partners about potentially taking over fifty percent interest in the JV in exchange for taking on the capex requirement?

A.   Yeah, I don't recall any specific conversations, but again generally I remember wanting to solve the core operating issues as well as the cash issues and - you know, and if you have to sequence those things, if you can't quite solve the core operations issues, leadership, food costs, labor costs, you know, construction design, all those things, you can't - you can't wrap all that up with a bow on top and call it done, but there needs to be a high level of confidence that that work is on its way, underway or parts of key elements of that have been solved for and - and then the - the funding comes also.  In the meantime it's a

Page 112

game of inches, is there a little bit of funding that can keep us going because we need the funding to solve the things that we so desperately want to solve so that we can keep going.  It - it's not nineteen million or nothing.  It's fix, you fix it or I will put in nineteen million and, you know, you've got to - you've got to -- One of the big partners is sitting there saying, well, I don't think we have enough cash to get through January. Well, all right, let's talk more about that because I mean obviously if you're right, and I don't know that I'm sitting here saying he was, but if he's right you've got a near term very serious matter that needs to be addressed while you still keep your eye on the long-term, but let's be honest.  That takes priority today.

Q.   Well, at any time during 2018 what conversations did you have with any of the JV partners about taking over the capex for further expansion into that market?

A.   I think conversations about recapitalizing the JV were ongoing.  I can't tell you a point in time where we had, you know, any one conversation.  It wasn't isolated that way.  It was always again interlinked and - and discussed independent upon the business getting healthier so that we could fund what we needed

Page 113

short-term and - and begin funding the long-term growth again.  You know, when you - when you have five open and you haven't yet started building the next twenty-five, the nineteen million that - that you're referring to, and again it was in a BCG deck so it was a contemplative prospective by BCG, but let's take that number at face value.  It's not necessary until you start building the next twenty-five.  The near term issue is to - is to solidify the model that you're going to grow with and so this - this, you know, Wendy's put in all your capital so we can grow again, well, okay, we're - we're clearly not against that, but let's talk about what we're going to grow and, you know, fine, somebody says, well, I want to talk about changing the partners.  All right, but still we've still got to talk about what we're going to do with the business and what are those exiting partners going to do.

On - on Andrew's slide he's the one that noted the risk.  You know, you just can't "fire Marcel" or kick Infinity to the curb because they had HR, local compliance, accounting and that was a shared services model with him and then - and then, you know, you have no visibility in the business or ability to pay people, so again it's - it's a - it's an interdependent relationship with a lot of people involved.



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
114–117

Page 114

We - we didn't - we didn't have any decision to invest or not to invest.  It was - it was about solving the near term issues, and I'll tell you in terms of investment, we invested - we continued to invest heavily especially, as I mentioned a moment ago, through G&A.  My team spent a lot of time, a disproportionate amount of time on the field, on the ground trying to crack the code on some of these matters including labor costs and doing things like, you know, adjusting how we stopped delivering food into the dining room, going to customer serve drinks, pulling labor out that didn't affect the customer experience and getting really close to the cash flow necessary to create a base of sustainability from which to start growing again.

Q.   So those - those close cutting measures that you just - or efficiency measures that you just described, when did you - when did Wendy's or the JV start implementing those measures?

A.   The JV did implement them.

I will tell you I think some of the frustration that Andrew shared in his document that he wasn't - he wasn't happy with Marcel's leadership in the market to - to do the work to - to push through the change, you know, we adopted his frustration as our own and my solution was to send senior level leaders.  I

Page 115

mean I had my - my SVP of - of the region in the market and I had other operations support people in the market and financial analysts that went in the market and said, hey, we can roll up our sleeves and - and start working on these things in partnership with the local operator and I think we can crack the code on some of these enhancements and improvements and - and my recollection is we were really pleased.  I can't remember exactly where that was on the calendar, but it was important because it was - it was breeding -- It was breathing back into the Brazil business.  I'm saying business, not JV.  I'm not trying to separate them artificially, but the real confidence is in the ability to grow Wendy's in the market and it was breathing confidence back into that to say, gosh, even with these ridiculous rents compared to the sales that we have we're finding ways to - to make this a profitable growth-centered business.

Q.   When was that?

A.   It would have been around this time probably after this e-mail.  I can't remember for sure, but it was - it was this action orientation that - that we took on to - to really take a bigger role than was prescribed or described in the JV agreement, but just out of, you know, a franchisor often does what a franchisor does and just rolls up their sleeves and helps and that's - that

Page 116

was our approach.

Q.   What did you -- What do you remember from the JV agreement that contemplated the limited role that you expected going into this market?

A.   Well, it was outlined in some of the earlier documents that you shared with me.  We were a minority investor, had more of a capital role than operations role.  Infinity was the operator.  Infinity was the operating partner that was going to invest their capital and enjoy a big part of that equity because of their operating capabilities.  They had in country expertise, they had - they had some of these systems and processes in place because of their other portfolio of restaurants, they understood how to navigate the employment environment in the country which is always very difficult when you're entering a country for the first time, so that was their job and, you know, part of that job is - is the operating model itself and I think, you know, as Andrew indicated that's where he had some frustration with them.

Q.   Mr. Wright, I'm showing you a document that's four pages.  It starts on Bates number 8153 and continues to 8156.  It's an e-mail string.

I don't know your preference.  Do you want me to start from the bottom and let you read up or do you

Page 117

want to start from the top and read down?

A.   Up, down is fine.

Q.   Okay, so I'll scroll through this.  Let me know if I'm too fast or too slow, okay?

A.   Okay.

Okay.

Okay.

Okay.

Okay.

Okay.

All right.

Okay.

Q.   All right, having read through this e-mail string do you remember these exchanges?

A.   I don't remember them specifically, but I remember this season, if you will, of the - of the discussions and this - this e-mail helped me recall even some of the names that I've long since let slip out of my memory for the - the Infinity partners Group.

Q.   Okay, so let's look at this e-mail in the middle.  It's a to - to you, correct?

A.   Yes.

Q.   The date is January 25th, 2018, correct?

A.   Yes.  Yes.

Q.   The subject is re, Brazil update, true?



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
118–121

Page 118

A.  Yes.

Q.  And it's an e-mail from Andrew Levy, right?

A.  Yes.

Q.  The time says 6:11 a.m., correct?

A.  Correct.

Q.  And this is appearing on Bates number 8153, true?

A.  Yes.

Q.  All right, I want to read the first sentence. It says, "Great news.  We've been told that all four partners in Brazil have now signed the document."  Did I read that correctly?

