**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

WENDY'S NETHERLANDS B.V.,

          Plaintiff,

v.

ANDREW LEVY,

          Defendant.

Civil Action No. 2:24-cv-03077

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF WENDY'S**
**NETHERLANDS B.V.'S MOTION FOR FINAL SUMMARY JUDGMENT**

1

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ......................................................................................................................... 1

RESPONSE TO WENDY'S UNDISPUTED FACTS ......................................................................... 3

LEVY'S ADDITIONAL UNDISPUTED FACTS ............................................................................. 11

ARGUMENT ............................................................................................................................. 18

I.     Wendy's Should Not Win Summary Judgment on a Record It Chose to Leave
Incomplete ................................................................................................................ 18

II.    Summary Judgment Does Not Permit the Court to Weigh Disputed Evidence
or Reject Sworn Testimony. ...................................................................................... 19

       A.    Wendy's motion fails because the record supports each element of
duress and leaves the core threat for trial ................................................ 19

             1.    Wendy's forbearance evidence creates a trial issue on
involuntary acceptance ................................................................ 20

             2.    Wendy's sue-first argument does not establish a reasonable
alternative ................................................................................... 22

             3.    Wendy's coercion argument fails on the record and the
contract ....................................................................................... 24

                  a.   Wendy's threat denial leaves a fact dispute for trial .......................... 24

                  b.   Wendy's legal-right argument fails because the contract
barred the default. .............................................................. 25

       B.    Wendy's is not entitled to summary judgment on Levy's fraud
counterclaim .............................................................................................. 27

             1.    Levy's fraud counterclaim is timely under New York and
Brazilian law, and remains timely even under Ohio's shorter
period. ........................................................................................ 27

             2.    The Cognovit Note's release does not bar the fraud
counterclaim ............................................................................... 29

             3.    The record permits a reasonable jury to find fraud by clear and
convincing evidence ................................................................... 31

CONCLUSION ........................................................................................................................... 35

CERTIFICATE OF SERVICE ...................................................................................................... 35

i

**TABLE OF AUTHORITIES**

**Cases**

*A.M. Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989 (6th Cir. 1993) ............................... 31

*Abington Emerson Cap., LLC v. Adkins*, No. 2:17-cv-143, 2021 WL 611998 (S.D. Ohio Jan. 22, 2021) ...................................................................................................... 28

*American Standard, Inc. v. Meehan*, 517 F. Supp. 2d 976 (N.D. Ohio 2007) ............................. 23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 3, 19

*Ansley v. Cooke*, No. 1:17-cv-271, 2017 WL 3872481 (S.D. Ohio Sept. 5, 2017) ...................... 30

*Baker v. 40 Wall St. Holdings Corp.*, 226 A.D.3d 637 (2d Dep't 2024) ..................................... 27

*Blodgett v. Blodgett*, 551 N.E.2d 1249 (Ohio 1990) ................................................................. 19, 24

*Brash v. Richards*, 195 A.D.3d 582 (2d Dep't 2021) ................................................................... 27

*Cacevic v. City of Hazel Park*, 226 F.3d 483 (6th Cir. 2000) ....................................................... 18

*Carr v. Armstrong Air Conditioning, Inc.*, 817 F. Supp. 54 (N.D. Ohio 1993) ............................ 20

*Connaughton v. Harte-Hanks Commc'ns, Inc.*, 842 F.2d 825 (6th Cir. 1988), *aff'd*, 491 U.S. 657 (1989) ............................................................................................. 25

*Cronin v. Kaivac, Inc.*, No. 1:19-cv-758, 2025 WL 2696433 (S.D. Ohio Sept. 22, 2025) ................................................................................................................................. 3

*Damron v. Butler Cnty. Child.'s Servs.*, No. 1:08-CV-257, 2009 WL 5217086 (S.D. Ohio Dec. 30, 2009) ............................................................................................. 3

*DiFranco v. Razakis*, No. 94809, 2011-Ohio-1677 (Ohio Ct. App. Apr. 7, 2011) ...... 20, 22, 23, 24

*Doolittle & Chamberlain v. McCullough*, 7 Ohio St. 299 (1857) ................................................. 22

*Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259 (6th Cir. 1988) ...................................................... 31

*Friedland v. Lipman*, 68 Ohio App. 2d 255, 429 N.E.2d 456 (8th Dist. 1980) ........................... 31

*Gallagher v. Lederer*, 86 Ohio App. 181 (1949) .......................................................................... 27

*Griffith v. MacAllister Rental, LLC*, 2021-Ohio-1800 (1st Dist.) ................................................ 28

*Haller v. Borror Corp.*, 50 Ohio St. 3d 10, 552 N.E.2d 207 (1990) ...................................... 29, 30

*Hammon v. Huntington Nat'l Bank*, 2018-Ohio-87, 102 N.E.3d 1248 (8th Dist.) ...................... 29

*Hotel Sheraton Gibson, Inc. v. Morris*, No. C-780299, 1979 WL 208716 (Ohio Ct. App. July 11, 1979) ................................................................................................ 26, 27

*In re SBG Burger Opco, LLC*, No. 6:23-bk-04797-TPG (Bankr. M.D. Fla. Nov. 14, 2023) ........................................................................................................................ 29

*Lenco Corp. v. Schear's Metro Markets, Inc.*, 1993 WL 211333 (2nd Dist. June 16, 1993) ...................................................................................................................... 23

*Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St. 3d 453, 2018-Ohio-15 ............................... 24

*Mancino v. Friedman*, 69 Ohio App.2d 30 (8th Dist. 1980) .................................................... 24, 25

*Massi v. Blue Cross & Blue Shield Mut. of Ohio*, 765 F. Supp. 904 (N.D. Ohio 1991) ............... 20

*Maust v. Bank One Columbus, N.A.*, 614 N.E.2d 765 (Ohio Ct. App. 1992) ................... 20, 22, 23

*Pablo Air Charter, LLC v. Black*, 692 F. Supp. 3d 749 (N.D. Ohio 2023) ...................................... 3

*Pitts v. Dayton Power & Light Co.*, 748 F. Supp. 527 (S.D. Ohio 1989) ............................... 20, 22

*Sargiss v. Magarelli*, 12 N.Y.3d 527 (2009) ................................................................................ 28

*Sheffield Metals Cleveland, LLC v. Kevwitch*, 2017 WL 5256832 (N.D. Ohio Nov. 13, 2017) ...................................................................................................................... 22

*Shirk v. Fifth Third Bancorp*, No. 05-cv-49, 2007 WL 1100429 (S.D. Ohio Apr. 9, 2007) ........................................................................................................................ 28

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ...................................................... 19

*Tallmadge v. Robinson*, 158 Ohio St. 333, 109 N.E.2d 496 (1952) ............................................. 24

*Togo Intl., Inc. v. Mound Steel Corp.*, 106 Ohio App. 3d 282 (1995) .......................................... 27

*Tri-County Wholesale Distribs., Inc. v. The Wine Grp., Inc.*, No. 2:10-cv-693, 2010 WL 3522973 (S.D. Ohio Sept. 2, 2010), *aff'd*, 565 F. App'x 477 (6th Cir. 2012) ................... 22

*Williams v. Ideal Food Basket, LLC*, 219 A.D.3d 917 (2d Dep't 2023) ...................................... 27

*Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102 (6th Cir. 2010) ............................................. 29

**Statutes**

Fla. Stat. § 95.031 ....................................................................................................................... 29

Fla. Stat. § 95.11 ......................................................................................................................... 29

**Other Authorities**

Cód. Civ. arts. 205, 422 (Braz.) ............................................................................................ 28

Ohio Rev. Code § 2305.09 ................................................................................................... 28

Restatement (Second) of Contracts § 175 ............................................................................. 22

Restatement (Second) of Contracts § 176 ............................................................................. 22

**Rules**

CPLR 213 .............................................................................................................................. 27

Fed. R. Civ. P. 56 ............................................................................................................. 3, 18

The defendant, Andrew Levy ("Levy"), responds in opposition to the Motion for Final Summary Judgment ("Motion") filed by the plaintiff, Wendy's Netherlands B.V. ("Wendy's"). In support, Levy states the following:

<u>**INTRODUCTION**</u>

Ronald Reagan once called these the nine most terrifying words in English: "I'm from the government, and I'm here to help." Wendy's asks this Court to accept the corporate version. Kaffenbarger said Wendy's "wanted Andrew to win," but Wendy's never defined or calculated winning. Wendy's claims forbearance on Levy's image-activation default, yet used that supposed forbearance to force Levy to sign an unrelated Note based on a default Wendy's declared a year early. Wendy's claims concern for Levy's health while its own correspondence pushed him out of the system. In this record, "help" meant leverage. Wendy's story collapses against its own witnesses and documents, and summary judgment must fail.

The Court should first defer or deny summary judgment on the fraud counterclaim under Rule 56(d). Marcos Silva sits at the center of Wendy's disputed funding representation. Wendy's subpoenaed Silva, canceled his deposition two days before it would proceed as "cumulative," and now seeks judgment because the record lacks the testimony Wendy's chose not to take. Levy moved within minutes to preserve that testimony. Wendy's should not manufacture a gap and then profit from it.

