**Page 1**

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

WENDY'S NETHERLANDS B.V.,

    Plaintiff,

vs.               Civil Action No.: 2-24-cv-03077

ANDREW LEVY,

    Defendant.

_____/

Zoom Deposition Teleconference

Monday, May 11, 2026

9:32 a.m. to 1:30 p.m.

VIDEO-RECORDED DEPOSITION OF

CARLOS ALVES

    Taken before Nicholas Bruens, Court Reporter, a Notary Public for the State of Florida at Large, pursuant to Notice of Taking Video-Recorded Deposition Duces Tecum filed in the above-styled cause.

**Page 2**

APPEARANCES:

On Behalf of the Plaintiff:
HOLLAND & KNIGHT
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
305-789-7520
cary.aronovitz@hklaw.com
BY:  CARY ARONOVITZ, ESQUIRE

On Behalf of the Defendant:
BECKER & POLIAKOFF, P.A.
1 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
954-985-4177
gsliwka@beckerlawyers.com
jpolenberg@beckerlawyers.com
ydaneshfar@beckerlawyers.com
BY:  GABRIELLE SLIWKA, ESQUIRE
BY:  JON POLENBERG, ESQUIRE
BY:  YASIN DANESHFAR, ESQUIRE

ALSO PRESENT:
DAN SHUEY
ELIN PARK
JULIO SUAREZ, VIDEOGRAPHER

**Page 3**

INDEX

| | PAGE |
|---|---|
| TESTIMONY OF CARLOS ALVES | |
| Direct Examination by Ms. Sliwka | 6 |
| Certificate of Oath | 124 |
| Certificate of Reporter | 125 |

INDEX OF EXHIBITS
PLAINTIFF'S EXHIBITS MARKED

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Wendy's Funding Presentation Regarding WBR | 43 |
| Exhibit 2 | WBR Brazil Funding Presentation | 49 |
| Exhibit 3 | Email chain including Mr. Alves and Wendy's leadership | 65 |
| Exhibit 4 | Email from Sergio from Brazil Franchising to Mr. Alves | 78 |
| Exhibit 5 | Bates Stamp Ranging from Wendy 0006242 to 6258 and Other Documents | 87 |
| Exhibit 6 | Documents attached to Email Shared With Group | 91 |
| Exhibit 7 | Email from Mr. Alves to Group with Documents | 102 |
| Exhibit 8 | Documents attached to Email Shared With Group | 108 |
| Exhibit 9 | Update to Abigail in the Case | 110 |

    (Exhibits retained by the court reporter.)

**Page 4**

THEREUPON:

    THE VIDEOGRAPHER: We are now on the record. The time is 9:32 a.m. Eastern Standard Time on May 11th, 2026. This begins the video conference deposition of Carlos Alves taken in the matter of Wendy's Netherlands B.V. versus Andrew Levy filed in the United States District Court, Southern District of Ohio, Eastern Division.

    The case number is 2-24-cv-03077. My name is Julio Suarez and I will be your remote videographer. The court reporter is Nick Bruens. We are representing Esquire Deposition Solutions today.

    As a courtesy, will everyone who is not speaking, please mute your audio and please remember to unmute your audio when you are ready to speak. Will everyone present please identify themselves and state whom you represent, after which the witness will be sworn in?

    MS. SLIWKA: Good morning, Gabrielle Sliwka and Jon Polenberg on behalf of defendant, Andrew Levy.

    MR. ARONOVITZ: Good morning. Cary Aronovitz with the law firm of Holland & Knight on behalf of the plaintiff, Wendy's Netherlands B.V..



Page 5

THE COURT REPORTER:  Okay.

MR. ALVES:  Good morning.  Carlos Alves representing Wendy's.

MS. PARK:  Good morning.  Mr. Alves

MR. ARONOVITZ:  Well, let me -- let me correct that.  Mr. Alves, you're here as a witness.  You are not here representing Wendy's.  You're here as a witness to the matter, as an individual.

MR. ALVES:  Yeah.  Correct.

MR. SHUEY:  And this is Dan Shuey.  I'm in-house Counsel with Wendy's.

THE COURT REPORTER:  Okay.  Perfect.

MS. PARK:  And Elin Park from Holland & Knight on behalf of Wendy's.

THE COURT REPORTER:  Okay.  Perfect. Mr. Alves, can you raise your right hand, please?

MR. ALVES:  I'm sorry.

THE COURT REPORTER:  Can you raise your right hand, please, Mr. Alves?

CARLOS ALVES,

Having been first duly sworn and responding, "Yes," was examined and testified as follows:

THE COURT REPORTER:  All right.  Thank you very much.

Page 6

DIRECT EXAMINATION

BY MS. SLIWKA:

Q.   Good morning, Mr. Alves.  Can you please state your full name for the record?

A.   Yes.  My full name is Carlos Eduardo de Andrade Alves.

Q.   My name is Gabrielle Sliwka and I have questions for you, okay?

A.   Okay.

Q.   I want to begin by going over the ground rules for this deposition, okay?

A.   Okay.

Q.   I understand -- you understand that you're under oath, right?

A.   Yes.

Q.   You understand that you must tell the truth, right?

A.   Yes.

Q.   The whole truth, understand?

A.   Yes.  Uh-huh.

Q.   And nothing but the truth, okay?

A.   Yes.

Q.   And you will do that, right?

A.   Yes.

Q.   You understand the testimony you give here

Page 7

today is just as important as testimony in court?

A.   Yes.

Q.   Before a judge and maybe a jury, right?

A.   Yes.

Q.   You understand the judge and jury may well hear and see your deposition testimony, right?

A.   Yes.

Q.   So, you understand that you must give truthful, complete and accurate testimony today, right?

A.   Yes.

Q.   And you will do that, right?

A.   Yes.

Q.   If there's a question that you don't understand, let me know, okay?

A.   Yes.

Q.   If you don't understand the question, let me know so I can address that, okay?

A.   Yes.

Q.   If you answer, I will take it that you understood the question.  Is that fair?

A.   Yes.

Q.   If you want to take back, add to, correct or in any way modify an answer you have already given, please let me know, okay?

A.   Yes.

Page 8

Q.   And I will let you do that, okay?

A.   Okay.  Yes.

Q.   This is another way we can get truthful, complete and accurate testimony today, okay?

A.   Okay.

Q.   We will take breaks about once an hour, okay? If you need to take a break sooner than that, let me know, okay?

A.   Okay.

Q.   And I will let you take that break, okay?

A.   Okay.

Q.   You understand that the court reporter is taking down everything that's being said, right?

A.   Yes.

Q.   You understand that the court reporter will create a transcript of your testimony, right?

A.   Yes.

Q.   And you will have the ability to read the transcript and make corrections, okay?

A.   Okay.

Q.   Bear in mind that if you make corrections, I've got to tell the judge and jury that you changed your testimony, okay?

MR. ARONOVITZ:  Object.  Object to form.

MS. SLIWKA:  And --



Page 9

MR. ARONOVITZ: But you can answer the question.

MS. SLIWKA: Let me -- so, throughout the deposition, your attorney may make objections to the questions I'll be asking. Unless he instructs you not to answer, I will -- I am entitled to your response. Unless your attorney instructs you not to respond, in which case, you should heed to your attorney's advice.

BY MS. SLIWKA:

Q. Is there any reason, medical or otherwise, that prevents you from giving truthful, complete and accurate testimony today?

A. No.

Q. If that ever changes, you must tell me immediately, okay?

A. Okay.

Q. Let's talk about your preparation to attend today's deposition, okay?

A. Okay.

Q. How did you prepare for this deposition?

A. I had a meeting with my counsel, Cary.

Q. Other than your attorney, did you speak with anyone else?

A. No.

Page 10

Q. What documents did you review?

A. The counter -- the document that has all the counter asks from Levy.

Q. Any other preparation that we have not discussed?

A. What was the question? I'm sorry.

Q. Anything else you did to prepare, other than meeting with your attorney and reviewing these documents?

A. No. That's it.

Q. And the only document that you reviewed was Mr. Levy's answer and counterclaim. Is that correct?

MR. ARONOVITZ: Object to form.

THE WITNESS: No.

MR. ARONOVITZ: And Mr. Alves, documents that you and I have shared, I'm going to instruct you not to discuss as that's part of the attorney-client privilege.

THE WITNESS: Okay.

BY MS. SLIWKA:

Q. And did you bring any documents with you to this deposition today?

A. No.

Q. Let's talk about your employment and tenure at Wendy's, okay?

Page 11

A. Okay.

Q. How long have you worked for Wendy's?

A. It's been 12 years.

Q. What is your current position at Wendy's?

A. As Director of Operations for Latin America.

MR. ARONOVITZ: Gabrielle, I don't want to interrupt you when you start questioning. I do want to note for the record that, you know, present here today -- even though it's stated Jon Polenberg on behalf of the defendant, Mr. Polenberg is not here during this deposition.

MR. POLENBERG: No. I'm here.

MS. SLIWKA: No. He's here. He's here with me in the room.

MR. ARONOVITZ: Okay. Thank you. I didn't see him.

MS. SLIWKA: He's not on camera. He's just not on camera.

MR. ARONOVITZ: Okay.

MS. SLIWKA: He's in the room.

MR. ARONOVITZ: Thank you.

MS. SLIWKA: That's the reason why we made sure to enter his appearance. And just for clarification, later in the day Yasin Daneshfar might join us in which case we will make his

Page 12

appearance on the record as well.

MR. ARONOVITZ: Understood.

BY MS. SLIWKA:

Q. So, you worked for Wendy's for 12 years, correct?

A. Yes.

Q. And can you please repeat, what is your current title?

A. I'm Director of Operations for Latin America.

Q. And what are your responsibilities under this position?

A. This position, basically, I ran a team of operations managers that visits franchisees and have, you know, discussions about how they are operating, company standards, etcetera.

Q. In Latin America you stated, correct?

A. Yes.

Q. What locations does Wendy's have in Latin America currently?

A. Currently, we have restaurants, franchisees operating in Mexico, Caribbean. We have Puerto Rico, Bahamas, Dominican Republic, Cayman Islands, USVI.

And then, I have Central America in Guatemala, Panama, Honduras and El Salvador. And then, there are franchises operating in South America, in Guyana, Chile,



Page 13

Argentina.

Q. And were these all the locations that Wendy's held?

A. All these are operations -- franchisee operating locations.

Q. All franchisee operating locations. Does Wendy's have a participation in these franchises?

A. No.

Q. Are there any franchises currently in Brazil?

A. No.

Q. What role did you hold before your current position?

A. I was a finance manager for Latin America.

Q. Finance manager. Would that be the head of financial planning and analysis for Latin America?

A. Yeah. That would be the --

Q. And when did you start that position?

A. I started that position when I joined Wendy's in April 2014.

Q. And you were employed by Wendy's during 2014 and 2020, correct?

A. Yes.

Q. And during that time, you held a senior finance role for Latin America and Caribbean, correct?

A. Yes.

Page 14

Q. What geographic regions were under your responsibility?

A. All Latin America and Caribbean --

Q. Great.

A. -- where Wendy's had the presence.

Q. Mr. Alves, can you repeat your answer because I had a connectivity issue and I missed some of your response.

A. Yeah. My role covered all the Latin America and Caribbean where Wendy's had residence.

Q. And your role included overseeing the Brazil operations, correct?

MR. ARONOVITZ: Object to form.

THE WITNESS: No.

BY MS. SLIWKA:

Q. So, Brazil did not fall within your financial planning analysis scope. Is that correct?

A. Brazil was part of our region, but it was not my operations responsibility.

Q. Whose operations was it?

A. There was a -- it was a JV that had a local team that had, you know, owners, three different partners.

Q. What was your involvement?

A. My involvement was reviewing, together with

Page 15

the other partners, the monthly financials. And also, being part of the Wendy's Group. I also support with, you know, Wendy's compliances, like reporting from the JV to Wendy's, sales reporting, royalties reporting.

Also, whenever there was funding required from the Wendy's Team, I would get the information to send to treasurer for transfer. And that was it.

Q. And how would you do that?

A. And monthly reviews with the other groups.

Q. How would you do that?

A. What?

Q. To process the information and provide it to Wendy's for funding decisions. Like, what were the steps that you would take for that?

A. I would get the information from the Board of the JV and send internally for approval.

Q. And who was at the Board of the JV?

A. There was a representative from Infiniti, Starboard and Wendy's.

Q. Who were these parties? Were they part of the JV? Were they JV members?

A. They were the JV stakeholders.

Q. And who -- what was Infiniti?

A. Infiniti was the local partner that, you know, had the local expertise. One of the partners from the

Page 16

JV, but the local one, the local group.

Q. So, it was the Brazilian partner?

A. Yes.

Q. And what other members were part of the JV?

A. I don't recall exactly all the names. It's been a while.

Q. That's okay.

A. Yeah. One that -- one that had most of the interaction was Marcel, which is the -- was also part of the managing director for the JV.

Q. And I'm not -- I'm sorry if I'm not being clear. I'm not asking you all of the owners and all of their names, I'm talking more about the stakeholders, right? My understanding is that there were a few stakeholders and institutional stakeholders.

So, that's the question that I'm asking. Like, what were the parties involved in the JV?

MR. ARONOVITZ: Object to form.

MS. SLIWKA: You may answer.

THE WITNESS: Well, the stakeholders were the legal stakeholders, from my understanding.