A.  You did.

Q.  What document do you think that Mr. Levy is referring to?

A.  I can't remember if it was a document about a guarantee or if it was a document to release equity to him.  I'm trying to use the - the e-mail to refresh my memory itself because he says, "We remain prepared to fund their shortfall as discussed."  That's the next sentence I'm reading on this document anyway, and I seem to recall -- I wouldn't have remembered this without this e-mail.  I seem to recall he and Marcos being prepared to fund the unfunded capital call by Infinity, but there was something about their release or their

Page 119

awareness that they're because of him now funding that his equity position would grow and theirs would shrink. I can't remember exactly, but it was in that arena and I remember now that he had some frustration with those four partners.  I think one of them was just a celebrity.  It might have been a celebrity football player who was really hard to track down, but getting the four signatures that - that they would allow whatever the outcome of his funding would - would be a good thing.

Q.  And then the --

A.  Yeah.

Q.  -- second paragraph discusses hiring an investment banking firm, correct?

A.  It does, yes.

Q.  Does that refresh your recollection about going down the - the path of finding a broker to help sell the business?

A.  It does and it comports with some of the earlier information that you refreshed my memory with, that they were looking to sell the JV and - and I do recall because Marcos had a little more in market experience than Andrew that his - you know, it was his network that I think was trying to - to find an investment banking firm that could help with that

Page 120

process.

Q.  Okay, and in - in the e-mail from you you wrote - you wrote that, "Regarding loan funding, I do not have anything new since our phone call last week, but clearly the news this week puts this whole venture back on a better footing."  Did I read that correctly?

A.  You did.

Q.  Okay, what did you mean when you said regarding loan funding?

A.  He had -- As I said in earlier testimony, he continued to request that Wendy's fund the operating capital necessary to keep the business operating even through a loan, and I can't recall the amount of the loan, but it was - I mean it might have been a million and a half, two and a half million dollars but, you know, what - what I'm reading in my note here is on its face kind of what it says, that's great news, you - you got those signatures and, you know, your funding kind of buys us some time and I - and I state that we'll work on the cash flow projections, our team would work on those cash flow projections.  Now that we have that infusion of cash what is this new date on the calendar that we're now facing as, you know, potential insolvency and -- But I just wanted to make clear to him because I never wanted to mislead him.  I don't have anything new in

Page 121

terms of our side of things clearly, you know, in terms of the loan because he asked about the loan, is there anything new on our side.  Not since our call last week. I don't have any new news on that.

Q.  Okay, and just to make the record clear, I'm marking this as Exhibit 5 to your deposition.

A.  Okay.

(Whereupon, Defendant's Exhibit 5 was marked)

BY MR. POLENBERG:

Q.  Do you remember -- Let me ask that a different - different way.

What were the representations from Wendy's about additional loans into the joint venture --

MR. ARONOVITZ:  Object to form.

BY MR. POLENBERG:

Q.  I'm sorry.  Let me finish the question.

-- during this period of time?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't recall any commitments made by Wendy's to additional funding.  I - I recall many discussions often started by Andrew about what - what would help and what would be necessary and - and he was often, you know, very evenhanded about that.  He said, look, that may influence ownership of the JV or things like that,



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
122–125

Page 122

but he -- I understand why he would maybe have done that because he saw us as the partner with the deepest pockets, so he kept turning to me to try to find sources of funding to help keep the venture going so that we could get growing again.

MR. POLENBERG:  I lost my number order here. Hang on a second.

THE WITNESS:  Sure.

MR. POLENBERG:  Madam court reporter, did I skip an exhibit?

THE COURT REPORTER:  I just did a search.  I don't see the number 4 indicated on the record.

MR. POLENBERG:  Yeah, okay.

Thank you.

THE COURT REPORTER:  Sure.

BY MR. POLENBERG:

Q.   All right, let me show you -- Are you able to see the document I have up on the screen?

A.   I am.

Q.   This is a - a three page document Bates number LEVY 0004003 through 4035.

A.   Okay.

Q.   This an e-mail to you, correct?

A.   Correct.

Q.   It's dated February 2nd, 2018, right?

Page 123

A.   Right.

Q.   It's from Marcos Silva, correct?

A.   Yes.

Q.   I'm going to go ahead and mark this as Exhibit 4 to your deposition, okay?

A.   Okay.  All right.

(Whereupon, Defendant's Exhibit 4 was marked)

BY MR. POLENBERG:

Q.   I'm going to scroll through it.

MR. ARONOVITZ:  Jon, for the record this is Exhibit 4, LEVY --

MR. POLENBERG:  Yeah, I don't think --

MR. ARONOVITZ:  -- 4033?

MR. POLENBERG:  Yeah, I don't think I did 4. That's what - that's what I confirmed with --

MR. ARONOVITZ:  Okay.

MR. POLENBERG:  -- madam court reporter.

MR. ARONOVITZ:  Okay.

BY MR. POLENBERG:

Q.   May I continue?

A.   As far as I'm concerned, yes.

Q.   Oh, yeah, I was waiting for you.

A.   Oh, I'm sorry.

Q.   No, it's okay.

A.   I apologize.

Page 124

Yeah, go ahead I should have said.

Okay.

Okay.

Okay.

All right.

Great.

Q.   All right.

A.   All right.

Q.   Having reviewed this e-mail exchange, do you recall what was happening in February, 2018?

A.   I don't.  This - this is a bit of a reminder for me but, no, I - I don't recall the specific details about all that was going on here.

Q.   Is it fair to say that in February, 2018 Wendy's was onboard with finding a buyer for a major part of WBR shares?

A.   Yeah, I think my acknowledgment here indicates that - that we were - we were open to it.  If I read my note properly I think I said -- You'd have to scroll down for me to review that again -- But I think I said that there's a parenthetical statement in the next note from me.

Sorry.  Back up.  I apologize.

Well, I can't find it.

Yeah, I mean I'm acknowledging his desire to

Page 125

get all these extensions and I wanted him to know that while that's fine this is not really that necessary. It's not uncommon to have a franchise that is getting sold where the - the new franchisee wants to negotiate directly with the brand on what are the developmental commitments and have those change.  Are they going to extend?  Are they going to be shorter?  Because that's often part of their business plan if they're going to take over that business and as I described that's typically what we would do so, you know, I acknowledged his request but I think that, you know, there are times when I receive letters like this from franchisees they make an assumptive statement that - that assumes my alignment just because we talked about something and I have to very carefully let them know that's not - that's not what I agreed to.  It's I acknowledge that's what you said but it doesn't mean that's what - what the company signed up for, and that's what I was hoping to do here with this note.

MR. ARONOVITZ:  Jon, can you also scroll down. There's one more e-mail in this chain that Bob wrote.

THE WITNESS:  Yeah, here's the one I was thinking of.