On the merits, Wendy's asks for a trial ruling without a trial. It asks the Court to weigh disputed evidence, credit Wendy's witnesses, and reject Levy's sworn testimony. Summary judgment forbids that move. The clear-and-convincing standard asks only whether a reasonable jury could find for Levy on this record, with every inference drawn against Wendy's. Levy offers affirmative evidence and a credibility-driven theory that clears that threshold. Trial must decide the dispute.

1

That rule controls duress. Wendy's calls its pressure help, then treats that label as proof Levy acted freely. Kaffenbarger's testimony defeats both points. He admitted that Wendy's conditioned forbearance of Levy's franchise obligations on Levy signing the Cognovit Note. Wendy's kept that condition off paper, but supplied it under oath.

Levy testified that Wendy's tied his more than 100 North American franchises to the Brazil note and left him no choice but to sign. This Court already found that account sufficient to state a meritorious defense. Wendy's "sue first" answer supplies no reasonable alternative. Litigation could not stop an off-paper threat on a five-day deadline while Levy's livelihood hung in the balance.

Wendy's also had no privilege to coerce the signature. The parties' Letter of Agreement barred Wendy's from declaring the default Wendy's used as leverage, yet Wendy's declared that default a year early and delivered the notice the same day it collected Levy's signature. Trial must decide whether Wendy's helped Levy or coerced him.

Wendy's fraud arguments fail for the same reason. The counterclaim remains timely under every potentially governing law. New York governs because Wendy's says the loan documents selected it. Brazilian law supplies a ten-year period because the transaction's Brazilian-law instruments point there. Ohio law does not start the clock when a promise goes unfulfilled. Levy needed notice of fraud, not merely notice of nonperformance.

The Cognovit Note's release does not bar the claim either. Wendy's must prove that the release reaches an independent fraud claim based on separate Brazil-funding representations, and it cannot carry that burden as a matter of law. Fact disputes over consideration, assent, and duress independently defeat the release.

The merits are no better for Wendy's. Its corporate representative admitted the operative commitment: Wendy's would keep participating "as long as the partners are participating." Levy satisfied that condition by funding roughly $1.276 million through April 2018 to keep the restaurants open. Wendy's documents show continued market support and a bridge-loan analysis to make payroll as late as 2019. Wendy's pivoted to exit only after Levy committed his capital and Infinity defaulted. Wendy's then credited Levy $1.2 million for the same assurances Wendy's now denies.

The record creates trial issues on every ground Wendy's raises. The Court should deny summary judgment.

### RESPONSE TO WENDY'S UNDISPUTED FACTS

To avoid repetition and given the page limitations, Levy defines below the recurring objections he will assert, as applicable, in individual responses to Wendy's statement.

A.      Argument and Characterization Objection ("Objection A"): Levy objects to statements that lack competent record support, overstate or mischaracterize the evidence, selectively quote cited material, or recast advocacy as fact. Fed. R. Civ. P. 56(c)(1); *Pablo Air Charter, LLC v. Black*, 692 F. Supp. 3d 749, 752 n.1 (N.D. Ohio 2023). Levy also objects to narrative paragraphs that mix facts, law, citations, and argument instead of discrete Rule 56 facts. *See Damron v. Butler Cnty. Child.'s Servs.*, No. 1:08-CV-257, 2009 WL 5217086, at *1, *7 (S.D. Ohio Dec. 30, 2009).

B.      Materiality Objection ("Objection B"): Levy objects to Wendy's immaterial statements because Rule 56 reaches only facts that affect the claims, defenses, or elements at issue under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cronin v. Kaivac, Inc.*, No. 1:19-cv-758, 2025 WL 2696433, at *4 (S.D. Ohio Sept. 22, 2025).

1.      **Response:** Undisputed.[1]

2.      **Response:** Objection A. Undisputed.

3.      **Response:** Objection A. Disputed. Levy disputes that the Guarantee imposed a fixed, presently due personal debt when the Cognovit Note was negotiated, because he testified it created only a "contingent liability." ECF No. 130-4 PAGEID #3388 at 128:1–6.

4.      **Response:** Undisputed.

5.      **Response:** Objection A; Objection B. Disputed. Levy disputes any characterization that the debt was fixed or liquidated, and his duress defense challenges only the February 2020 Cognovit Note, not the 2015 Guarantee. ECF No. 130-4 PAGEID #3388 at 128:1–6.

6.      **Response:** Objection A. Disputed. The record shows the wind-down proceeded "as requested by Wendy's USA." *See* Exhibit 1, December 30, 2019 email; ECF No. 130-34 PAGEID #3878 at 163:17–20. The cited materials show, at most, an asserted right to seek payment under the Guarantee, not termination rights over Levy's U.S. franchises. ECF No. 130-1 PAGEID #3202– 03.

7.      **Response:** Objection A. Disputed. Wendy's threatened terminating Levy's North American franchises as leverage to force him to sign. ECF No. 130-4 PAGEID #3378 at 87:24– 88:2, PAGEID #3385 at 117:16–21; ECF No. 130-21 PAGEID #3624 Daughney Dep. 20:14–16, PAGEID #3627 at 32:13–16, PAGEID #3630 at 42:11-15.

8.      **Response:** Objection A. Disputed. Exhibit 11 states Wendy's "shall not default" Levy's franchise agreements if he made reasonable efforts to meet the IA schedule. ECF No. 130- 11 PAGEID #3527. Wendy's corporate representative lacked the information needed to know

---

[1]      The paragraph numbers in this response correspond with the paragraph number for each statement in Wendy's statement of undisputed facts.

whether the IA obligations were in default as of January 2020. ECF No. 130-6 PAGEID #3481 at 107:10–18; PAGEID #3486-3487 at 128:14–129:23; PAGEID #3501 at 188:11–17.

9. **Response:** Undisputed.

10. **Response:** Disputed. Levy disputes the "178" denominator because the May 2019 Michigan sale required adjusting the store count and IA percentage, and Wendy's representative lacked the data to determine Starboard's shortfall after that adjustment. ECF No. 130-6 PAGEID #3480 at 102:16–104:18; PAGEID #3481 at 107:10–18; PAGEID #3486-3487 at 128:14–129:23. The "cleanliness" assertion is overstated because Exhibit 12 is only an internal summary of 24 CEE evaluations, not store-level proof that "many" stores had falling cleanliness grades. *Id.* PAGEID #3480 at 104:3–11; ECF No. 130-12 PAGEID #3538.

11. **Response:** Disputed. Wendy's contemporaneous record shows it planned a "final offer," resolved to "put our full effort into enforcing these obligations," and pushed "further divestiture ASAP" because "the system is watching." ECF No. 130-13 at PAGEID #3539. Wendy's also tied divestiture pressure to Levy's signing the Note. ECF No. 130-6 PAGEID #3501 at 188:18–189:10.

12. **Response:** Undisputed.

13. **Response:** Objection A. Disputed. The June 13, 2019 talking points addressed Levy's position on the Guarantee, including his disputed "uncompromised" $2,000,000 starting point. ECF No. 130-9 PAGEID #3514-23. The Guarantee created only a "contingent liability," and Levy's duress defense challenges the February 2020 Cognovit Note. ECF No. 130-4 PAGEID #3388 at 128:1–6; ECF No. 51 PAGEID #2101-02.

14. **Response:** Undisputed.

5

15. **Response:** Disputed. Levy disputes that Starboard was behind on IA obligations because the alleged default was only a "potential" or "presumptive" future default under the parties' December 2018 reimaging schedule. ECF No. 130-4 PAGEID #3380-3381 at 97:12–98:1; PAGEID #3385 at 115:15–117:21. Wendy's could "not default" the franchise agreements if Levy made reasonable efforts to meet the agreed schedule. Exhibit 2, February 15, 2020 email and attachments; ECF No. 130-11 PAGEID #3527.

16. **Response:** Undisputed.

17. **Response:** Disputed. Levy disputes Wendy's argumentative use of this fact and footnote 5's implication that he had ready funds or faced no financial pressure during the Note negotiations. ECF No. 130 PAGEID #3161-62. Levy underwent chemotherapy during the negotiations, yet Wendy's continued pressing the Note to conclusion. ECF No. 130-4 PAGEID #3384 at 110:13–15, PAGEID #3386 at 118:14–22; ECF No. 130-6 PAGEID #3488 at 133:3-25; PAGEID #3489 at 138:19-25.

Levy further disputes footnote 5 because the Park City home was illiquid, jointly owned, encumbered by a sizeable mortgage, and existed alongside "massive amounts of financial obligations to Wendy's and our lenders and creditors domestically and internationally." ECF No. 130-4 PAGEID #3323 at 63:7–15. Levy also rejected the claimed $5 million "profit" as misleading because it ignored the purchase price. *Id.* 63:15–24. Heather Levy owned the Montana ranch through an LLC/trust structure, and the purchase funds came from personal assets generated by Andrew's work and businesses, not available cash from the Park City sale during the Note negotiations. ECF No. 130-35 PAGEID #3888 at 7:23–8:19; PAGEID #3895 at 35:17–36:14.