BY MS. SLIWKA:

Q. And do you remember some of these entities?

A. I'm sorry?

Q. You remember the name of these entities?



Page 17

A. No.

Q. You don't remember? Okay. We'll get back to it. Let's first talk about -- when I -- if I say FP&A, you will understand that I mean financial planning and analysis, right?

A. Yes.

Q. So, let's talk about your role as head of FP&A, okay?

A. Uh-huh.

Q. As head of FP&A, what were your primary duties?

A. So, for the region, my primary duties were running the forecast for the region from the Wendy's standpoint, you know, in terms of sales, G&A, revenues. So, also, annual operating plan.

Also, as I said before, a little bit of compliance on, you know, all the Wendy's agreements and reporting compliance, payments compliance with, you know, between franchisees and Wendy's. And also, I'll do part of the, you know, business reviews.

Q. Let's talk a little bit more about this last component, the part of business reviews. Like, what role would you play pertaining to these business reviews?

A. My role usually was a cross-functional meeting

Page 18

in this business review. So, my role from a financial standpoint was to understand, you know, performance, you know, also tie into our planning process, see if there was any risk to our sales forecast and royalties forecast.

And also, review travel plans when necessary, depending on the outcome from the reviews. I'll review the internal leadership team to see how we allocate our, you know, travel budget. You know, any -- that issue. Also, you know, flagging our forecast risk and opportunities.

Q. Please explain a little more how you would be involved in the funding decisions and the information that was provided to Wendy's.

MR. ARONOVITZ: Object to form.

MS. SLIWKA: You may answer.

MR. ARONOVITZ: Just to be clear, I'll object, you know, throughout the deposition at times. Typically, with an objection saying object to form, that's something that later we'll have a, you know, conversation with the court if needed. You can go ahead and answer the questions unless I specifically instruct you not to answer.

THE WITNESS: Okay. Thank you. Yeah. So, I was not part of the decision of the funding. I was

Page 19

part of this approval, sending the approval process to treasury after all the process was decided and approved.

BY MS. SLIWKA:

Q. So, let's -- if you could, like, walk me through the process, itself. There would be -- you can tell me more about the process, like step by step on how other than processing with treasurer, what role did you play with funding --

A. So --

Q. -- other than progressing with the Treasury Department?

A. Yeah. The funding was usually decided by a JV Board meeting. And with that approval from the board meeting, I would send to internal Wendy's approval from the leadership finance and other Wendy's chain, the amount that needs to be funded and send to treasury with all the approval documentation attached.

Q. Who in Wendy's leadership was involved in these funding decisions?

A. Usually, it was the CFO, the international CEO.

Q. And who were the CFO and the international CEO at the time?

A. There were multiple.

Page 20

Q. If you can remember.

A. One time it was G.P., which is Gunther Plosch as CFO. As international leader, we had Bob Wright. We had Abigail Pringle. I don't remember if there was any other.

Q. So, these would be the people making funding decisions on behalf of Wendy's, correct?

A. After board approval, JV Board approval.

Q. And when we say JV Board approval, we mean WBR Board approval, correct?

A. WBR Board approval, correct.

Q. Okay. So, who did report to you, as a head of FP&A?

A. I had one financial analyst at a certain point from my group.

Q. And who did you report to?

A. When I joined, I report to Carlos Ribas. Then there was a change in organization in terms of reporting matrix and then I report to the international director of finance.

Q. And that was?

A. Multiple people.

Q. Okay. And who is Carlos Ribas?

A. He's the VP of the Latin America region, senior VP.



Page 21

Q. And what role did he play regarding WBR?

A. It was -- regarding WBR, it was almost like a franchisee from our region.

Q. Carlos Ribas?

A. Yes. From what I understand. Like, dealing with a franchisee in the region.

Q. Okay. What type of analysis does FP&A perform?

A. In a franchisee -- as a franchisor, usually we run, you know, it's -- as I said, it's more of on the Wendy's side of FP&A. So, running sales analysis and sales trends, revenue, G&A analysis, bad debt analysis, which -- basically, what impacts Wendy's, you know.

Q. Okay. And does it also do forecasting?

A. Forecasting for Wendy's, yes.

Q. For Wendy's. And would it also make capital allocation recommendations to Wendy's?

A. No. Because -- well, in my region, we don't invest -- we don't operate the restaurants, so there is no capital allocation --

Q. Okay.

A. -- involved.

Q. So, there would be no capital allocations because Wendy's does not own restaurants in your region. Did I understand that correctly?

Page 22

A. Currently, yes.

Q. Was that the case with WBR as well?

A. With WBR, we had a 20 percent ownership. So, there was a little bit of capital planning together with the other partners.

Q. What did you do related to WBR specifically?

A. So, WBR was, basically, liaised with the local team because they had a finance, head of finance in the business, a director of finance liaised with the team and to understand what would be the capital needs for the development that was planned and how much Wendy's would have to invest.

Q. What type of analysis did you do related specifically to WBR?

A. I didn't do any analysis to WBR. All the analysis were done by the local team. I just reviewed the information and capital investment information.

Q. And you would share that information with Wendy's leadership, correct?

A. I would share that, yes. What happens, too, is, like, in the beginning of the JV, all the analysis, everything, the setup was done by the corporate team. The region was not involved.

So, by the time we were involved, we already had probably, like, two or three restaurants built in place.

Page 23

So, we did that analysis for, basically, two restaurants in the region.

Q. So, when did you become involved with WBR then?

A. I don't remember exactly. The time was around two years.

Q. So, it was only after two of the restaurants had already been opened. Did I understand that correctly?

A. Yes.

MR. ARONOVITZ: Object to form.

THE WITNESS: That the region was involved, more involved.

BY MS. SLIWKA:

Q. So, your role included advising Wendy's about deploying capital into markets as well, correct?

MR. ARONOVITZ: Object to form?

THE WITNESS: Not necessarily. I was part of the analysis. I would send the analysis to my boss and he was the one making the decision.

BY MS. SLIWKA:

Q. And who was that boss making the decisions?

A. It was the director of international, which had multiple people.

Q. Is it fair to say that your analysis informed

Page 24

decisions about whether to continue or stop funding a business?

MR. ARONOVITZ: Object to form.

THE WITNESS: No.

BY MS. SLIWKA:

Q. Why not?

A. Because, well, the analysis was performed, as I said, by the local team. And that was shared with the Board of WBR and they were, basically, making the decision on whether or not to continue.

Q. So, the analysis came strictly from WBR and would be provided to the senior leadership at Wendy's and you didn't play a part in providing this information to them?

MR. ARONOVITZ: Object to form.

THE WITNESS: No. What I said is the information, the analysis, was performed by the local team, shared with the Board of the JV. All the strategic decisions were made by the Board of the JV. And then, once the board agrees, that information would go to Wendy's for approval.

And in some cases, my boss was representing on the finance group and I would provide detail to him, but it was the same information that was shared with the board meeting, the WBR Board



Page 25

meetings.

BY MS. SLIWKA:

Q. So, you didn't prepare any analysis, right?

MR. ARONOVITZ: Object to form.

THE WITNESS: I don't remember if I've done any analysis per se.

BY MS. SLIWKA:

Q. So, you just forwarded the analysis from WBR to the board, is that correct?

MR. ARONOVITZ: Object to form.

THE WITNESS: Forward to my boss, not the board.

BY MS. SLIWKA:

Q. And from the WBR Board to your boss, correct?

A. From WBR Board to my boss, yes.

Q. And what was the name of this boss again?

A. I had multiple.

Q. You can give me the names that you remember.

A. I had Wade Guzdanski, I had Peter Koumas. I think those were the two. And Daniel Rojas, too. So, three about that time.

Q. Let's talk about your involvement with WBR, okay?

A. Okay.

Q. What is WBR?

Page 26

A. WBR is the joint venture formed in Brazil to open Wendy's restaurants.

Q. And I think we've discussed this, but who were the members of WBR?

A. It was Starboard, Wendy's and Infiniti, which is the local partner.

Q. Do you remember the amount of shares each partner owned?

A. Initially, I think it was 40, 40, 20. 40 Infiniti, 40 Starboard, 20 Wendy's.

Q. And what responsibilities did each WBR member have with respect to joint venture funding?

A. I don't know the exact responsibilities. I know usually the funding were discussed during the WBR board meetings.

Q. What was your role with respect to WBR?

A. My role with WBR was similar to what I have with other franchises. It's supporting and, as I said, compliance, reporting. I was in charge for cross-functional meetings for monthly reviews.

Q. And how would you play that role?

A. Listening and providing, you know, my perspective internally. As I said, like, most of the analysis were to inform my internal forecast, which is how we handle it with the other franchises.

Page 27

Q. What type of analysis were they?

A. It was, you know, sales trend. It was a new market, so there was not a lot of historical information, so -- the business analysis, as I said, was performed by the local team. And then, I would use that for our internal analysis and that was our internal forecast, which is, basically, understanding which risk would be put into those forecasts that the local team did. And that information, actually, usually doesn't go to franchisees because it's our internal forecast.

Q. So, what type of internal analysis would you provide Wendy's with the information you get from WBR?

A. It was sales analysis.

Q. Sales analysis. Okay. And what type of information would those sales analysis involve?

A. How we would calculate royalties and our sales forecast internally.

Q. Cash flow as well?

A. Cash flow, we would look at -- I would receive when we had the funding processed.

Q. And --

A. As part of the documentation to the funding approval process.

Q. EBITDA as well?

A. EBITDA?

Page 28

Q. Yes.

A. Yes, yes.

Q. So, how was this information you provided to Wendy's used internally?

A. Well, the cash flow was to form the -- was to support the funding requests. The EBITDA was to inform how the business was overall performing.

Q. We discussed earlier that you were not involved since the onset of the operations of WBR. When did you become involved, if you can remember?

A. I don't remember exactly the time.

Q. Were you involved in analyzing WBR in 2017?

A. 2017, yes.

Q. And 2018 as well?

A. 2018, yes.

Q. And 2019?

A. 2019, yes.

Q. What would you say was WBR's financial state in 2017, based on your analysis?

A. It was a --

MR. ARONOVITZ: Object to form.

THE WITNESS: I would say it was a startup.

BY MS. SLIWKA:

Q. What do you mean by that?

A. It was a new business in a new country.



Page 29

Q.  I -- I have to ask you a little more about it, just because I am not a financial person.  What -- what does it mean when you say it was a startup in a new business in a new country?  What did that mean for the financial state of the operations?

A.  Well, for the financial state, it -- you know, it was probably on the investment timeframe of a business because it was open for less than a year in 2017.

Q.  So, the financial stage, is that what you said?

A.  The financial, yeah.

Q.  What would that mean to a layperson?  Like, what does that mean as far as a business goes?

A.  From a perspective, it means that you are still investing in a business because you have maybe two restaurants open.  And you have already a structure to support a business that's growing.  So, it requires more investment in that initial -- initial timeline than revenue, per se.

Q.  What does investment mean?

A.  Investment in capital, investment in G&A, because you have to support the restaurant to have the structure to support the restaurant.

Q.  And what about loans?

Page 30

A.  What do you mean?

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.  Are these part of the investment as well?

A.  Yes.  Loans, yes.

Q.  What roles did Wendy's have in relation to WBR?

A.  Wendy's was a minority investor and had a loan with JV.

Q.  And -- and franchise -- and as a franchisor as well, correct?

A.  And franchisor as well.

Q.  So, Wendy's played a role as equity holder, as a lender, and as a franchisor, correct?

A.  Yes.

Q.  So, Wendy's provided financing to WBR and held the ownership interest as well, correct?

A.  Yes.

Q.  So, we discussed Wendy's.  No.  Sorry.  WBR's financial state in 2017 and said that -- sorry.  I don't mean to put words in your mouth, but when it comes to -- let me start over.  In 2017, what was the financial state of WBR?

A.  What exactly do you mean by financial state?

Q.  I mean, in what financial condition was the JV

Page 31

in 2017?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't remember exactly the numbers if that's what you're asking.  But as I said, it was an investment piece and it was losing money.

BY MS. SLIWKA:

Q.  It was losing money in 2017?

A.  Yes.

Q.  And it was in investment stage?

A.  Yes.

Q.  How about 2018?

A.  I don't remember the numbers again, but it was coming towards a break-even in terms of restaurant level.

Q.  What do you mean by break-even?

A.  It had improved versus prior year performance-wise.

Q.  And was it still losing money --

A.  Yes.

Q.  -- in 2018?  Was it still under investment stage in 2018?  2019?

A.  2019 was better than 2018.

Q.  How so?

A.  I don't recall the percentages with the

Page 32

improvements.

Q.  But was it still losing money in 2019?

A.  Yes.

Q.  And was it still in investment stage in 2019?

A.  In 2019, I don't think they opened any restaurants.  But from a startup, it's, like, the first three years of operation.  So, it was -- to me, it was still in investment mode.

Q.  Okay.  And when we say investment mode, what does that mean practically speaking?

A.  We are still not getting your return or your positive.

Q.  And does it also mean that -- sorry.  Let me rephrase that.  Would it also mean that investment by members or capital investment must be made by members of the JV?

A.  I don't recall exactly if in 2019 the partners were still investing.

Q.  How about 2018?

A.  2018, I think there was still capital allocation, yes.

Q.  How about the cash flows in 2019?

A.  Well, as I said, it was still negative.  So, it still -- the JV still needed cash flow -- cash inception.



CARLOS ALVES
WENDY'S NETHERLANDS B.V. vs LEVY

May 11, 2026
33–36

Page 33

Q. How about 2018?

A. Yes.

Q. Yes.

A. Cash flow was negative. Well, it still required investment in 2018.

Q. And in 2017?

A. Yes. Because they were building the restaurants.

MS. PARK: Can we take a short break?