Yeah, so even - even the second sentence, "I



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
126–129

Page 126

assure you we share the same goals of transitioning the business and defaulting the JV doesn't offer any support to that goal."  So there was -- In his previous comments he was saying, you know, we need to default the JV, we need to default the JV and my position as stated in this e-mail was it's not necessary.  Bring us a buyer because the buyer can buy the JV whether it's defaulted or not, the buyer can buy the JV whether it's in compliance or not and we will be glad to negotiate a new agreement with the buyer if there is a buyer and that's very easy for - for investment bankers or brokers to communicate and, you know, it's all factored into the value of the business too, so that's - that's all I'm trying to say to these guys.

BY MR. POLENBERG:

Q.   Yeah.  No, fair enough.

     Mr. Wright, I'm asking is it fair to say that at this time Wendy's was onboard with selling a major share of the interest in WBR?

A.   Yeah, I think that's fair.

Q.   Okay.

A.   If I can amend that answer I would say under the right circumstances to the right buyer, but it's still fair that we were onboard.  That's - that's kind

Page 127

of part and parcel to the business.  We - we have franchisees that want to exit the system all the time and we're - we're not going to try to hold someone hostage inside the brand if they don't want to be part of the brand anymore.

Q.   Okay, but just so I'm clear on your answer, Wendy's was onboard with looking for a buyer, true?

A.   Sure.

Q.   Wendy's was onboard as long as the right buyer was the right buyer, right?

A.   Right.

Q.   As long as the terms were right, right?

A.   Absolutely.

Q.   All right, I'm going to show you the next document.

     We should be going an hour.  If you want to go ahead and take a break because the next one will probably be the last break, so if you want to take a break now and then we'll be done with the next series.

A.   I don't need a break right now.  If everyone else does I'm fine to take one, but...

Q.   All right, we'll take - we'll take another document then we'll take a break.

A.   Okay.

Q.   All right, I'm showing you a document that --

Page 128

Well, first can you see the document?

A.   I can.

Q.   And this is a document that has Bates numbers LEVY 0008978 through 8979.

A.   Okay.

Q.   I'm going to mark this as Exhibit 6 to your deposition.

A.   Okay.

     (Whereupon, Defendant's Exhibit 6 was marked)

BY MR. POLENBERG:

Q.   I'm going to scroll down, so go ahead and start reading and let me know when I can proceed.

A.   Go right ahead.

     Okay.

     Okay.

     Okay.

     Okay.

Q.   All right, before we go a little further do you see it says regards, Edu?

A.   Yes.

Q.   Do you know who that refers to?

A.   I do.

Q.   Who?

A.   Yeah, that's Carlos Alves.

Q.   Okay.

Page 129

A.   We all call him Edu.  He called himself Edu. That's why we did that.

Q.   Okay, so looking at this Exhibit 6 your - your e-mail at the top is dated February 28th, 2018, correct?

A.   Correct.

Q.   It's to Marcos Silva, right?

A.   That's right.

Q.   And that's your e-mail address on the front line, correct?

A.   It is.

Q.   Now that top e-mail is responding to the e-mail from Mr. Silva, right?

A.   That's correct.

Q.   Who's Carlos Ribas?

A.   Carlos was my senior leader in charge of Latin America and Caribbean in the International Division.

Q.   Do you remember a board meeting about W - WBR funding sometime before - near February 27th, 2018?

A.   I can't pinpoint each board meeting without some - you know, some specific refresher like what you're providing with some of these e-mails, but I will tell you that every board meeting the way Wendy's worked at the time is as a COO I was in the boardroom for every board meeting.  In fact, I was in the room as we met with the executive committee in preparation for the



Page 130

board meeting and typically I would prepare contents for my section of the presentations and the board meeting on North American operations on all of the underlying departments that I led, and there were many of them. When I - when I was there at this time about a third of all the G&A in the company reported to me.  Carlos was one of those direct reports and I had a section in the board deck always on International and my relationship with the board was one of transparency, so when we had great things going on I like to talk about those things and if we had some challenges in the business it was my method to talk about those - those challenges so, yeah, we would have talked about Brazil for sure in the boardroom.

Q.   Okay.

A.   Yes.

Q.   And when Mr. Ribas said -- According to Mr. Silva Mr. Ribas said it was a nonevent.  Do you know anything about that?

A.   No.  No.  I can't -- I mean, look, that's Marcos relaying to me what he heard from Carlos which is supposedly what Carlos heard about a board meeting which he wasn't in, so I mean it wasn't uncommon for people on my team to want to know how the board meeting went and I - I didn't always give play-by-plays about how the

Page 131

board meeting went and so, you know, Carlos -- Or sorry -- Marcos and Andrew were always trying to find out where the board stood on -- Not always.  I'm sorry. Often tried to find out where the board stood on this venture and, you know, I think that's probably where this comes from.

Q.   Okay, at this point in February, 2018 do you have any recollection about additional funding for the joint venture?

A.   Yeah, look, that was ongoing.  Yeah, February, '18, January of '18 as you saw in previous e-mails, December of '17 we were talking about funding kind of my entire time of leading International and - and Brazil.

Q.   What about Wendy's --

A.   Yeah.

Q.   -- funding the joint venture?

A.   That was always a contemplated component of the joint venture.  That's how it was set up.  The joint venture partners would put in funding and sometimes Wendy's would loan funding or at least guarantee that loan like we described in - in earlier testimony so, yeah, we - we absolutely talked about that.

Q.   And your e-mail I'm going to read the sentence.  It says, "Given that we have funding through mid May, the pressure for any additional funding isn't

Page 132

as urgent as it was a few weeks ago."  Did I read that correctly?

A.   That's right.  You did.

Q.   Okay, why does that matter?

A.   Well, because Carlos' note below is asking where is the million five.

Q.   Yes.

A.   I'm reminding Carlos with my opening statement we've - we've made some adjustments to the business model, the - the missing funding from Infinity has been put into the business granted through Starboard, but still we now have cash and we've got plenty of cash to fund the business through mid May and so any additional funds whether it's a million five or any other number is certainly not as urgent as it was a few weeks ago.  The combination of the operations efforts and - and the actual catch-up of the missing funding has - has cleaned that up a little bit.

MR. ARONOVITZ:  Mr. Wright, you mentioned in your answer, you're talking about to Carlos.  Do you mean you're telling that to Marcos?

THE WITNESS:  Thank you for the correction, Cary.  I apologize.  Yes, I meant Marcos.  That's my note to Marcos, not Carlos.

MR. POLENBERG:  Mr. Aronovitz, I know you want

Page 133

to get the record straight, but we can always clear that up on redirect.  It wasn't a major error, I - it's not a big deal, but I really prefer it be handled in the course of testimony.

MR. ARONOVITZ:  Okay, I understand.  I want to have - make sure we have an accurate transcript because it's clearly what he means and --

MR. POLENBERG:  No dispute.

MR. ARONOVITZ:  -- there is a difference between a Marcos and a Carlos here where one is with Wendy's and one is their partner.