18. **Response:** Objection A. Disputed. By June 2019, Wendy's was "pressuring and threatening" Levy and had dismissed his position that the existing Guarantee was sufficient. ECF

6

No. 130-4 PAGEID #3318 at 45:1–16; PAGEID #3319 at 46:7–13. The pressure increased near the end of 2019, and Levy had "no desire" to sign the Note. ECF No. 130-4 PAGEID #3381 at 99:20–100:20. Kaffenbarger threatened to terminate all North American franchises if Levy did not sign. *Id.* PAGEID #3386 at 119:20–121:18.

19. **Response:** Objection A. Disputed. The Note addressed the same indebtedness as the Guarantee, and Levy disputed the claimed amount. ECF No. 41, PAGEID #1342:14–25; ECF No. 130-6 PAGEID #3497 at 172:2–18; Ex. 9.

20. **Response:** Objection A. Undisputed.

21. **Response:** Undisputed.

22. **Response:** Disputed. Levy disputes that the $1.2 million reduction "immediately reduced the principal" because Wendy's held the credit "in abeyance until the end," conditioned it on compliance and no default, and reinstated the full $5,550,360.55 principal if those conditions failed. ECF No. 130-21 PAGEID #3645 Daughney Dep. 102:6–104:8; ECF No. 130-19 PAGEID #3607–16. Wendy's also described the February 14 version as its "final offer" and imposed a hard acceptance deadline. ECF No. 130-21 PAGEID #3627 at 29:15–31:7; PAGEID #3629-3630 at 40:18–42:7; ECF No. 130-6 PAGEID #3495 164:17–166:12.

23. **Response:** Disputed. Counsel's "signing is not an issue" statement reflected surrender after Wendy's made its position clear as "sign or out." ECF No. 130-4 PAGEID #3390-91 at 136:7–12; 139:22–140:3.

24. **Response:** Disputed. Wendy's was "threatening the rest of the franchise operations," tying Levy's Brazil obligations and the Note to U.S. franchise issues, and using a draft notice of non-compliance that "seems to me to be a threat." ECF No. 130-21 PAGEID #3624 at 20:10–16; PAGEID #3627 at 32:8–16; PAGEID #3629 at 38:10–19; PAGEID #3630 at 42:14–15.

Wendy's also imposed a cross-default provision over Levy's objection. *Id.* PAGEID #3645 at 101:16.

25.     **Response:** Disputed. The final Cognovit Note used a 4.5% interest rate, but the $1.2 million credit was "held in abeyance until the end" and depended on the absence of default. ECF No. 130-22 PAGEID #3649-86; ECF No. 130-21 PAGEID #3645 at 102:6–104:8. Levy does not dispute that he signed the Note on February 23, 2020.

26.     **Response:** Objection A. Undisputed.

27.     **Response:** Disputed. Levy disputes that he had non-Wendy's franchise businesses when he executed the Cognovit Note. Between 2018 and 2020, "there were just Wendy's franchises," and he owned no Applebee's franchises. ECF No. 130-4 PAGEID #3358 at 6:2–7:2, 7:10–16; ECF No. 130-4 PAGEID #3311 at 15:25–17:9.

28.     **Response:** Objection A. Disputed. Levy does not dispute the missed January and April 2024 payments, but disputes any "breach" of a valid "contractual obligation" because the Note is unenforceable due to duress. ECF No. 130 PAGEID #3166; ECF No. 130-4 PAGEID #3382 at 102:20–105:3. Levy also disputes the asserted $5,887,834.05 balance because Wendy's exhibit contains inconsistent totals and unsupported acceleration, reinstatement, and late-fee assumptions. ECF No. 130 PAGEID #3164; ECF No. 130-23 PAGEID #3687–3727.

29.     **Response:** Objection A. Disputed. Wendy's threatened termination of Levy's North American franchises during the Note negotiations and tied "Brazil note terms" to "numerous US issues with the Levy franchise." ECF No. 130-4 PAGEID #3378 at 87:11–88:2, PAGEID #3385 at 117:16–21; ECF No. 130-21 PAGEID #3630 at 42:14–15; Exhibit 3 June 12, 2019 Wendy's internal email chain.

30.     **Response:** Objection A. Disputed. Kaffenbarger confirmed that Wendy's pressured Levy to divest restaurants he did not want to sell, tied that pressure to signing the Note, offered forbearance conditioned on signing, and viewed the situation as "extreme" in part because Levy "wasn't signing the cognovit note." ECF No. 130-6 PAGEID #3501-3502 at 188:18–189:2; PAGEID #: 3502 at 191:6–15; PAGEID #: 3502-3503 at 192:6–193:23; PAGEID #3489 at 139:1–18; PAGEID #3490 at 143:9–144:12.

31.     **Response:** Objection A. Undisputed.

32.     **Response:** Objection A. Disputed. The Counterclaim alleges that named Wendy's officers, including Carlos Ribas, Todd Penegor, and Bob Wright, made the funding representations that induced Levy to invest additional capital. ECF No. 51 at PAGEID #2105, ¶¶ 16, 18.

33.     **Response:** Objection A. Disputed. Levy disputes that all three JV partners independently decided to close the Brazil restaurants because the contemporaneous record states the shutdown proceeded "as requested by Wendy's USA." *See* Ex. 1; ECF No. 130-34 PAGEID #3878 at 163:17–20. Paragraph 33 also cites "Board Resolution, Exhibit 4," but the Motion identifies Exhibit 4 as the Levy Deposition. ECF No. 130 PAGEID #3159; ECF No. 130-4 PAGEID #3307–51.

34.     **Response:** Objection A. Disputed. Wendy's included the Release in the February 2020 Note negotiations, and duress tainted the entire closing package. *See* Ex. 2; ECF No. 130-24 PAGEID #3728–29. The Counterclaim alleges Wendy's made pre-Note funding representations through named officers, and Levy disputes that the Release bars his independent fraud claim. ECF No. 51 at PAGEID #2104–08, ¶¶ 16, 18–19, 22–23.

35.     **Response:** Objection A. Disputed. Levy identified the speakers and circumstances, including Bob Wright, Carlos Ribas, Todd Penegor, Carlos Alves, and the April 18 and May 8,

9

2017 presentations. ECF No. 130-4 PAGEID #3367 at Levy Dep. (Vol. II) 42:10–17; PAGEID #3367 at 43:18–44:1; ECF No. 51 at PAGEID #2105 ¶¶ 16, 18. Silva also put Wendy's "pledge" in writing, and Wendy's did not correct him. ECF No. 130-34 PAGEID #3866-3867 at 116:23–117:1; PAGEID #3867 at 118:8–17; PAGEID #3868 at 122:2–3; PAGEID #3870 at 129:11–130:4; Exhibit 4, January 9, 2018 email re: WBR partner meeting.

36.     **Response:** Undisputed.

37.     **Response:** Objection A. Disputed. Levy does not dispute that the April 2018 emails were exchanged, but disputes Wendy's inference that he understood Wendy's had definitively refused all further support. ECF No. 130 PAGEID #3166; ECF No. 130-25 PAGEID #3730-31. The exchange asked how WBR would obtain money "to keep this afloat until the sale is completed," and Silva discussed possible funding structures, including a loan dependent on Wendy's payment priority, an equity process, and "deferral of interest and royalties." ECF No. 130-25 PAGEID #3730-31. Silva's statement that Wendy's would contribute only deferrals was not Levy's admission of a definitive refusal. ECF No. 130-4 PAGEID #3373-74 at 69:15–72:13. Wendy's made its funding commitments through multiple written and verbal communications, and those commitments drove Levy's funding decisions. *Id.* PAGEID #3367-68 at 42:5–46:22. Wendy's also continued supporting WBR after April 2018. ECF No. 130-2 PAGEID #3273 at 157:2–12; ECF No. 130-34 PAGEID #3847-3848 at 39:5–42:18; PAGEID #3855 at 69:10–70:10; PAGEID #3855 at 71:8–22.

38.     **Response:** Objection A. Disputed. Levy disputes that Wendy's May 2 statement was a final or general refusal to support WBR because it concerned Wendy's refusal to subscribe Infinity's delinquent equity quotas. ECF No. 130-4 PAGEID #3371 at 61:1–25; PAGEID #3373 at 67:20–69:8. Wendy's continued supporting WBR after May 2. ECF No. 130-2 PAGEID #3273 at

10

157:2–12; ECF No. 130-34 PAGEID #3847-3848 at 39:5–42:18; PAGEID #3855 at 69:10–70:10; PAGEID #3855 at 71:8–22.

39. **Response:** Objection A. Undisputed.

40. **Response:** Objection A. Undisputed.

### LEVY'S ADDITIONAL UNDISPUTED FACTS

1. Levy was "ready to pull the plug" in 2017 when Wendy's misrepresented its "additional capital and funding" and commitment to "loan additional money" and "stand shoulder to shoulder in funding the deficiencies of the Brazilian partner." (ECF No. 130-4 PAGEID #3320 at 51:23-52:9.)

2. Levy "would never have done any of that" without Wendy's representations and inducements. (ECF No. 130-4 PAGEID #3320 at 51:23-52:9.)

3. Levy invested additional funds in WBR for it to continue operating in Brazil based on Wendy's commitments and representations. (ECF No. 130-4 PAGEID #3380 at 94:2-20.)