THE WITNESS: Yes.

THE COURT REPORTER: Okay.

MR. ARONOVITZ: Sure.

THE COURT REPORTER: Let's go off the record.

THE VIDEOGRAPHER: One sec. The time is 10:17 a.m., we're off the record.

(Off the record.)

(Back on the record.)

THE VIDEOGRAPHER: The time is 10:26 a.m. and we're back on the record.

BY MS. SLIWKA:

Q. Mr. Alves, let's talk about the analysis provided by the senior leadership of WBR, okay?

A. Okay.

Q. What financial reports did you generate regarding WBR?

Page 34

Q. Well, I did not generate any financial reports. It was more presentation, you know, about P&L, high-level P&L, you know, cash flow needs. Some of the initiatives that, you know, their team were doing on the ground and primarily that.

Q. And how frequently you provided these reports?

A. To leadership?

Q. To leadership, yes.

A. About once a quarter.

Q. Once a quarter? And who received these reports?

A. It was my boss, the finance director. And then, that would be presented to the CFO. Sometimes the international -- sorry. CFO and the international leader for Wendy's and sometimes to the CEO.

Q. And were these reports or presentations also shared with the franchisor?

A. That was the franchisor.

Q. Sorry. The franchisee. My apologies.

A. No.

Q. So, they were not shared with Andrew Levy, correct?

A. Well, that was -- as I said, those presentations were Wendy's presentation just to give an update on the business. But all the financial

Page 35

statements and cash flow, everything was shared by the joint venture WBR to all the owners, all the stakeholders.

Q. What analysis did you prepare regarding funding decisions?

A. The analysis was done by the local team. The local team had a financial team, a finance team and they would do all the analysis. That was shared with the board members of the joint venture. And then, I would receive it to review and send it to Wendy's for funding.

Q. And how would these funding presentations look like?

A. It wasn't a presentation. It was just, like the approval from the board, WBR Board. And then, I would send it to the treasury team with an internal form for approval.

Q. And to your knowledge, were these documents produced in this case?

MR. ARONOVITZ: Object to form.

THE WITNESS: I didn't see -- I wouldn't see the documents from the -- for the board approval because that was confidential to my job, my position, so I didn't get that detailed documentation.

BY MS. SLIWKA:

Page 36

Q. Why were these documents confidential?

A. The documents for approval was the minutes from the board meeting and I didn't get access to that.

Q. Okay. So, let's talk about Wendy's funding process, okay?

A. Uh-huh.

Q. How many times has your department raised the need for additional funding to WBR's operation?

MR. ARONOVITZ: Object to form.

THE WITNESS: I don't recall how many times.

BY MS. SLIWKA:

Q. Do you recall when would you raise the need for additional funding?

A. Well, the local team would raise the need and then we'd go through all the process with the board members of the JV. Then it goes to me to send the request for approval.

Q. How would the local team request additional funding?

A. They would send -- prepare, like, cash flows. Usually, we would have the discussion during the monthly reviews with all the partners. And then, they would send the request and they would work with the board members of the JV. And then, that request would come to me to send to Treasury.



Page 37

Q.  So, your analysis informed Wendy's decisions regarding about funding WBR, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  The analysis, as I said, would be done by the local team.

BY MS. SLIWKA:

Q.  And what would this analysis look like?

A.  They would send cash flow requests.  They would send -- you know, they would present to all the partners on a monthly basis how the business was performing, what were the campaigns in place, initiatives to improve, you know, operations performance.  And that was, basically, the discussion.

Q.  Wendy's did not fund WBR through equity, is that correct?

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.  Did Wendy's fund WBR through equity?

A.  Through equity?  Yes.

Q.  How?

A.  Whenever there was an equity call with the board members, each of the individual members had to put equity in the business.

Q.  How much did they contribute in 2017?

A.  I don't remember.

Page 38

Q.  And how about 2018?

A.  I don't remember.

Q.  And 2019?

A.  I don't remember.

Q.  Did any of the WBR members fail to contribute equity?

A.  I don't recall exactly if everybody had all the full contributions.

Q.  What would happen to WBR without additional funding?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  If they were losing -- if there was an entity that was losing money, it would not continue to operate without cash flow at that point.

BY MS. SLIWKA:

Q.  And was WBR having negative cash flow in 2017?

A.  Yes.  They were investing in new restaurants.

Q.  And in 2018 --

A.  Yes.

Q.  -- did they have negative cash flow?  And in 2019?

A.  Yes.

Q.  So, WBR needed additional funding in 2017, correct?

Page 39

A.  Yes.

Q.  And in 2018?

A.  Yes.

Q.  And in 2019?

A.  Yes.

Q.  What types of funding solutions did Wendy's consider for maintaining WBR's operations?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Oh.  I don't know all the different options that were discussed.  That was above my level.

BY MS. SLIWKA:

Q.  Okay.  Let's talk about Wendy's funding decision in 2017, okay?

A.  Uh-huh.

Q.  In 2017, would Wendy's have evaluated making additional capital contributions to WBR?

A.  Yes.

Q.  Why?

A.  Because they're still opening restaurants.  Like the first, I would say, cluster of restaurants that they opened.

Q.  And there was still negative cash flow at that period, correct?

A.  Yes.  Because they opened three restaurants in

Page 40

2017.

Q.  So, Wendy's was considering additional funding for WBR in 2017, correct?

A.  Yes.

Q.  Would your department analyze whether Wendy's should invest additional funds?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No.

BY MS. SLIWKA:

Q.  Would you have analyzed the amount of capital WBR required to continue operations?

A.  The analysis, again, was done by the team, local team.

Q.  But you would provide them information?

A.  No.  I would not provide any information, they would provide the information and all the partners would review it.

Q.  You would review them, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Not only me, no.  Initially, it was the board of the joint venture, WBR.  And then, I would get information and share with my boss with the review.

BY MS. SLIWKA:

Q.  But you review it with your boss, correct?



Page 41

A.  Yeah.

Q.  Would your analysis have identified whether WBR was financially viable at that point?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No.  It didn't get to that point.

BY MS. SLIWKA:

Q.  Would Wendy's have internally evaluated investing a substantial amount of capital into WBR in 2017?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I wasn't part of that, you know, strategic discussion.

BY MS. SLIWKA:

Q.  How about in 2018?

A.  I wasn't part of neither.

Q.  And would your answer be the same for 2019?

A.  2019 there was no capital investment.  There was investment on cash flow, funding cash flow.

Q.  What recommendation did your team provide Wendy's senior leadership about whether to continue investing funds in WBR in late 2017?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  No recommendation.  We just presented the results, but we didn't recommend it.

Page 42

BY MS. SLIWKA:

Q.  How about early 2018?

A.  Same.

Q.  What were WBR's financial circumstances in late 2017?

A.  I think we talked about it before, but they were -- as I said, they were investing in new restaurants still losing money.  It was negative.  It was a startup.

Q.  Did you discuss any of this with Andrew Levy?

A.  No.

Q.  Did you discuss any of this with any of the Infiniti members?

A.  No.

Q.  As head of FP&A, have you seen funding presentations regarding WBR?

A.  Yes.

Q.  What did these presentations look like?  What information did they contain?

A.  It was a list of, you know, items like cash flow, items like cash flow forecasts from the team and, you know, investment needed for the new restaurants.

Q.  Would such presentations be shared with WBR members?

A.  Yeah.  That was the first step, was always

Page 43

share all the financials and presentations with all the partners.

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.  And so, they would be shared with Andrew Levy, correct?

A.  Yes.

Q.  I'm going to share a document with the witness.  Just one second.  I am marking as Exhibit 1 a document with Bates stamp ranging from Levy 0006656 to 6659. I am sharing my screen.  So, I am sharing Exhibit 1 with Wendy's counsel and the witness.

(Thereupon, the documents were marked as Defendant's Exhibit Number 1.)

MS. SLIWKA:  Mr. Alves, you see there's this initial email on 3-10, but I'll scroll down to your email on May 8th, 2017.  Please review and then we'll go through the presentation that's attached to this email.

THE WITNESS:  Yeah.

BY MS. SLIWKA:

Q.  May I scroll down?

A.  Yeah.

Q.  So, Mr. Alves, what is this document that we're looking at right now?

Page 44

A.  Seems to me a funding discussion.

Q.  And how do you know that?

A.  Because of the title.

Q.  So, Exhibit 1 is a Wendy's funding presentation regarding WBR, correct?

A.  Yes.

Q.  It's dated May 2017, correct?

A.  Correct.

Q.  Were you involved in preparing Exhibit 1?

A.  I don't recall.

Q.  Okay.  Let's -- okay.  Let's walk through the -- let me -- please review the -- let me know when to scroll down so you can review --

A.  Okay.

Q.  -- the entire document.

A.  Yes.

Q.  Because we're going to discuss it so you can explain the document to me.  Let's first -- I'll scroll down for you --

A.  Uh-huh.

Q.  -- so you can review.  Let me make it bigger because it does -- can you read this page?

A.  Yes.

Q.  Okay.  Otherwise, I can make it bigger.  Just let me know when to scroll down and I will.



Page 45

A. Uh-huh.

Q. All right. That's too big.

A. Yep.

Q. I think that's the extent of this. Let me make it scroll up to the beginning. And if you need me to get to any of the pages, please let me know. Can you please explain Exhibit 1 to us?

A. Yeah. So, I don't recall the circumstances, you know, but that was an update on cash -- one of the updates on cash required from the JV that I sent to the board team for discussion.

I got all that information from the local team to, basically, consolidate and send to the -- consolidate and put in a presentation format and send it to the board.

Q. Based on this analysis, how much cash did WBR need to fund operations?

A. I think it is there. Yeah. Here. That one.

Q. This one, right?

A. No. The one -- the one above.

Q. The one above? Where does it say that?

A. Let's see. Total cash need -- oops. Slide 4.

Q. This one?

A. Yeah.

Q. So, is it the 336 -- 376 figure or is it the

Page 46

10094 figure?

A. That's the cumulative by Q4 20- -- Q4 '18.

Q. Can you give me a Bates number?

A. Yeah. You have by quarter there how much cumulative they need and total cash needed. If you go to the total cash needed, you'll see by quarter how much.

Q. One second. This -- so, that would be page 4, correct? It doesn't have a Bates number, but --

A. Yeah. That's the page.

Q. All right. On page 4. How is that going to be funded?

A. Well, at that time, I don't remember where they were on the loan because there was a loan from Wendy's. So, I cannot tell you how much of the loan was withdrawn at that time.

Q. A loan from Wendy's, right, because we discussed earlier that Wendy's was also a lender in this transaction.

A. And capital from the investors.

Q. Right. How long would the funding take to be put in place?

A. From approval to -- because there was a lot of process, like -- on the loan there has to be the meeting with the board members, get approved, and then I would

Page 47

send the request to Treasury. And that was, I would say, after the meeting, the board meeting, I would say a week.

Q. When we're talking about board meeting and, again --

A. WBR Board meeting.

Q. WBR Board meeting.

A. Board meeting, yes.

Q. So, this document addresses WBR's funding needs, correct?

A. Yes.

Q. It includes discussion of equity commitment by partners, correct?

A. Yes.

Q. And it also includes loan options, correct?

A. Loan withdrawal, yeah. I think that was the loan, the original agreement, but I cannot confirm it because it was long ago.

Q. So, this analysis reflects that WBR required millions of dollars in funding, correct, in 2017?

A. Yes.

Q. Including approximately $3.5 million projected for 2018, correct? Let me scroll up.

A. Yeah. About, yeah. Uh-huh.

Q. Would this analysis assume WBR members would

Page 48

contribute capital?

A. Yes.

MR. ARONOVITZ: Object to form.

THE WITNESS: Like, if you look at the bottom, it showed -- no, no. The same page, the same slide.

BY MS. SLIWKA:

Q. This page?

A. Yeah.

Q. Yes. Page four.

A. How much would be the loan and capital requirement.

Q. So, this would inform me of the --

A. I don't remember at that time.

Q. This analysis assumes Wendy's would contribute capital as well, correct?

A. Yes.

Q. This analysis will reflect whether funding was financially viable, correct?

A. Yes.

Q. Let me take this -- stop sharing this. What types of presentations did your department prepare that informed Wendy's funding decisions regarding WBR?

A. Well, funding decisions was, basically -- as I said, it was, you know, cash flow requirements, which is



Page 49

similar to that information that was provided by the team, local team and performance, basically.

Q. Who was in copy of such communications?

A. I don't recall.

Q. But they would have been shared between 2017 and 2019, correct?

A. Yes.

Q. Let me share another. Is this -- can you see my screen? Is this large enough? Should I make it a little --

A. Make it a little bigger, please.

Q. All right. So, this is an email from April 3rd, 2017 from Wade Guzdanski, I want to say.

A. Uh-huh.

Q. And my apologies for mispronouncing. To a Gunther Plosch, Carlos Ribas, Mike Yurick, Leigh Burnside and Carlos Alves, MCC Bob Wright.

MR. ARONOVITZ: Gabrielle, can you just read for the record the Bates number for this Exhibit 2?

MS. SLIWKA: Of course. Absolutely. Yes. I haven't marked it yet. I am marking this as Exhibit 2, a document with Bates numbers -- Bates stamp ranging from Wendy 0013900 to 13931.