MR. POLENBERG:  Fair, and that's why I'm not making a big deal but, please, you could have cleared it up on redirect, too.

BY MR. POLENBERG:

Q.   Mr. Wright, the - the date of this e-mail is February 28th, 2018, right?

A.   Right.

Q.   Do you know if 2018 was a leap year?

A.   No.

Q.   Okay, so it's either fourteen or sixteen days till mid May?  Is that fair to say?

MR. ARONOVITZ:  Object to form.

BY MR. POLENBERG:

Q.   Oh, I'm sorry.  Yeah, that's not -- That's two


ESQUIRE
DEPOSITION SOLUTIONS

ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
134–137

Page 134

and a half months.  Fair to say?

A.  Yes.

Q.  Okay, do you know if that estimate of cash flow through mid May turned out to be accurate?

A.  I don't recall specifically.  No, I don't.

Q.  Is it fair to say that as of the end of February that Wendy's was prepared to provide the additional funding whatever amount it ended up being?

A.  I think it's fair to say that Wendy's was prepared to continue to support this endeavor.  I'm not trying to not answer your question, but provide funding under what circumstances and I think that's the pattern that you're seeing in each of these back and forths.  You know, there - there's - there's clearly a -- I mean even the 1.5 as I state in my e-mail it came from an estimate of what it might take to get to transition of ownership, so I'm - I'm not reflecting on my memory, I'm reflecting on nearly forty years of how I manage situations like this and I believe in my heart what I meant here is that, okay, fine, yeah, if there - if it's going to take funding to get to a transition of ownership, we did that estimate, we can certainly be prepared to do that and we had a number around that, but, you know, here I have Marcos wanting the money to fund it into the business and it's not necessary right

Page 135

now and this is - this is very common in - in the, you know, the food business is that every dollar you don't put in is a - is a return on investment that you don't need back and so - and in a situation like this I would say that - that my approach has paid dividends because it put a tremendous amount of urgency on the leadership in the market as well as the adjustments that needed to be made to the business model that started producing its own sustainability versus just asking Wendy's to keep funding it.  It doesn't mean that we weren't willing to fund it, it doesn't mean that Wendy's -- In fact, that was never really discussed that Wendy's was walking away from this market, from this goal or from this venture, but that's not what this e-mail stream suggests.  This e-mail is - is Marcos asking for the funding now and - and I'm reminding him it's not necessary right now.

Q.  Understood what your testimony is.  I'm -- It's also true that this e-mail does not say, no, we're not agreeing to fund 1.5 million dollars, right?

A.  That's correct.  That's correct, yeah.

Q.  Okay, and so you're saying you're not going to fund it right now, right?

A.  I didn't say either of those things.  I'm saying this is how we came up with that estimate and it is no longer as urgent as it was when we started coming

Page 136

up with an estimate.

The estimate was developed for the purposes of bridging the gap to a sale.  That gap has now been bridged in another way and may or may not need this amount of money, but inherent in the estimate and the discussion about bridging a gap to a sale is the willingness to help support that business until you get to that sale.

Q.  You understand that - you understand that from Starboard's perspective between the conversations that it had with Wendy's it understood that the capital contribution it provided was in exchange for Wendy - Wendy's agreeing to fund this 1.5 million dollars, right?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No, I do not.

BY MR. POLENBERG:

Q.  I'm not saying that's what had happened.  I'm saying you understand that's their position?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No.

BY MR. POLENBERG:

Q.  Okay, no, you don't know that's their position or, no, that wasn't their position?

A.  No, I don't know that that's their position.

Page 137

I think they made clear that that was their desired outcome.

Q.  Okay, and here in your e-mail on February 28th, 2018 you did not say, no, we will not advance, fund or contribute the 1.5 million dollars, right?

A.  That's exactly right.  I did not say we would not do it.

Q.  Okay, and the fact is Wendy's did not do that, right?

A.  That I don't know.  I don't know when there was additional funding or if, you know, in this case this funding was talked about in the context of a transition to a new owner, and this happened after I turned over International to Abigail Pringle, but I think I know - I think I know the history here is that it never was sold.  It never was turned over to a new owner.  There never was an owner that was found, an interested party that I recall.  I certainly never entertained it because I would have interviewed them if I was still running the business.

Q.  Let me put that back up.

Are you able to see the document?

A.  I am.

Q.  This is - this is back to Exhibit 6.  It's --



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
138–141

Page 138

And the sentence you're - you're referring to says, "As mentioned before, the 1.5 million dollar number came from an estimate of what it might take to get to a transition in ownership, not necessarily a fixed number waiting to be allocated."  Did I read that correctly?

A.   Yes.

Q.   That didn't say you didn't write there that it's 1.5 million dollars once you find an owner, right?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No.  In that sentence I did not say that.  In the subsequent two sentences I said that.

BY MR. POLENBERG:

Q.   Okay, hold on.

So the next two sentences read, "I'd like to better understand how that transition work is going as well.  And the two conversations are essentially connected."  Did I read those correctly?

A.   You did.

Q.   Your understanding of those two sentences is that Wendy's would not provide 1.5 million dollars till it understood who the buyer was?

A.   That's not correct.

Q.   Okay, how would you --

A.   My understanding --

Page 139

Q.   How would you --

A.   Those - my understanding of those two sentences is to connect the need for funding whether it's a million five that was the original estimate or a different number to the transition work and I'd like to better understand how that transition work is going, so I wasn't making one dependent on one another.  I'm - I'm creating a connection between those two business objectives of - of transitioning the ownership and supporting the ownership through the transition of that ownership with additional funding.

Q.   And sitting here do you know whether - whether at this point in February, 2018 an investment banker was in place?

A.   I don't know.

Q.   Do you know -- Do you recall any potential buyers for the business that were identified?

A.   I remember some - vaguely remember some allusion that Marcos made to connections that he was making for people that, you know, thought it might be of interest to them.  I don't recall anything that was, you know, on its face fully viable as a - you know, as a bona fide buyer who's got letters of intent or all the other activity you would see through an investment banker that shows that to be happening and yet in good

Page 140

faith as I stated here I'd like to better understand how that work is going.  He was close to it and so I offered to get together on the phone with the team to get that update including the performance of the business and continue to link those two together.

Q.   And what was the information you recall you received about the process or efforts to find a buyer?

A.   I don't recall any specifics.  I - I frankly don't recall whether even though I offered maybe a call was in order, I don't know that we had a call on this per se.  I - we were in regular dialogue, so I'm confident that we'd continue to have similar conversations, but I don't recall the specifics of any updates I got.

You know, it doesn't mean they didn't do it, but I don't recall.

Q.   Okay.

We didn't take a break, so why don't we go ahead and take that break.