4. Levy told Kaffenbarger that Wendy's had made assurances to him. (ECF No. 130-6 PAGEID #3498 at 174:25–175:2.)

5. The Cognovit Note's $1.2 million credit tied back to Wright's assurances discussions with Levy. (ECF No. 130-6 PAGEID #3498 at 75:24–76:3.)

6. Levy believed Wendy's assurances reduced his obligation to $2 million to $3 million. (ECF No. 130-6 PAGEID #3471 at 65:7–11.)

7. Wendy's committed to fund WBR through written and verbal communications, including PowerPoint presentations. (ECF No. 130-4 PAGEID #3367 at 44:19–45:9.)

8. Wendy's did not tell Marcos Silva to distinguish its funding forecasts from an actual commitment. (ECF No. 130-34 PAGEID #3866-3867 at 116:23–117:1.)

11

9.      Silva put Wendy's funding "pledge" in writing; Wendy's discussed it internally and never corrected the characterization. (ECF No. 130-34 PAGEID #3866-3867 at 116:23–117:1; PAGEID #3868 at 122:25–123:5; PAGEID #3870 at 129:11–19.)

10.     Wendy's funding presentations assumed Wendy's would contribute capital. *See* Exhibit 5, Carlos Alves Dep., at  48:15–17.

11.     Wendy's shared WBR's financial statements, cash-flow analyses, and funding presentations with Levy and the other partners. *See* Ex. 5 at 42:23–43:7; 34:25–35:3.

12.     Wright told Levy that Wright and Penegor had authority to fund WBR without further Board approval. (ECF No. 130-4 PAGEID #3368 at 46:5–22.)

13.     Wright told Levy that Wendy's committed the funding and that Wright and Penegor did not need further Board approval. (ECF No. 130-4 PAGEID #3367 at 45:6–19; PAGEID #3370-3371 at 57:23–58:4.)

14.     Levy funded WBR in 2017 and 2018 because of Wendy's commitments. (ECF No. 130-4 PAGEID #3370 at 54:4–5.)

15.     Levy would not have advanced additional debt and equity into WBR absent Wendy's funding commitment. (ECF No. 130-4 PAGEID #3371 at 59:11–15.)

16.     Wendy's representations induced Levy to continue funding WBR after he had begun advocating to wind it down. (ECF No. 130-4 PAGEID #3368 at 46:5–13; PAGEID #3322 at 59:15–19.)

17.     Wendy's still evaluated a $2 million bridge loan to the joint venture as of March 25, 2019. (ECF No. 130-28 PAGEID #3752 at 61:22–62:15.)

18.     Wendy's did not decide to stop financially supporting WBR until late 2019. *See* Ex. 5 at 116:14–19.

19. The $1.5 million funding would have solved months of WBR cash-flow issues. (ECF No. 130-4 PAGEID #3273 at 157:14–25.)

20. Wendy's never funded the $1.5 million. (ECF No. 130-4 PAGEID #3270 at 148:11–13; PAGEID #3273 at 157:14–25.)

21. Levy contributed more than $600,000 that Infinity did not contribute. (ECF No. 130-28 PAGEID #3757 at 81:22–82:3.)

22. WBR approached restaurant-level break-even but still lost money and needed funding. *See* Ex. 5 at 101:19–20; 31:13–23.

23. Wendy's could fund WBR with its own non-U.S. cash. *See* Ex. 5 at 59:25–60:2.

24. Wendy's admitted that it would "continue to participate as a partner" only "as long as the partners are participating." ECF No. 130-34 PAGEID #3855 at 71:20-25.

25. Wendy's funding support was "contingent upon the rest of the partners carrying their pro rata portion." ECF No. 130-2 PAGEID #3245 at 55:2-18.

26. The bridge-to-sale discussions reflected Wendy's "willingness to help support that business until you get to that sale." *Id.* PAGEID #3267 at 136:2-8.

27. The spring 2018 funding discussions addressed "who was going to put money in to help support the business to avoid full closure." ECF No. 130-28 PAGEID #3740 at 15:15-19.

28. Wendy's wanted to evaluate whether Brazil could succeed and preferred an open market if the business could work. *Id.* at 15:20-16:4; PAGEID #3752 at 64:13-15.

29. Shutdown "became more viable" only later, "as the 12 months proceeded." *Id.* PAGEID #3753 at 65:1-7.

13

30.     Had Levy stopped funding in 2017, his exposure would have been roughly $2 million, and he would not have contributed the additional $1.276 million. (ECF No. 130-4 PAGEID #3320 at 52:10–18.)

31.     Before Levy signed the Cognovit Note, Wendy's gave him no specific number of restaurants Starboard should keep. (ECF No. 130-6 PAGEID #3494 at 159:8–160:5.)

32.     No contract required Levy to sign the Cognovit Note. (ECF No. 130-6 PAGEID #3492 at 151:4–16.)

33.     Wendy's attached a draft forbearance-of-default agreement to the Cognovit Note. (ECF No. 130-6 PAGEID #3503 at 193:6–23.)

34.     Wendy's told Levy he was in default but would receive forbearance if he signed the Cognovit Note. (ECF No. 130-6 PAGEID #3503 at 193:6–23.)

35.     The documents showed Wendy's intended to terminate every Levy franchise relationship. (ECF No. 130-21 PAGEID #3643 at 93:8–20.)

36.     Wendy's held the $1.2 million reduction in abeyance until the end and conditioned it on no default. (ECF No. 130-21 PAGEID #3645 at 102:6–22; PAGEID #3645 at 103:21–104:8.)

37.     Wendy's initially demanded Levy's personal residence as security for the note. (ECF No. 130-21 PAGEID #3628 at 33:12–17; PAGEID #3637 at 72:7–9.)

38.     Andrew Levy underwent cancer treatment during the relevant period. (ECF No. 130-35 PAGEID #3896 at 38:24–39:5.)

39.     The December 2019 draft Note demanded the Levy family's Park City residence as security. (ECF No. 130-35 PAGEID #3891 at 20:4–23.)

40.     The Brazil venture used no cross-default or cross-collateralization with the North American business. (ECF No. 130-4 PAGEID #3378 at 88:11–23.)

14

41. Wendy's never identified the "right size" for Starboard's restaurant portfolio. (ECF No. 130-6 PAGEID #3495 at 161:10-19.)

42. Wendy's did not evaluate the secured financing facility to determine whether restaurant debt exceeded restaurant value. (ECF No. 130-6 PAGEID #3495 at 161:10-19.)

43. The joint capital plan accounted for stores remaining after Richmond but not the additional divestitures Pringle expected. (ECF No. 130-6 PAGEID #3495 at 162:1-24.)

44. On December 28, 2019, Penegor told Wendy's leadership to "take a hard look" at Levy's portfolio and refinancing plans. *See* ECF No. 130-13 PAGEID #3540.

45. Penegor said Levy should "exit the system and focus on his health." *Id.*

46. Penegor was Wendy's Chief Executive Officer at the time. ECF No. 130-6 PAGEID #3489 at 137:10-138:25.

47. Pringle later told Wendy's to "push for further divestiture ASAP." *See* ECF No. 130-13 PAGEID #3539.

48. Pringle said further divestiture was needed because Levy was "very, very far behind on IA obligations and the system is watching." *Id.*

49. During this period Pringle was part of Wendy's senior leadership team. ECF No. 130-6 PAGEID #3462 at 32:12–23.

50. Wendy's used Levy's Image Activation obligations to push for more divestiture. (ECF No. 130-6 PAGEID #3508 at 188:18-24.)

51. Wendy's could impose further divestitures if Levy failed to execute the Cognovit Note. (ECF No. 130-6 PAGEID #3501-3502 at 188:18-189:10.)

52. Levy's failure to do what Wendy's required would require further divestiture. (ECF No. 130-6 PAGEID #3502 at 189:3-5.)

15

53.     Wendy's could terminate Levy's franchise agreements without notice if Levy did not divest as Wendy's required and Wendy's called default. (ECF No. 130-6 PAGEID #3502 at 189:6-10.)

54.     Kaffenbarger admitted that Wendy's pressured Levy with defaults because "he wasn't signing the cognovit note," "among other things." (ECF No. 130-6 PAGEID #3502 at 191:6-15.)

55.     Wendy's conditioned forbearance of Levy's IA obligations on Levy executing the Cognovit Note. (ECF No. 130-6 PAGEID #3502 at 192:6-193:23.)

56.     The Cognovit Note itself confirms that Wendy's accepted Levy's signature in exchange for "forbearance relative to actions which it might otherwise take as of the date of this Note." Note, ECF No. 5 PAGEID #: 365.

57.     Levy signed the Cognovit Note to "take the bullet to the head [sic] in a slow death rather than an instantaneous kill." (ECF No. 130-4 PAGEID #3382 at 104:22-25.)

58.     Levy negotiated within the "restraints and confines, the handcuffs" Wendy's put on him.  (ECF No. 130-4 PAGEID #3382 at 104:25-105:3.)

59.     Levy negotiated the Cognovit Note only because Wendy's told him he would lose the entire business if he did not cooperate. ECF No. 41 PageID # 1375:5-9.

60.     Levy added that his Wendy's franchises were his "entire livelihood."  ECF No. 41 PageID # 1375:5-9.

61.     On February 14, 2020, Green sent Wendy's "settlement package," including the Cognovit Note and a Notice of Noncompliance with Reimaging Requirements and Agreement of Forbearance of Default. ECF No. 130-20 PAGEID #3618-3619.