(Thereupon, the documents were marked as Defendant's Exhibit Number 2.)

Page 50

MS. SLIWKA: It contains WBR Brazil funding presentation. Just for the record, I would also like to enter the appearance of my co-counsel, Yasin Daneshfar, who is joining me, and Mr. Polenberg is stepping out in a moment.

So, let me scroll up so Mr. Alves can read the email, and then we can go through the presentation as well. Just let me know when to scroll down, Mr. Alves.

THE WITNESS: Okay.

BY MS. SLIWKA:

Q. May I?

A. Yeah.

Q. I'll make it a little less zoomed in. So, it's a WBR Wendy's Brazil funding discussion. Let's scroll down to the first slide. I'll do a few of them.

A. Uh-huh.

Q. Scrolling down. Okay. Let me scroll up to the email, itself, and I'll make it larger again so we can --

A. Uh-huh.

Q. -- go through some of these names. So, starting with Wade Guzdanski, if you remember, who was Mr. Guzdanski and what role did he play with Wendy's?

A. You know, Wade was -- he was my boss at a

Page 51

certain point. He was the International Director of Finance.

Q. Okay. And how about Mr. Gunther Plosch?

A. Yeah. He was the CFO for Wendy's.

Q. He was the CFO. How about Mr. Ribas?

A. Mr. Ribas is the Senior VP of LAC, Latin America region for Wendy's.

Q. And Mr. Yurick?

A. Mr. Yurick was the Operations Leader for International at Wendy's.

A. Mrs. Burnside?

A. She was the VP of Financial Planning for Wendy's.

Q. And Mr. Wright?

A. He was -- at that time, I think he was the President for International, but he was also Chief Operations Officer for Wendy's.

Q. So, what is Exhibit 2? I'll scroll down.

A. Yeah. This document was an update on the funding and, you know, capital needed for Brazil and some background on the project.

Q. How is it different from Exhibit 1?

A. I think it has a little bit of more information here on the background, which is -- I'm sure there were people that were not 100 percent involved in

Page 52

the beginning in this group of females. So, he might want to give an additional background on the project.

Q. So, what does this document reflect about Wendy's plan to fund WBR?

MR. ARONOVITZ: Object to form.

THE WITNESS: I think it was more informative on where the business stands and what needed to happen to continue to improve.

BY MS. SLIWKA:

Q. And where did the business stood at this point?

A. As a -- it was similar to what was presented before. The business needed some cash flow to support operations.

Q. How much funding was expected from equity versus debt at this point?

A. I don't recall. Go into the details there.

Q. What does this document reflect about total cash required to support WBR? And I can scroll down if you just let me know where --

A. If you --

Q. Yes. Because I --

A. I don't remember all the numbers.

Q. Yes. There are too many slides. We can go through them together until we find the appropriate one.



Page 53

A.  I think that's the 10 million that we saw in the other slide.

Q.  This one?

A.  The waterfall.

Q.  The waterfall?

A.  Yes.

Q.  This one?

A.  No.  That is the original one.

Q.  See this --

A.  Yeah.  I think this was more of the overall update --

Q.  Let's see --

A.  -- from the business.

Q.  Maybe it's -- I don't see it.  So, here it says funding source based on 15.1 million, Phase 1.  Was that how much was expected to be spent on Phase 1?

A.  I would say probably, but I wasn't part of the original cash flow discussion.

Q.  Let's scroll down a little more and see.  Is this the slide that would inform us as far as the cash needed to fund the business in different stages?

A.  Yeah.  Probably.  That shows, like, a five-year cash flow.  Yup.  With CapEx and everything.

Q.  So --

A.  Based on the original model.

Page 54

Q.  And how much cash was needed to fund WBR in 2017?

A.  It says that about 10 million, but it opened, like, five restaurants.  9.9 million.

Q.  9.9 million.

A.  But it went from five to ten restaurants.

Q.  Was that a one-time need or part of a broader funding requirement?

A.  I think this was more of a presentation of the overall project the first five years.  I don't -- I don't recall exactly the circumstances, but from what I saw here, it looks like it's a five-year plan, the original one.

Q.  Let's turn to page Bates number 13910.  Let me scroll back up.  13910.  Okay.  What assumptions were made regarding WBR's profitability based on this slide?

MR. ARONOVITZ:  Gabrielle, can you just scroll up?  I just want to see the header.

MS. SLIWKA:  Of course.

MR. ARONOVITZ:  Thank you.

MS. SLIWKA:  Okay.

THE WITNESS:  Yeah.  That was based on those sales levels and the JV expectation for the year.

BY MS. SLIWKA:

Q.  So, it says that losses were assumed through

Page 55

2020, correct?

A.  Yep.

Q.  What does it mean that losses were projected through 2020?

A.  It seems that from the original plan, they were expecting JV losses in the first three years -- three or four years of operation.

Q.  What level of capital will be required given those projected losses?

A.  I have to go to the cash flow page.

Q.  Let's scroll back down.  Is this the one?

A.  Yeah.  That would be the one.  Yeah.  This original model suggests 31.9 million dollars cumulative.

Q.  Cumulative.  So, when this was projected, WBR would not be profitable for several years, correct?

A.  Well, it doesn't show on this slide.

Q.  I'll go back.

A.  If you go to the -- no.  That's the same slide.  If you go to that slide, it shows in that original --

Q.  This one?

A.  Put that together, like the cash flow information.  Who did the original model?  But it seems that they were expecting loss in the first year.

Q.  Okay.  But this slide is from 2017 and

Page 56

projected losses until 2020, correct?

A.  It seems to be earlier because it's the original plan and it says 2015 here as the first year so --

Q.  Okay.  Okay.  Let's turn to page 13926.  Let me scroll down a little bit.  I mean, if you see something that you need to look at it before --

A.  Okay.

Q.  -- I scroll.  Let me see.  Is this too small?

A.  No.

Q.  Okay.  Please review it.  Let me know when you're done.  What does this chart reflect about WBR's sales performance over time?

A.  It shows a negative trend.

Q.  What do you mean by that?

A.  You see the charts, like, coming from the left to the right.  It's going down.

Q.  Over what period were these declines occurring?

A.  It seems, like, 32, maybe 32 weeks.

Q.  What impact would declining volumes have on cash flow?

A.  It will drive lower EBITDA and more cash flow requirement.

Q.  And based on this, sales volumes were



Page 57

consistently declining, correct?

A.  Yes.

Q.  Let's turn to page 13923.  Okay.  And 24. What opportunity was identified for Wendy's in this slide?

A.  Well, it's showing, like, cash flow requirements and how much additional needed from a -- besides the equity partnership.  The equity component.

Q.  Did you --

A.  How much needed.

Q.  Here in the bottom, it identifies -- what opportunity does it identify for Wendy's?

A.  To reinvest non-U.S. excess cash balances.

Q.  What does this slide reflect about Wendy's ability to deploy non-U.S. cash into WBR?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yeah.  I don't recall the circumstances here.  I don't remember what and maybe I don't even know why it was that implied here.  Maybe it is to support the line of credit that was originally signed.

BY MS. SLIWKA:

Q.  How would that support the line of credit?

A.  Well, they would use the funding to the money that is outside of the non-U.S. cash balance to fund the

Page 58

line of credit, which for the JV doesn't seem like it really matters because the line of credit is what -- signing what it look like and what's matter in this situation from what I hear, I see.

Q.  How would reinvesting non-U.S. excess cash function as a funding source?

A.  Well, from what I see that if there is cash outside and they can use for a commitment, which was the line of credit, I don't see why not use it.  But I'm not an expert in that area.

Q.  Let me scroll down because I think there's additional information on the next slide and please review it.  Let me try to make it slightly bigger, but not too much.

A.  Uh-huh.  So, yeah.

Q.  What advantages did Wendy's identify in using internal cash instead of third-party financing?

A.  You can see over there what it says.

Q.  If you could --

A.  Do I need to read it?  You know, it's in there.

Q.  Okay.  So, it would avoid the need to accrue for tax liabilities in relation to earnings for Wendy's non-U.S. subsidiary, correct?

A.  Apparently, yes.  As I said, I'm not an expert

Page 59

on taxes and interest rates impact.

Q.  So, it also says that it would also minimize bureaucracy on approving line of credit with bank within already very complex environments to operate, correct?

A.  It does say that.

Q.  And it's also an opportunity for Wendy's to capitalize that as we moved into the JV Phase 2, correct?

A.  It does say that.

Q.  What level of control would Wendy's retain if it funded WBR this way?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Well, from what I understand, the control is based on the ownership percentages and not the funding, the ownership percentages.

BY MS. SLIWKA:

Q.  How does that option compare to requiring WBR to obtain external bank financing?

A.  It says right there, I think.  You know, from a timeline standpoint and availability of funding, it seems to have been easier to do through the Wendy's company, but I was not part of that decision.

Q.  But this slide shows --

A.  They're --

Q.  This slide shows that Wendy's had the ability

Page 60

to fund WBR using its own non-U.S. cash, correct?

A.  It says there.

Q.  I'll stop sharing that.  Okay.  Let's talk about Wendy's funding decisions in early 2018, okay?

A.  Okay.

Q.  Wendy's considered contributing significant additional capital to WBR in late 2017, early 2018, correct?

A.  I don't know.  I don't remember if that was -- I wasn't involved in these conversations.  I don't know if that was --

Q.  But we discussed that WBR had cash flow issues in 2017, 2018 and 2019, correct?  So, he needed --

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.  He needed additional funding to continue operations, correct?

A.  Yes.  Correct.

Q.  What options did WBR have to continue operations if Wendy's refused to invest additional funds?

A.  Well, WBR would have to look for funding from third-party banks locally or if the other partners would be, you know, interested in funding.

Q.  Would your analysis assume that WBR partners



Page 61

would contribute capital in Wendy's absence?

MR. ARONOVITZ: Object to form.

THE WITNESS: Which analysis are we talking about, asking?

MS. SLIWKA: Funding analysis.

THE WITNESS: Which one?

MS. SLIWKA: Cash flow, any of the analysis that we discussed earlier.

THE WITNESS: Well, as I said, like, the cash flow -- cash flow analysis were put together by the JV team and then presented it to the WBR Board for discussion and approval.

BY MS. SLIWKA:

Q. When were the capital investment by each member of WBR expected?

A. That was based on the cash flows discussions with the board meeting, WBR Board meeting.

Q. But was it a specific time that each member was supposed to redeem their shares?

A. I don't know. I don't recall if there was anything written in their original agreement.

Q. To your knowledge, did any of the members fail to redeem their equity shares?

A. I don't know if there was a timeline, per se.

Q. Okay.

Page 62

A. I cannot tell you an answer.

Q. FP&A models typically assume partner contributions when evaluating funding needs, correct?

MR. ARONOVITZ: Object to form.

THE WITNESS: If it -- the way I saw it was set up, there was a piece that was based on the loan and partner contribution.

BY MS. SLIWKA:

Q. So, on the Exhibit 2, we saw that Wendy's considered investing in US cash into WBR. To your knowledge, was that option ever exercised by Wendy's?

A. From my knowledge, that was the funding for the original loan signed between Wendy's and the WBR entity and stakeholders.

Q. Let me go back to Exhibit 2 real quickly. In 2017, the five restaurants of Phase 1 were either open, under construction or under negotiations, correct?

A. Yes. Correct.

Q. And in 20- -- as of 2017, Wendy's was still disbursing the loan to fund the construction and securing these locations as well? That's your position?

A. I believe so.

MR. ARONOVITZ: Object to form.

BY MS. SLIWKA:

Q. So, what funding alternatives did Wendy's

Page 63

consider for WBR's additional capital needs?

A. I don't recall the options. From what I recall, it was the loan and the capital equity infusion in the business.

Q. The loan with Wendy's?

A. With Wendy's, yes.

Q. Did Wendy's also seek or recommend third-party bank loans for WBR?

A. When? I think at a certain point, yes, and, you know, there was a loan with a local bank, but I don't remember when it was in this timeline.

Q. At the time those third-party loans were obtained, WBR was already struggling to stay afloat, correct?

MR. ARONOVITZ: Object to form.

THE WITNESS: Which loans are you asking for?

MS. SLIWKA: I'm talking about the third-party loans, not the Wendy's loans.

THE WITNESS: Yeah. At that time -- yeah. The WBR still needed some cash infusion and the loans were approved by the WBR Board.

BY MS. SLIWKA:

Q. Let's see another presentation. If one of the partners would have failed to make capital contributions, what options would the other partners

Page 64

have had at that point?

A. I don't remember which options we would have discussed because that was more a part of the board discussion -- WBR Board discussion.

Q. If one of the members of WBR failed to make the capital contributions, would the other members have to step into their shoes and make the capital contribution in their place?

MR. ARONOVITZ: Object to form.

THE WITNESS: I understand if that is the agreement within the board members.

BY MS. SLIWKA:

Q. Wouldn't that happen if -- let's start over. We discussed how the joint venture was experiencing cash flow issues and had negative cash flow. At the time, capital investment was expected. If one of the members failed to contribute the expected capital contribution, what would have happened to WBR?

MR. ARONOVITZ: Object to form.

THE WITNESS: They would need to find another source of cash injection in the business.

BY MS. SLIWKA:

Q. And what if they failed to find this other source?

MR. ARONOVITZ: Object to form.