A.   Okay.

Q.   All right.

A.   Ten minutes?

Q.   Yeah, let's come back in ten.

A.   Terrific.  Thank you.

THE VIDEOGRAPHER:  Okay, we're going off the

Page 141

record.

The time is 4 -- 2:02 p.m.

(Whereupon, there was a brief recess observed)

THE VIDEOGRAPHER:  All right, we are now back on the record.

The time is 2:12 p.m.



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
141–144

Page 141

(The testimony from page 141 to page 164 has been marked confidential, excerpted and bound separately).

BY MR. POLENBERG:

Q.   Mr. Wright, I'm going to show you another document.

A.   Okay.

Q.   Are you able to see this document?

A.   I am.

Q.   It goes from Bates number 13861 to 13863 and then it has several pages of spreadsheets that will follow.

A.   Okay.

Q.   I'm sorry.  13864.

I'm going to show you these spreadsheets just so - for completeness.  I am not going to ask you to read these I-Charts, okay?

A.   Okay.

Q.   And I won't be asking any questions about them, but if you need me to enlarge them or you need to refer to it as we go through the examination you just

Page 142

let me know and we'll work through it, okay?

A.   Thank you.

Q.   All right, so you let me know when to move on.

A.   Okay.

Okay.

Okay.

Great.

Okay.

Q.   I'm going to apologize in advance for these, so...

A.   I've seen many of them in my career, so -- I see the summary at the bottom of this one that was screenshot and captured in the e-mail above.

Okay.

All right.

Okay.

All right.

Understood, yes.

Oh, I think this is a different version.  Okay.

Q.   Sorry I laughed.  I can't read it at all.

Do you want me to make it larger?

A.   No.  It appears to be cash flow by week instead of by period just at a glance and, look.  I trust the people that build these spreadsheets on both

Page 143

sides.  I'm sure it flips, so...

Similar.  It looks like a weekly spreadsheet.  This does too.  Okay.

This is added another week.  That's good.

Q.   That's the --

A.   Okay.  Okay.

Q.   All right, so looking at this e-mail exchange, first of all R dollar sign and then a number with - that is not U.S. dollars, right?

A.   That's real.

Q.   Right.

A.   That's the currency, the local currency real, yeah.

Q.   The numbers in the table that appears on page 13861, are those in U.S. dollars or in real?

A.   I'm - I'm triangulating because when Carlos Ribas says, "I wasn't crazy.  See Edu's explanation of the eight hundred real with no deferred royalties or loan interest," and then eight hundred at the bottom of that.  This -- Oh, yeah.  And even the top at the header is British real, so BRL.

Q.   I couldn't read that.

A.   Brazilian.  Sorry.  Not British.  Brazilian real so, yeah, these -- I think these are in local currency.

Page 144

Q.   Okay.

A.   Conversion rate, I don't know, a hundred and fifty grand or something like that.  That's really --

Q.   Yeah, this - this entire e-mail which we're going to mark to your deposition as Exhibit 7.

A.   Okay.

(Whereupon, Defendant's Exhibit 7 was marked)

BY MR. POLENBERG:

Q.   This entire e-mail was forwarded to you on March 2nd, 2018, correct?

A.   Uh-huh.  (Affirmative response).

Q.   Yes?

A.   Yes.

Q.   And it's from Carlos Ribas, right?

A.   Correct.

Q.   And you pointed out that there's this see the explanation below, the R, the real eight hundred thousand below, you pointed that out, right?

A.   I did, yeah, and I - I have a vague recollection of this.  I wasn't crazy part was he and I, I seem to recall around this time that he and I thought we had a different date in mind where we had cash funding to fund the business until and I think that's what he might have been referring to with the I wasn't crazy introductory statement.  His number - his date was

ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
145–148

Page 145

a little different than the one I had in my head.

Q.   All right, so --

A.   Yeah, it looks like there's a note - it looks like an editor's note confirms that because he says this is what is missing to be able to fund through May --

Q.   Right.

A.   -- and now the fund through date looks like it's April, so this -- I'm re-connecting the dots to the previous document that you showed me.

Q.   All right, so in the e-mail dated March 2nd from Carlos Ribas to Carlos Alves at 4:07 p.m., go ahead and read that --

A.   Yes.

Q.   -- e-mail.  It starts on page 13861 and goes to page 13862.

A.   Uh-huh.  (Affirmative response).  I see that.

Q.   Do you see that last sentence?

A.   I do.

Q.   I'm going to read it.  "Anyway, now Bob asked Peter to evaluate if we can 'delay' the next one to two loan payments without triggering Wendy's write down."

A.   Yes.

Q.   Did I read that correctly?

A.   Yes.

Q.   What is a Wendy's write down?

Page 146

A.   Again I don't remember this specific request from me to Peter and - but it makes sense that I would have asked a question like that, so what I was asking is, all right, so now if it is true that we have one month less of cash flow to get to this transition than we thought we had, well, again, Wendy's is prepared to participate in helping with that.  One thing we can do is delay or defer a couple of loan payments.  That's cash going out the door for those loan payments.  The question I asked Peter, Peter Koumas who is in the Wendy's Corporate Finance Team, I think he reported directly to the CFO, if not, he was a - he was a director level person on the finance team is -- And I'm always thinking about, you know, all kinds of implications of our decisions, so I'm asking a few questions.  If we did that would we trigger a write down of the value of that asset which would - you know, you would have to do that if you've got - you know, you've got unsupported value of the asset then you have to write it down on the balance sheet.

Q.   Okay, so but it says Wendy's write down.  You're talking about Wendy's write down of the value reported on a balance sheet?

A.   Yeah.  Yeah.  It's like, look, if we - if we forego two loan payments, one or two loan payments to

Page 147

give some breathing room of cash to this business I'm just asking the finance guy at the company are there implications to the consolidated balance sheet of Wendy's by making that decision and that's - that's all it amounts to.

Q.   The asset you're referring to would be the loan, right?

A.   That's correct, because the loan from Wendy's to the JV is an asset on Wendy's books.

Q.   Right.

A.   We have to test our assets, you know, whether it's real estate leases and, you know, capital investments in existing locations and if they don't pass the - the test of - of viability then you have to - you have to write off that asset and move it from the balance sheet to the P&L as a loss.  In dollar terms it's not that big of a deal given what we're talking about a couple of loan payments here, but I - I don't like to surprise the CFO with, you know, actions like that if there - those are those implications and - and they have a way of working with the auditors to judge whether or not that's going to happen.  That's exactly what that question is.

Q.   Understood.

The - the -- At this point did Wendy's put in

Page 148

the 1.5 million dollars?

A.   It doesn't appear so because all the spreadsheets that you showed me and even the e-mail I think towards the bottom of the original part of the e-mail was that, yeah, here's - here's Marcos' summary.  If Marcel puts in three hundred and seventy-five thousand real, Starboard two million and Wendy's 4.8 million which is 1.5 million dollars then it says here we can still get to the end of the year.