16

62.     The asserted noncompliance could give Wendy's the right to terminate Levy's franchises. (ECF No. 130-21 PAGEID #3627 at 31:23-32:7.)

63.     Levy executed the Cognovit Note in Franklin County, Ohio, on February 23, 2020. Note, ECF No. 5 PAGEID # 362, 366.

64.     On February 14, 2020, Kerry Green's email advised Levy and his counsel that Wendy's settlement package represented its "final offer" and would "automatically expire" unless all documents were fully executed by February 19, 2020. ECF No. 130-20 PAGEID #3617-3618.

65.     The February 14, 2020, correspondence stated that Wendy's "reserves all rights and remedies."

66.     Levy's counsel later wrote that "Andrew will execute the documents" and "not signing is not an issue."  ECF No. 130-20 PAGEID #3617-3618.

67.     On February 18, 2020, Wendy's extended the deadline and kept the 4.5% offer open if Levy executed the Note in Dublin, Ohio, by February 25, 2020. *Id.*

68.     The Note preserved the same termination leverage and added acceleration. ECF No. 130-22 PAGEID #3649-86.

69.     The Note made default, termination, transfer, or cessation of all U.S. Wendy's franchises an event of default.  *Id.*

70.     The 2015 Guarantee contained no comparable franchise cross-reference.

71.     Wendy's delivered the executed default notice as part of the closing package associated with execution of the Cognovit Note. *See* Ex. 2.

72.     Losing his Wendy's restaurants would have resulted in personal bankruptcy. (ECF No. 130-4 PAGEID #3393 at 146:15-17.)

17

73.     The Cognovit Promissory Note states that Wendy's accepted the Note in exchange for "forbearance relative to actions which it might otherwise take as of the date of this Note." ECF No. 130-22 PAGEID #3649-86.

<strong><u>ARGUMENT</u></strong>

**I.     Wendy's Should Not Win Summary Judgment on a Record It Chose to Leave Incomplete.**

Wendy's moved for summary judgment on the fraud counterclaim after it deprived Levy of the deposition at its core. Rule 56(d) addresses that problem. The Court may defer or deny summary judgment when the nonmovant identifies the discovery sought, the facts it may reveal, and why those facts remain unavailable. Fed. R. Civ. P. 56(d); *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). Levy has made that showing.

Marcos Silva is the pivotal witness on Wendy's disputed funding representation. He dealt directly with Bob Wright and Carlos Ribas and wrote that Wendy's had made an "additional funding pledge" of $1.5 million. ECF No. 51, ¶¶ 22-23. Wendy's now says it made no funding representation and that the $1.5 million was "only an estimate." ECF No. 130, PAGEID #3179-80. Silva can testify which account is true and address authority, reliance, and causation.

Wendy's caused that testimony gap. It subpoenaed Silva, noticed his deposition for May 20, 2026, then canceled it two days before the deposition would proceed. Wendy's called his testimony "cumulative and . . . no longer needed." ECF No. 125 at 2 & n.2. Seven minutes later, Levy moved to preserve the date and cross-notice the deposition. Levy then served a new subpoena and set the earliest date Rule 45 allowed. ECF Nos. 109, 124. Wendy's cannot abandon the deposition and then demand summary judgment because Levy lacks Silva's testimony.

The Magistrate Judge's denial of Levy's extension motion does not foreclose Rule 56(d) relief. That ruling turned on Rule 16(b)(4) diligence. It did not decide Silva's materiality or the

18

prejudice from losing his testimony. ECF No. 126 at 5. Levy's Rule 72(a) objection remains pending. ECF Nos. 129, 131. The Court should not decide a fact-intensive fraud claim on an incomplete record while Levy's access to that record remains unresolved.

At minimum, the Court should defer ruling until it resolves Levy's Rule 72 objection or deny summary judgment on the fraud counterclaim without prejudice.

## II. Summary Judgment Does Not Permit the Court to Weigh Disputed Evidence or Reject Sworn Testimony.

If the Court reaches the merits, Wendy's still asks the Court to resolve a trial dispute at summary judgment. The clear-and-convincing standard asks only whether a reasonable jury could find for Levy after drawing the record and all justifiable inferences against Wendy's. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986). Credibility, weight, and legitimate inferences remain trial functions. *Id.* at 255. Summary judgment cannot stand when the nonmovant offers "more than a scintilla of affirmative evidence," advances a "not implausible" theory, and presents credibility questions. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

That is the case here. Levy has come forward with affirmative evidence, sworn testimony, and contemporaneous documents that support each element. Wendy's answer is to credit its own witnesses' denials over that evidence and pronounce Levy's proof insufficient. Under *Anderson* and *Street*, that is a trial argument, not a basis for summary judgment.

### A. Wendy's motion fails because the record supports each element of duress and leaves the core threat for trial.

That standard matters most on duress. Wendy's duress argument rests on one premise. It says it helped Levy, then treats that help as proof that he acted freely. Wendy's own witness defeats both points.

Duress requires involuntary acceptance, no reasonable alternative, and coercive acts by the other party. *Blodgett v. Blodgett*, 551 N.E.2d 1249, 1251 (Ohio 1990). The factfinder decides

19

whether the facts satisfy that standard. *Massi v. Blue Cross & Blue Shield Mut. of Ohio*, 765 F. Supp. 904, 910 (N.D. Ohio 1991); *accord Carr v. Armstrong Air Conditioning, Inc.*, 817 F. Supp. 54, 58 (N.D. Ohio 1993). Negotiation before signing does not defeat involuntary acceptance by itself.

Ohio cases apply that rule when the party gave in, not by counting negotiation time. Five days of refusal and consultation still left summary judgment unsupported. *Maust v. Bank One Columbus, N.A.*, 614 N.E.2d 765, 767 (Ohio Ct. App. 1992). A business-judgment settlement and mid-litigation duress defense produced the same result. *DiFranco v. Razakis*, No. 94809, 2011-Ohio-1677, ¶¶ 10-13 (Ohio Ct. App. Apr. 7, 2011). Time to weigh options did not end duress either. *Pitts v. Dayton Power & Light Co.*, 748 F. Supp. 527, 534 (S.D. Ohio 1989).

The record here fits that structure. Kaffenbarger said Wendy's wanted Levy to win, but he identified no store-count metric, sustainable-portfolio analysis, or valuation work. ECF No. 130-6 PAGEID #3498 at 175:19-176:10; PAGEID #3494 at 157:6-24; 158:11-20; 160:12-15; Statement of Additional Facts ("SAF") ¶43. Penegor's email and Pringle's push for faster divestiture show they wanted him out. *See* Exhibit 6, December 31, 2019 Wendy's internal email chain.

### 1. Wendy's forbearance evidence creates a trial issue on involuntary acceptance.

Wendy's own forbearance evidence creates the involuntary-acceptance issue. Wendy's frames its reimaging patience as restraint, but Kaffenbarger testified that Wendy's conditioned forbearance on Levy signing the Note. SAF ¶¶ 51, 54-55. The Note confirms the exchange because Wendy's accepted it for "forbearance relative to actions which it might otherwise take as of the date of this Note." *See* ECF No. 130-22 PAGEID #3652. The executed notice lists only reimaging conditions and never mentions the Note. *See* Ex. 2. That omission matters, especially because the LOA barred the default Wendy's used as leverage. *See infra* Part II(A)(3)(ii). Wendy's kept the

20

coercive condition off paper, but Kaffenbarger supplied it under oath. A trial could find that Wendy's used promised forbearance from a purported franchise-default to force Levy's signature on a separate debt instrument.

Levy's testimony describes the same dynamic from the inside. He treated the Note as the slower version of the same fatal choice. (SAF ¶¶ 57-58.) Green's February 15, 2020 letter transmitted Wendy's final offer and required full execution by February 19, or the offer would "automatically expire" and Wendy's would consider discussions terminated. Wendy's then extended the deadline on February 18 and kept the closing open if Levy executed the Note in Dublin by February 25. Levy signed on February 23, when Wendy's delivered the executed default notice with the closing package. SAF ¶¶68, 73. That sequence shows a will worn down, not a negotiation reopened.

The Court already recognized that testimony's force. In vacating the Cognovit Judgment, the Court found that Levy testified he signed because Wendy's ultimatum threatening his 100-plus domestic franchises left him no choice. ECF No. 44, PAGEID #1420-21. Levy testified Kaffenbarger tied the Brazil note to losing franchises and gave Green's letter the same domestic-termination meaning. *See* ECF No. 41 PAGEID #1372-77 at 40:7-41:1, 43:5-9, 45:8-10.)

Wendy's leans hardest on Daughney's message that "not signing is not an issue." But Wendy's asks the Court to credit one line from a witness whose testimony it otherwise discounts. Daughney testified that Wendy's was "threatening the rest of the franchise operations," tying in the domestic franchises, and sending what looked like a threat through the notice of non-compliance. (ECF No. 130-21 PAGEID #3630 at 42:14-15, PAGEID #3627 at 32:8-16, SAF ¶36.) Kaffenbarger could not recall telling Levy that signing was optional.