CARLOS ALVES
WENDY'S NETHERLANDS B.V. vs LEVY

May 11, 2026
65–68

Page 65

THE WITNESS: I'm assuming the boards would need to have a discussion about that. I cannot represent that decision.

BY MS. SLIWKA:

Q. To your knowledge, did Starboard make capital contributions to honor Infiniti's shares -- to redeem Infiniti's shares?

A. I think they did once, but you have to go to the documents of the entity because the board should have discussed that.

Q. Let's --

A. I don't have access to that.

Q. Okay. Let's talk about WBR's financial condition in early 2018. Okay?

A. Okay.

Q. I'm going to mark as Exhibit 3 a document with Bates stamp ranging from Wendy 0013861 to 13864, an email chain including you and Wendy's leadership. I'm going to share my screen.

(Thereupon, the documents were marked as Defendant's Exhibit Number 3.)

THE WITNESS: Okay.

BY MS. SLIWKA:

Q. I'm going to start by the first email on these chains so we can go through it together. These are

Page 66

attachments. Let me scroll up and make it as big as I can. Okay. So, this is the first. I'm not sharing it, right? But now I am.

A. Okay.

Q. I'll scroll up because there's -- Mr. Ribas then shares the email with you and there's the email from Mr. Ribas to you.

A. Uh-huh.

Q. And then, there's your -- you go by Edu, correct?

A. Yes, that's correct.

Q. Okay So, there's your email to Mr. Ribas and then there's your last entry that Mr. Ribas shares the email with Mr. Wright and then Mr. Wright shares it with Peter Koumas including the two cash flow projection attachments.

A. Uh-huh.

Q. What is this document, Mr. Alves?

A. Yeah. Those were the cash flow projections that the local team, the JV team, used to put together.

Q. And how do you know that?

A. Because I was referring to it on the email. You see, cash flow submitted by Humberto. Humberto was the CFO for the JV.

Q. Okay. What was your role in preparing or

Page 67

reviewing this analysis?

A. It was, basically, to understand what's changed from the previous cash flow -- previous information to the latest one.

Q. Okay. And what was the purpose -- the purpose of this cash flow analysis?

A. I know it -- well, I don't recall exactly why I was asked on this, but it looks like they were having some special variances that they needed to understand.

Q. Right. And what time period does it cover?

A. It says there --

Q. If you want, I can scroll up. I think it says --

A. January 2018 versus March. Is that --

Q. Let me --

A. I'd have to look at --

Q. I'll scroll down to the cash flow document, itself, so we can look at it. And I apologize, it's an Excel spreadsheet.

A. No worries.

Q. Yeah. When you turn them -- let's see.

A. Yeah. That's the document the JV used to prepare.

Q. Okay. And how frequently were updates like this prepared?

Page 68

A. I don't know or remember.

Q. Okay. How was this document used by Wendy's in making decisions about WBR?

A. Well, again, decisions about WBR was made by all the stakeholders from what I understood. This was to give us a perspective, you know, what was needed to continue operating the business.

Q. What does this document reflect about the difference between projected and actual performance? And I can scroll up again to your analysis.

A. Yeah. I don't remember exactly.

Q. Let me -- let me make it available to you. Because I think we can focus more on the -- your email.

A. Yeah. It says there are variances. There's capital expenditure variances. Key money receipts from revenue payment.

Q. What were the primary drivers of variance reflected here?

A. It says there's capital spending and receipts -- receipts from revenue from what I can see.

Q. Let's turn to page -- what does this projection show?

A. It shows the key items impacting cash flow with imbalance and imbalance by period on a weekly basis it looks like.



Page 69

Q.   And it shows -- it shows a negative cash flow. Am I correct?

A.   Yes.

Q.   Of how much?

A.   Well, it's coming down from 2.7 in four weeks. So, it's, like, 2 million, $2.2 million variance.  Not dollars, sorry.  Brazilian Reais.

Q.   Brazilian Reais.  How significant is that variance from projections?

A.   I don't recall the projections.  I don't know which projections you're asking me.

Q.   Something about -- let's scroll up to your email, itself, because -- let's see.  What are some assumptions that are being made here under Mr. Silva's email as far as funding for the next months?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  It says there in the email from Marcos Silva that the projections expected for that period seems more than equity -- equity balance. That's what's written there.

BY MS. SLIWKA:

Q.   It assumes more equity investment, correct?

A.   And then it assumes --

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yeah.  Investment of other

Page 70

different parties.

BY MS. SLIWKA:

Q.   It assumes Starboard Equity Investment, correct?

A.   Correct.

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.   And it assumes Wendy's loan as well, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yes.

BY MS. SLIWKA:

Q.   So, let's look at the email from Mr. Ribas directly to you.  It says -- if you could read it for me, please, Mr. Alves, what this -- from the beginning. This is what --

A.   This is what -- this is what it says in the email from Ribas.  This is what Marcos and their share with Bob, Adia (phonetic), Peter and I on the call today.

Biggest issue is Bob thought we had until the end of April before cash ran out and not -- and not it's end of March.  He asked what's changed and Marcos said nothing materially.

Where did we miss this by one month?  We told BOD and once S.B. put in their equity, we could float cash

Page 71

through April.

Q.   So, this email indicates that -- first of all, what does BOD mean and what does SB mean?

A.   Well, it looks like it's board of directors and Starboard.

Q.   And this would be Wendy's Board of Directors or WBR's Board of Directors?

A.   I don't know.

Q.   So, you told board of directors that once Starboard put in their equity, you could -- WBR could stay afloat -- could float cash through April?  Is that -- did I read that correctly?

A.   Yeah.  That's what it says.

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.   Do you recall having these discussions with Wendy's Board of Directors?

A.   No.  I -- I never met them.

MR. ARONOVITZ:  I'm sorry.  Which email are we reading right now?

MS. SLIWKA:  We're reading the one from --

THE WITNESS:  From Ribas --

MS. SLIWKA:  -- Ribas to Mr. Alves.

THE WITNESS:  I haven't met the Board of Directors of Wendy's.

Page 72

MS. SLIWKA:  Okay.

THE WITNESS:  Of Wendy's.

BY MS. SLIWKA:

Q.   So, let's focus on this analysis.  I'm going to call it an analysis just because you provide your input about the numbers.  So, it says here's the reconciliation from the last cash flow versus the cash flow submitted by Humberto on January 17th.  What is this showing us as far as how much money was needed to fund WBR at this point?

A.   Well, it shows the variance.  That there is a variance of around 800,000 Brazilian Reais.  From the previous cash flow and the latest cash flow submitted by the JV -- the WBR entity.

Q.   So, the email by Mr. Ribas indicates that a board of directors was informed that WBR could stay -- could float cash through April.  But this analysis shows that by January of 2017 there was negative 800,000 Reais in cash projections for WBR, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  From what I understand -- what is understand is our two cash flows.  One, that was sent in January 17th that had one assumption.  And then, the other one, that it was sent -- I can't read the dates there.  It's March 2nd.  It has a



Page 73

variance from the original one by 800,000, roughly, 800,000 Brazilian Reais.

BY MS. SLIWKA:

Q. And what were the assumptions that the January '17 projection made that the March 2nd, '18 projection did not make that made this variance of 800,000 Reais?

A. Well, the numbers -- like, from -- the numbers are there. It's 275 of capital investment and another 25,000 of key money. Then there is these receipts from revenue of 600-something and 194 positive from payment expenses.

Q. Is there anywhere in there a loan by Wendy's in $1.5 million in those assumptions?

A. I don't remember. I don't have the document.

Q. No. I mean, in the numbers you're looking, that you have in front of you are -- do you have any loans by Wendy's in $1.5 million in those expectations?

A. Can you go to the cash flow, please? Because --

Q. Of course.

A. No. The cash flow file, the one that has the weekly cash flow requirement.

Q. There is the balance of --

A. This -- it's down there.

Q. Okay. So, this assumption that was made on

Page 74

Mr. Silva's email that there would be a Wendy's loan of 1.5 million is not reflected in these cash projections for March, correct?

A. I cannot answer that.

MR. ARONOVITZ: Object to form.

BY MS. SLIWKA:

Q. Can you point to me where in here it shows, it reflects, a loan by Wendy's in any way?

A. If you could please go to the cash flow, I can --

Q. Yes.

A. -- see if there is anything there.

Q. Like, let's do that. Let me scroll down to the -- this is the January one. Do you want to look at both?

A. Yes.

Q. Okay. Let me make it bigger and --

A. Because I think this file only says the cash flow needed. It doesn't show where it's going to come from.

Q. Just let me know if you need me to scroll left, right, up and down and I will --

A. Yeah. To the right, please. Yeah. I don't think there is a source of funding on this cash flow. It's just the cash flow needed for the entity.

Page 75

Q. But the email that Mr. Silva sent to Mr. Suarez (sic) included this funding by Wendy's, right, in the email that we saw earlier?

A. That --

Q. I can scroll up again if needed.

A. Yes, please.

Q. Let's scroll down to the rest of the cash flow analysis.

A. Yeah. It looks like these files only show the cash flow requirements for the JV, not how it was funded.

Q. With how it was funded.

A. Yeah.

Q. I see. So, by early March 2018, WBR had a negative cash position of approximately 800 -- negative 800,000 Reais, correct?

A. Until the end of April, right, is that what the cash flow says?

Q. It should be -- I'm just saying, like, by --

A. I can go -- just sorry -- until when the cash flow goes, please, because I think that answers your question so -- this one.

Q. This one?

A. Yeah.

Q. I'll make it bigger.

Page 76

A. Scroll to the right, please. Scroll to the right.

Q. To the right?

A. Yeah. Can you scroll up a little bit --

Q. Of course.

A. -- just so I can see the dates? April. Yeah. Down now. It looks like it's until April. 26. Do you have the original as well?

Q. The original?

A. The one from January '17.

Q. I think this is the one from January, if I'm not mistaken, because there are two documents. Hold on and I'll get you -- I'll get you the March one. It should be this next one. This is the March one.

A. Let's go to March and April. Uh-huh. That's it. Scroll all the way to the right, please.

Q. Uh-huh.

A. 3.6, 3.7. It looks like the 800 is until June.

Q. Okay.

A. Which is 3.7 versus 4.5 from what I see here in this file.

Q. So, let's go back to the -- to Mr. Ribas' email. The board of directors, whether it was Wendy's or WBR, was told that once Starboard put their equity,



Page 77

WBR could flow cash through April.  Is that correct?

A.  That's what it says in the email.

Q.  So, the expectations at this point were that the cash flow would have shown -- would have not been negative in March of 2017, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't think that is true.  Like, it shows that it requires cash investment, so it was negative.

MS. SLIWKA:  It says could flow cash through April.

THE WITNESS:  Yes.  Until April, yes, that's correct based on this statement.

BY MS. SLIWKA:

Q.  What does that mean?

A.  Well, that was not my statement.  So, it looks like there was cash available for the initial forecast from January, there was cash available until April.  And with the revised one, they need about 100,000 more cash.

Q.  So, in reality, in March of 2017, WBR had a negative cash balance.  Is that correct?

A.  Yeah.

MS. PARK:  Can we take a break?

MR. ARONOVITZ:  Absolutely.

MS. SLIWKA:  Come back in 10 minutes.

Page 78

THE COURT REPORTER:  Okay.

THE VIDEOGRAPHER:  The time is 11:49 a.m. and we're off the record.

(Off the record.)

(Back on the record.)

THE VIDEOGRAPHER:  The time is 12:04 p.m.  We're back on the record.

BY MS. SLIWKA:

Q.  Mr. Alves, let's talk about Wendy's alternatives to funding WBR, okay?

A.  Okay.

Q.  Mr. Alves, who is Sergio?

A.  Sergio?  Do you have a last name?

Q.  I don't have a last name, but I have a company named Brazil Franchising.

A.  I don't recall exactly who is the person.  I know we talked to so many people.

Q.  Let me go ahead and mark this as Exhibit 4.  Let me share my screen.

(Thereupon, the documents were marked as Defendant's Exhibit Number 4.)

MS. SLIWKA:  This is a document with a base stamp ranging from Wendy 0013592 to 13595.  An email from Sergio from Brazil Franchising to you, Mr. Alves.

Page 79

THE WITNESS:  Uh-huh.

MS. SLIWKA:  Let me make it a little bigger because the font is a little small.  Please review this and let me know once you're done reading the email.

THE WITNESS:  Okay.

BY MS. SLIWKA:

Q.  What is this document, Mr. Alves?

A.  Sergio was with one of the groups that eventually we were talking to.

Q.  What were you talking to --

A.  WBR engaged on a -- engaged with a company to try to find a buyer to -- or investor to WBR.  When was that?

A.  I don't recall exactly when.

MR. ARONOVITZ:  Gabrielle, do you mind -- can you scroll up to the top --

MS. SLIWKA:  Of course.

MR. ARONOVITZ:  -- to see the date?

THE WITNESS:  The end of -- the end of 2018.  I think it was sometime in 2018.

MS. SLIWKA:  Sometime in 2018.  What was your role --

THE WITNESS:  This is one of the groups that was interested in asking, you know, additional

Page 80

information, like follow-up --

MS. SLIWKA:  What is --

THE WITNESS:  -- preferences.

BY MS. SLIWKA:

Q.  We engaged.  What do you mean by we?

A.  WBR engaged with a company, like a broker, like, you know, to find a partner or a buyer for the JV.  And Sergio was one of the candidates that contact, you know, the group to have conversations about the plans and the options for Brazil.