Q.   Yes.

A.   I don't - I don't think any of those funds were contributed, I don't recall for sure, but at this point it does not appear that Wendy's has put that in.

Q.   Okay.

A.   Not yet anyway.

Q.   I'm showing you another document.  It is Bates number 13761 through 13764.  I'm going to mark this as Exhibit 8 to your deposition and I'm going to scroll through it and you just tell me to go as you're ready.

A.   Thank you.

(Whereupon, Defendant's Exhibit 8 was marked)

THE WITNESS:  Okay.

Okay.

Okay.

Okay.



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
149–152

Page 149

MR. ARONOVITZ:  Jon, can you - can you scroll this one up just a little bit so I can see the center?

Perfect.  Thank you.

THE WITNESS:  Okay.

Okay.

Okay.

And this e-mail is from -- Sorry.  If you don't mind scrolling up one more time.  This one is from Marcos as well.  Okay, and it's to Marcel and Carlos, Humberto and copying Kevin and - and Andrew.  Okay, understood.

Sorry.  Yeah, thank you.  If you scroll back down.

BY MR. POLENBERG:

Q.  No apologies necessary.

A.  Okay.

Okay.

Okay.

Okay.

All right.

Q.  All right, do you remember this e-mail exchange?

A.  No.

Q.  You had pointed out that there's a series of

Page 150

e-mails from Marcos Silva directly without intervening e-mails from anyone else.  Do you remember that?

A.  Yes.

Q.  Let's start with those Marcos Silva e-mails.

So going to the bottom first.

Is this the last one?  Yeah.

So there's an e-mail from Marcos Silva dated July 5th, 2018 which is - starts on page 13763 and ends on 17 -- 13764, right?

A.  Yes.  Yes.

Q.  And included on the addressees is Carlos Ribas, right?

A.  Yes.

Q.  In this e-mail Mr. Silva gives an update as to what's going on, right?

A.  Yes.

Q.  Is anything in this e-mail that you were - that sitting here today you remember is inaccurate, wrong or - or false?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I - I can't go to every single detail in here, but generally this brings back some of those memories like that Sforza was a - a family business that I think Marcos and Marcel thought may be interested in buying the business even if, you

Page 151

know, they could - they could buy it and - and Wendy's would maybe write off the existing debt or something like that.  I remember there was a - there was a belief that they may be interested, so this part of the e-mail rings true with me that they just - they weren't - they weren't really interested given the early stage of the development and then I did more general feedback about the lack of interest through Conext was - that's consistent with my general memory about the situation as well.

BY MR. POLENBERG:

Q.  Who is Conext?

A.  I think that was the M&A firm that - that they found in the country to help try to broker a deal.

Q.  Okay, and the funding analysis, do you have any reason to doubt what's stated here?

A.  No.  Generally speaking, you know, we keep kind of coming to the same point plus or minus a number of weeks of how much funding is - is available.

Q.  Right, and on July 5th the next e-mail in this string is another e-mail from Mr. Silva, correct?

A.  It is.

Q.  And it's referring to a call that occurred earlier in the day, right?

A.  Yeah, the way I read these, I don't know that

Page 152

this is accurate, is one is setting up the call and one is summarizing the call.

Q.  Okay, and the e-mail that followed -- And this - this -- Let me - let me start over, okay, Mr. Wright?

A.  Sure.

Q.  So the July 5th, 2018 e-mail from Marcos Silva at 6:32 p.m. was copied to or sent to Carlos Ribas among others, right?

A.  Yes.

Q.  And the first sentence in the body of the e-mail is, "Quick follow-up from our call - call earlier today," right?

A.  Right.

Q.  That e-mail appears on page 13762, correct?

A.  It does, and 763, right?

Q.  Well, yes.  Fair.

The part I read was on 7 -- 13762, right?

A.  Yes.

Q.  And then the summary of the e-mail and then the next steps and the rest of the content that Mr. Silva drafted is on 13763, right?

A.  That's correct.

Q.  And then the next e-mail after that there's another e-mail from Mr. Silva, right?



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
153–156

Page 153

A.   It is.

Q.   And there's no intervening e-mail from Mr. Ribas saying that what was stated in the sum up of the call was incorrect, inaccurate or false, right?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No.  Not that I see here.

BY MR. POLENBERG:

Q.   Okay, and then there's an e-mail on July 19th, 2018 from Mr. Silva, right?

A.   Yes.

Q.   Again Mr. Ribas is copied, right?

A.   Yep.

Q.   And Mr. Alves is copied, right?

A.   Yes.

Q.   And this e-mail is, as you put it before, setting up a call between - for these people to attend, right?

A.   Apparently, yes.

Q.   And in this call there's two plans, plan A and plan B, right?

A.   Right.

Q.   The - the agendas is going to discuss in plan B shutting down the restaurants, right?

A.   That's right.  That's the way I read it.

Q.   Yeah, so from the end of December when you had

Page 154

the e-mail from Mr. Levy December, 2017, remember December 22nd, 2017 we had that two page deck?

A.   Yes.

Q.   I'm sorry?

A.   Pard me for just one second.

An unexpected interruption and, ladies, I apologize.

Q.   Not a problem.

So between the December 22nd, 2017 e-mail from Mr. Levy with the two page deck to July 19th, 2018 the discussions have changed to including discussions about shutting down the Brazil operation, right?

A.   That's correct.

Q.   And then there's another e-mail from Mr. Silva on July 23rd, 2018, correct?

A.   That's correct.

Q.   And Mr. Alves is on this e-mail, right?

A.   He is.  Yeah, Carlos Ribas is on there, too.

Q.   Mr. Ribas and Mr. Koumas?

A.   Yes.

Q.   And this - this is discussing the call that they had apparently on the afternoon of July 23rd, correct?

A.   It is.  It's not clear who was on the call.  I mean it is a summary to these people.  I don't - I don't

Page 155

know that all those people were on the call.  I'm not sure it's relevant because the summary is what's important.  I think the - the audience is important there.

You know, the thing as you - as you let me read this a moment ago that last paragraph is the one that I think is - is very clear that Marcos has said that we decided to make sense to have a board meeting on Wednesday to make a decision on next steps and, you know, I think he's -- I believe that he said in a - in a subsequent e-mail that that is their belief in what the next steps ought to be.