Ratification does not cure that trial issue. It applies only after coercion ends and the party stays silent despite a fair chance to avoid the contract. *Sheffield Metals Cleveland, LLC v. Kevwitch*, 2017 WL 5256832, *9 (N.D. Ohio Nov. 13, 2017). Continued performance ratifies only if the party stood silent "after he was released from duress." *Doolittle & Chamberlain v. McCullough*, 7 Ohio St. 299, 307 (1857); *Pitts v. Dayton Power & Light Co.*, 748 F. Supp. 527, 535 (S.D. Ohio 1989).

Wendy's cannot show release from duress. The Note preserved the same termination leverage, added acceleration, and made default, termination, transfer, or cessation of all U.S. Wendy's franchises an event of default. *See* SAF ¶¶68, 73. The 2015 Guarantee contained no comparable franchise cross-reference. The debt did not change. The instrument did.

The cognovit posture confirms the point. A missed payment authorized judgment by confession, which Wendy's exercised in 2024. Levy asserted duress at his first opportunity to be heard, his successful motion to vacate the Cognovit Judgment. He did not stand silent.

### 2.      Wendy's sue-first argument does not establish a reasonable alternative.

Wendy's no-reasonable-alternative argument fails for the same reason. It treats litigation as an escape from the same leverage Wendy's created. Ohio applies the Restatement to duress claims. *See DiFranco*, No. 94809, 2011-Ohio-1677, ¶¶ 12-13; *Maust*, 614 N.E.2d at 768. Litigation does not qualify when the process cannot give effective relief. Restatement (Second) of Contracts § 175 cmt. b. Ordinary "take this offer or litigate" pressure remains part of bargaining. *Id.* § 176 cmt. a. That rule does not protect a demand to sign a new instrument on one obligation under threat of destroying a separate relationship.

Damages could not fill that gap. *See*, *e.g.*, *Tri-County Wholesale Distribs., Inc. v. The Wine Grp., Inc.*, No. 2:10-cv-693, 2010 WL 3522973, at *8 (S.D. Ohio Sept. 2, 2010), *aff'd*, 565 F. App'x 477, 483 (6th Cir. 2012). *Tri-County* involved an injunction, but it confirms the point. The

22

franchisees had statutory goodwill-compensation rights, yet damages still could not remedy their ruined distribution relationships because no one could easily calculate the harm. *Id.* Wendy's threat was worse. It targeted more than 100 restaurants that supplied Levy's livelihood. Losing them meant personal bankruptcy. SAF ¶72. Damages after the fact could not make him whole.

An injunction did not offer a real path either. Written termination and irreparable harm do not make an injunction effective unless the franchisee can prove likely success. *American Standard, Inc. v. Meehan*, 517 F. Supp. 2d 976, 990-91 (N.D. Ohio 2007). *Meehan* denied an injunction despite a 36-year franchise relationship, a written termination letter, and irreparable harm from lost goodwill and discharged employees. *Id.* at 988-91.

Levy had less to work with than the franchisee who lost in *Meehan*. Wendy's declared no default, served no termination notice, and kept the threat oral, disputed, and off paper. Before closing, Wendy's had triggered nothing Levy could enjoin. That left Levy seeking emergency relief against an unissued termination based on a denied threat. Declaratory relief adds nothing because it would not preserve the franchise without coercive relief on the same premature record.

Wendy's deadline made any theoretical filing ineffective. Green's February 15 letter gave Levy until February 19 to sign, with two weekend days between, while the threat stayed off paper. Pringle's email shows Wendy's controlled the runway and kept the coming domestic escalation from Levy because he would become agitated. *See* Ex.3. Wendy's cannot control the information, impose a 5-day deadline, and call litigation an alternative.

Nor does refusal count as a reasonable alternative. Every duress victim can refuse. If "refuse and see what happens" were enough, no duress claim would survive, and *Maust*, *DiFranco*, and *Lenco Corp. v. Schear's Metro Markets, Inc.*, 1993 WL 211333, *5 (2nd Dist. June 16, 1993), could not have come out as they did. "Refuse and hope" supplies no effective relief where Wendy's

23

offered only forbearance dependent on Levy's signature. (SAF ¶¶ 51, 54-55.) Levy's real alternative, if any, is trial.

### 3. Wendy's coercion argument fails on the record and the contract.

The final point turns on Wendy's pressure, not Wendy's label for it. Coercion exists when threats overcome the victim's will and induce an act he otherwise would not perform and had no duty to perform. *Tallmadge v. Robinson*, 158 Ohio St. 333, 109 N.E.2d 496, 500 (1952); *Blodgett*, 551 N.E.2d at 1251. A party acts improperly when it leverages one contract to extract a new one or withholds something it already owes to force a signature on a separate instrument. *DiFranco v. Razakis*, No. 94809, 2011-Ohio-1677, ¶¶ 12-13 (Ohio Ct. App. Apr. 7, 2011); *Mancino v. Friedman*, 69 Ohio App.2d 30, 36–37 (8th Dist. 1980).

#### a. Wendy's threat denial leaves a fact dispute for trial.

Levy does not concede that clear and convincing evidence governs duress here. *Lucarell* applied that standard only to a party seeking to avoid a release of liability. *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St. 3d 453, 2018-Ohio-15, ¶ 52. The Court need not decide the standard now because Levy prevails under Wendy's version.

Wendy's lead argument counts witnesses rather than applying Part II's standard. Kaffenbarger denies the ultimatum, and no email records it. But Levy's sworn testimony supplies the threat and creates a trial issue. ECF No. 130-4, PAGEID #3386 at 119:20–121:18; ECF No. 44, PAGEID #1420–21 & n.5.

Wendy's cannot dismiss Levy's testimony as self-serving. Wendy's has no video, no prior sworn contradiction, and no physical impossibility. It has Kaffenbarger's denial, competing circumstantial evidence, and a credibility dispute. That record cannot erase testimony this Court heard live and found sufficient to establish a meritorious defense. "That the issue is disputed, however, goes to the merits of the duress defense." ECF No. 44, PAGEID #1420-21 & n.5.

24

Circumstantial evidence supports the same inference. *Connaughton v. Harte-Hanks Commc'ns, Inc.*, 842 F.2d 825, 838 (6th Cir. 1988), *aff'd*, 491 U.S. 657, 668 (1989). Wendy's CEO wrote that Levy should exit the system and focus on his health, and Pringle pushed faster divestiture because the system was watching. SAF ¶¶47-48. Wendy's asked Levy in writing whether it made sense to continue as a Wendy's franchisee. *See* Ex.3. Wendy's says the message was "sell." Levy swears Kaffenbarger delivered it as sign or be terminated. On summary judgment, the inference belongs to Levy.

> **b.** **Wendy's legal-right argument fails because the contract barred the default.**

Wendy's privilege argument collapses under the contract, the numbers, and Wendy's own cases. Wendy's and the Starboard franchisees entered a Letter of Agreement (the "LOA") that amended the 178 franchise agreements. Wendy's could not "default [the franchisees] under any Franchise Agreement" if they made "reasonable efforts" to reimage 40% of their restaurants by the end of 2020. ECF No. 130-11 PAGEID #3527. Kaffenbarger signed on December 11, 2018, and the first milestone fell on December 31, 2020. The threats Levy describes ran through 2019. Green's ultimatum issued February 14, 2020, and Levy signed the Note on February 23, 2020.

Those dates matter. Wendy's had promised not to declare the default, it now says privileged its pressure. A party has no legal right to threaten what its own contract forbids. At best, Wendy's threatened to breach the parties' agreement. That is not privilege. That is *Mancino*, withholding what one already owes to extract a signature on a separate instrument.

The notice proves the same point. Wendy's executed and delivered it the same day Levy signed the Note. *See* Ex. 2. It quotes the LOA's reasonable-efforts standard for 40% by year-end 2020, then declares a franchise-agreement breach as of December 31, 2019. *Id.* But no milestone existed on December 31, 2019. *Id.*; *see also* ECF No. 130-11 PAGEID #3527. Wendy's declared

25

the default a year early and delivered that declaration the day it collected the signature its own pressure extracted. *Id.*

Levy signed on February 23. Wendy's delivered the closing package with the Note, the executed notice declaring the phantom default, and forbearance conditioned on Levy's signature. (ECF No. 130-4 PAGEID #3384 at 110:13–15, PAGEID #3386 at 118:14–22; ECF No. 130-6 PAGEID #3488 at 133:3–25, SAF ¶46.) Wendy's own CEO had written internally that Levy "should be working to exit the system and focus on his health," while Wendy's pushed "for further divestiture ASAP" because "the system is watching." SAF ¶¶47-48. The deadline moved. The threat did not. That sequence shows an overborne will, not free negotiation.

The numbers fail too. Wendy's had to adjust the Image Activation figures for the Michigan sale. *See* ECF No. 130-6 PAGEID #3480-81 at 102:16-103:2; 107:12-18. Once Wendy's removed the sold restaurants, Kaffenbarger could not say Starboard remained out of compliance. (ECF No. 130-6 PAGEID #3481 at 107:10-108:5, PAGEID #3485 at 123:20-129:23.) The LOA's safe harbor required 10% of the then-existing restaurant portfolio each year.