Q.  So, what was your role in relation to this communication?

A.  I don't exactly remember this communication, but I was part of the group that was, you know, talking to the company that was looking for candidates and I was in some of the meetings as well.

Q.  What is being proposed in this email?

A.  It says, like, a new master franchisee, master franchise agreement --

Q.  So --

A.  -- and they would open a new company.

Q.  So, what was Brazil Franchising seeking to do with respect to Wendy's Brazil operations?

A.  That's what it says there.  Like, they would buy the WBR assets and open new restaurants with a new



CARLOS ALVES
WENDY'S NETHERLANDS B.V. vs LEVY

May 11, 2026
81–84

Page 81

entity.  That was one of the proposals.

Q.  What assets were being considered for transfer or sale?

A.  That would be all the restaurants operating at the time.

Q.  And how does that relate to WBR's financial condition in 2018?

A.  I don't recall exactly why we decided to go this way.  You'd have to go back to the board -- WBR Board members' minutes.  But at that time, we were looking for somebody either to partner or -- or buy the assets and continue to grow the business.

Q.  And that's because WBR was encountering cash flow issues, correct?

A.  It --

MR. ARONOVITZ:  Object to form.

THE WITNESS:  It had the cash flow negatives, but, you know, again, we need to look at the minutes to see if the board -- WBR Board had decided that some -- you know, the partners were not going to invest anymore.  I don't have the details on the reason why we pursued that path.

BY MS. SLIWKA:

Q.  What role did you play in evaluating this proposal?

Page 82

A.  I was, basically, partnering with all the different partners to help assess it.

Q.  How does this proposal relate to Wendy's broader strategy for WBR at that time?

A.  Well, I think the WBR strategy was -- the board's strategy, the WBR Board strategy.  Wendy's at that time was the franchisor in this situation.  I don't know -- I don't have details if -- what was the decision trigger.  Because usually, those are board discussions at the WBR levels.

Q.  So, Sergio is expressing interest in acquiring all the assets of WBR, correct?

A.  Yes.  Correct.

Q.  What steps were taken after this proposal was received?

A.  I don't remember.

Q.  To your knowledge --

A.  We talked to so -- we talked to many candidates, so I don't recall exactly what happened with Sergio.

Q.  How many candidates?

A.  I don't know, but we had calls every week with candidates.

Q.  And do you recall the names of some of these candidates?

Page 83

A.  I would have to -- I don't know off the top of my -- but local groups.

Q.  And what happened to these negotiations?

A.  I think, like, it didn't move forward.  I don't recall exactly which, you know, group, nor where we stood with which one of them, you know.

Q.  Why didn't --

A.  None of them materialized, basically.

Q.  Why?

A.  I don't know.

Q.  What information was requested from this perspective operator?

A.  There was, like, a pitch stack that was built with this company that was helping us.  And that was what, you know, the board has agreed to distribute to the candidates working with this company, the broker company.

Q.  Which board?

A.  WBR Board.

Q.  But Wendy's, as a franchisor, played a part in deciding whether a prospective purchaser was a viable candidate, right?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  The purchase -- so, I think we need to separate it in two ways.  So, the M&A

Page 84

transaction had to be approved by the board, WBR Board, okay?  And a franchisee needs to be approved by Wendy's.  Any franchisee needs to be approved by Wendy's as a franchisee.  But the M&A transaction was to be approved by the board, the WBR JV Board.

BY MS. SLIWKA:

Q.  And to your knowledge, did WBR approve this -- this potential purchaser?

A.  I don't remember.  No, I don't.  And there was board -- board discussions.  WBR Board discussion, to be clear.

Q.  How would transferring operations to a third-party operator affect WBR's ongoing cash burden?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Well, if it is a full transference, the new owner would take over the ongoing cash flows from -- from, you know, a transactional standpoint.

BY MS. SLIWKA:

Q.  How would it affect WBR's ability to meet its obligations?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  It depends on the deal price, right?

BY MS. SLIWKA:



CARLOS ALVES
WENDY'S NETHERLANDS B.V. vs LEVY

May 11, 2026
85–88

Page 85

Q. How so?

A. Well, the deal price, whatever the price was for that purchase would be my understanding to pay off, you know, WBR obligation in the case of an assets transfer.

Q. Okay. Based on the type of proposal reflected in this email, what impact would the transition to a third-party operator have had on WBR's financial losses?

MR. ARONOVITZ: Object to form.

THE WITNESS: It doesn't say anything on pricing or anything on this email, so --

MS. SLIWKA: Okay.

THE WITNESS: I don't know. I cannot tell you.

BY MS. SLIWKA:

Q. But a successful transition could reduce ongoing operating losses, correct?

A. Yes.

Q. How?

A. Because if it is a -- if it is a full -- an asset sales, somebody -- well, if it is a sale, somebody would take over the ongoing operating costs. And, you know, with the price, you know, for the purchase, that would reduce WBR liabilities.

Q. What alternatives was Wendy's considering if

Page 86

this proposal did not move forward?

MR. ARONOVITZ: Object to form.

THE WITNESS: What I can tell you is that we -- we, WBR partners, were engaged with, you know, a broker to find a solution, a partner.

BY MS. SLIWKA:

Q. So, the solution was finding another partner?

A. At that time, that was the --

MR. ARONOVITZ: Object to form.

THE WITNESS: -- goal of the WBR group.

BY MS. SLIWKA:

Q. Let me take this down. Let me share the next exhibit. As head of FP&A, have you seen Wendy's internal financial presentations?

A. Wendy's Corporate?

Q. Yes.

A. Just the, you know, earnings release and maybe there is, you know, international presentations from different regions and things like that.

Q. So, if we were talking about discussions about Brazil, would you have access to those presentations?

A. No. Just the ones that I helped, like the one you showed, like with the way that I have consolidated a couple of slides. Those are the ones that I would probably copy and sometimes not even copy.

Page 87

Q. So, if you were copied, it's safe to assume that you had participated in providing information or providing analysis in some way?

A. Not a hundred percent.

MR. ARONOVITZ: Object to form.

BY MS. SLIWKA:

Q. Can you explain to me when to be copied in these internal presentations?

A. Usually, it would be, like, if, you know, I need to provide any input, feedback or anything. Or just, you know, if it is original, like just us LAC presentation. But if it is, like, top level, I'll probably -- I could be copied or I could not be copied. It depends. That is the judgment of whoever is sending.

Q. Let me share this exhibit, which we'll mark as Exhibit 5.

(Thereupon, the documents were marked as Defendant's Exhibit Number 5.)

MS. SLIWKA: So, a document with Bates stamp ranging from Wendy 0006242 to 6258. Let me see. It's an email by Mr. Alves to several people. We have Kerry Green. We have Kris Kaffenbarger. We have Brandon Hartman. We have Kirk Vidra and we have Peter Koumas and we have Carlos Ribas.

And subject is material for our call. It

Page 88

includes three attachments. One called Brazil discussion with JP, GP and Abigail. The second one, Brazil plan with no development until April 2020 and even the Brazil project timeline.

THE WITNESS: Okay.

BY MS. SLIWKA:

Q. Mr. Alves, what is Exhibit 5?

A. I need to look at the details, but it looks like it was a file that some slides that we put together to update leadership.

Q. Let's scroll down to the attachments so we can review them. Let me know when to scroll down.

A. Uh-huh.

Q. We have the agenda here.

A. Uh-huh.

Q. We have the project timeline. We have key financial model assumptions. I think you spent more time with this --

A. There's a lot of information.

Q. Cash flow expectations for 2019. Funding options to cover 2 million shortfall. We have recommendation. We have this talking about the partners expectations. Then we have the appendix. It seems to be sales data, P&L data, then that seems to be the end of the presentation.



Page 89

Then we have -- this was an Excel spreadsheet containing those numbers.  I believe that spreadsheet is called Brazil two-year plan with no development.  That is what that -- this document is supposed to reflect.

A.  Uh-huh.

Q.  And then we have this last presentation about Brazil as well.  I'll make this bigger so we can read. Let me scroll to the right.  Containing the financial information for the joint venture including information about cash flow and income.  This is taking too long to --

A.  What are the years like, please?

Q.  Of course,  2018 and 2022.

A.  Uh-huh.

Q.  Is it fair to think that this is by unit?

A.  Uh-huh.

Q.  And at this point there were five units, correct?

A.  Yes.  That's correct.

Q.  This shows the financial information per unit up to 2020.  These.  These.  Breakdown.  Did you prepare this presentation, Mr. Alves?

MR. ARONOVITZ:  Gabrielle, I'm going to object to this exhibit.  I'd like this objection, instead of objecting after every question, to stay for the

Page 90

remainder of the exhibit.  The email is sent.  The first CC is Kerry Green, that's in-house counsel for Wendy's.  I also see Kirk Vidra, who I also believe is counsel.

Not seeing the exhibit in front of me, I can't say that -- you know, whether the entire document is attorney-client privileged or not, but I am going to object based on attorney-client privilege. You can answer -- you can ask questions, Mr. Alves can answer them, but I do want to lodge that so that we can further review the document.

MS. SLIWKA:  No problem.  I'll make a note. I'm going to stop sharing since we have questions whether this should have been privileged or not. Let me see.  I'm going to -- yeah.  That was all related to the document.  Let's carry on.

BY MS. SLIWKA:

Q.  What other types of analysis would you provide Wendy's senior leadership as it relates to WBR?

A.  It was performance, initiatives that people were -- the teams were working on, the local team, like cross-functional initiatives.  That cash flow needed requirement.  That was, like, my piece of support in the -- in the project.

Q.  Would you also have provided a valuation

Page 91

analysis, a WBR valuation analysis?

A.  The local team put together a valuation based on the assets list.  I'll review -- like, all the other partners also review it.

Q.  Let's look at an exhibit.  We'll mark this as Exhibit 6.  It has a Bates ranging from Wendy 0001347 to 1356.

(Thereupon, the documents were marked as Defendant's Exhibit Number 6.)

BY MS. SLIWKA:

Q.  Mr. Alves, do you see the email on your screen?

A.  Yes.  Uh-huh.  Yeah.

Q.  What is Exhibit 6?

A.  I was sharing some documents for a call with the group.

Q.  Okay.  What was this call with the group supposed to cover?

A.  It was regarding a Brazil update, the Brazil project update.

Q.  And who was the intended audience for this document?

A.  It is on the email there.

Q.  Okay.  Who is Kris Kaffenbarger?

A.  He's our head of franchise management.

Page 92

Q.  How was he involved with WBR?

A.  On the day-to-day.

Q.  He was involved in the day-to-day with WBR?

A.  No.  No, he wasn't.

Q.  So, how was he?

A.  He got more involved when we started discussing, like, potential M&A transition.

Q.  Okay.  How about C. Kelleher, who was that?

A.  I don't remember.

Q.  Okay.  We talked about Mr. Ribas.  How about Brandon Hartman?

A.  Brandon Hartman used to work for Kris Kaffenbarger.

Q.  Okay.  We talked about Mr. Koumas.  I see there's a CC of Mr. Silva as well.  And Kerry -- there's also a copy of Kerry Green and Kirk Vidra.

MR. ARONOVITZ:  Yeah.  This one, though, this is also Mr. Alves to -- Andrew Levy is also copied.

MS. SLIWKA:  Okay.  So, we're okay to continue because -- okay.

MR. ARONOVITZ:  Yes.

MS. SLIWKA:  Because others outside of Wendy's -- okay.  So, it includes three attachments.  One is called Brazil status update, the second one called cashflow Brazil and the other one is Brazil



Page 93

timeline.  Let's go over these attachments so we can discuss the entire document.

THE WITNESS:  Yeah.

MS. SLIWKA:  I'm going to scroll down and you let me know when to -- when to continue and when to stop.  We've got the call agenda here then we have this asset valuation slide.  Then the next one is project timeline.  Cashflow expectations for 2019.

THE WITNESS:  Uh-huh.

MS. SLIWKA:  Funding allocation summary.  And that's the end of that presentation.  Then we have the -- this Excel spreadsheet in Brazil.  JV cash forecast.  I think it includes only 2019.

THE WITNESS:  Uh-huh.  Yeah.

BY MS. SLIWKA:

Q.  And then, the next one I believe is called Brazil timeline, which also appears on the presentation above.  So, that's the entire document.  Was this document prepared to update Wendy's leadership on WBR's financial condition?

A.  Not only Wendy's leadership, but also the other partners.

Q.  And this was already --

A.  The actual -- So, yeah, that valuation, as I mentioned, was based on the information that the local

Page 94

team provided on asset cost.  And then -- and the cashflow that they put together just consolidated in smaller categories.

Q.  And this was shared in anticipation of a conference call, correct?

A.  Yes.

Q.  What was this call supposed to discuss?

A.  There is an agenda in the -- in the invite if you want to go back there because I don't remember exactly.  Not there.  Like, if you go to the invite -- up.  If you move up.  Yeah.  There you go.  There is, like, that still.

Q.  Right.  And as it relates -- and again, we -- we discussed this earlier.  Edo is how you --

A.  I go by, yeah.

Q.  Wendy's refer to you, right?

A.  Yes.

Q.  And based on this email, the three items that Peter and you were responsible for presenting, correct?

A.  That's correct.

Q.  And what are they?

A.  Was the valuation, the cashflow that the team put together, the cash injection required and to be discussed, and then timelines.

Q.  Okay.  Let's go to page three of the

Page 95

presentation and scroll down.  What does asset valuation section -- sorry.  What does the asset valuation section show here?