Q.   And that next e-mail you're referring to is this e-mail?

A.   That's correct.

Q.   Now this e-mail is from Mr. - Mr. Ribas, correct?

A.   Yeah.

Q.   And you're copied on this e-mail, true?

A.   Yes.

Q.   And in the - in the e-mail there's - there's a 1G, right?

A.   Uh-huh.  (Affirmative response).

Q.   Yes?

A.   Yes.

Page 156

Q.   Okay, and that says, "If E is unsuccessful, within approximately four weeks we will proceed to plan B," right?

A.   It does say that, yes.

Q.   And - and you understand plan B to be the plan B that Mr. Silva suggested in his earlier e-mail?

A.   Yeah, I assume that's the linkage, especially since it's in the same e-mail chain, yeah.

Q.   And just for completeness, paragraph 1E is an M&A approach looking for a buyer, right?

A.   That's right.

Q.   So is it fair to say that on July 25th, 2018 Wendy's is also now open to considering shutting down the expansion into Brazil?

A.   Yeah, I think that's fair given what this e-mail states.  Yes, especially if you've got one partner that, you know, really hasn't been carrying their weight and another partner, the other forty percent partner is indicating they are going to stop investing in the business and there's no - no one -- If E is unsuccessful, which is how Carlos outlined this call, to find a different franchisee then you'd have to shut it down.

Q.   And at this point Wendy's is not discussing putting in the 1.5 million dollars, right?



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
157–160

Page 157

A.   Well, again I just read this e-mail for the first time in - in about eight years, but I think somewhere in the e-mail it said that Wendy's was still prepared to guarantee the loan from Bradesco, so - and - and it says here in Carlos' note that plan is endorsed by Wendy's, so it may not be a million five in direct funding, but it's two million in real in indirect funding through a guaranteed loan, so I think your statement is accurate that it doesn't say anything about funding a million five in any of this e-mail string but it's not - it isn't prepared to help fund the business until you can get it sold.

Q.   I understand.

So it's fair to say that from the time the 1.5 million dollars was discussed in the e-mail chains until this July 25th, 2018 Wendy's had not funded that additional capital, correct?

A.   I don't believe so because the - the amount free cash flow to keep the business going would - would certainly not be the problem.  Now these other issues might still exist and the partners may still be talking about closing it down, but if the 1.5 U.S. had been funded it certainly would have solved the, you know, months worth of cash flow issues, so it doesn't look like it was.

Page 158

Q.   Okay, and then there's an e-mail from Mr. Ribas to you, correct?

A.   Yes.  In response to my note to him.

Q.   Yes.

A.   Yeah.

Q.   And that was dated July 25th, 2018, correct?

A.   Right.

Q.   And Mr. Ribas is referring to WBR models that Wendy's had prepared, correct?

A.   I don't know who prepared those.  I don't think this says that.

Q.   Well, let's say -- Let's - let me read for the record.

"FYI, I was discussing with Peter about sharing our WBR models with Marcos prior to the call (to help them understand why we want to continue operating two to three restaurants while we look for a buyer/operator), --

A.   Okay.

Q.   -- but we decided best not to at this time as Humberto's models" -- I'm sorry -- "Humberto's model shows the same, just more aggressively."  Did I read that correctly?

A.   Yes.

Q.   Okay, so in this sentence Mr. Ribas refers to

Page 159

our WBR models, right?

A.   Yes.

Q.   And so that would be Wendy's WBR models, right?

A.   Yeah, that's - I think that's a fair assumption.

Q.   Okay, and so what does it mean that Humberto's model show the same, just more aggressively to your understanding?

A.   I don't know.  Humberto was kind of the new on the ground leader as Marcel stepped away from the business, he was an Infinity person and really was kind of a roll up your sleeves person down there, so he ran -- It says his model shows the same.  I assume what Carlos is intending to communicate is continuing to operate two or three restaurants while we look for a buyer or operator, his model must show something similar.  I don't know what more aggressively means.  Faster with better outcomes?  Who knows.

Q.   And what was the result after this call?

A.   I do not recall.

Q.   How many stores did - did WBR operate in the remainder of 2018?

A.   Yeah, I - I think it was around this - this targeted number because this was also around the time

Page 160

that Abigail took over.  I can't remember the dates exactly, but it was around this time, but anyway I - I think in terms of eliminating liability for the JV and unlocking cash and preserving cash flow this - this model of two or three locations which was also referenced in another e-mail took the two largest biggest cash losers off the backs of the business which had the effect of - of prolonging the sustainability of the business so, you know, this wasn't a close the doors on everything overnight type of plan as again this documentation is reminding me of.  It was again some triage on where the biggest cash drains were so that the partners could find the best solution and get out of there and you can see here there's still talk of a new buyer.

Q.   When was it having looked at all these e-mails that you exited control over the International Division?

A.   It was around this time later I mean because I'm still copied on it, but I - I recognized in this string of e-mails a reference to Abigail being brought into the loop and now as I recall initially Abigail's connection as the chief development officer was related to some of Starboard's missed commitments domestically. I do not remember what those were and I don't remember kind of the specifics, so there was a - there was a time



ROBERT D. WRIGHT  Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
161–164

Page 161

period where Abigail was involved while I was still running International and then after some additional period of time then she took over International.  This was still mine.  This was still my responsibility for this business.  At the time I still had - you know, I still had International at this time.

Q.   Okay, is it fair to say though by 2019 you were not involved any longer?

A.   That's correct.

Q.   Okay.

A.   Yes.

Q.   Do you remember setting up a call with Mr. Levy in 2019 to discuss Brazil?

A.   No.  No.

Q.   Let me just close the loop because this is the last document I have and maybe --

A.   Okay.

Q.   -- this will help refresh your recollection.

A.   Sure.

Q.   I'm showing you a document that we're going to mark as - as Exhibit 9 to your deposition.  It's Bates number 3809 Wendy production.

(Whereupon, Defendant's Exhibit 9 was marked)

BY MR. POLENBERG:

Q.   Are you able to see that?

Page 162

A.   I am.

Q.   Okay, and it's a really short exhibit.  Exhibit 9 has two e-mails, one from Mr. Levy to you dated March 13th, 2019.  Do you see that one?

A.   Yes.

Q.   And then there's a response to you -- A response -- I'm sorry.  Let me ask that differently, okay?

A.   Sure.

Q.   There's a response from you on March 13th, 2019 at 4:24 p.m. Central Time, correct?

A.   Yes.

Q.   So in March of 2019 do you remember having a call with Andrew Levy shortly after this e-mail exchange?

A.   Again I don't remember the direct linkage on my calendar between this e-mail exchange and a call with Andrew, but my communications with Andrew continued until I left the company.  I mean I saw him at meetings and, you know, at the convention and things like that, so they would have continued.

I - I seem to remember based on this e-mail that as Andrew indicates which helps me remember he's going to - he's going to have a call with the team tomorrow walking them through some of the history, not

Page 163

all of it pretty for either of us.  I think he's referring to his company and - and the Wendy's company, and he just wanted to make sure that we stay aligned and you got a heads-up.