That uncertainty matters. A threat cannot draw privilege from a right whose factual basis Wendy's witness cannot confirm. Wendy's authority protects only a threat to assert what a party believes to be its legal right. *Hotel Sheraton Gibson, Inc. v. Morris*, No. C-780299, 1979 WL 208716, at *1 (Ohio Ct. App. July 11, 1979). A default declared a year early, on a restaurant count Wendy's cannot defend, against a covenant not to declare it, is not a right anyone could believe in. This Court has already found the claimed right's scope unproven. "Wendy's has not demonstrated . . . that it had the right to terminate all of Defendant's U.S. franchise agreements." ECF No. 44, PAGEID #1421 n.5.

26

Wendy's privileged-threat cases involved threats to sue, not self-help termination across more than 100 restaurants. *Gallagher v. Lederer*, 86 Ohio App. 181, 182 (1949); *Togo Intl., Inc. v. Mound Steel Corp.*, 106 Ohio App. 3d 282, 288 (1995); *Hotel Sheraton Gibson*, 1979 WL 208716, at *1. A lawsuit puts a disputed claim to a neutral decisionmaker before the business disappears. Wendy's threatened the opposite.

**B.      Wendy's is not entitled to summary judgment on Levy's fraud counterclaim.**

Wendy's fraud arguments fail for the same reason its duress arguments fail. Wendy's asks the Court to resolve disputed facts against Levy. The record defeats Wendy's limitations defense under any governing law. It creates fact issues on the Release's scope, consideration, assent, and validity. And it permits a reasonable jury to find fraud.

**1.      Levy's fraud counterclaim is timely under New York and Brazilian law, and remains timely even under Ohio's shorter period.**

*New York.* New York law governs, as Wendy's has repeatedly told this Court. Wendy's states that the Credit Agreements "were governed by New York law." ECF No. 130 PAGEID #3157 (¶3). Wendy's also concedes that "[t]he Guarantee Agreement specifies New York law applies." *Id.* PAGEID #3177 n.12. New York gives a fraud plaintiff the greater of six years from accrual or two years from discovery. CPLR 213(8). Levy's claim satisfies both branches.

The six-year branch alone defeats Wendy's defense after the COVID-19 toll. Executive Orders 202.8 through 202.72 tolled New York limitations periods from March 20, 2020 through November 3, 2020, adding 228 days. *Baker v. 40 Wall St. Holdings Corp.*, 226 A.D.3d 637, 638–39 (2d Dep't 2024). *Baker* held that the toll applies even when the limitations period did not expire during the tolling window. *Id.*; *see also Brash v. Richards*, 195 A.D.3d 582, 582 (2d Dep't 2021); *Williams v. Ideal Food Basket, LLC*, 219 A.D.3d 917, 918 (2d Dep't 2023).

Levy's fraud claim arises from the funding representations that induced his June 2017 through April 2018 contributions. ECF No. 130-4 PAGEID #3375 at 77:8–15; ECF No. 130-9 PAGEID #3514-23. The six-year period, with the 228-day toll added, remained open when Levy asserted the counterclaim on June 4, 2024. He did so by filing his motion for leave with the proposed amended answer and counterclaim attached. *See Shirk v. Fifth Third Bancorp*, No. 05-cv-49, 2007 WL 1100429, at *3 (S.D. Ohio Apr. 9, 2007). That ends the limitations defense.

The two-year discovery branch confirms the same result. Mere suspicion does not start the discovery clock. *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009). WBR's distress and Wendy's nonperformance supplied, at most, grounds for suspicion. They did not reveal Wendy's internal approval, allocation, authority, or present intent.

***Brazil.*** Brazilian law supplies an independent timeliness ground if the Court reaches choice of law. The Credit Agreements provide that the Notes are "governed by Brazilian Applicable Law," incorporate the Brazilian Civil Code, and define default by reference to Articles 333 and 1,425. ECF No. 130-1 §§ 2.3, 12.1(m). Ohio's Restatement analysis reinforces that choice because the representations concerned WBR's capital needs, Levy funded Brazilian operations, and the injury, commercial object, and parties' relationship centered in Brazil. *Abington Emerson Cap., LLC v. Adkins*, No. 2:17-cv-143, 2021 WL 611998, at *25–27 (S.D. Ohio Jan. 22, 2021); *Griffith v. MacAllister Rental, LLC*, 2021-Ohio-1800, ¶¶ 8–14 (1st Dist.). Brazilian law imposes good-faith duties and supplies a ten-year prescriptive period when no shorter period governs. Cód. Civ. arts. 205, 422 (Braz.); Affidavit of Gabrielle Sliwka, Esq., ECF No. 57 PAGEID #2478–2538. Levy's counterclaim arises from 2017 through 2020 conduct, so Brazilian law makes it timely.

***Ohio.*** Ohio's four-year period runs from discovery, not accrual. Ohio Rev. Code § 2305.09(C), (D). The clerk entered the amended pleading on August 28, 2025. ECF No. 51. Even

28

using that later date, Wendy's must prove Levy discovered, or with reasonable diligence should have discovered, the fraud before August 2021. It cannot. Wendy's points only to WBR's distress and Wendy's nonfunding, but those 2018 events show nonperformance, not fraud discovery. ECF No. 130 PAGEID #3186–87. Ohio does not convert a broken promise into fraud notice. *Hammon v. Huntington Nat'l Bank*, 2018-Ohio-87, ¶¶ 50–55, 102 N.E.3d 1248 (8th Dist.).

The same rule applies here. WBR's distress and Wendy's nonfunding did not reveal Wendy's internal approval, authority, allocation, or present intent. Levy sat outside Wendy's senior leadership team and Board and knew only what Wendy's told him. SAF ¶13. Wendy's May 2018 "will not participate" email did not start the clock either. Levy understood it to decline only Infinity's delinquent quota subscription, and Silva's reply confirmed Wendy's continued supporting WBR "through deferral of interest, royalties[,] and providing services." *Id.* PAGEID #3373 at 67:20–69:8; 63:20–23.

At the latest, the Starboard bankruptcy made Wendy's internal facts susceptible to discovery on November 14, 2023. *In re SBG Burger Opco, LLC*, No. 6:23-bk-04797-TPG (Bankr. M.D. Fla. Nov. 14, 2023). The petition, first-day disclosures, and schedules placed the debtors' finances and transfers under scrutiny. That date falls within four years under either counterclaim-date scenario. At minimum, the discovery date presents a trial issue. Florida's materially identical discovery rule yields the same result. Fla. Stat. §§ 95.031(2)(a), 95.11(3)(i).

### 2.     The Cognovit Note's release does not bar the fraud counterclaim.

Wendy's release defense fares no better. Wendy's must prove that the release reaches Levy's fraud counterclaim. ECF No. 130 PAGEID #3187–88. Ohio law bars only claims a release encompasses. *Haller v. Borror Corp.*, 50 Ohio St. 3d 10, 13, 552 N.E.2d 207, 210 (1990). Release is an affirmative defense, so Wendy's bears the burden to prove a valid release that reaches the counterclaim. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1108 n.3 (6th Cir. 2010).

29

Wendy's has not carried that burden. Levy's counterclaim does not relitigate the Guarantee in isolation. ECF No. 51 PAGEID #2104–08. It arises from Wendy's Brazil representations and performance, including promises to continue funding Brazilian operations or find a buyer, which induced Levy to invest additional capital in WBR. *Id.* Wendy's describes the counterclaim that way. ECF No. 130 PAGEID #3165.

The record supports that distinction. Levy testified that Wendy's committed to additional WBR funding beyond the credit agreements and JV agreement. Wendy's personnel, including Wright and Ribas, made those commitments directly and through Silva. Those commitments drove Levy's decision to invest more. Wendy's also told him Wright and Penegor had authority to fund without further Board approval. SAF ¶13. Levy sat outside Wendy's senior leadership team and Board and knew only what Wendy's told him, including that "the money was committed" and no further Board approval was needed. *Id.* SAF ¶13.

Contemporaneous correspondence supports that funding-commitment understanding. On January 10, 2018, Silva asked Wright to "confirm my understanding" of "how the additional funding pledge from Wendy's for $1.5MM is going to be documented." *See* Exhibit 7, January 15, 2018 email. Silva understood Wendy's funding "would be a direct loan to WBR immediately after the R$2.7MM equity shortfall was addressed" and was "not contingent on additional equity contributions from WBR." *Id.* Wright never disclaimed Silva's "pledge" characterization. *Id.*

A release tied to the Note or Guarantee does not extinguish an independent fraud claim unless it encompasses that claim. *Haller*, 552 N.E.2d at 210. Ohio law rejects Wendy's overbroad reading. *Ansley v. Cooke* held that a release tied to employment did not bar separate shareholder and self-dealing claims. No. 1:17-cv-271, 2017 WL 3872481, at *3 (S.D. Ohio Sept. 5, 2017). *Friedland v. Lipman* held that broad release language did not support summary judgment on a

30

fraud claim where intent remained disputed. 68 Ohio App. 2d 255, 259, 429 N.E.2d 456, 458 (8th Dist. 1980). Broad language does not necessarily bar unforeseen claims, especially when the releasee concealed them. *A.M. Int'l, Inc. v. Int'l Forging Equip. Corp.*, 982 F.2d 989, 995–96 (6th Cir. 1993); *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 263 (6th Cir. 1988).