A.  That was, basically, this asset cost, the asset balance we had in our -- in the books, in the JV books.  So, they provided us how much they would estimate to be sold off.

Q.  So, this is how much they estimated the --

A.  The value of the assets.

Q.  The value of the assets.  In case -- why was this valuation prepared?

A.  As part of the discussion up there, the topics, that's one, you know, thing, as I mentioned before, we were working on.  WBR Board members decided to engage with a, you know, third-party broker to find a buyer or, you know, a partner.

Q.  How were these values determined?

A.  That was based on book value.

Q.  I'm sorry.  I didn't get --

A.  Based on the book value of those assets.

Q.  Okay.  Why was it necessary to value these assets at the time?

A.  Because the business EBITDA was negative.

Q.  And what does it mean that the -- what does it mean for a company to have --

Page 96

A.  From a valuation standpoint.  From a valuation standpoint you could -- there was -- from a cash flow standpoint, there was no value to attribute to EBITDA.  But there were equipment and, you know, some of the initial costs that incurred to establish the business.

Q.  But this valuation was tied to potential asset sales, correct?

A.  Yes.

Q.  And this reflects considering of monetizing WBR's assets, correct?

A.  Yes.

Q.  Let's go to the next page.  Project timeline, I'll make it larger as possible.  What is shown in the project timeline?

A.  That was -- well, that was, basically, a timeline by restaurant of what could be done.

Q.  In what way what could be done?

A.  Selling the assets of those --

Q.  Selling the assets?

A.  Yeah.

Q.  So, this timeline reflects steps towards selling or transitioning WBR assets, correct?

A.  That's correct.

Q.  These are not steps towards expansion or growth, correct?



Page 97

A. Correct.

Q. Let's go to the next page.

A. Well, let me fix that.

Q. Of course.

A. It could -- it could, you know, rely on growth if somebody else takes over and improves the restaurants and continues to develop the brand.

Q. But not as --

A. Like --

Q. Not as WBR stood at that moment?

A. Not WBR Group.

Q. Okay. And can you walk me through this cash flow presentation? I mean, this table. What does it show?

A. It shows, you know, all the inflows that we could potentially get if we had, you know, pursued that path of selling those assets and also the cash flow needed for the year to operate the entity. And, you know, the balance. And if you needed some short-term borrowing. Borrowing. Sorry.

Q. And did it need some short-term borrowing?

A. With -- the WBR had a short-term borrowing. Not recall when was it. I don't remember exactly when was it.

Q. Was this loan with Wendy's or with a different

Page 98

entity?

A. There was a loan with a third-party entity.

Q. Okay. And what trends do you see in the cash flow over time?

A. Well, there was all the costs we would have to incur with the entity until the end of the year if you were -- if you were to sell it by P7 2019. P7, P8

Q. So, what does the need for short-term borrowing reflect about WBR?

A. It was to cover --

MR. ARONOVITZ: Object to form.

THE WITNESS: -- the cash flow.

BY MS. SLIWKA:

Q. I'm sorry. Mr. Alves, can you repeat your answer?

A. It was to cover the cash flow needed.

Q. Okay. Because there was a negative cash balance?

A. Yes.

Q. Correct?

A. Uh-huh.

Q. And WBR required borrowing to maintain operations, correct?

MR. ARONOVITZ: Object to form.

THE WITNESS: Yes.

Page 99

BY MS. SLIWKA:

Q. Without funding, WBR could not sustain operations, correct?

A. Yes.

Q. What source of cash are identified on this funding allocation summary?

A. So, this one -- so, it had all the obligations required to -- you know, in case of the sale to close the entity, basically, if it was an asset sale.

Q. So, this would not --

A. The proceeds -- the proceeds expected.

Q. Can you explain that to me, if you could walk me through it?

A. Yeah. If you go to the first section there, you have a list of sales proceeds, which was the expectation from, you know, our local partner, which was the expert in the market. And then, some of the fees associated to it. You know, some of the lease penalties because we were in a contract.

Q. Right.

A. Some of the termination costs. There was, like, a lawsuit with one of the restaurants. I don't recall what it was, what that thing was.

Q. These were costs that WBR was expected to incur with the sale of the assets?

Page 100

A. Yes.

Q. Like, some of -- some of cash in and some --

A. Some of cash out, exactly.

Q. And that included bank loans as well?

A. Yeah. There was a bank loan, yeah.

Q. All right. Oh, I see. I was going to ask why there were two separate entries where one is for Brazilian Reais and the other one is the same --

A. In US dollars.

Q. -- in US dollars. Okay. So, this reflects that the asset sales were being used to fund operations or pay obligations, correct?

A. Yeah. That's correct.

Q. Let's go to page 10. What does this cash forecast show in more detail? And I can make it --

A. Very similar to the other one you're seeing. It shows all the estimated, you know, inflows from sale. You know, the cash outflows based on the forecast the local team put together and all the liabilities that had pending.

Q. And where are the primary sources of inflows identified here?

A. In this scenario, it would be the asset sale.

Q. The asset sale. What risks are associated with relying on these types of inflows?



CARLOS ALVES
WENDY'S NETHERLANDS B.V. vs LEVY

May 11, 2026
101–104

Page 101

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Well, from what I see, the risk is -- you know, that was an estimate that was put together by, you know, the local team.  We reviewed and there was -- the proposal of that meeting was to discuss and review anything that needed to be adjusted.

BY MS. SLIWKA:

Q.  So, without these transactions, these asset sales, WBR will face liquidity issues, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yes.  That's what it shows if they were to close, right, because there is a bunch of items there related to closing or paying off liabilities.

BY MS. SLIWKA:

Q.  Taking this exhibit as a whole, how would you describe WBR's financial condition at that time?

A.  It was requiring additional funding to operate.

Q.  What options was WBR and Wendy's considering in responding to these challenges?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Well, I think this was one of the options that were in discussions, to sell the

Page 102

assets.

BY MS. SLIWKA:

Q.  And this document reflects financial distress, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Yes.

BY MS. SLIWKA:

Q.  It reflects reliance on asset sales rather than operational profitability, correct?

A.  This document specifically, yes.

Q.  It reflects considering of transitioning or exiting the business, correct?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  In this case, yes.  In this scenario here, it was transitioning or exiting.  Yes.

MS. SLIWKA:  Let's see another evaluation document.  I am marking this as Exhibit 7.

(Thereupon, the documents were marked as Defendant's Exhibit Number 7.)

MS. SLIWKA:  A document with Bates stamp ranging from Wendy 0001325 to 1329.  Let me share this with counsel and Mr. Alves.  It's an email by Mr. Alves sent on February 22nd, 2019 to Mr. Levy, Kevin Holbrook, Marcel Gholmieh, Carlos Ribas, Cary

Page 103

Green, Peter Koumas, Kris Kaffenbarger, and Kirk Vidra.

Subject, BPO Evaluation WBR and has a Brazil valuation attachment.  Let me let you review it, Mr. Alves, and please let me know when you'd like me to scroll down for you.

THE WITNESS:  Uh-huh.  Okay.

MS. SLIWKA:  It seems like there's an agenda circulated by Patricia Guelo (phonetic) --

THE WITNESS:  Uh-huh.

MS. SLIWKA:  -- to Mr. Alves and Kevin Holbrook with Starboard.  We have the valuing information to scroll down -- we have the --

MR. ARONOVITZ:  Gabrielle, can I see the to and from --

MS. SLIWKA:  Of course.

MR. ARONOVITZ:  -- on the first email that Mr. Alves sent?

MS. SLIWKA:  Yes.  Let me make it larger for you.

MR. ARONOVITZ:  Okay.  That's fine.

BY MS. SLIWKA:

Q.  All right.  Okay.  Seems to be another asset valuation for WBR.  If you could tell me, Mr. Alves, what is Exhibit 7?

Page 104

A.  Yeah.  That was -- yeah.  Another asset valuation, which seems to be similar to the one I had before.  The intent was to share with the whole group that information for discussion.

Q.  Okay.  Who was the whole group?

A.  I saw in the email it was Andrew, Mr. Levy, Kevin, who was Starboard's CFO, Patricia, who was the CFO for the JV in Brazil and, you know Kris, and Kerry, and Carlos Ribas.

Q.  And what was --

A.  So --

Q.  Sorry.  Go ahead.  Please continue.

A.  No.  There was -- so, there was a group, like, that, you know, was intended to send this for discussion.

Q.  What does this email reflect about the situation that WBR was facing at the time?

A.  That was, you know -- the team was challenging because, you know, there needed to be a discussion on funding and they were balancing the payments with the cash flow they had in place until this decision was made.

Q.  What role did EBITDA or cash flow play in that analysis?

A.  There's -- as you saw in the previous file,



Page 105

there was a cash flow needed just to continue to support the JV.

Q.  What assets were included in the valuation?

A.  All the JV -- all the JV assets, fixed assets.

Q.  What does this valuation process suggest about Wendy's strategy for WBR at that time?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't recall where, you know, Wendy's and partners were regarding WBR at that time.  I cannot -- I don't remember exactly in the timeline.

BY MS. SLIWKA:

Q.  What would happen to WBR's operations if those transactions were completed?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Well, whatever, you know, the procedures, you know, were, they would, you know, liquidate the liabilities if, you know, enough and, you know, exit the entity or transition to somebody else to operate.

BY MS. SLIWKA:

Q.  What types of costs are referenced in this document?

A.  Which -- which page?

Q.  I can scroll down.  Are these all costs

Page 106

associated with the project?

A.  Those were the investments that the team used -- the local team used to build the valuation.

Q.  And how are those costs factored into the valuation?

A.  Well, based on that cost the team associated, what would be, like, the depreciation and how much they would expect to receive for those items.

Q.  And this analysis includes potential termination costs, correct?

A.  Not on this table.

Q.  So, this does not include termination costs?

A.  No.  This was only asset valuation.

Q.  Just asset valuation?

A.  Yeah.

Q.  Okay.  What does Exhibit 7 reflect about what Wendy's knew regarding WBR's condition at that time?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  Well, I think everybody knew about WBR conditions at that time, all the different partners.  And this was the plan that was aligned to move forward.  That's my -- my understanding and this should all be in those board meetings minutes as part of the agreements of moving forward with the entity.

Page 107

BY MS. SLIWKA:

Q.  And what was this condition that every partner knew about?

A.  Because all the strategic decisions were made by the board of the JV?

Q.  No.  I'm sorry, Mr. Alves.  I meant what was the condition that every partner knew about?

A.  Oh.  As you said, the condition -- the performance of the business, because that was clear to everyone.

Q.  Let's talk about Wendy's shift from funding WBR to Exhibit Strategy, okay?

A.  Okay.

Q.  As head of FP&A, have you prepared updates about Wendy's projects?

A.  I did about, you know, for the leadership team, yes, Wendy's leadership team.

Q.  And would you have done -- prepared updates about WBR about -- sorry.  Let me -- would you have prepared updates about WBR to be provided to Wendy's leadership team?

A.  I didn't understand the question.

Q.  Let me rephrase it.  You said that you have prepared updates about Wendy's projects that were provided to its senior leadership, correct?

Page 108

A.  Yes.

MR. ARONOVITZ:  Object to form.

BY MS. SLIWKA:

Q.  Would you also have provided updates about WBR to Wendy's senior leadership team?

A.  Yes.  Again, I was -- it was a cross-functional update.  I was more focused on the financial piece of the business.

Q.  Let me share a document that might be helpful.  I am marking as Exhibit 8, a document with a Bates stamp ranging from Wendy 0007698 to 7710.

(Thereupon, the documents were marked as Defendant's Exhibit Number 8.)

MS. SLIWKA:  I am going to share Exhibit 8 with counsel and witness.  You are not copied on the top email, but you're copied on the one below.  The email comes from Mr. Koumas to Suzie Thuerk, I want to say, unless I am mispronouncing that.  It copies you, it copies Leigh Burnside, it copies Kelly Moore and it copies Aaron Kale.  The subject is recapped from our discussion on Brazil.  Please, Mr. Alves, review this email.  I will scroll it down for you so you can review the entire document.

THE WITNESS:  Okay.  No, no, please.  Let me



Page 109

review what is there.

MS. SLIWKA: Okay. You said okay. I wasn't sure.

THE WITNESS: Okay.

MR. ARONOVITZ: Gabrielle, I am looking at this email, this specific one from Edu, September 16th, 2019. It is copying Kerry Green and Kirk Vidra, and it does appear to be discussing legal issues. This specific portion of it should be attorney-client privilege.

MS. SLIWKA: Okay. So, let's --

MR. ARONOVITZ: Wendy 7699.

MS. SLIWKA: All right. Let's take a quick break, so we can -- like, just five minutes and then we'll be back.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 1:00 o'clock, and we are off the record.

(Off the record.)

(Back on the record.)

THE VIDEOGRAPHER: The time is 1:06. We're back on the record.

BY MR. ALVES:

Q. Mr. Alves, we were talking about exit strategy and valuations that were provided to Wendy's before we

Page 110

took our break. So, let's talk about Wendy's strategic decision to avoid bankruptcy and preserve the brand, okay?

A. Uh-huh.

Q. I am marking as exhibit. Let's say Exhibit 9, but it could be off. Exhibit 9, a document Bates stamp ranging from Wendy's 0005441 to 5481.

(Thereupon, the documents were marked as Defendant's Exhibit Number 9.)