Kris -- There's only one Kris that I know in the company, that's Kris Kaffenbarger who did work with franchise transitions and I think by now Andrew might have been trying to sell some of his domestic markets, I can't recall, but Kris - if Kris was involved that's usually domestic franchise-to-franchise sales.

Q.   Okay.

A.   I do recall a call after I had been - after I stepped away from the international business as my title in this e-mail describes that Andrew called me and wanted to talk through his - you know, his discussions with Abigail about the history of the business and it was a friendly call because he said, look, here's - here's what I'm going to say and I don't want to - you know, he was kind of -- Frankly he was very kind to me and he said, you know, you were always supportive, we were always trying to find a solution here, but the history is not really pretty and I want you to know I'm not trying to throw any person under the bus here.  We all have, you know, our hands in whether a business succeeds or fails and I wouldn't want you to think that

Page 164

about - you know, about me talking to Abigail.  I don't know if that was this call that he set up, but it fits generally with that timeframe of him just giving me a courtesy that he's going to tell a not so great story and I'm a part of the story.



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
164–167

Page 164

Q.   And after that call you said you talked to Mr. Levy up until the time you left Wendy's, right?

A.   Yeah, I had -- I mean it wasn't nearly as frequent as when I was running International, but again I was still running the domestic business and he was a big franchisee of ours so, you know, we stayed in touch.

Q.   Okay, at any time did you discuss any of the other issues related to the - Wendy's transition away from the Brazil market and its involvement with Mr. Levy?

A.   No.  In fact, I don't - I don't necessarily agree that Wendy's transitioned away from the Brazil market.  I mean the brand did but, look, all parties as you saw in that e-mail chain were making some determinations about what was best for their business and so, yeah, look, I think if I ran into Andrew today and we stood on the corner and chatted for awhile we'd talk about Brazil at some point just because it was such a big part of our work life together during that --

Q.   Yeah.

Page 165

A.   -- period of time.

Q.   Yeah.

A.   It - it would always come up, but not - not with anything meaningful.

Q.   Did you discuss at any time with Mr. Levy in 2018 or 2019 up until the time you left Wendy's any of the issues that are at play in this case?

A.   No.  Not beyond what you've - you've reminded me of and what I've responded to here, no.

Q.   Okay.

A.   When I was notified of the deposition was the first time I knew that there was anything lingering.

MR. POLENBERG:  Okay, I - I tender the witness.

MR. ARONOVITZ:  Why don't you give me, you know, three minutes --

MR. POLENBERG:  Sure.

MR. ARONOVITZ:  -- and then we'll - and we'll finish up.

MR. POLENBERG:  Okay.

MR. ARONOVITZ:  A very short break.

MR. POLENBERG:  You got it.

THE VIDEOGRAPHER:  All right, we're going off the record.

The time is 14:50 -- I'm sorry -- 2:57 p.m.

Page 166

(Whereupon, there was a brief recess observed)

MR. ARONOVITZ:  I have no further questions for the witness.

MR. POLENBERG:  Okay, so, Mr. Wright, I'm sure that Mr. Aronovitz would tell you in private, but you have the option to read your deposition or you can waive reading the deposition.

If you read the deposition you will get a letter from the court reporter giving you an opportunity to go through the deposition and you would have an errata sheet next to you and you can make sure that everything that was taken down in the deposition was consistent with how you recall you testified and then all the parties would get a copy of that errata sheet when you're done.

Do you want to read or waive the - the deposition transcript?

MR. ARONOVITZ:  And let me also advise we will be asking for a transcript on my side, so if you want to have an opportunity to read it to make sure everything is accurate, you know, you can do so, Mr. Wright.

THE WITNESS:  Okay, I think that would be fine.

MR. POLENBERG:  Okay, everyone -- I guess

Page 167

you're ordering.  I'm ordering, too.

MR. ARONOVITZ:  Yes.

THE VIDEOGRAPHER:  Okay --

MR. POLENBERG:  We'll hold - we'll hold -- I'm going to hold on the videography for right now.

MR. ARONOVITZ:  The same.  No need for the videographer, but we'll get a copy of the transcript.

THE VIDEOGRAPHER:  Okay, understood.

MR. POLENBERG:  Normal delivery is fine with - with me.  I only need an electronic copy.  I don't need a hard copy.

MR. ARONOVITZ:  That's fine as well.

MR. POLENBERG:  And, Miss Lehto, Gabby will send you the exhibits.

THE COURT REPORTER:  Okay, thank you.

Can we go off the record?

MS. SLIWKA:  Miss Lehto, if you can put your e-mail in the chat.  Again when I joined I don't -- I think when you shared I wasn't - I had no --

MR. POLENBERG:  I have it.

MS. SLIWKA:  You have it, Jon?

Okay, never mind.  I will just get it from Jon.

THE VIDEOGRAPHER:  All right, we can certainly



Page 168

go off the record.  Let me just get this set up.

All right, this concludes the video recording deposition of Mr. Robert Wright.

The time is 3:02 p.m.  We are now off the record.

(The deposition concluded at 3:02 p.m.)

Page 169

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF BROWARD

I, VALERIE LEHTO, the undersigned authority, certify that ROBERT DEAN WRIGHT remotely appeared before me and was duly sworn.

Dated this 18th day of May, 2026.

*Valerie Lehto*

VALERIE LEHTO, RPR
NOTARY PUBLIC - STATE OF FLORIDA
My Commission Expires:  8/22/2026
My Commission No.:  HH 289463

Page 170

CERTIFICATE

STATE OF FLORIDA
COUNTY OF BROWARD

I, VALERIE LEHTO, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition as hereinabove shown, and the testimony of said witness was reduced to computer transcription under my personal supervision and direction and that the record is a true record of the testimony given by the witness and that the witness has requested a review of said transcript pursuant to Rule 30(e)(2).

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 18th day of May, 2026.

*Valerie Lehto*

VALERIE LEHTO
Registered Professional Reporter
COMMISSION NO. HH 289463
MY COMMISSION EXPIRES 8/22/2026

Page 171

DEPOSITION ERRATA SHEET

ASSIGNMENT NO. J14813024
WENDY'S NETHERLANDS B.V. vs ANDREW LEVY

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2026.

_____
        ROBERT DEAN WRIGHT



ROBERT D. WRIGHT  Non-Confidential
WENDY'S NETHERLANDS V. LEVY

May 12, 2026
172–173

Page 172

```
            DEPOSITION ERRATA SHEET
Page No. _____ Line No. _____ Change to: _____

_____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____


SIGNATURE:_____DATE:_____

         ROBERT DEAN WRIGHT
```

Page 173

```
            DEPOSITION ERRATA SHEET
Page No. _____ Line No. _____ Change to: _____

_____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____

Page No. _____ Line No. _____ Change to: _____

Reason for change:_____


SIGNATURE:_____DATE:_____

         ROBERT DEAN WRIGHT
```