The release independently presents fact issues on consideration, assent, and duress. Wendy's identifies no present consideration Levy received for releasing an independent fraud counterclaim. The purported $1.2 million discount was conditional. Wendy's held it until the end and made it contingent on no default. SAF ¶36, ECF No. 130-21 PAGEID #3645. The Note also reinstates the full $5,550,360.55 principal if Levy does not satisfy the conditions. ECF No. 130-19 PAGEID #3607–16. A forfeitable credit on the underlying debt does not supply consideration for surrendering a separate fraud claim.

Duress defeats the release for the reasons set out in Part II(A), *supra*. The same leverage that makes the Note's execution a trial issue applies to the Release, which Wendy's included in the same closing package. ECF No. 130-21 PAGEID #3391 at 139:22–140:3; SAF ¶¶ 32, 51, 55. Wendy's disputes that account, and it defeats summary judgment.

The Release does not bar the counterclaim as a matter of law. Wendy's has not shown that it reaches Levy's separate Brazil-funding fraud claim. Fact disputes over consideration, assent, and duress preclude summary judgment.

> **3.     The record permits a reasonable jury to find fraud by clear and convincing evidence.**

On the merits, the fraud claim turns on a simple fact dispute. Wendy's made a conditional funding commitment, and Levy satisfied the condition. Wendy's admitted it was always its position that, if the partners were participating, Wendy's would continue to participate as a partner. SAF

31

¶24. But the minute one of those partners kind of fell off, things started to become a little bit more difficult. *Id.*

Wright confirmed the same conditional framework. Wendy's would support continued funding "contingent upon the rest of the partners carrying their pro rata portion of the investment necessary to keep the business going." SAF ¶25. Wright's February 2018 email characterized the $1.5 million as an estimate, but he testified that the bridge-to-sale discussion carried "the willingness to help support that business until you get to that sale." *Id.* SAF ¶26; *See also* Exhibit 8, February 28, 2018 email. Silva characterized the funding in writing as a pledge and direct loan. Wendy's did not correct him. Wendy's witnesses now call it an estimate. Koumas confirmed that "Levy contributed the capital that Infinity was not contributing," and that his slide showed more than $600,000. SAF ¶21.

Wendy's kept the same course until after Levy's money was in. During the funding period, Wendy's sought to keep WBR open and discussed "who was going to put money in to help support the business to avoid full closure." *Id.* SAF ¶27. Wendy's preferred "an open and operating market." *Id.* at 15:20-16:4; SAF ¶28. Shutdown "became more viable" only later, "as the 12 months proceeded." *Id.* SAF ¶29.

Wendy's own funding materials assumed Wendy's capital. Alves authenticated a Wendy's-prepared funding presentation and confirmed that the analysis "assumes Wendy's would contribute capital." *See* Ex. 5 at 48:15-17; *see also* Exhibit 9, May 8, 2017 email with attachments. He also confirmed that Wendy's shared those presentations with every partner, including Levy. *See* Ex. 5 at 42:23-43:7. Another Wendy's presentation identified "non-U.S. excess cash balances" as a funding source, and Alves confirmed Wendy's could fund WBR with its own non-U.S. cash. *Id.* at

32

57:3-58:4; *see also* Exhibit 10, April 3, 2017 email with attachments. Those materials contradict Wendy's present claim that no committed funding was contemplated.

Wendy's stalled before it refused. On February 28, 2018, while Levy was still funding, Wright wrote that additional funding "isn't as urgent as it was a few weeks ago." *See* Ex. 8. Wright admitted that the email "does not say, no, we're not agreeing to fund." ECF No. 130-2 PAGEID #3267 at 135:17-20. Wendy's March 25, 2019 materials still evaluated a "$2M bridge loan from Wendy's to the JV" because, "without a cash infusion[,] the JV will not have enough liquidity to make payroll in Mid-April." *See* Exhibit 11, March 25, 2019 email with attachments.

Wendy's exit pivot came later. Alves confirmed that WBR engaged a broker at the end of 2018 and that the 2019 valuation work focused on selling the assets or transitioning the business. *See* Ex. 5 at 79:20-80:7; 96:6-11; *see also* Exhibit 12, March 2, 2018 email with attachments; Exhibit 13, March 8, 2019 email with attachments; Exhibit 14, October 4, 2019 email with attachments. Wendy's pursued continued operation and a sale after Levy's April 2018 contributions, then pivoted to exit only after his capital was committed and Infinity had defaulted.

Wendy's May 2 statement did not change that record. Levy understood it to mean only that Wendy's would not subscribe Infinity's delinquent equity quotas, not that Wendy's refused all further support. ECF No. 130-4 PAGEID #3371 at Levy Dep. Vol. II 60:16–61:25, PAGEID #3373 at 67:20–69:8; ECF No. 130-26 PAGEID # 3732-33. Silva's reply confirmed Wendy's continued supporting WBR "through deferral of interest, royalties[,] and providing services." *Id.* PAGEID #3372 at 63:20–23. By May 2, Levy had already made all six contributions.

Reliance and damages remain bounded and documented. Levy identified six contributions, totaling approximately $1.27 million, made after he had decided he otherwise would wind down the venture. ECF No. 130-4 PAGEID #3375 at 77:8–15; ECF No. 130-9 PAGEID #3514-23. Each

33

contribution predates Wendy's May 2, 2018 refusal, and Levy did not fund after that. ECF No. 130-4 PAGEID #3375 at 77:19–23; PAGEID #3376 at 78:18–19.

WBR's need for Levy's capital was real and continuous. Wendy's regional finance lead confirmed that WBR required additional funding in 2017, 2018, and 2019, that its cash flow stayed negative, and that "without funding, WBR could not sustain operations." *See* Ex. 5 at 98:8-99:4. Alves also confirmed that by 2018 the business had come toward break-even at the restaurant level, even though it continued to require investment. *Id.* at 31:12-15; 32:19-21. The record would allow a reasonable jury to find that Levy contributed to a functioning venture Wendy's was working to keep open, not a foregone loss.

Wendy's induced Levy's continued funding. He told Wendy's in 2017 that he wanted to close WBR, when his "exposure then was much, much less." SAF ¶12. "The only reason [he] continued making those investments" was Wendy's "[c]ommitments to . . . additional funding, which never happened." *Id.* Those commitments "disappeared" only after he "committed additional cash equity and debt obligations." *Id.*

Wendy's later valued the assurances it now denies. Wendy's credited Levy $1.2 million when it memorialized his debt in the Cognovit Note. Wendy's corporate representative testified that this credit "ties back to Mr. Wright's discussions with Mr. Levy about assurances." ECF No. 130-6 PAGEID #3473 at 75:24-76:3. He personally negotiated the credit with Levy and confirmed, "I do the $1.2 million credit. Yes, I do recall that." *Id.* PAGEID #3473 at 75:22-23; SAF ¶¶68, 73. A party does not discount a debt by $1.2 million to account for assurances no one gave.

The remaining conflicts require trial. Wendy's witnesses deny that Wendy's "committed" funding and call the $1.5 million an estimate. Levy testified that Wright told him the money was committed. SAF ¶13. Levy added that Wright and Penegor told him they had authority to fund

34

WBR without further Board approval. SAF ¶13. Wendy's never asked Wright to rebut that testimony. Those credibility disputes defeat summary judgment under *Street*. 886 F.2d at 1479–80.

### CONCLUSION

For these reasons, this Court should deny Plaintiff Wendy's Netherlands B.V.'s Motion for Final Summary Judgment.

Dated: July 15, 2026.                                Respectfully submitted,

                                         */s/ Jon Polenberg*
                                         Jon Polenberg, Florida Bar No. 653306
                                         *(Admitted Pro Hac Vice)*
                                         BECKER & POLIAKOFF, P.A.
                                         1 East Broward Blvd., Suite 1800
                                         Ft. Lauderdale, FL 33301
                                         Telephone: (954) 987-7550
                                         Facsimile: (954) 985-4176
                                         jpolenberg@beckerlawyers.com
                                         *Attorneys for Defendant*
                                         *Andrew Levy*

### CERTIFICATE OF SERVICE

I certify that on July 15, 2026, the foregoing document was electronically filed with the Clerk of the Court via the Court's CM/ECF system, which will electronically serve a copy of same via email on all counsel of record for all parties.

                                         */s/ Jon Polenberg*
                                         Jon Polenberg

## SERVICE LIST

Shalyn Watkins
HOLLAND & KNIGHT LLP
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660
Telephone: (213) 896-2559
Facsimile: (949) 833-8540
shalyn.watkins@hklaw.com
ericka.mendez@hklaw.com
hapi@hklaw.com
*Attorneys for Plaintiff*
*Wendy's Netherlands B.V.*

Elin Parker (*Admitted Pro Hac Vice*)
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Telephone: (312) 715-5730
Facsimile: (312) 578-6666
elin.park@hklaw.com
*Co-Counsel for Plaintiff*
*Wendy's Netherlands B.V.*

Cary Aronovitz (*Admitted Pro Hac Vice*)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Telephone: (305) 789-7520
Facsimile: (305) 789-7799
cary.aronovitz@hklaw.com
*Co-Counsel for Plaintiff*
*Wendy's Netherlands B.V.*

36

31824805.v2