MS. SLIWKA: I am sharing Exhibit 9 with counsel and witness.

BY MS. SLIWKA:

Q. Mr. Alves, what is Exhibit 9?

A. Well, it looks like it is an update to -- to Abigail in this case.

Q. And who is providing that update?

A. Well, I sent the email, but that is usually, like, group discussion, probably that group that is in the email.

Q. Okay.

A. As copied.

Q. So, this is a Wendy's internal status update on WBR, correct?

A. Yes.

Q. Let's scroll down so we can go through it and

Page 111

then we'll discuss it in more detail. Says, like, it's from 2019.

MR. ARONOVITZ: Gabrielle, going back to the top of it, it's an internal email from Mr. Alves copying Kirk Vidra and Kerry Green, in-house counsel for Wendy's. And this does appear to be, you know, relating to legal advice. This document should be marked attorney-client privileged.

MS. SLIWKA: Okay. That seems to be the case for -- let's go off the record to have a discussion, please.

MR. ARONOVITZ: Okay.

THE VIDEOGRAPHER: The time is 1:08 p.m. and we're off the record.

(Off the record.)

(Back on the record.)

THE VIDEOGRAPHER: The time is 1:10. We're back on the record.

MS. SLIWKA: Let's -- let's review the document before we make decisions.

MR. ARONOVITZ: But let me say for the record, Exhibit 9 is an email with an attachment from Mr. Alves to a few people, including in-house counsel for Wendy's. Mr. Alves can continue to answer questions about this document, but I'm going

Page 112

to object based on attorney-client privilege to everything with Exhibit 9.

So, to allow the deposition to proceed, Mr. Alves, you know -- Ms. Gabrielle, you can ask questions, but we are reserving the right that this, depending on the document that I would have to go through in more detail, the entire set of questions would be attorney-client privilege.

So, to move forward with deposition, we'll continue, but I'm reserving that right as to attorney-client privilege.

MS. SLIWKA: For the record, our position is that this is a communication from Mr. Alves to Wendy's SLT and does not appear to have -- to be seeking legal advice in any way.

So, it's our position that it's not privileged, but for the sake of the deposition, we will continue with answers, with questions on this document. And if there are any issues, Mr. Aronovitz will advise his client not to answer our questions.

MS. SLIWKA: So, let's first review the document. The attachment appears to be a Brazil status update including a November 22nd, 2019 update.



Page 113

It makes recommendations on what loans were supposed to be -- were recommended to be paid. There are entries about the 2015 and 2017 credit agreement and guarantor payment documentation.

It includes, also, franchisee transition with Emilio, which we'll talk about it. It includes what appears to be Mr. Alves' recommendation for SLT.

MR. ARONOVITZ: Object to form. I mean, Ms. Sliwka, why don't you just ask questions about the document?

MS. SLIWKA: Yes. I mean, I wanted him to have a look at it and you to have a look at it first, but let's jump to the questions about the document.

BY MS. SLIWKA:

Q. Were you involved in preparing or reviewing Exhibit 9, Mr. Alves?

A. Yes. Part of the documentation was my inputs. And that -- just for the record, that is a -- although it was sent by me, there was the group, that group document, to update Abigail Pringle, who was a president of International.

Q. What parts of this presentation did you prepare?

Page 114

A. It was the update on the financial cash flow. You know, the bank update, which was provided by the -- WBR.

Q. Okay. Were you responsible for making these recommendations for the SLT as well?

A. There was the group recommendation.

Q. The group recommendation. What group?

A. The one that are on the email.

Q. The ones that are on the email made this recommendation for SLT?

A. Yes.

Q. Okay. How about this liquidation restructuring option summary? Was that also provided by you or was it --

A. No. That was by legal. By legal counsel.

Q. Reserve reconciliation, was this analysis or information provided by you?

A. That was from our accounts receivable team.

Q. Okay. And -- and this Emilio plan was, were you involved in -- in preparing this slide as well?

A. This, I was part of the -- I was involved in part of this one. This is one of the candidates we talked that --

Q. Okay.

A. -- the broker brought up.

Page 115

Q. And -- and this would have been part of your analysis as well?

MR. ARONOVITZ: Object to form.

THE WITNESS: No. This is their, the candidate proposal.

BY MS. SLIWKA:

Q. The candidate. Okay. Would you have been responsible for this slide?

A. Yes, yes.

Q. And the short-term profit roadmap, were you responsible for this slide as well?

A. There was -- yes. With the input from the candidate.

Q. This Brazil work plan slide, were you involved in preparing this one as well?

A. Yeah. With the group, that group from the email.

Q. And this would have been prepared by you with input from the potential purchaser?

A. I don't recall this one.

Q. Okay. How about this slide about data and valuation sensitivity?

A. Sensitivity, yeah. I think I was involved on this one. Yeah.

Q. How about this slide?

Page 116

A. Yeah. This is what the candidate was discussing with the group.

Q. Let's scroll down. Let's -- let's talk about these slides that you have prepared. Let's talk about the recommendations for SLT first. Walk me through some of these recommendations that were being made for SLT at this point.

A. Yeah. From what I recall -- well, this -- so, first of all, this was the update to Abigail only, not the whole SLT. So, there was -- she was international president and we were giving her update and got her feedback before sharing this with SLT or, you know, GP and the others involved.

But the long -- so, that's the way with -- so, at that time, you know, only when this was supporting financially the business that was end of '19. So, we suggested us to pay the -- the loans that were unsecured. And you saw in one of the emails before that we had agreed on that.

Q. It also talks about formal restructuring versus informal restructuring, correct?

A. Yeah. I don't recall exactly the main point on this one because I think this group wanted to just transition to -- and take -- like, operate for a little bit and then buy. I think that was their original



Page 117

proposal.  So that's why we -- we --

Q.  At this point, you -- one of the options on the table was restructuring or liquidating the joint venture, correct?

A.  Correct.  Correct.

Q.  And the third option is only leveraging the new partner, Emilio, if no additional investment to help fix the model?

A.  Yeah.  That's what I was saying.  Like, this group wanted to take over, run for a while and fix the model and then decide on a purchase.  And that's why we that we had that scenarios to show what needs to happen for us to get some EBITDA value from the acquisition, from a potential acquisition.

Q.  And you were not involved in preparing this -- this slide specifically, were you?

A.  Yeah.  That was more legal and tax.

Q.  Okay.  So, we're not going to discuss that.  Why was a formal bankruptcy not pursued with WBR?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't know.  I cannot answer that.

BY MS. SLIWKA:

Q.  Were you part of any discussions that took place regarding filing for bankruptcy?

Page 118

A.  No.  None that I recall.

MR. ARONOVITZ:  I object to form.  And also, Mr. Alves, if these are discussions you're being asked about with, you know, counsel for Wendy's, I would instruct you not to discuss your discussions with counsel for Wendy's.

BY MS. SLIWKA:

Q.  How long had Wendy's been evaluating potential restructuring before this document was created?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I don't remember.

BY MS. SLIWKA:

Q.  How did WBR's financial condition influence the timing of this analysis?

MR. ARONOVITZ:  Object to form.

THE WITNESS:  I mean, that was analysis that we used to do on a -- probably on a quarterly basis.  But I don't recall exactly what's triggered this time -- this detailed analysis.

BY MS. SLIWKA:

Q.  So, this analysis were created on a quarterly basis?

A.  Not in that --

MR. ARONOVITZ: Object to form.

THE WITNESS:  That depth.

Page 119

BY MS. SLIWKA:

Q.  What recommendations, if any, did your team provide?

A.  My team, we did not provide any recommendation.  We just shared the facts and, you know, consolidate some information from the different groups.

Q.  And what were the facts on November of 2019 as you recall?

A.  Well, we saw, like, the cash flows.  I don't recall all the details at this point, but --

Q.  Were any --

A.  -- nobody was investing anything anymore in the business.  So, that --

Q.  Was Wendy's investing in the business at that point?

A.  Well, we secured the loans and we were funding, suggesting to fund to pay off the local loans and, you know.

Q.  Can you walk me through those steps of securing the loans and -- and -- and paying them?

A.  Well, I don't recall exactly all the steps, but WBR -- based on that cash flow, we saw a couple documents, a few documents ago, there was a need to fund the business before all the, you know, selling it.  The local -- the JV WBR managed to get a local loan.

Page 120

And, you know, as you also saw in one of those emails that was mentioned sent from Peter Koumas, you know, Wendy's had agreed to -- that we are not gonna pursue any, you know, charge of the loans with the partner.

So, that's why we suggested that we were going to fund this to pay these loans that we had agreed upon before.

Q.  And what, ultimately, happened to WBR's assets?

A.  They were, you know -- some of the sites, they were able to secure the local group led by Marcel was able to secure -- to recover some of the key money.  And the assets were sold for other, like, restaurant business.  And basically, that's -- that's -- that was it.

Q.  And what happens to the proceeds of those -- of that -- those sales?

A.  So, those sales, there's staff paying for the, you know, liabilities of the entity.  You know, there were also some costs to, you know, the image of the restaurant to shut down, to take, you know -- take all the equipment to send to somebody else.

You know, and ongoing costs of the joint venture, carrying costs, some of the initial ones.  And -- and



Page 121

some of the closing costs you saw in that spreadsheet, the big one, that I took you through that had Brazilian Reais and US dollars.

Q. And what were some of the liabilities that the assets were used to -- to -- to pay?

A. I don't recall in order how it was performed. You'd have to go through the local, you know, group.

Q. Was any of the proceeds used to -- to pay any of the -- the loans that the members had with Wendy's as a lender?

A. I don't think so, but I cannot tell you a hundred percent.

MS. SLIWKA: Let's take a quick break and then we'll come back. I -- I don't think I have any -- I don't have much further to go, Cari.

MR. ARONOVITZ: Okay.

THE COURT REPORTER: All right. Off the record.

THE VIDEOGRAPHER: Time is 1:25. Off the record.

(Off the record.)

(Back on the record.)

THE VIDEOGRAPHER: The time is 1:29. We're back on the record.

MS. SLIWKA: I have no further questions at

Page 122

this time for the witness. I will tender it to Mr. Aronovitz reserving the right to recall Mr. Alves if there are any documents that are determined not to be privileged at a later time or if there are any supplemental production at any time. We'll -- we'll tender the witness to Mr. Aronovitz.

MR. ARONOVITZ: I have no questions for Mr. Alves and we will read.

THE COURT REPORTER: Okay.

MS. SLIWKA: We'll read as well.

THE COURT REPORTER: Okay.

THE VIDEOGRAPHER: Perfect. Attorney Sliwka, will you be ordering the video transcripts -- the video and the transcript and would you like that synced?

MS. SLIWKA: No video, but we'll like the transcript.

THE VIDEOGRAPHER: Noted.

THE COURT REPORTER: Mr. Aronovitz, do you want a copy?

MR. ARONOVITZ: We'll take a copy of the transcript.

THE COURT REPORTER: Okay. Ms. Park or --Wait. They're with -- who's she with? Does

Page 123

anybody else want a copy or you're all with the same --

MR. ARONOVITZ: No. The other parties are with Wendy's.

THE COURT REPORTER: Okay. That's what I figured. All right. Well --

MS. SLIWKA: Nick, I will be sending you the exhibits.

THE COURT REPORTER: Okay. To Nick3336@aol.com.

MR. ARONOVITZ: Thanks. Gabrielle, can you just copy me on that?

MS. SLIWKA: Absolutely. You got it, Cari.

THE VIDEOGRAPHER: All right, everyone. With that, the time is 1:30 and we are off the record.

(Thereupon, the video-recorded deposition was concluded at 1:30 p.m.)

(Reading and signing of the video-recorded deposition transcript was reserved.)

Page 124

```
              CERTIFICATE OF OATH
STATE OF FLORIDA
COUNTY OF PALM BEACH


     I, Nicholas Bruens, Court Reporter, Notary
  Public, State of Florida, certify that Carlos
  Alves, personally appeared before me on the 11th
  day of May, 2026, and was duly sworn.
     Signed this 20th day of May, 2026.



              Nicholas Bruens
         _____
         Nicholas Bruens, Court Reporter
         Notary Public, State of Florida
         Commission No.:  HH 332386
         Commission Expires:  March 11, 2027
```



Page 125

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Nicholas Bruens, Court Reporter, certify that I was authorized to and did report the video-recorded deposition of Carlos Alves; that a review of the transcript was reserved; and that the transcript is a true and correct record of my notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 20th day of May, 2026.

_Nicholas Bruens_
_____
Nicholas Bruens, Court Reporter

Page 126

VIDEO-RECORDED DEPOSITION ERRATA SHEET

Assignment No.: J14813006

WENDY'S NETHERLANDS B.V., VS. ANDREW LEVY

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my video-recorded deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for the changes and/or corrections, if any, as indicated by me on the VIDEO-RECORDED DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 20th day of May, 2026.

_____
CARLOS ALVES

Page 127

VIDEO-RECORDED DEPOSITION ERRATA SHEET

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page 128

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____

Page No.    Line No.    Change to    Reason for
_____
_____
_____



Page 129

Page No.        Line No.        Change to        Reason for

_____

_____

_____

Page No.        Line No.        Change to        Reason for

_____

_____

_____

Page No.        Line No.        Change to        Reason for

_____

_____

_____

Page No.        Line No.        Change to        Reason for

_____

_____

_____

Page No.        Line No.        Change to        Reason for

_____

_____

_____

_____
    CARLOS ALVES                        Date

